**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>PROFESSIONAL FEE MATTERS<br>CONCERNING THE JACKSON WALKER<br>LAW FIRM | Civil Action No. 4:23-cv-04787 |

**LITIGATION TRUSTEE'S MOTION FOR ENTRY OF AN ORDER**
**APPROVING SETTLEMENT AGREEMENT WITH JACKSON WALKER LLP**

TO THE HONORABLE ALIA MOSES,
CHIEF UNITED STATES DISTRICT JUDGE:

NOW COMES, Michael I. Goldberg, in his capacity as the Trustee of the GWG Litigation Trust (the "Litigation Trustee"), and files this motion requesting entry of an order approving the Settlement Agreement, attached as **Exhibit A** (the "Proposed Settlement") by and among the Litigation Trustee and Jackson Walker LLP ("Jackson Walker") (collectively with the Litigation Trustee, the "Settling Parties"), and in support thereof, states as follows.

## PRELIMINARY STATEMENT

1.      The Litigation Trustee respectfully seeks the Court's approval of the Proposed Settlement with Jackson Walker in the amount of $405,000.00, which resolves all claims the GWG Litigation Trust (the "Litigation Trust") has or may have against Jackson Walker. The Proposed Settlement also resolves any objections the Litigation Trust could have asserted in connection with Jackson Walker's final fee application in the Debtors' bankruptcy case and is conditioned on the Court's approval of Jackson Walker's final fee application. If the Court denies approval of the Proposed Settlement, including the resolution of Jackson Walker's final fee application, the Proposed Settlement will be void and the Settling Parties will revert to their positions immediately before they executed the Proposed Settlement.

1

2.     The Proposed Settlement was the product of extensive settlement negotiations, including a mediation before Judges Royal Ferguson (Ret.) and Gary Feess (Ret.). The Proposed Settlement recovers approximately 31% of the total fees Jackson Walker billed in GWG's bankruptcy case, and more than 68% of the fees billed by Jackson Walker and Ms. Freeman after November 30, 2022—the date Jackson Walker filed a motion on behalf of the Debtors seeking to appoint Judge Jones (who had no prior involvement in the bankruptcy case) as mediator with respect to hotly contested negotiations regarding a potential plan.[1] Notably, the Proposed Settlement recovers the full amount billed by Ms. Freeman in connection with GWG's bankruptcy case and which Jackson Walker included in its final fee application.

3.     After careful evaluation, the Litigation Trustee has concluded that the Proposed Settlement is fair, reasonable, and in the best interests of the Litigation Trust and its ultimate beneficiaries. First and foremost, the Proposed Settlement maximizes recovery on the Litigation Trust's strongest and most likely theory of recovery: disgorgement of fees incurred after Jackson Walker became aware of a Jones-Freeman relationship. Because Judge Isgur was the presiding judge over GWG's bankruptcy case, not Judge Jones, the Litigation Trustee does not believe that Jackson Walker had an obligation to disclose to GWG or to Judge Isgur—at least in GWG's bankruptcy case—what it knew about the Jones-Freeman relationship when it was retained by the Debtors or when it filed its retention application in May 2022. In the Litigation Trustee's view, that changed on November 30, 2022, when Jackson Walker filed a motion on behalf of the Debtors seeking Judge Jones's appointment as mediator. At that point, the Litigation Trustee asserts that

---

[1] The total amount that Jackson Walker and Ms. Freeman billed from December 1, 2022, and onward (*i.e.*, after the motion to appoint a mediator was filed) is $592,729.31 (of which Ms. Freeman billed $205,157.81).  In total, Jackson Walker's final fee application sought $1,030,910.50, $47,164.00 in paraprofessional fees, and $233,207.78 in expenses, totaling $1,311,282.23.

Jackson Walker was obligated to inform both the Debtors and the Court about what it knew regarding the Jones-Freeman relationship.

4.    Because the Litigation Trustee's view is that Jackson Walker's duty to disclose arose in late November—and the Litigation Trustee did not identify any colorable claims arising from Jackson Walker's representation prior to that time—the Litigation Trustee and his counsel concluded that the most likely disgorgement award would encompass Jackson Walker's fees following its alleged breach, and that a complete disgorgement of Jackson Walker's fees was less certain under Texas and federal bankruptcy law. Jackson Walker and Ms. Freeman collectively billed $592,729.31 from December 1, 2022, through June 20, 2023, including $205,157.81 billed by Ms. Freeman. The Proposed Settlement recovers roughly 68% of the total fees billed during that time period (*i.e.*, from December 1, 2022, through June 20, 2023), and approximately 31% of the total fees that Jackson Walker billed during the entirety of GWG's bankruptcy case. Once anticipated expenses are taken into account—including expert fees, deposition-related expenses, other discovery costs, and trial expenses that could easily add up to hundreds of thousands of dollars—the Litigation Trustee does not believe that the outcome of a lengthy process to secure a judgment would result in a better net recovery for the Litigation Trust on its primary theory of recovery.

5.    The Litigation Trustee also considered broader theories of liability against Jackson Walker, including those recently asserted by third parties and several former GWG bondholders. For the reasons detailed below (*see* pages 17–28), the Litigation Trustee concluded that these theories were speculative at best, unlikely to result in any meaningful recovery for the Litigation Trust, and would require the Litigation Trust to incur significant out-of-pocket expenses that might not be recoverable.

6.      Second, Jackson Walker has raised several legal defenses that complicate and potentially mitigate—if not bar—recovery. Among other arguments, Jackson Walker contends that it had no duty to disclose any connections to a mediator in the GWG bankruptcy case, and that Judge Jones did not preside over the GWG bankruptcy case, issued no judicial orders in the GWG bankruptcy case, and acted solely as a mediator. Jackson Walker also points to the involvement of sophisticated counsel for all the parties during the mediation sessions with Judge Jones, the absence of prejudice or harm to the estate, and the reasonable value of the legal services provided. These defenses, if successful, could significantly limit the Litigation Trust's recovery.

7.      Taking into account the strength of the Trust's core claim, the costs and risks of litigation, and the defenses that Jackson Walker has raised, the Litigation Trustee believes the Proposed Settlement is in the best interests of the Litigation Trust and its beneficiaries. It provides an immediate monetary recovery while avoiding lengthy and costly litigation (including potential appeals) with uncertain prospects. The Litigation Trustee therefore respectfully requests that the Court approve the Proposed Settlement by granting this Motion.

8.      Finally, the Litigation Trustee believes it is important to clarify that he played no role in GWG's bankruptcy proceedings or the mediation involving Judge Jones. The Litigation Trustee was contacted by the Official Committee of Bondholders ("Bondholder Committee") only after the Plan had been negotiated, and he formally assumed his role on August 1, 2023, when the Plan became effective. Prior to his appointment, the Litigation Trustee did not know and had never met Ms. Freeman or Judge Jones and had never participated in any case pending before Judge Jones in the Southern District of Texas. Moreover, to avoid any conflict of interest, the Litigation Trustee independently negotiated and determined that the Proposed Settlement was fair,

reasonable, and in the best interests of the Litigation Trust and its ultimate beneficiaries without any input from Ms. Freeman in her capacity as the Wind Down Trustee.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.[2] Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The basis for the relief requested herein is section 105 of title 11 of the United States Code (the "Bankruptcy Code"), the Confirmation Order (defined below), and Federal Rule of Bankruptcy Procedure 9019.

## BACKGROUND

10.    On April 20, 2022 (the "Initial Petition Date"), GWG Holdings, Inc., GWG Life, LLC, and GWG Life USA, LLC (collectively, the "Initial Debtors"), and on October 31, 2022, GWG DLP Funding IV, LLC, GWG DLP Funding Holdings VI, LLC, and GWG DLP Funding VI, LLC (collectively, the "DLP Entities," together with the Initial Debtors, the "Debtors"), commenced chapter 11 cases by filing voluntary petitions in the Bankruptcy Court for relief under chapter 11 of title 11 of the United States Code.[3]

11.    On May 19, 2022, Debtors filed an *Application to Retain Jackson Walker as Local Counsel and Conflicts Counsel for the Debtors and Debtors-in-Possession*, attaching an engagement letter dated April 15, 2022, signed by the Debtors' CEO at the time, Murray Holland.[4] On June 15, 2022, the Bankruptcy Court (Judge Isgur) entered an *Order Authorizing the Retention and Employment of Jackson Walker*.[5]  In relevant part, that Order provides: "The Firm will review

---

[2] On April 9, 2025, the Honorable Chief United States District Judge Alia Moses entered a Memorandum Opinion and Order withdrawing the reference of the GWG bankruptcy case, among others. *See In re GWG*, Case No. 22-90032 ("*In re GWG*"), ECF No. 2572; *In re Professional Fee Matters Concerning the Jackson Walker Law Firm*, Case No. 4:23-cv-04787 (the "Misc. Proceeding"), ECF No. 31.

[3] *In re GWG*, Case No. 22-90032, ECF No. 1.

[4] *Id*. ECF No. 267.

[5] *Id*. ECF No. 410.

its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, the Firm will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a)."[6]

12.    Jackson Walker's monthly fee statements do not show Ms. Freeman as a timekeeper for GWG from April 20, 2022, through October 31, 2022.[7] Ms. Freeman first appeared as a timekeeper in Jackson Walker's Fee Applications for GWG in November 2022 and billed a total of $23,415.00.[8]

13.    On November 30, 2022, Debtors and the Special Committee of the Board of GWG filed a motion requesting Judge Jones's appointment as a judicial mediator.[9] Jackson Walker filed the motion but made no mention of any Jones-Freeman relationship. On information and belief, Jackson Walker also did not disclose any Jones-Freeman relationship to the Debtors prior to filing that motion. By this time, and as reflected in Jackson Walker's briefing in response to a fee objection filed by the U.S. Trustee,[10] there is no dispute that Jackson Walker was aware that a romantic relationship of some sort had resumed between Judge Jones and Ms. Freeman.

14.    Ms. Freeman left Jackson Walker to open her own firm by December 1, 2022, due—at least in part—to the fact that Jackson Walker became aware of the resumption of a romantic relationship between Judge Jones and Ms. Freeman. After opening her own firm, Ms. Freeman continued to work on the GWG case. Jackson Walker's Fee Applications include

---

[6] *Id*. ¶3.

[7] *Id*. ECF Nos. 829 and 1521.

[8] *Id*. ECF No. 1878.

[9] *Id*. ECF No. 1128.

[10] *Id*. ECF No. 2460.

Freeman's invoices as an expense for December 2022 (and going forward).[11] Ms. Freeman did not file her own retention application with the Court, and Jackson Walker did not amend its Bankruptcy Rule 2014 disclosures.[12]

15.    On January 5, 2023, the Bankruptcy Court (Judge Isgur) signed the *Order Appointing Judge Jones as Mediator*.[13] The parties engaged in mediation multiple times between January and February, and again in June 2023.[14] Jackson Walker and Ms. Freeman participated in one or more of these mediation sessions. On information and belief, at no time did Jackson Walker inform the Debtors, their counsel, or other interested parties of the Jones-Freeman relationship; nor did Ms. Freeman.

16.    Following the various mediation sessions, the Debtors, the Bondholder Committee, and others submitted a *Further Modified Second Amended Joint Chapter 11 Plan*,[15] which the Bankruptcy Court (Judge Isgur) confirmed on June 20, 2023.[16] On June 20, 2023, the Bankruptcy Court (Judge Isgur) entered its *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Further Modified Second Amended Joint Chapter 11 Plan* (the "Confirmation Order"),[17] which confirmed the *Debtors' Further Modified Second Amended Joint Chapter 11 Plan, submitted by the Debtors, the Bondholder Committee, and L Bond Management, LLC as Co-*

---

[11] *Id*. ECF Nos. 1878 and 2158.

[12] The Litigation Trustee acknowledges that Bankruptcy Rule 2014, on its face, does not specifically reference mediators in the categories of persons referenced therein.

[13] *In re GWG*, Case No. 22-90032, ECF No. 1323.

[14] *Id*. ECF No. 1881.

[15] *Id*. ECF No. 1924.

[16] *Id*. ECF No. 1952.

[17] *Id*.

*Proponents* (the "Plan").[18] Among other things, Judge Isgur independently found and concluded, that:

- "All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements."[19]

- "The exculpation provisions and the protections granted to the 1125(e) Parties contained in the Plan are appropriately tailored to the circumstances of these Chapter 11 Cases and are appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.*, 48 F. 4th 419 (5th Cir. 2022), because they are supported by proper evidence, proposed in good faith, formulated following extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope."[20]

- "The provisions of the Mediation Agreement and any subsequent mediated agreement among the Debtors and the Creditor Proponents constitute a good faith compromise and settlement among the Debtors and the Creditor Proponents of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors, Bondholder Committee, and LBM with respect to the allowance and treatment of the LBM L Bond Claims and the resolution of the Compensation Motion."[21]

17.     The Plan and Confirmation Order established the GWG Wind Down Trust ("Wind Down Trust") for the purpose of winding down the Debtors' affairs, liquidating the Wind Down Trust assets, and making distributions. Although the parties' initial mediation agreement identified Jeffrey Stein, an independent director serving as the Debtors' chief restructuring officer and chief executive officer at the time, as the Wind Down Trustee,[22] Ms. Freeman was ultimately appointed the Wind Down Trustee. On information and belief, it was not Jackson Walker that suggested Ms. Freeman as the Wind Down Trustee. Under the Wind Down Trust Agreement, the Wind Down

---

[18] *Id*. ECF No. 1678.

[19] *Id*. ECF No. 1952 at 36.

[20] *Id*. at 12.

[21] *Id*. at 29.

[22] *Id*. ECF No. 1518 at 3.

8

Trustee may only be removed "for Cause, after notice and a hearing, by: (a) the Bankruptcy Court on its own initiative; or (b) the Bankruptcy Court upon a motion from 25% or more of the Wind Down Trust Beneficiaries, then holding at least 25% of the then-outstanding New WDT Interests in the aggregate."

18.     The Plan and Confirmation Order also established the Litigation Trust for the purpose of prosecuting or settling certain of the Debtors' causes of action, appointed Michael I. Goldberg as the Litigation Trustee, and transferred all "Retained Causes of Action," among other things, to the Litigation Trust. The confirmed Plan defined "Retained Causes of Action" to mean "all Avoidance Actions, all Causes of Action set forth on a schedule in the Plan Supplement . . . and any other Causes of Action belonging to the Debtors or their Estates that are not released pursuant to this Plan or other Final Order." Plan Art. I(A)(161). The Plan and Litigation Trust Agreement granted the Litigation Trustee the power to investigate and pursue the Retained Causes of Action. Litigation Trust Agreement §§ 3.2(a), 3.8. The Plan and Litigation Trust Agreement also empower the Litigation Trustee to compromise and settle the Retained Causes of Action, but require the Litigation Trustee to seek approval from the Court, after notice and an opportunity for a hearing, for settlements "with an economic value of $5 million or more." Plan Art. IV(Q); Litigation Trust Agreement § 3.2(a).

19.     On August 21, 2023, Jackson Walker filed its Fourth and Final Fee Application for its work as co-counsel and conflicts counsel to the Debtors, seeking final approval of $1,311,282.23 in fees and expenses.[23] The deadline for filing objections to Jackson Walker's Fourth and Final Fee Application was set for September 11, 2023. Jackson Walker subsequently agreed to extend the deadline for the Office of the United States Trustee of the Southern District

---

[23] *Id*. ECF No. 2158.

of Texas (the "U.S. Trustee") to object to Jackson Walker's Fourth and Final Fee Application to March 29, 2024.[24]

20.    On November 2, 2023, the U.S. Trustee filed motions that sought, among other relief, the vacatur of orders approving Jackson Walker's retention as counsel and/or Jackson Walker's fee applications pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, in various bankruptcy proceedings where (a) former Judge Jones served as the presiding judge or court-appointed mediator, and (b) Jackson Walker served as estate-retained counsel.

21.    On February 29, 2024 and March 29, 2024, the U.S. Trustee filed (a) amended Rule 60(b)(6) motions in certain of the above-referenced cases, (b) initial Rule 60(b)(6) motions in certain other cases, and (c) objections to Jackson Walker's then-pending final fee applications in the remaining cases (collectively, the "Relevant Cases"),[25] including the GWG cases. All such motions and objections filed by the U.S. Trustee are collectively referred to herein as the "U.S. Trustee Filings."

22.    On May 22, 2024, Jackson Walker filed its response in opposition to the U.S. Trustee Filings in each of the Relevant Cases.[26]

23.    On July 1, 2024, the U.S. Trustee filed his reply in further support of the U.S. Trustee Filings[27] and, and August 12, 2024, Jackson Walker filed its sur-reply in further opposition to the U.S. Trustee Filings.[28]

---

[24] *Id.* ECF No. 2387.

[25] The U.S. Trustee's Opposition to Jackson Walker's Final Fee Application in the GWG proceedings was filed on March 29, 2024. *In re GWG*, Case No. 22-90032, ECF No. 2415.

[26] *Id*. ECF No. 2460.

[27] *Id*. ECF No. 2463.

[28] *Id*. ECF No. 2474.

24.    On October 7, 2024, the U.S. Trustee filed his Motion for Withdrawal of the Reference and Referral of the Objection to Jackson Walker's Final Fee Application and Related Matters to Chief District Judge Moses.[29]

25.    On April 9, 2025, Chief Judge Moses granted the U.S. Trustee's Motion for Withdrawal of the Reference.[30]

**A.    The Litigation Trustee's Claims Against Jackson Walker.**

26.    Following his appointment, the Litigation Trustee began investigating potential malpractice and other claims against the Debtors' former lawyers, including Jackson Walker. In the course of this investigation, and in light of the U.S. Trustee's Opposition to Jackson Walker's Final Fee Application,[31] the Litigation Trustee and his counsel reviewed, among other items, Jackson Walker's fee applications and billing records, pleadings in multiple cases involving Jackson Walker, deposition transcripts of Jackson Walker attorneys, and hearing transcripts and other filings in the GWG bankruptcy case. Based on his investigation, the Litigation Trustee determined that the Litigation Trust had potential claims against Jackson Walker (the "Debtors' Claims"), including breach of fiduciary duty for failing to inform the Debtors, their counsel, or other interested parties of the Jones-Freeman relationship or the alleged conflict of interest resulting from Judge Jones's serving as mediator in the case, in breach of the fiduciary duties it owed to Debtors.

27.    After exchanging letters detailing the Litigation Trust's claims and Jackson Walker's defenses, the Litigation Trustee and Jackson Walker entered into a Tolling Agreement to toll the statute of limitations until April 30, 2025, to give the parties time to attempt to resolve

---

[29] *Id*. ECF No. 2479.

[30] *Id*. ECF No. 2572; Misc. Proceeding, Case No. 4:23-cv-04787, ECF No. 31.

[31] *In re GWG*, Case No. 22-90032, ECF No. 2415.

the Debtors' Claims.[32]  On March 6, 2025, the Litigation Trustee and Jackson Walker mediated

the Debtors' Claims with Judge Royal Ferguson (Ret.) and Judge Gary Feess (Ret.) serving as

mediators. At the mediation, the parties agreed to settle the Debtors' Claims for $405,000.00.

28.     Over the following weeks, the Litigation Trustee and Jackson Walker negotiated

non-economic terms of the settlement, including waivers and releases. On April 29, 2025, the

Litigation Trustee and Jackson Walker executed the Proposed Settlement.

**B.     <u>The Proposed Settlement.</u>**

29.     The Proposed Settlement is straightforward and includes the following key terms,

summarized below in pertinent part:[33]

> <u>Effective Date</u>: The effective date of this Agreement (the "<u>Effective Date</u>") is the
> first day as of which all of the following conditions have been satisfied or, to the
> extent permitted herein, are waived:  (i) all Parties have executed and exchanged
> each Party's signature pages to this Agreement,; and (ii) the Bankruptcy Court has
> entered an order (the "<u>Approval Order</u>") approving all terms of this Agreement and
> overruling any objections to approval of this Agreement and such order has become
> a Final Order. If the Effective Date does not occur: (a) the Parties shall revert,
> without prejudice to or waiver of any right, to their respective positions
> immediately prior to the execution of this Agreement; and (b) neither this
> Agreement nor evidence of its terms shall be admissible for any purpose in the
> Bankruptcy Case or any other action or proceeding.
>
> <u>Settlement Payment</u>: Within five (5) business days after the Approval Order
> becoming a Final Order, JW shall pay or cause to be paid to the GWG Litigation
> Trust (receipt of which shall be promptly confirmed by the GWG Litigation Trust
> or its counsel) the sum of $405,000.00 (the "<u>Settlement Payment</u>").  Payment shall
> be made payable by wire transfer to an escrow account designated by the GWG
> Litigation Trust or its counsel.  The Settlement Payment shall be paid to the GWG
> Litigation Trust and distributed pursuant to the terms of the Confirmed Chapter 11
> Plan in the Bankruptcy Case.
>
> <u>Release in Favor of Jackson Walker</u>: On the Effective Date, and for the
> consideration described herein, and except for those obligations created by or
> arising out of this Agreement, the Litigation Trustee and the GWG Litigation Trust,

---

[32] The Tolling Agreement was further extended until September 30, 2025.

[33] This summary is provided solely for ease of reference and is qualified in its entirety by reference to the Proposed
Settlement, the actual terms of which are controlling here. *See* Ex. A.

for and on behalf of itself and the Debtors, hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors, affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the GWG Litigation Trust against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.

<u>Resolution of Jackson Walker's Final Fee Application</u>: The Proposed Settlement is conditioned on the Court's approval of JW's final fee application currently pending in the Bankruptcy Case, as reflected in the Approval Order attached as an exhibit to the Settlement Agreement.  If the Proposed Settlement is not approved by the Court, including the approval of JW's final fee application, the Parties revert to their respective positions immediately prior to the execution of the Proposed Settlement.

## **RELIEF REQUESTED**

30.    Through this Motion, pursuant to 11 U.S.C. § 105(a), Federal Rule of Bankruptcy Procedure 9019, and the confirmed Plan, the Litigation Trustee respectfully requests entry of an order approving the Proposed Settlement.

## **BASIS FOR RELIEF REQUESTED**

31.    The confirmed Plan provides that "the Litigation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgement any [Retained Cause of Action] and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that the entry into any

13

settlement of any Claim, Cause of Action, or other dispute with an economic value of $5 million or more (in the Litigation Trustee's good faith determination) as of the date of the consummation, settlement, or resolution of such transaction or dispute shall require the approval of the Bankruptcy Court after notice and an opportunity for a hearing." Plan Art. IV(Q). Although the Litigation Trustee does not believe that the Litigation Trust's claims against Jackson Walker have an "economic value of $5 million or more" for the reasons discussed below, the Litigation Trustee believes that seeking court approval of the Proposed Settlement is appropriate given the allegations made against Jackson Walker and the fact that Ms. Freeman serves as the Wind Down Trustee.

32.     Bankruptcy Rule 9019 authorizes the Court to approve the settlement of claims and controversies after notice and a hearing. Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).

33.     Settlements are considered a "normal part of the process of reorganization" and a "desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Indeed, "[t]o minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Approval of a compromise is within the sound discretion of the court. *See, e.g.*, *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

34.     When evaluating a settlement, the court's role is not to decide the issues in dispute. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993). Rather, the court determines whether the

settlement as a whole falls within the range of reasonableness and is fair and equitable. *Id.* (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also Ogle v. Morgan (In re Evergreen Helicopters Int'l Inc.)*, 50 F.4th 547, 556 (5th Cir. 2022).

35.     Courts consider the following factors when evaluating whether the compromise is fair and equitable: (a) the probabilities of success in the litigation, with due consideration for uncertainty in fact and law; (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (c) all other factors bearing on the wisdom of the compromise. *DeepRock Venture Partners, L.P. v. Beach (In re Beach)*, 731 F. App'x 322, 325 (5th Cir. 2018) (internal citations omitted); *see also Jackson Brewing*, 624 F.2d at 602 (same). In addition, under the rubric of the third, catch-all provision, the Fifth Circuit has identified two additional factors that bear on the decision to approve a proposed settlement: (i) whether the compromise serves "the best interests of the creditors, with proper deference to their reasonable views"; and (ii) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *In re Age Ref., Inc.*, 801 F.3d at 540.

36.     Each of these factors weighs in favor of approving the Proposed Settlement.

**A.    Litigation of the Debtors' Claims Would Be Subject to Risk and Uncertainty and Not Result in a Greater Net Recovery.**

37.     When evaluating the first factor considered by courts in the Fifth Circuit—the probabilities of success in the litigation—"it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in [a] settlement." *Cajun Electric Power Cooperative, Inc. v. Mabey*, 119 F.3d 349, 356 (5th Cir. 1997). Instead, the court "need only apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision." *Id.* (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)). Here,

for the reasons discussed below, the probability of success in the litigation weighs in favor of finding that the Proposed Settlement is fair and equitable.

38.     In the Litigation Trustee's view, the Litigation Trust has meritorious claims against Jackson Walker for breach of fiduciary duty for failing to inform the Debtors, their counsel, and other interested parties of the Jones-Freeman relationship or the conflict of interest that resulted from Judge Jones's serving as mediator in the case. Under Texas law, which governed Jackson Walker's engagement letter with the Debtors,[34] the most likely remedy available to the Litigation Trust for its breach of fiduciary duty claim is the disgorgement of Jackson Walker's fees. *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999). However, the "forfeiture of fees for clear and serious misconduct is not automatic and may be partial or complete, depending on the circumstances presented." *Id.* at 241. The relevant circumstances courts should consider, according to the Texas Supreme Court, include "the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." *Id.* at 243 (quoting Restatement (Third) of the Law Governing Lawyers § 49).

39.     Here, the Litigation Trustee's view is that Jackson Walker's alleged breach of duty occurred on or around November 30, 2022, when it filed a motion seeking Judge Jones's appointment as mediator without disclosing the Jones-Freeman relationship to the Debtors or the Bankruptcy Court. It does not appear that Jackson Walker was required to disclose the Jones-Freeman relationship prior to that time because the GWG bankruptcy case was pending before Judge Isgur (not Judge Jones) and had no other connection to Judge Jones that would have required

---

[34] *In re GWG*, Case No. 22-90032, ECF No. 267-1 at 5.

disclosure. The Litigation Trustee also did not identify any facts that would give rise to any claims against Jackson Walker predating that alleged breach of duty.

40.     Because Jackson Walker's duty to disclose, in the Litigation Trustee's view, arose in late November—and the Litigation Trustee did not identify any colorable claims arising from Jackson Walker's representation prior to that time—the Litigation Trustee and his counsel concluded that the most likely disgorgement award would encompass Jackson Walker's fees following its alleged breach, and that a complete disgorgement of Jackson Walker's fees was less certain, in part because the Litigation Trustee has found no evidence of any harm, injury, or other prejudice to the estate. *See In re GHR Energy Corp.*, 60 B.R. 52, 68 (Bankr. S.D. Tex. 1985) (declining to deny the entirety of the professional's fees upon a finding that the professional was not disinterested in the absence of some other actual injury or other prejudice to the estate) (quoting 2 COLLIER ON BANKRUPTCY § 328.04 at 328-15 (15th ed. 1979)).

41.     And indeed, Jackson Walker has argued that complete disgorgement would be inappropriate for a number of reasons, including that: (1) Judge Jones participated in the Debtors' case solely as a mediator and not as the presiding judge; (2) Judge Jones did not enter any judicial orders in the proceedings, including orders approving Jackson Walker's retention and fees; (3) sophisticated counsel were involved and helped to ensure an equitable mediation process; (4) the estate was not damaged, prejudiced, or harmed by Jackson Walker's alleged failure to disclose the Jones-Freeman relationship; and (5) Jackson Walker provided reasonable and necessary services to the Debtors in the bankruptcy cases.

42.     The Litigation Trustee also evaluated whether theories raised by other parties—including those asserted by the Debtors' former CEO, Murray Holland, in his motion to dismiss the adversary proceeding styled *Goldberg v. Heppner, et al.*, Adv. Pro. No. 24-03090 (the "D&O

Adversary Proceeding")[35]—could support additional claims or bases for recovery against Jackson Walker. Holland's arguments largely mirror those in a recently filed lawsuit by certain former GWG bondholders, some of whom are affiliated with Holland, asserting purported direct (and derivative) claims against Jackson Walker and others (the "Bondholder/Jackson Walker Complaint").[36]

43.    As to Jackson Walker, both Holland's motion and the Bondholder/Jackson Walker Complaint assert two principal allegations: (a) that Jackson Walker (notwithstanding its role as local counsel) orchestrated a scheme to oust GWG's management, derail a reorganization plan advanced by GWG's remaining independent directors, and impose a liquidation; and (b) but for Jackson Walker's failure to disclose the Jones-Freeman relationship, GWG would have reorganized and emerged from bankruptcy in a stronger position.[37]

44.    The Litigation Trustee strongly disputes Holland's assertion—echoed in the Bondholder/Jackson Walker Complaint—that the D&O Adversary Proceeding is a "misguided distraction." Long before the Litigation Trustee's appointment, both the GWG's Independent Investigations Committee (represented by the Katten Muchin law firm) and the Bondholder Committee (represented by the Akin Gump law firm) independently concluded, after extensive investigations, that GWG's former directors and officers—including Holland—faced colorable

---

[35] *Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 114 at 5-7, 29-36.

[36] *See Peterson v. Jones*, Case No. 4:25-cv-02761, ECF No. 1 at 2-5. According to GWG's Form-10K filed on November 5, 2021, Murray Holland served as a trust advisor for the trusts identified as plaintiffs in the *Peterson* case, which were referred to as the "Seller Trusts" in GWG's securities filings. GWG Form 10-K, filed on Nov. 5, 2021, at 86& n.1 *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001522690/000152269021000008/gwgh-20201231.htm. Although Holland purportedly resigned as trust advisor shortly before GWG filed for bankruptcy, Holland reportedly maintained "an indirect pecuniary interest in the assets of the Seller Trusts resulting from his ownership interest of 30% of the outstanding membership interests of" the Seller Trusts' sole beneficiary, MHT Financial LLC. *In re GWG*, Case No. 22-90032, ECF No. 1135 at 54.

[37] *Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 114 at 5-7, 29-36; *Peterson v. Jones*, Case No. 4:25-cv-02761, ECF No. 1 at 4-7, 42-47.

claims.[38] Following his appointment, the Litigation Trustee and his counsel reviewed hundreds of thousands of additional documents and ultimately filed a comprehensive, 300-page complaint asserting that Holland and other former officers and directors breached their fiduciary duties in connection with GWG's transactions with a company named Beneficient.[39] Notably, the Litigation Trustee alleged claims that GWG's officers and directors breached their duties by, among other things, allowing GWG funds to be used to pay purported debts Beneficient owed to an entity named HCLP, which had been represented as a third-party lender but was in fact related to and controlled by Beneficient's founder and GWG's chairman, Brad Heppner.[40] Confirming the Litigation Trustee's allegations, Beneficient recently filed a Form 8-K announcing that it had "identified credible evidence that Mr. Heppner participated in fabricating and delivering fake documents to [Beneficient] regarding his and others' relationships to HCLP" and was considering pursuing litigation against Heppner.[41]

45.     Notwithstanding his disagreement with Holland regarding the merits of the D&O Adversary Proceeding, the Litigation Trustee carefully considered whether Jackson Walker's alleged failure to disclose the Jones-Freeman relationship could support additional damages beyond fee disgorgement. This evaluation included a detailed review of prepetition events, pleadings in multiple cases involving Jackson Walker, deposition transcripts of Jackson Walker attorneys, hearing transcripts and filings in the GWG bankruptcy case, and discussions with counsel for the Official Committee of Bondholders. Despite serious concerns about Jackson

---

[38] *In re GWG*, Case No. 22-90032, ECF No. 1250 & ECF No. 1698 at 11-18.

[39] *See Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 3.  The Bankruptcy Court recently approved a settlement of a portion of the D&O Adversary Proceeding, including the Litigation Trustee's claims against Holland and other insured parties. *In re GWG*, Case No. 22-90032, ECF No. 160.

[40] *Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 3 at 4-6.

[41] Beneficient Form 8-K dated July 30, 2025 *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1775734/000164117225022297/form8-k.htm.

Walker's conduct, the Litigation Trustee concluded that the Litigation Trust is unlikely to recover damages based on the theory that Jackson Walker and Freeman obstructed confirmation of a viable reorganization plan.

46.    *First*, the Litigation Trustee found that certain core allegations made by Holland and others lacked factual support. A key example is the claim that Jackson Walker ousted GWG's prepetition management as part of a "fraudulent scheme" to drive the company into liquidation.[42] The Litigation Trustee's review of hearing transcripts, court filings, and other materials revealed no evidence supporting this theory.

47.    Instead, in June 2022, shortly after GWG filed for bankruptcy, the Bankruptcy Court approved the appointment of two new independent directors—Jeffrey S. Stein and Anthony R. Horton—to the boards of GWG and its affiliates.[43] These directors formed an Investigations Committee with authority to hire counsel and investigate prepetition transactions, including the Debtors' investments in Beneficient.[44] The Debtors then retained Katten Muchin Rosenman LLP ("Katten Muchin") to act solely as counsel for the Independent Directors and the Investigations Committee.[45]

48.    While investigating a 2021 transaction between GWG and Beneficient, which led to the resignation of directors serving on a GWG special committee, the Investigations Committee and Katten Muchin concluded that GWG management (including Holland) was aware that a March

---

[42] *See, e.g., Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF 114 at 6; *Peterson v. Jones*, Case No. 4:25-cv-02761, ECF No. 1 at ¶97.

[43] *In re GWG*, Case No. 22-90032, ECF Nos. 430 and 594.

[44] *Id.* at ECF No. 430 at 14; ECF No. 594 at Ex. A.

[45] *Id.* at ECF No. 649.

2021 Form 8-K inaccurately described the resignation of those special committee directors.[46] Katten Muchin reported its findings to the Debtors' counsel and full board,[47] at which point Jackson Walker, as local Debtors' counsel, reviewed the Investigation Committee's and Katten Muchin's findings.[48] That work—undertaken by the Investigations Committee and Katten Muchin in the first instance, according to Katten Muchin's and Jackson Walker's time records[49]— ultimately led the Debtors to file an amended Form 8-K.[50] The Investigations Committee and Katten Muchin then reported their findings to the Bankruptcy Court (Judge Isgur),[51] which suspended the authority of GWG's board of directors[52] and scheduled a hearing on whether to remove one or more GWG directors.[53] Ultimately, GWG's remaining prepetition directors and officers, including Holland, resigned.[54]

---

[46] *In re GWG*, Case No. 22-90032, ECF No. 1135 at 71-73; ECF No. 1698 at 14, 98-100; ECF No. 1073 at 6:14-9:25, 16:14-23:23 (Nov. 14, 2022 Hearing Transcript).

[47] *In re GWG*, Case No. 22-90032, ECF No. 1135 at 71-73; ECF No. 1698 at 98; ECF No. 1684 at pp. 55-57 of 101 (Katten Muchin time entries reflecting preparation of "talking points for meeting with Board concerning 4th special committee" and meeting with board on November 8, 2022); ECF No. 1073 at 4:19-22 (Nov. 14, 2022 Hearing Transcript).

[48] *In re GWG*, Case No. 22-90032, ECF No. 1073 at 14:17-15:1; 22:20-23:23; 26:21-27:5 (Nov. 14, 2022 Hearing Transcript).

[49] Katten Muchin's time records indicate that it began investigating the disclosure issue on or about November 1, 2022, after Katten Muchin deposed one of the former special committee members, Roy Bailey. *In re GWG*, Case No. 22-90032, ECF No. 1684 at pp. 47-67 of 101. Jackson Walker appears to have learned about Katten Muchin's findings on November 8, 2022, the same day that the Investigations Committee and Katten Muchin informed the full board of directors about its findings. *Compare id.* at p. 57 of 101 (Katten Muchin entries reflecting board meeting on November 8, 2022) *with* ECF No. 1243 at p. 13 of 24 (Jackson Walker entries first reflecting first "call with Katten team regarding investigation matters" and drafting motion for emergency hearing). Indeed, Jackson Walker's time entries reflect that it did not "review and analyze findings of Katten re SEC filings" until November 10, 2022, well after Katten Muchin had reported its conclusions to the full board. *Id.* at p. 13 of 24.

[50] GWG Form 8-K/A, filed Nov. 14, 2022, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001522690/000119312522284071/d417951d8ka.htm.

[51] *See In re GWG*, Case No. 22-90032, ECF No. 1073 (Nov. 14, 2022 Hearing Transcript)

[52] *Id.* at 32:18-33:6; *In re GWG*, Case No. 22-90032, ECF No. 1061.

[53] *In re GWG*, Case No. 22-90032, ECF No. 1061.

[54] *In re GWG*, Case No. 22-90032, ECF No. 1073 at 9:23-10:24 (Nov. 14, 2022 Transcript); ECF No. 1127.

49.     Based on the Investigations Committee's and Katten Muchin's report to the Bankruptcy Court (Judge Isgur) and the Litigation Trustee's own investigation,[55] the Litigation Trustee concluded that the resignations were triggered by the Investigations Committee's and Katten Muchin's work into misleading securities filings that Holland signed pre-petition—not by a scheme orchestrated by Jackson Walker.[56] The Litigation Trustee has uncovered no facts suggesting that the Independent Directors or Katten Muchin joined Jackson Walker in any alleged "fraudulent scheme" to oust GWG's prepetition management. To the contrary, on December 1, 2022—one day after Jackson Walker filed a motion seeking to have Judge Jones appointed as mediator—Jackson Walker filed a Joint Chapter 11 Plan on the Debtors' behalf that contemplated a going-concern reorganization, not a liquidation (the "Debtors' Proposed Plan").[57]

50.     ***Second***, any claim for damages against Jackson Walker (beyond fee disgorgement) would require the Litigation Trustee to prove causation—a demanding burden under Texas law. *See Liberty Mut. Ins. Co. v. Gardere & Wynne, L.L.P.*, 82 F. App'x 116, 118 (5th Cir. 2003) (plaintiff must prove causation to recover damages); *Taylor v. Alonso, Ceronsky & Garcia, P.C.*, 395 S.W.3d 178, 189 & n.6 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (causation is an element of legal malpractice and fiduciary duty claims seeking damages). Specifically, the Litigation

---

[55] The Litigation Trustee independently reviewed the relevant documents and testimony and reached the same conclusion as the Investigations Committee, Katten Muchin, and Jackson Walker: that the March 2021 Form 8-K was materially misleading in stating that the resignations "were not due to any disagreement with the company known to an executive officer of the company." *See Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 3 at ¶547 & ECF No. 132 at 47-49 & n.28, 163-65.

[56] *In re GWG*, Case No. 22-90032, ECF No. 1135 at 71-73 & ECF No. 1698 at 14, 98-100; ECF No. 1073 at 6:14-9:25, 16:14-23:23 (Nov. 14, 2022 Hearing Transcript).

[57] *In re GWG*, Case No. 22-90032, ECF No. 1134. As another example, although Ms. Freeman was eventually identified as the Wind Down Trustee, she was not identified as the Wind Down Trustee following the initial mediation sessions, which resulted in an agreement among the parties to liquidate the Debtors using a two-trust structure. Rather, the parties agreed to appoint Jeffrey Stein, the Debtors' chief restructuring officer and independent director, as Wind Down Trustee in connection with the mediated liquidation plan, again undercutting the theory that Jackson Walker was part of a plot from November 2022 onwards to force GWG into a liquidation so that Ms. Freeman could act as the Wind Down Trustee. *Id.* at ECF No. 1518 at 3. And ultimately, on information and belief, the recommendation to appoint Ms. Freeman as Wind Down Trustee came from parties other than Jackson Walker.

Trustee would need to prove that, but for Jackson Walker's alleged conduct, the Bankruptcy Court would have confirmed the Debtors' Proposed Plan under 11 U.S.C. § 1129. *See*, *e.g.*, *Yaquinto v. Segerstorm (In re Segerstrom)*, 247 F.3d 218, 225 (5th Cir. 2001) ("[T]he estate must prove a 'suit within a suit'—it must demonstrate that but for the manner in which [counsel] conducted her defense, [debtor] would have obtained a better result in the [underlying] litigation."); *Haddy v. Caldwell*, 403 S.W.3d 544, 546 (Tex. App.—El Paso 2013) (suit-within-a-suit causation requires a plaintiff to prove that, "'but for' the attorney's breach of duty, the plaintiff would have prevailed on the underlying cause of action and would have been entitled to judgment"); *Land Ventures for 2, LLC v. Fritz*, 551 B.R. 846, 852–53 (M.D. Ala. 2015) (debtor was required to show that "underlying bankruptcy proceeding *would have* resolved more favorably to [debtor], not merely that the proceeding *might have* been more favorable" on claim against debtor's counsel).

51.    After thorough analysis, the Litigation Trustee concluded that proving that the Debtors' Proposed Plan could have been confirmed was highly uncertain. For example, the Trustee would need to show that: (a) all impaired classes of claims, including Bondholders, would have voted to accept the Debtors' Proposed Plan, *see* 11 U.S.C. § 1129(a)(8); or (b) if an impaired class rejected the Debtors' Proposed Plan, the Bankruptcy Court would have approved the Debtors' Proposed Plan under 11 U.S.C. § 1129(b)'s cramdown provisions. The Litigation Trustee's investigation and review of filings in the bankruptcy case suggests that the likelihood of proving either scenario was extremely low.

52.    It was far from certain that the Debtors could have secured the necessary creditor votes required by 11 U.S.C. § 1129(a)(8). Both before and after the Debtors filed their Proposed Plan, the Bondholder Committee strongly opposed any plan that converted Bondholder debt into preferred equity while using their collateral to fund new, untested business ventures, as the

Debtors' Proposed Plan did.[58] Compounding matters, GWG faced an active SEC investigation,[59] prepetition management had resigned following Katten Muchin's findings about the 2021 Form 8-K,[60] and the Bondholder Committee had filed a motion with a draft complaint raising serious concerns about GWG's investments in Beneficient and the conduct of GWG's directors and officers.[61] Multiple lawsuits were also pending against Holland and other members of GWG's former management, including a securities fraud class action brought by former GWG Bondholders.[62] In short, GWG lacked a credible management team to execute the Proposed Plan, and its former leadership was engulfed in allegations of fraud and misconduct.

53.    In the Litigation Trustee's experience, the Bondholder Committee's opposition—coupled with allegations of mismanagement—would make it exceedingly difficult to show that at least two-thirds in amount and more than one-half in number of Bondholders (or any other impaired class) would have voted to accept the plan. *See* 11 U.S.C. § 1126(c).

54.    Absent acceptance by all impaired classes, the Litigation Trustee examined whether the Proposed Plan could have been confirmed under § 1129(b)(2)(A)'s cramdown provisions.[63] Based on the Litigation Trustee's analysis, however, the Debtors' Proposed Plan did not appear to

---

[58] *See, e.g.*, *In re GWG*, Case No. 22-90032, ECF Nos. 852, 942, 1250, and 1253; *see also id.* at ECF No. 1134 at Art. IV(A) (describing Reorganized Debtors post-confirmation business) & ECF No. 1135 at 73-74 (same).

[59] *Id.* at ECF No. 1135 at 92-93. Although the SEC eventually terminated its investigation without recommending any enforcement action, there are ongoing investigations related to GWG and Beneficient. In fact, the settlement with Beneficient and GWG's former fiduciaries includes a holdback to fund expenses incurred with that investigation. *Id.* at ECF No. 2533 at ¶2 & ECF No. 2533-1 at ¶¶1(o) & (ee).

[60] *See supra* at pages 20–21.

[61] *In re GWG*, Case No. 22-90032, ECF No. 1250.

[62] *See In re GWG Holdings, Inc. Securities Litig.*, Case 3:22-cv-00410-B (N.D. Tex.); *Paul Capital Advisors, L.L.C. v. Holland*, C.A. No. 2022-0167-SG (Del.Ch.).

[63] GWG's "L Bonds" were secured by all of the Debtors' assets, including their equity stakes in Beneficient. GWG Prospectus dated June 3, 2020, at 1 ("Obligations under the L Bonds are secured by substantially all the assets of GWG Holdings (the most significant components of which are cash and investments in subsidiaries), and by a guarantee and corresponding grant of a security interest in substantially all the assets of our subsidiary, GWG Life, LLC.") *available at* https://www.sec.gov/Archives/edgar/data/1522690/000121390020014212/ea122727-424b1_gwgholdings.htm.

satisfy any of the three options available under 11 U.S.C. §1129(b)(2)(A). The Proposed Plan neither allowed Bondholders to retain their liens with deferred cash payments equal to their secured claims, nor did it provide for the sale of collateral with liens attaching to the proceeds— requirements of § 1129(b)(2)(A)(i) and (ii).

55.    Instead, the Debtors' Proposed Plan envisioned using Bondholder collateral to capitalize "GWG Asset Management," a new venture, free and clear of all liens while giving Bondholders (a) an uncertain distribution from an exit financing facility (only after capitalizing the reorganized entity and paying other expenses) and (b) illiquid preferred equity redeemable in five years, with dividends that might be paid in cash if (i) the reorganized Debtors could monetize GWG's interests in Beneficient and FOXO and (ii) a new board decided to distribute funds rather than reinvest them.[64] Such treatment is unlikely to meet § 1129(b)(2)(A)(i) or (ii)'s requirements. *See*, *e.g.*, *In re N.S. Garrott & Sons*, 48 B.R. 13, 17 (Bankr. E.D. Ark. 1984) (rejecting plan that failed to meet requirements under 11 U.S.C. § 1129(b)(2)(A)(i) where secured creditor did not retain its lien and total stream of cash payments did not equal amount of secured claim).

56.    Likewise, the Litigation Trustee concluded that it would be nearly impossible to prove that the contemplated preferred equity provided Bondholders the "indubitable equivalent" of their claims under § 1129(b)(2)(A)(iii), the Debtors' only other option for obtaining a nonconsensual confirmation. The "indubitable equivalent standard requires a showing that the objecting secured creditor will receive the payments to which it is entitled, and that the changes forced upon the objecting creditor are completely compensatory, meaning that the objecting creditor is fully compensated for the rights it is giving up." *In re Pearl Resources LLC*, 622 B.R. 236, 271 (Bankr. S.D. Tex. 2020). Here, Bondholders would have surrendered secured claims in

---

[64] *In re GWG*, Case No. 22-90032, ECF No. 1134 at §§ IV(A), (P); ECF No. 1135 at 2-4, 14-15, 73-74.

exchange for risky equity, with dividends that might or might not be paid in cash[65] and which would only be redeemed if the new business lines succeeded—an exchange courts often reject as inequivalent. *See*, *e.g.*, *In re River East Plaza, LLC*, 669 F.3d 826, 832 (7th Cir. 2012) ("But because of the different risk profiles of the two forms of collateral, they are not equivalents, and there is no reason why the choice between them should be made for the creditor by the debtor."); *In re Platte River Bottom, LLC*, 2016 WL 241464, at *6 (Bankr. D. Colo. Jan. 19, 2016) ("[B]ankruptcy courts generally do not function as incubators for start-up enterprises.").

57.     In sum, the Litigation Trustee concluded that the Litigation Trust would face insurmountable challenges proving suit-within-a-suit causation—*i.e.*, that but for Jackson Walker's alleged conduct, the Debtors would have successfully satisfied 11 U.S.C. § 1129's requirements to secure confirmation of the Debtors' Proposed Plan.

58.     ***Third***, the Litigation Trustee determined that proving actual damages with reasonable certainty would be highly problematic. *See*, *e.g.*, *Sanders v. Flanders*, 564 F. App'x 742, 745 (5th Cir. 2014) ("[A] plaintiff must establish his damages through 'competent evidence with reasonable certainty.'") (quoting *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001)). The Debtors' Proposed Plan was speculative, and depended on the success of yet-to-be-launched, new business lines at the direction of unidentified new board members and managed by an unidentified management team.[66] Proving that these new business lines would have succeeded—without any operating history[67] or an experienced management team and board of

---

[65] *In re GWG*, Case No. 22-90032, ECF No. 1135 at 2-7, 73-74.

[66] *Id*. at 73-76.

[67] *Id*. at 28 ("There can be no assurances regarding the level of success that the Reorganized Debtors will obtain in pursuing the GWG Asset Management or other business plans."); *id*. at 91 ("The proposed GWG Asset Management business has no operating history.").

directors[68] and while facing an ongoing SEC investigation,[69] significant regulatory risks,[70] a recent emergence from bankruptcy,[71] and liens on all of the Debtors' assets[72]—would be speculative at best. *See*, *e.g.*, *Texas Instruments, Inc. v. Teletron Energy Mgmt.*, *Inc.*, 877 S.W.2d 276, 279–80 (Tex. 1994) (discussing considerations when seeking to recover lost profits, including the "fact that the business is new" and "the experience of the persons involved in the enterprise"). Indeed, such a highly speculative go-forward business plan would likely be insufficient to pass the feasibility requirements for plan confirmation. 11 U.S.C. § 1129(a)(11); *see*, *e.g.*, *Canal Place Ltd. P'ship v. Aetna Life Ins. Co (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 579 (5th Cir. 1991) ("Speculative, conjectural or unrealistic projections by Debtor cannot support Debtor's predictions of future performance."); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506-10 (Bankr. S.D. Tex. 1989) (rejecting plan failed to satisfy feasibility requirement).

59.     Moreover, the Litigation Trustee's investigation raised serious concerns about the circumstances surrounding the Debtors' investments in Beneficient and the value of those investments, which led the Litigation Trustee to file multiple lawsuits and arbitrations against a variety of parties.[73] And once Beneficient began trading publicly, its stock price predictably

---

[68] *Id.* at 75-76.

[69] *Id.* at 92.

[70] *Id.* at 95-97.

[71] *Id.* at 94 ("Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.").

[72] *In re GWG*, ECF No. 975-1 at p. 61 of 75 (defining "Collateral" under debtor-in-possession financing facility to include "all of the real, personal and mixed property (including Equity Interests in GWG Life, the Restricted Subsidiaries, FOXO, and BEN) in which Liens are purported to be granted pursuant to the DIP Order or Collateral Documents . . .").

[73] *See Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 3 at ¶¶1-34, 626-75 & ECF No. 132 at 26-28, 54-64; *Goldberg v. Foley & Lardner LLP*, Adv. Pro. No. 24-03119, ECF No. 1 (Bankr. S.D. Tex.); *Goldberg v. Holland & Knight LLP*, Adv. Pro. No. 25-03064, ECF No. 1 (Bankr. S.D. Tex.).

collapsed long before the Debtors or the Wind Down Trust could sell a single share.[74] After all, prior to and after going public, Beneficient repeatedly reported that it had a history of significant net losses and had never achieved profitability.[75] More recently, Beneficient's founder resigned amid scrutiny over related-party transactions, and Beneficient announced that it had discovered that its founder "fabricated and delivered fake documents" concerning his relationship with those parties—issues at the heart of the Litigation Trustee's ongoing litigation.[76] In his resignation letter, the founder's counsel admitted that "*the only viable course for [Beneficient] at this point is an orderly wind down of operations*."[77]

60.    Accordingly, it is far from certain that GWG could have successfully launched or funded new business lines with Bondholder collateral, much less that the Debtors' Proposed Plan would have yielded a better result than a liquidation plan. Moreover, given the Litigation Trustee's ongoing litigation against several third parties in which the Litigation Trustee is challenging the value of GWG's investments in Beneficient, proving damages from an alleged "lost reorganization" is even less likely.

---

[74] The Wind Down Trust did not begin selling any Beneficient stock until October 20, 2023, at which point Beneficient's stock price had already collapsed to $0.70/share. Beneficient Schedule 13-D, filed on October 27, 2024, at 6, *available at* https://www.sec.gov/Archives/edgar/data/1775734/000101376223007349/ea187391-13da2gwgwind_benefi.htm. Holland's motion suggested that the Wind Down Trustee's sale of Beneficient stock was the reason for its precipitous decline once it began trading in June 2023. *Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 114 at 23-24. Holland's claims, however, ignore the fact that Beneficient's common stock was structurally subordinated to approximately $100 million in debt owed to related parties and more than $1.9 billion in preferred equity, while Beneficient's assets (excluding the goodwill that it has now written off) totaled just $621 million. Beneficient Form 10-K, filed on July 13, 2023, at F-3, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775734/000117573423000008/ben-20230331.htm.

[75] *See, e.g.*, Beneficient Form 10-K, filed on July 13, 2023, at 28, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775734/000117573423000008/ben-20230331.htm ("We have a history of net losses . . . . We have not achieved profitability, and we may not realize sufficient revenue to achieve profitability in future periods.").

[76] *Goldberg v. Heppner et al.*, Adv. Pro. No. 24-03090, ECF No. 3 ¶¶1-34; Beneficient Form 8-K, filed on August 5, 2025, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1775734/000164117225022297/form8-k.htm.

[77] Beneficient Form 8-K, filed on June 25, 2025, & Ex. 99.1 (emphasis added) *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001775734/000164117225016507/form8-k.htm.

61.     For these reasons, the Litigation Trustee determined that pursuing additional claims against Jackson Walker based on these theories would be speculative, costly, and unlikely to benefit the Litigation Trust. The Proposed Settlement, on the other hand, recoups 68% of Jackson Walker's total fees billed after its alleged disclosure violation, which is the most likely remedy based on the Litigation Trustee's analysis of the claim, and avoids the time and added expense associated with litigation (discussed next).

## B.    The Complexity and Likely Duration of the Litigation and Attendant Expense, Inconvenience and Delay Weigh in Favor of the Proposed Settlement.

62.     Were the Litigation Trustee to file a lawsuit and litigate the Debtors' Claims, it would be a lengthy process. In 2023, the median time from filing to beginning trial was 25.5 months in the Southern District of Texas.[78] Any appeals to the Fifth Circuit could add another year to the process, where the median time from filing an appeal to the issuance of an opinion or final order in the 12-month period ending September 30, 2023, was 10.7 months.[79] The Proposed Settlement, by contrast, allows for an increased distribution to the Debtors' bankruptcy estate much sooner; if the Proposed Settlement is approved, the Litigation Trustee and the Wind Down Trustee are prepared to distribute the net settlement proceeds expeditiously (in addition to the proceeds from other settlements reached by the Litigation Trustee).

63.     The Litigation Trustee also considered other factors, such as the expense, inconvenience, and delay associated with litigating claims against Jackson Walker. The Litigation Trustee estimated that expenses—such as expert fees, deposition costs, and other litigation

---

[78] U.S. District Courts, Median Time From Filings To Trial For Civil Cases In Which Trials Were Completed— During the 12-Month Periods Ending December 31, 2022 and 2023, https://www.uscourts.gov/statistics/table/t3/statistical-tables-federal-judiciary/2023/12/31.

[79] U.S. Courts of Appeals, Median Time for Civil and Criminal Cases Terminated on the Merits, by Circuit, During the 12-Month Period Ending September 30, 2023, https://www.uscourts.gov/sites/default/files/data_tables/jb_b4a_0930.2023.pdf.

expenses—could add up to several hundred thousand dollars, which may not be recoverable against Jackson Walker. If the Litigation Trustee were limited to seeking disgorgement, then those expenses could easily result in a worse net recovery than the Proposed Settlement.

64.     Moreover, if the Litigation Trustee pursued a damages theory, litigation costs could easily exceed $1 million, as the Litigation Trustee would need to hire multiple experts to value the Debtors' assets (its life insurance portfolio and equity investments) and evaluate the likelihood of success of the Debtors' Proposed Plan, as well as conduct additional extensive discovery into the bankruptcy case and events. Given the low probability of success for such a damage theory, incurring such expenses could result in an even worse outcome for the Litigation Trust's ultimate beneficiaries by diverting money that could be distributed instead to funding expenses in speculative litigation with a highly uncertain outcome.

65.     In short, the Litigation Trustee believes that a certain and more immediate recovery is of particular benefit to the Litigation Trust and its ultimate beneficiaries when compared to the complexity, delay, and expense that would come with pursuing litigation against Jackson Walker.

**C.    The Proposed Settlement Is in the Best Interests of the Litigation Trust and Is the Product of a Good Faith, Arm's Length Negotiation.**

66.     The "other factors bearing on the wisdom of the compromise," including "the best interests of the creditors" and whether the "settlement is truly the product of arms-length bargaining," also support approving the Proposed Settlement. *See Beach*, 731 F. App'x at 325.

67.     Based on a review and analysis of the Proposed Settlement, and after consultation with counsel, the Litigation Trustee determined in his reasoned and prudent business judgment that the marginal chance of recovering an amount greater than the Proposed Settlement was not worth the risk, time, and expense required, for the reasons discussed above. Accordingly, entering

into the Proposed Settlement is in the best interests of the Litigation Trust, its sole beneficiary, the Wind Down Trust, and the Wind Down Trusts' beneficiaries.

68.    The Bankruptcy Court has already approved four settlements between the Litigation Trustee and various parties.[80] The Proposed Settlement with Jackson Walker, along with the other settlements for which the Litigation Trustee also is seeking approval, will allow the Litigation Trust to distribute approximately an additional $5.1 million to the Wind Down Trust, after accounting for attorneys' fees and other expenses. *See* Ex. B at 1.  If all of these settlements are approved (in addition to those already approved by the Court), the Litigation Trustee estimates that total distributions to the Wind Down Trust will be approximately $63.39 million (*see* Ex. C at 1) and total distributions to former GWG L Bond holders will range between 3.532% and 3.642% (*see* Ex. C at 2-3).

69.    The Proposed Settlement is a good-faith, extensively-negotiated arm's length resolution of the Debtors' Claims. As detailed above, the settlement was reached following a full-day mediation with two nationally recognized mediators who are both former Federal District Court Judges, and also involved post-mediation negotiations. The Litigation Trustee engaged in these discussions in good faith, and all the negotiations were at arm's length. Further, to the best of the Litigation Trustee's knowledge, Jackson Walker participated in the settlement discussions and acted in good faith in reaching the Proposed Settlement.

70.    Accordingly, the Litigation Trustee submits that the Proposed Settlement is a fair and equitable resolution of the Debtors' Claims and respectfully requests that the Court enter an order approving the Proposed Settlement.

---

[80] *See In re GWG*, Case No. 22-90032, ECF Nos. 2544, 2699, 2700, 2701, and 2703.

## NOTICE

71.     Because the Wind Down Trust maintains the master service list, the Litigation Trustee is coordinating with the Wind Down Trust, its advisors, and Stretto regarding service (but not the merits) of this Motion, as well as the other Rule 9019 motions that the Litigation Trustee is filing seeking approval of other settlements. Service will occur by First Class US Mail on all parties and also by e-mail whenever possible. Stretto will file an affidavit of service with the Service List attached as soon as possible after service is completed. Further, this Motion and all exhibits will be posted on the GWG Trust website.

## PRAYER

WHEREFORE, the Litigation Trustee respectfully requests that the Court enter the Order, substantially in the form filed with this Motion, (i) granting this Motion; (ii) approving the Proposed Settlement by granting the Proposed Order attached hereto as **Exhibit D**; and (iii) granting all other relief that is appropriate under the circumstances.

**Dated**: October 3, 2025

**REID COLLINS & TSAI LLP**

By: */s/ Nathaniel J. Palmer*
    William T. Reid, IV
    Tex. Bar No. 00788817
    S.D. Tex. Bar No. 17074
    Nathaniel J. Palmer (admitted *pro hac vice*)
    Tex. Bar No. 24065864
    Taylor A. Lewis (admitted *pro hac vice*)
    Tex. Bar No. 24138317
    1301 S. Capital of Texas Hwy
    Building C, Suite 300
    Austin, Texas 78746
    (512) 647-6100
    wreid@reidcollins.com
    npalmer@reidcollins.com
    tlewis@reidcollins.com

    *Counsel for the GWG Litigation Trustee*

**<u>CERTIFICATE OF SERVICE</u>**

I, Nathaniel J. Palmer, certify that on October 3, 2025, I caused a true and correct copy of this Motion for Entry of an Order Approving Settlement Agreement to be served by the Court's CM/ECF system on all parties entitled to notice.


<div align="center" style="margin-left:auto">

*/s/ Nathaniel J. Palmer*
Nathaniel J. Palmer

</div>