**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:

PROFESSIONAL FEE MATTERS
CONCERNING THE JACKSON
WALKER LAW FIRM

CIVIL ACTION NO. 4:23-cv-04787

**OBJECTION TO LITIGATION TRUSTEE'S MOTION FOR ENTRY OF AN ORDER
APPROVING SETTLEMENT AGREEMENT WITH JACKSON WALKER LLP**

## <u>TABLE OF CONTENTS</u>

Introduction ........................................................................................................ 1

Relevant Background Facts................................................................................ 6

Argument & Authorities .................................................................................. 10

I.   The Settlement Should be Rejected. .................................................... 10

   A.   With Freeman on Both Ends of the Settlement, it is a Product of Fraud and Collusion. ............................................................................................. 11

   B.   The Settlement is a Net Payout by the Victims of Jackson Walker's Fraud and is Not in the Best Interests of the Estate or the Bankruptcy System as a Whole. ............ 13

   C.   The Conflicted Litigation Trustee Dismisses Valuable Claims without Having Tested Any of Them................................................................................................ 14

     1.   Jackson Walker deliberately concealed the relationship for profit and the Litigation Trustee's "investigation" that supposedly failed to find evidence of the same demonstrates his conflict and his unwillingness to legitimately pursue claims against the firm and Freeman. ............................................................................. 14

     2. Jackson Walker had a legal duty to disclose the relationship and the Litigation Trustee's suggestion to the contrary confirms it had no intention of earnest pursuit of the claims against the firm…………………………………………………………..16

     3. The fact that Jones was not presiding over the GWG bankruptcy, but Jackson Walker still interjected him to control the outcome makes the case against the firm stronger, not weaker……………….……………………………………………………19

     4. The Litigation Trustee's unsupported conclusions on causation and damages are misguided and demonstrate predetermination in favor of Jackson Walker….20

II.   Given the Litigation Trustee's Manifest Conflict, Plaintiffs Should be Granted Limited Special Appointment and/or Derivative Standing to Pursue the Claims Against Jackson Walker, Freeman, and Jones. ........................................................................ 25

Conclusion ...................................................................................................... 25

Come now Gary Peterson, Chris Nakashima, John English, Jaquetta English, LT-1 Exchange Trust, LT-2 Exchange Trust, LT-3 Exchange Trust, LT-4 Exchange Trust, LT-5 Exchange Trust, LT-6 Exchange Trust, LT-7 Exchange Trust, LT-8 Exchange Trust, LT-9 Exchange Trust, LT-12 Exchange Trust, LT-14 Exchange Trust, LT-15 Exchange Trust, LT-17 Exchange Trust, LT-18 Exchange Trust, LT-19 Exchange Trust, and LT-20 Exchange Trust ("Objectors"), and file this objection to the Litigation Trustee's Motion for Entry of an Order Approving Settlement Agreement with Jackson Walker LLP, and in support thereof would show as follows:

## **INTRODUCTION**

1.      The Litigation Trustee's attempt to settle claims against Jackson Walker and Elizabeth Freeman is the product of collusion and part of an ongoing effort to bury valid and valuable claims against the Wind Down Trustee—Freeman—who is still pulling the strings.

2.      The Litigation Trustee has been sitting on the putative settlement since April 2025, but waited until October 3, 2025, the day after Plaintiffs filed their response to Jackson Walker's Rule 12b motion in *Peterson v. Jones et al.*,[1] to move for approval. As will be demonstrated herein, the Litigation Trustee's motion and settlement is an attempt to shield Freeman, with whom he collaborates under the plan, from liability.

3.      In fact, the settlement is a tremendous gain for both Jackson Walker and Freeman. Because it is contingent upon this Court's full approval of Jackson Walker's final motion for $1.3 million in attorneys' fees and expenses, the settlement will result in a net payout to

---

[1] *Peterson v. Jones, et al.*, No. 25-2761, ECF Nos. 28 at ¶ 11 (Responses filed October 2, 2025, noting that Jackson Walker "still has not put its backroom deal before this Court").

Jackson Walker and Freeman herself. After subtracting fees and notice costs, the settlement would theoretically provide $224,633.90 of funds to the Wind Down Trust.

| Proposed Settlement | $405,000.00 |
|---|---|
| Litigation Trustee Counsel Fee | - $101,250.00 |
| Notice Expense (1/3 of $220,000.00 estimated cost)[2] | -$73,333.33 |
| Litigation Trustee Success Fee (pro rata of $104,303.92)[3] | -$5,782.76 |
| **Net Settlement Distribution** | **$224,633.90**[4] |

4.    But because the settlement is contingent on approval of Jackson Walker's fee motion, the net payout will be *from* the estate *to* Jackson Walker. If the proposed settlement is compared against only the fees not yet approved by interim orders, the estate will *pay out* at least another $45,000 to Jackson Walker with a net effect on the estate of *negative* $225,442.97.[5]

| Actual Settlement Distribution | $224,663.90 |
|---|---|
| Pending Payment from JW Fee Application | -$450,076.87 |
| **Net to the GWG Estate** | **-$225,442.97** |

5.    If, on the other hand, the settlement is compared with Jackson Walker's cumulative $1.3 million in fees and expenses, the estate *pays* a whopping $1.08 million to Jackson Walker, the Litigation Trustee and his attorneys for fees and expenses.

---

[2] *See id.* at ECF No. 100-2.

[3] *See id.*

[4] This amount does not, of course, include administration and distribution expenses, some of which presumably would be paid to Freeman as trustee of the Wind Down Trust.

[5] Jackson Walker has already been awarded $861,205.41 in fees pursuant to three orders approving their interim fee applications (ECF Nos. 1046, 1724, and 2011). Although Jackson Walker's three interim fee applications request 80% of billed fees and 100% of billed expenses totaling $700,958.91 (ECF Nos. 829, 1521, and 1878), the orders approving reference only the gross amount of 100% of billed fees and 100% of billed expenses. This conflicts with Freeman's quarterly reports that represent Jackson Walker has only been paid $609,520. (ECF No. 2756). If Freeman is correct, the net payout to Jackson Walker will be $296,762.28.

| Actual Settlement Distribution | $224,663.90 |
| Jackson Walker's Final Fee and Expense Request | -$1,311,282.28 |
| **Net to the GWG Estate** | **-$1,086,648.38** |

6.      Either way, Jackson Walker profits immensely. Meanwhile, Freeman keeps all her fees, remains in the position she assumed through fraud, and can use the proceeds to pay herself still more fees. And the estate continues to pay for their fraud.

7.      Why would anyone agree to this? Because Jackson Walker, Freeman, and Jones made sure they would under the plan.[6] First, the plan they crafted requires the Litigation Trustee to cooperate and communicate with Freeman about any litigation. Second, the plan provides that the Litigation Trustee is appointed by the Bondholder Committee.[7] The Bondholder Committee, in turn, is represented by Freeman's ex-husband's law firm, Porter Hedges.

8.      Freeman is on both sides of the agreement—both as Wind Down Trustee and as a party released under it.[8] That is the only explanation for zero consideration from Freeman—despite her billing $205,157.81 in attorneys' fees and more than $1 million as Wind Down

[6] The fact that Jones was not the presiding judge in the case does not diminish Jackson Walker's liability. Just the opposite, it demonstrates the lengths to which the firm went to ensure his control and manipulation. Although Jones was not the presiding judge, Freeman and Jackson Walker moved to have him appointed. At mediation, Jones announced the *GWG* bankruptcy would no longer be a restructuring, but would go to liquidation and that Judge Isgur, his dear friend, would do whatever he said. Jones also arranged for Freeman to serve as Wind Down Trustee, collecting $50,000 per month. Jackson Walker knew of the intimate, live-in relationship all the while and never disclosed it.

[7] *GWG*, No. 22-90032, ECF No. ¶ 124.

[8] Proposed Settlement, ¶ 4(a) (releasing Jackson Walker "and its … directors, officers, employees, agents, … attorneys, partners, associates, staff members … from any and all actions, suits, … damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind … arising out of, related to, based upon, by reason of, or in any way involving any act, atter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the GWG Litigation Trust against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions").

Trustee. Further, once the settlement proceeds from her fraud are deposited into the Wind Down Trust, Freeman can use them to pay herself more fees. Freeman will be paying herself from the money meant for the victims of her fraud. Freeman's involvement also explains why Jackson Walker walks away with most of its fees.

9.      The Litigation Trustee claims that despite his obligations to communicate with Freeman under the plan, he "independently negotiated and determined that the Proposed Settlement was fair, reasonable, and in the best interests of the Litigation Trust and its ultimate beneficiaries without any input from Ms. Freeman *in her capacity* as the Wind Down Trustee."[9] Does this mean he spoke to her about it in a personal capacity? Or that her input did not affect his determination about the plan? Whatever conversations he had with Freeman about the litigation and/or settlement with Jackson Walker (or potential litigation against her), he was required to confer with her regularly under the plan, particularly about claims.[10]

10.     This Court should not approve the collusive settlement, which after notice and fees, offers the 27,000 Wind Down Trust interest holders, on average, less than $9 each, or around 0.01% of their approximate $1.6 billion in lost bond value. Aside from considerable fees left on the table (including Freeman's more than $1 million as Wind Down Trustee), it purports to release all claims brought against Jackson Walker and Freeman by Plaintiffs in the *Peterson v. Jones* litigation.

---

[9] Motion ¶ 8 (emphasis added).

[10] *GWG*, No. 22-90032, ECF No. 1924 at 41 ("The … Wind Down Trustee … and Litigation Trustee shall all use best efforts to cooperate with each other to ensure all necessary actions are taken as contemplated under this Plan"); *GWG*, No. 22-90032, ECF No. 1910 at p.2 ("the sole purpose of the Litigation Trust is to hold and liquidate the Litigation Trust Assets in a manner consistent with the Plan and the terns of this Agreement, in cooperation with the Wind Down Trustee…."); ¶ 1.5(a) (requiring the Litigation Trustee's "cooperation with the Wind Down Trustee"); ¶ 2.1 ("The Wind Down Trustee and the Litigation Trustee shall communicate on a regular basis, confer and coordinate efforts to maximize the ultimate recovery by the Wind Down Trust Beneficiaries from distributions from the Wind Down Trust, including anticipated transactions involving Wind Down Trust Assets and initiation of litigation/settlements involving Litigation Trust Assets").

11.     Predictably, the Litigation Trustee adopts Jackson Walker and Freeman's narrative as to why he believes these claims will fail without having brought them himself. This is hardly surprising given his conflicts and the fact that more than two years have passed since Jones publicly acknowledged the relationship, and the Litigation Trustee still has taken no efforts to bring any action against Freeman or to have her removed as Wind Down Trustee. The Litigation Trustee speculates that Plaintiffs would have difficulty proving their case because the alternative restructuring plan might not have been approved. The Litigation Trustee ignores that Freeman, Jackson Walker, and Jones' scheme resulted in a waste of an approximate waste of $2 billion in assets, regardless of the alternative plan.[11]

12.     The Litigation Trustee is settling "to avoid the substantial stress and distraction of continued litigation[.]"[12] With the caveat that he never initiated litigation in the first place (despite Jones admitting to the relationship in October 2023), what the Litigation Trustee is really avoiding is transparency and meaningful redress that can only come from plaintiffs who do not answer to Freeman.

10.     Plaintiffs in the *Peterson v. Jones* litigation should be granted the right to pursue the litigation so that the claims can be fully litigated with transparency, and so that meaningful relief can reach the estate. While the Litigation Trustee uses costs as a pretext for not pursuing the claims (while still releasing them), Plaintiffs' counsel have agreed to front the expenses for the litigation, with reimbursement of expenses contingent upon a recovery. Allowing Plaintiffs to pursue these claims will not burden or diminish the estate's limited resources if there is no recovery.

---

[11] *Id.* ¶ 110.

[12] Proposed Settlement at p. 2 ¶ L.

5

## RELEVANT BACKGROUND FACTS

13.     The Objectors collectively held bonds worth more than $300 million, which became Wind Down Trust Interests post-confirmation.[13] Plaintiffs still hold these interests, which have lost at least 96% of their value since Freeman—in concert with Jones and Jackson Walker—took over.

14.     Although she did not start billing in the case until it was time to procure Jones' formal involvement, Freeman was a key figure in the GWG bankruptcy from the very beginning. Jackson Walker's billing records confirm she was consistently working on the case (but not billing for it) from the day of Chapter 11 filing.[14] Holding back her initial billing was part of Jackson Walker's effort to camouflage her involvement. Despite not billing for her participation for the first six months, Freeman billed a significant portion of Jackson Walker's fees. As one of fifteen attorneys appearing in Jackson Walker's monthly fee statements, Freeman accounted for 18.2% of all attorney's fees billed through Jackson Walker in the fourteen months from filing to confirmation.[15] All along, Jackson Walker concealed the Jones-Freeman relationship from those interested in the bankruptcy.

---

[13] *Peterson*, No. 25-2761, Complaint, ECF No. 1 ¶¶ 133–36.

[14] The day of filing, April 20, 2022, and the next day, April 21, 2022, Jackson Walker attorney Kristhy Peguero billed time for strategizing with "L. Freeman" in connection with the GWG bankruptcy. *GWG*, ECF No. 829, Jackson Walker's First Interim Fee Application, Exhibit A, First Monthly Fee Statement, Exhibit C at 12–13 (pdf pp. 26–27). A few days later, Ms. Peguero billed three consecutive days—April 26–28, 2022—for working with Freeman on the case *Id*. at 13. Ms. Peguero then collaborated with Freeman in *GWG* from May through August, and then October, 2022. *Id.* at 4, 14; Exhibit B, Second Monthly Fee Statement, Exhibit C at 6–8 (pdf. pp. 41, 43); Exhibit C, Third Monthly Fee Statement, Exhibit C at 2–3 (pdf. p. 53–54); *GWG*, ECF No. 1521, Jackson Walker's Second Interim Fee Application, Exhibit A, Fourth Monthly Fee Statement, Exhibit C at 2 (pdf. p. 15); Exhibit C, Sixth Monthly Fee Statement, Exhibit C at 7, 10–11 (pdf. pp. 48, 51–52).

[15] Jackson Walker billed $1,255,400.50 in gross fees, including Freeman's time billed both as a partner and through her law firm. GWG, No. 22-90032, ECF No. 2158. Freeman billed $23,415.00 in November 2022 as a Jackson Walker partner and $201,675.00 through her firm from December 2022 through June 2023 for a combined total of $225,090.00. *Id.* $225,090.00 / $1,255,400.50 = 18.2%

15.    The Litigation Trustee takes a deceptively narrow perspective of Jackson Walker's role in mass fraud on the United States Bankruptcy system. In his view, Jackson Walker's concealment of the relationship did not become actionable until November 30, 2022, when Jackson Walker and Freeman moved for Jones' appointment as mediator without disclosing it. The Litigation Trustee views GWG in a vacuum as if Jones, Freeman, and Jackson Walker had not also targeted dozens of distressed entities to pilfer. And he ignores that they were discussing how to keep a lid on the relationship all along in the GWG bankruptcy.

16.    To be sure, Jones, Jackson Walker, and Freeman did not just decide on the day they filed the motion to appoint Jones that they would bring him into the case while concealing the relationship. The motion to appoint itself notes that they had already spoken with Jones about his availability.[16] Meanwhile, ahead of the motion, Freeman was billing for "[d]evelop[ing] litigation and plan structuring strategy."[17] Ironically, around a week before moving for Jones' appointment, Freeman billed for work on "disclosure items for professionals[.]"[18] The Litigation Trustee's narrow view of Jackson Walker's misconduct as limited to nondisclosure simply ignores the bigger picture, which of course inures to Freeman's and Jackson Walker's benefit at the expense of the GWG estate.

17.    The Litigation Trustee also ignores that Jackson Walker filed a supplemental declaration of disinterestedness on October 6, 2022, averring that they searched and reviewed the "Firm's conflicts system database" and updated their disclosures to include Schedule 1.[19]

---

[16] *GWG*, No. 20-90032, ECF No. 1128 at ¶ 22.

[17] *Id.* at ECF No. 2158 at pdf. p. 145.

[18] *Id.* at ECF No. 1878, Jackson Walker's Third Interim Fee Application, Ex. A, Seventh Monthly Fee Statement, Ex. C at 12 (pdf p. 25).

[19] *Id.* at ECF No. 828 ¶¶ 8, 9.

Under Schedule 1(n), the Firm listed "N/A" as to any conflicts with "Bankruptcy Judges for the Southern District of Texas[.]"[20] Even though they had not yet brought Jones into the case, it was a knowingly false statement for Jackson Walker to represent on October 6, 2022 that it had no conflict with any bankruptcy judges in the Southern District.

18.     Jackson Walker ultimately submitted more than $200,000 in billing from Freeman as a partner and through her newly formed entity, The Law Office of Liz Freeman.[21] This included Freeman billing for mediation before Jones.[22]

19.     On November 30, 2022, GWG's counsel Jackson Walker filed a motion seeking to have Judge Jones appointed as mediator in the GWG bankruptcy.  Jackson Walker knew when it filed that motion about the domestic relationship between Judge Jones and Jackson Walker's partner Elizabeth Freeman.  The motion was not just a failure to disclose; it was an unmitigated betrayal of the duties owed to GWG and was the very act that brought that corrupt relationship from the background to the forefront of the GWG bankruptcy.

20.     The mediation led by Judge Jones for this Houston bankruptcy of a Dallas-based company was conducted in New York City. Freeman, as debtor's co-counsel, was also in New York when Jones declared the company would not be reorganized but liquidated instead. On cue, Freeman then accepted a role as "trustee," after which she was complicit in the squandering of the bankruptcy estate with no recovery to stakeholders from GWG's substantial original assets. This series of corrupt decisions wrought irreparable damage to the

---

[20] *Id.* at ECF No. 828 at schedule 1(n) (pdf p. 20).

[21] *Id.* at ECF No. 2158, Jackson Walker's Fourth and Final Fee Application, Fourteenth Monthly Fee Statement, Ex. 3 (pdf p. 273).

[22] *Id.* at ECF No. 2158 at PDF pp. 179–80, 195.

company and thousands of stakeholders. Jackson Walker was obligated to put GWG's interests above its own and it failed completely.

21.     The Litigation Trustee offers, "[o]n information and belief, it was not Jackson Walker that suggested Ms. Freeman as the Wind Down Trustee."[23] Since the statement is made on information and belief, the Litigation Trustee ostensibly did not get an affidavit from Jackson Walker. Regardless, Jackson Walker advocated for approval of the plan that appointed her without disclosing what it unquestionably knew—the mediator and Freeman were in an intimate, live-in relationship.

22.     After Freeman took over, she quickly liquidated the trust assets so there were funds to pay the professionals (including herself at the rate of $50,000 per month), while at the same time wasting away the bondholders' value. Freeman inherited a life settlements portfolio worth $800 million and equity holdings and interests in Beneficient valued at approximately $1.7 billion.[24] The BEN stock became worthless because Freeman filed an emergency motion—again without disclosing her conflicts of interest and ulterior motives to Plaintiffs, other stakeholders, or the bankruptcy court—to sell all the stock on the day of the IPO which caused the price to plummet as they quickly then flooded the market with GWG's substantial holdings.[25] This despite SEC regulations and lock-up agreements that required the estate to dribble out the shares to avoid collapsing the market with too much supply while divesting of the BEN shares, as well as over proposals by BEN to repurchase its own stock at much higher prices than Freeman sold.[26] Likewise, with the nearly $800 million in the life settlement

---

[23] Motion at ¶ 17.

[24] *Peterson*, No. 25-2761, Complaint, ECF No. 1 at ¶ 106.

[25] *Id.*

[26] *Id.* ¶¶ 106–08.

portfolio and cash assets on hand pre-petition, Freeman accrued $277 million in debt during her tenure and realized only $10 million in her fire sale of the portfolio[27]. The only benefit of operating in this fashion was to obtain quick and easy cash to pay the fees for Freeman and other bankruptcy professionals.

23.    Jones publicly acknowledged the relationship in October 2023 and resigned the same month. The Litigation Trustee has taken no action to prosecute claims against Freeman or remove her as Wind Down Trustee. Instead, he continues to acquiesce to her ongoing collection of fees from the plan that she set up with her live-in boyfriend as mediator. And he attempts to release her personally as well, without telling the Court as much, through this proposed settlement with Jackson Walker.

## ARGUMENT & AUTHORITIES

### I.    The Settlement Should be Rejected.

24.    In considering whether to approve a settlement, courts consider (a) the probabilities of success in the litigation, with due consideration for uncertainty in fact and law; (b) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and (c) all other factors bearing on the wisdom of the compromise. *In re Beach*, 731 F. App'x 322, 325 (5th Cir. 2018) (internal citations omitted). The Fifth Circuit has identified two additional factors: (i) whether the compromise serves "the best interests of the creditors, with proper deference to their reasonable views"; and (ii) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *In re Age Ref., Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). "The trustee bears the burden of establishing that the balance of the above factors supports a finding that the compromise is fair, equitable, and in

---

[27] *Id.* ¶ 109.

the best interest of the estate." *In re DeRosa-Grund*, 567 B.R. 773, 785 (Bankr. S.D. Tex. May 19, 2017).

> ### A.    With Freeman on Both Ends of the Settlement, it is a Product of Fraud and Collusion.

25.    The settlement smacks of collusion. On the one hand, Freeman as Wind Down Trustee confers and works in cooperation with the Litigation Trustee in determining what matters to prosecute and settle. He must confer with Freeman before bringing any cause of action.[28] He is required to cooperate with the Wind Down Trustee, which includes communicating, conferring, and coordinating efforts "on a regular basis" for any litigation and settlements.[29] Freeman and Jackson Walker crafted the plan that put him in the position of Litigation Trustee, and he was appointed by a committee represented by Freeman's ex-husband's firm. Whatever the Litigation Trustee's equivocal statements on Freeman's input mean, he was required under the plan and litigation trust agreement to confer with her.

26.    On the other hand, Freeman is a party being released for fraud on the estate potentially involving billions of dollars. Freeman is effectively releasing herself and her former firm for their fraud. And because she is still Wind Down Trustee, she can pay herself with the proceeds once they are distributed to the Wind Down Trust. Because Freeman is "effectively on both

---

[28]    *GWG*, No. 22-90032, ECF No. 1910 at ¶ 2.1 ("The Wind Down Trustee and the Litigation Trustee shall communicate on a regular basis, confer and coordinate efforts to maximize the ultimate recovery by the Wind Down Trust Beneficiaries from distributions from the Wind Down Trust, including anticipated transactions involving Wind Down Trust Assets and initiation of litigation/settlements involving Litigation Trust Assets"); *see also id.* p.2 ("the sole purpose of the Litigation Trust is to hold and liquidate the Litigation Trust Assets in a manner consistent with the Plan and the terns of this Agreement, in cooperation with the Wind Down Trustee…."); ¶ 1.5(a) (also requiring "cooperation with the Wind Down Trustee"); ¶ 2.1 ("The Wind Down Trustee and the Litigation Trustee shall communicate on a regular basis, confer and coordinate efforts to maximize the ultimate recovery by the Wind Down Trust Beneficiaries from distributions from the Wind Down Trust, including anticipated transactions involving Wind Down Trust Assets and initiation of litigation/settlements involving Litigation Trust Assets").

[29]    *Id.*

sides of the settlement," the Court should find "an inference of collusion." *Folsom Lodging LLC v. Daikin N. Am. LLC*, 2021 Cal. Super. LEXIS 137689 *10–11; *see also Overrated Prods. v. Universal Music Grp.*, 2019 U.S. Dist. LEXIS 216107, *12 (C.D. Cal. Jul. 31, 2019) ("[a]n assignment is presumptively collusive where the assignor and assignee are so closely related as to present an "excellent opportunity for manipulation") (citations omitted).

27.     The Litigation Trustee's inherent structural conflict festered its way into the proposed settlement he presents to this Court. First, the Litigation Trustee inexplicably releases Freeman without any consideration from her.[30] Second, he broadly releases Jackson Walker for its leveraging of the Jones-Freeman relationship in the GWG bankruptcy while narrowly construing the claims against the firm as merely involving *some* of the $1 million+ in fees awarded. He also purports to release the much broader claims asserted by Plaintiffs for the much broader harm to the bondholders.[31]

28.     Third, because the Litigation Trustee has acquiesced to Freeman remaining in her position as Wind Down Trustee, once the settlement funds make their way into the Wind Down Trust, she can use them to pay herself still more fees (Freeman has budgeted over $600,000 in fees for herself for the next year).[32]

29.     Fourth, the Litigation Trustee has agreed to make the settlement contingent upon full approval by this Court of *all* Jackson Walker's fees.[33] If this Court disagrees with any aspect

---

[30] Proposed Settlement, ¶ 4(a).

[31] Proposed Settlement, ¶ 4(a) (releasing Jackson Walker for, among other things, "any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the GWG Litigation Trust against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions").

[32] *GWG*, No. 20-90032, ECF No. 2570-1 (exhibit to GWG Wind Down Trust Budget).

[33] Motion, at ¶ 29 ("The Proposed Settlement is conditioned on the Court's approval of JW's final fee application currently pending in the Bankruptcy Case, as reflected in the Approval Order attached as an exhibit to the

of the pending fee motion and denies the relief sought, the settlement agreement is void. The Litigation Trustee and Jackson Walker are attempting to coerce this Court into full approval notwithstanding serious problems with the motion—including compensating Freeman for mediating before Jones while hiding the relationship from bondholders and others in the GWG bankruptcy.

30.     Fifth, the settlement releases the Litigation Trustee himself.[34] Absent from the agreement is any discussion about what conduct the Litigation Trustee requires a release for and/or what specific consideration was given up in exchange for it. To the extent the Litigation Trustee suggests this is simply a matter of form, the agreement provides in all caps and bold that all terms were negotiated and are not mere boilerplate.[35]

31.     The settlement reveals one thing—the Litigation Trustee is hopelessly conflicted and cannot be entrusted with pursuing (read burying) claims against Jackson Walker or Freeman.

**B.      The Settlement is a Net Payout by the Victims of Jackson Walker's Fraud and is Not in the Best Interests of the Estate or the Bankruptcy System as a Whole.**

32.     The proposed $405,000 settlement is a ridiculously low sum for the proposed release. Indeed, the Litigation Trustee had to resort to combining the settlement with two others in order to demonstrate its supposed benefits because the Jackson Walker settlement's proceeds alone are so infinitesimal in the context of the bondholders' losses. The $405,000 gross settlement is a paltry portion of the $5.1 million the Litigation Trustee references from the aggregate three settlements.

---

Settlement Agreement. If the Proposed Settlement is not approved by the Court, including the approval of JW's final fee application, the Parties revert to their respective positions immediately prior to the execution of the Proposed Settlement"); *see also* Proposed Settlement, ECF No. 100-1 ¶ 2(a).

[34] Proposed Settlement at ¶ 4(b).

[35] *Id.* at ¶ 7.

33.    The approximate $224,000 that would actually reach the bondholders from the proposed Jackson Walker settlement is around 17% of the firm's total fees and expenses and less than the $228,572.81 billed by Freeman alone between November 2022 and June 2023.[36] Again, because the settlement is contingent on this Court's approval of additional fees, the end result is money flowing out of the estate, not into it.

34.    Paying the bondholders less than $9 each on average does not serve their best interests when Jackson Walker conspired with Freeman and Jones to gut the company for professional fees. It would pay bondholders around 0.01% of their approximate $1.6 billion in damages. The delay that would accompany pursuit of actual, meaningful redress far outweighs acceptance of a nuisance settlement now.

### C.    The Conflicted Litigation Trustee Dismisses Valuable Claims without Having Tested Any of Them.

35.    The Litigation Trustee offers no explanation for letting Freeman off the hook for nothing. As to Jackson Walker's *de minimis* settlement, he presents a series of pretexts.

#### 1.    Jackson Walker deliberately concealed the relationship for profit and the Litigation Trustee's "investigation" that supposedly failed to find evidence of the same demonstrates his conflict and his unwillingness to legitimately pursue claims against the firm and Freeman.

36.    According to the Litigation Trustee, Jackson Walker is only liable for mere nondisclosure of the conflict. He does not grapple with the certainty that, in fact, the firm's conduct was intentional. The firm did not accidentally move to appoint Jones at a time when it indisputably knew he was in an intimate relationship with Freeman. And it did not

---

[36] *GWG*, No. 22-90032, Jackson Walker's Fourth and Final Fee Application, ECF No. 2158 & exhibits. Freeman billed $23,415 in attorneys' fees while at Jackson Walker in November 2022 and $205,157.81 in fees and expenses with the Law Office of Liz Freeman from December 2022 through June 2023.

accidentally fail to disclose when it advocated for a plan that appointed Freeman as Wind Down Trustee at Jones' insistence.

37.    Nevertheless, the Litigation Trustee claims he found no evidence of a fraudulent scheme by Jackson Walker. The extent of his investigation was review of "hearing transcripts, court filings, and other materials…."[37] Of course, Jackson Walker would never announce its plan to prey on GWG as a distressed entity through the Jones-Freeman relationship during hearings or in filings. To say there is no evidence of deliberate concealment for profit is to ignore Jackson Walker's undeniable pattern of concealment of the relationship for profit across myriad mega-bankruptcies.[38] The Litigation Trustee hopes to abandon these claims without filing a lawsuit, conducting discovery, or engaging in any meaningful or transparent investigation.

---

[37] Motion at ¶ 46.

[38] *See e.g., In re Westmoreland Coal Company, et al.*, No. 18-35672; *In re Jones Energy, Inc., et al.*, No. 19-32112; *In re McDermott*, No. 20-30336; *In re Sheridan Holding Company, I, LLC*, No. 20-31884; *In re Whiting*, No. 20-32021; *In re Seadrill Limited*, No. 21-30427; *In re Brilliant Energy, LLC*, No. 21-30936; *In re Basic Energy Services, Inc.*, No. 21-90002; *In re Strike LLC*, No. 21-90054; *In re Seadrill New Finance Limited*, No. 22-90001; *In re 4E Brands Northamerica LLC*, No. 22-50009; *In re Sungard AS New Holdings*, No. 22-90018; *In re LaForta Gestao e Investments*, No. 22-90126; *In re Hornbeck Offshore Services, Inc., et al.*, No. 20-32679; *In re Stage Stores,* Inc., et al., No. 20-32564; *In re Neiman Marcus Group LTD, LLC., et al.*, No. 20-32519; *In re JC Penny, Company Inc.*, No. 20-20182; *In re Chesapeake Energy Corporation*, No. 20-33233; *In re Covia Holdings Corporation, et al.*, No. 20-33295; *In re Volusion, LLC*, No. 20-50082; *In re Denbury Resources Inc., et al.*, No. 20-33801; *In re iQor Holdings Inc., et al.,* No. 20-34500; *In re Bouchard Transportation Co., Inc., et al.,* No. 20-34682; *In re Tug Robert J. Bouchard, Corporation*, No. 20-34758; *In re Gulfport Energy Corporation*, No. 20-35562; *In re Mule Sky LLC, et al.*, No. 20-35561; *In re Seadrill Partners, LLC, et al.*, No. 20-35740; *In re Katerra Inc., et al.*, No. 21-31861.

**2.    Jackson Walker had a legal duty to disclose the relationship and the Litigation Trustee's suggestion to the contrary confirms it had no intention of earnest pursuit of the claims against the firm.**

38.    Remarkably, the Litigation Trustee suggests—as a serious defense—that Jackson Walker "had no duty to disclose any connections to a mediator in the GWG bankruptcy case[.]"[39] In the Litigation Trustee's view, this could "significantly limit" recovery.[40]

39.    The Litigation Trustee's understanding of the law on this point is badly mistaken. Jackson Walker affirmatively represented to all bankruptcy participants in its supplemental declaration of disinterestedness that it had no conflict with any bankruptcy judge in the Southern District and then moved to appoint Jones. Having made the false representation to the Court and all bankruptcy participants, the firm had an affirmative duty to correct their false representation. "Full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)); *In re Ward*, 894 F.2d 771, 776 (5th Cir. 1990) ("Naturally, if there is a duty to supply correct information it can be breached by omission as well as by affirmative misrepresentation").

40.    The Litigation Trustee is mistaken that the duty to disclose only arose when Jackson Walker moved for mediation on November 30, 2022. In fact, it arose at least by October 6, 2022, when the firm falsely informed the Court and bankruptcy participants that it had no conflicts with *any* bankruptcy judge in the Southern District. The Litigation Trustee is leaving nearly two months of billing off the table.

---

[39] Motion at ¶ 6.

[40] *Id.*

16

41.    Additionally, once Jackson Walker moved to appoint Jones with Freeman still at the firm, it was required by Bankruptcy Rule 2014 to disclose any facts relevant to the bankruptcy court's determination of eligibility to be retained under 11 U.S.C. § 327.

42.    The Bankruptcy Court for the Southern District of Texas has held that mediators are "governed by the provisions of the Code and Rules regulating employment of professional persons[,]" including § 327 and Rule 2014. *In re Smith*, 524 B.R. 689, 695 (Bankr. S.D. Tex. 2015). Under Section 327, a bankruptcy estate may only employ "attorneys . . . or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327. The definition of "disinterested person" includes a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C) (emphasis added). "[H]iding a romantic relationship that includes a million-dollar-plus home jointly owned by a judge and a lawyer would fit into the category of 'any other reason.'" Nancy B. Rappaport, Am I My Colleague's Keeper When It Comes to Disclosing Connections?, 40 EMORY BANKR. DEV. J. 334, 373 (2024).

43.    As a partner at Jackson Walker, Freeman (and her firm by association) were not disinterested where she represented a party in a mediation before Jones. Because her relationship with Jones was relevant to whether she continued to meet Section 327's eligibility requirements if Jones was appointed mediator, she and Jackson Walker were obligated to disclose it under Bankruptcy Rule 2014. Freeman's interest in remaining counsel for the estate—and her and Jackson Walker's interest in keeping the relationship secret to avoid

challenges to compensation in cases where Jones presided as a judge or mediator—conflicted with the estate's interest in having an impartial mediator and also required disclosure. That duty was and is ongoing. *See In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005). The retention order appointing Jackson Walker (and Freeman as its partner), recognized as much, requiring counsel "to ensure that no conflicts or other disqualifying circumstances exist or arise" and to "promptly" disclose them if they do.

44.     Jackson Walker and Freeman also had a duty to disclose the conflict under the Local Rules of the Southern District of Texas. Local Rule 16.4.I(2) provides that "[i]ssues concerning potential ADR provider conflicts shall be raised with the judge presiding in the case relating to the ADR proceeding." The Local Rules also make 28 U.S.C. § 455 disqualification standards applicable to mediators. Jones' impartiality would reasonably be questioned under Section 455(a), and Freeman was the equivalent of a spouse under Section 455(b)(5). Because Jones was prohibited from serving as a mediator under both 455(a) and (b), Jackson Walker and Freeman were obligated to disclose the conflict to Judge Isgur.

45.     Jackson Walker's obligation to disclose is also "founded upon the fiduciary obligation owed by counsel for the debtor to the bankruptcy court." *In re Futuronics Corp.*, 655 F.2d 463, 470 (2d Cir. 1981) (cleaned up); *see also In re EWC, Inc.*, 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992) ("professionals performing duties for the estate are held to high fiduciary standards, and act as officers of the court"). "An attorney retained pursuant to Section 327(a) assumes a fiduciary responsibility to refrain from rendering any unauthorized service in furtherance of an interest adverse to the client he serves by court appointment." *Rome v. Braunstein*, 19 F.3d 54, 62 (1st Cir. 1994). The fiduciary duty includes the duty "to disclose any actual or potential conflicts of interest with the estate." *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 850 (B.A.P.

18

10th Cir. 1997); *see also ICM Notes, Ltd. v. Andrews & Kurth, L.L.P.*, 278 B.R. 117, 123–24 (S.D. Tex. 2002) ("counsel of a debtor-in-possession owes certain fiduciary duties to both the client debtor-in-possession and the bankruptcy court . . . including . . . [a] duty . . . to disclose any actual or potential conflicts of interest with the estate"), *aff'd*, 324 F.3d 768 (5th Cir. 2003).

### 3. The fact that Jones was not presiding over the GWG bankruptcy, but Jackson Walker still interjected him to control the outcome makes the case against the firm stronger, not weaker.

46.     The Litigation Trustee misunderstands the import of Jones not presiding over the GWG bankruptcy. The fact that Jackson Walker interjected Jones into the case only demonstrates their fraudulent scheme was even more intentional and duplicitous than in other cases because the firm still secured Jones' influence and control. As described in Plaintiffs' complaint, Jackson Walker and Freeman interjected Jones into the case at a time when Freeman and Jackson Walker were preparing to amicably and quietly separate rather than finally disclose the relationship. Without disclosing the relationship, Jackson Walker and Freeman moved for Jones' appointment as mediator and filed their motion at a time when their disclosures indicated "N/A" for the section concerning Bankruptcy Judges for the Southern District of Texas. And Freeman even argued during the hearing on the motion that Jones should be appointed to "help keep everybody within the guardrails that would be appropriate."  All the while, Jackson Walker and Freeman kept the disqualifying relationship secret. These facts are arguably even more egregious than instances in which Freeman and Jackson Walker plotted in advance for a case to assigned to Jones.

4.    **The Litigation Trustee's unsupported conclusions on causation and damages are misguided and demonstrate predetermination in favor of Jackson Walker.**

47.    The Litigation Trustee falsely concludes that the estate was not harmed by Jackson Walker's fraud. Here, the Litigation Trustee is oblivious to Freeman's reckless wasting of assets and the near complete devaluation of bonds/Wind Down Trust interests that followed. *See infra* ¶ 22. This case is thus nothing like *In re GHR Energy Corp.*, 60 B.R. 52, 68 (Bankr. S.D. Tex. 1985), cited by the Litigation Trustee, where disgorgement was not required because there was no harm to the estate. By contrast, Jackson Walker's coverup of the Jones-Freeman relationship, placing Jones in the position of mediator and Freeman as Wind Down Trustee, caused the near complete devaluation of the bonds/Wind Down Trust interests and gutted the GWG estate. Also, not surprisingly, *GHR Energy* did not involve a law firm's deliberate concealment of a relationship between its key restructuring partner and a judge whom it moved to appoint as mediator.

48.    The Litigation Trustee's causation argument fundamentally misunderstands Plaintiffs' claims. Plaintiffs do not merely assert legal malpractice. Rather, they allege causes of action based on Jackson Walker's intentional misconduct in targeting distressed entities to plunder for professional fees and aggrandizement. These claims include fraud, conspiracy, and violations of the RICO statute, among others. The Litigation Trustee cites no case in which a court imposed the suit-within-a-suit standard to these causes of action,[41] and Plaintiffs could

---

[41] *See* Motion at ¶ 50 (citing *In re Segerstrom*, 247 F.3d 218, 225 (5th Cir. 2001) (suit-withing-a-suit applicable to legal malpractice and breach of fiduciary duty claim); *Haddy v. Caldwell*, 403 S.W.3d 544, 546 (Tex. App.—El Paso 2013) (applying suit-within-a-suit causation to a legal malpractice claim); *Land Ventures for 2, LLC v. Fritz*, 551 B.R. 846, 852–53 (M.D. Ala. 2015) (in a legal malpractice claim brought under the Alabama Legal Services Liability Act, party was required to show proceeding would have been resolved more favorably).

find none. As such, these claims do not require proof that the proposed restructuring plan would have been successful.

49.     In any event, the Litigation Trustee provides scant support for his insistence that he would be unlikely to recover damages based on the theory that Jackson Walker and Feeman obstructed confirmation of a viable organization plan. Moreover, the Litigation Trustee's characterization of Plaintiff's argument is a straw man—Plaintiff has never asserted that the law firm and Freeman committed this obstruction all on their own but did so in concert and in a long-running conspiracy with Jones. And of course, regardless of whether the alternative plan was approved, Freeman, along with her co-conspirators Jackson Walker and Jones, wasted assets of the bankruptcy estate leaving nearly no recovery to stakeholders from GWG's considerable original assets.

50.     The Litigation Trustee also argues that it was not certain that the proposed plan going into mediation would have obtained enough votes to be implemented because the Bondholder Committee was opposed to any plan that converted debt into preferred equity and that GWG's pre-petition management was under investigation. This argument first ignores that the plan was proposed by the Chief Restructuring Officer, Jeffrey Stein *after* GWG's pre-petition management was threatened into resignation. It further discards without any analysis or reasonable consideration of the merits of the proposed plan—just like Jones did when he did not allow the parties to mediate the proposed restructuring plan and unilaterally dictated that GWG would be liquidated.

51.     To the contrary, GWG's proposed restructuring plan would have preserved the superiority of the bondholders' interests with a preference over every other security in the capital structure—the same priority as in the pre-bankruptcy company. Further, the proposed

21

plan would have registered the new preferred stock so that bondholders would have more liquidity with a market available immediately after the company emerged from bankruptcy versus the bonds that had to be held until maturity. The proposed plan would have allowed bondholders, soon-to-be preferred stockholders, significant liquidity which the liquidation plan, now three years post-filing, will never provide.

52.     Regardless, the Litigation Trustee's defense of his own investigation of this pivotal issue is simply not plausible. He contends that he found that "certain core allegations" made by Holland and others relating to this obstruction "lacked factual support."[42] Again, the Litigation Trustee only investigated the matter by reviewing "hearing transcripts, court filings, and other materials" and concluding from this paperwork that there was "no evidence supporting this theory."[43] This is hardly a comprehensive, diligent investigation. None of these hearing transcripts involved testimony by Holland, for example, nor were any of these transcripts of testimony in proceedings involving Holland. Moreover, common sense would dictate that the co-conspirators are unlikely to confess to this brazen scheme in formal testimony, especially when no one asked them about it. Tellingly, the Litigation Trustee never attempted to interview Mr. Holland about this central issue, nor, upon information and belief, even attempted to interview any of the other participants with relevant knowledge. Scanning through pleadings and transcripts from the comfort of a desk is patently insufficient to discharge a litigant's duties to fully and diligently investigate an opposing litigant's factual claims. The Litigation Trustee's unsupported and undocumented "conclusion" about the Jones-Freeman-Jackson Walker obstruction scheme should be dismissed.

---

[42] Motion at ¶ 46.

[43] Id.

53.    The Litigation Trustee also relies upon his own document review, "concerns" raised by others and allegations raised by other law firms to reach the conclusions that GWG was doomed when it sought bankruptcy protection and that its management had engaged in misconduct. He makes much of a Form 8-K filed with the SEC in March of 2021, alleging that GWG management materially misstated that two committee board members resigned without any dispute.[44] The Trustee fails to address that the Form 8-K at issue was filed after receipt of advice by Mayer Brown—GWG's lead bankruptcy counsel that settled the Litigation Trustee's claims against it for $30M or approximately *all* they fees they billed in the bankruptcy proceeding. The Trustee relies upon findings of yet another law firm that led to a later revision to the Form 8-K filing.

54.    He then touts an SEC investigation to support his conclusion that GWG management was not fit to continue to manage GWG. It is true that the SEC conducted a comprehensive, multi-year investigation of GWG and its management's operations, including exhaustive focus on the very transactions recited in the Motion that the Litigation Trustee claims he finds so nefarious. But the SEC's investigation does not help the Litigation Trustee or his misplaced factual claims. That is because the SEC, after intense scrutiny of these transactions and management's decisions, made the decision to close the investigation in mid-2024 with no enforcement action. Such declinations—especially after such a long-running and in-depth investigation—are a rare occurrence. Further, they stand in stark contrast to the minimal "investigation" conducted by the Litigation Trustee.

55.    The Trustee's contrary reliance on his own analysis (and that of another law firm) for the notion that the Form 8-K was materially misleading, along with his other conclusions

---

[44] Motion at ¶ 48.

about the conduct of GWG's management, is not reasonable in light of the SEC's termination of its investigation. The declination of any enforcement action by the SEC is the most compelling reason for concluding that: 1) the company was not doomed when it sought bankruptcy protection, 2) GWG's investment in Beneficient was not defective, 3) there were no violations or misconduct by GWG's management, and 4) the March 2021 Form 8-K was not materially misleading.

56.    The closure of the SEC investigation should have caused the Litigation Trustee to reconsider the conclusions he had reached and the claims he has made. Instead, he failed to legitimately investigate valuable claims and continues to rely on conclusions reached by others in past years who did not have access to the same investigative tools and information underlying the SEC's comprehensive investigation. The Litigation Trustee is hardly the superior expert in evaluating claims of corporate management misconduct. His claimed factual assertions, reached without the benefit of a diligent independent investigation of his own, cannot be reconciled with the SEC's conclusions.

57.    And of course, the Litigation Trustee has every reason to give short shrift to Plaintiffs' claims and defer to Freeman, who along with Jackson Walker, helped put him in his position, and with whom he was obligated to cooperate in consideration of the claims against Jackson Walker. The Litigation Trustee never had any intention of actually prosecuting claims against Jackson Walker, and it certainly never did against Freeman, whom he releases under the agreement for no consideration.

58.    The Litigation Trustee's reasons for failing to prosecute claims for the harm done to bondholders are mere excuses. His analysis is not in the best interests of the Wind Down

Trust interest holders and further demonstrates his conflict. The settlement should not be approved.

> **II.    Given the Litigation Trustee's Manifest Conflict, Plaintiffs Should be Granted Limited Special Appointment and/or Derivative Standing to Pursue the Claims Against Jackson Walker, Freeman, and Jones.**

59.    The Litigation Trustee uses expense as a justification for not pursuing the claims that Plaintiffs have already raised and intend to seek standing to pursue in *Peterson v. Jones, et al.* As described in Plaintiffs' complaint, they intend to move for special limited appointment and/or derivative standing to pursue claims on behalf of those harmed by Jackson Walker, Jones, and Freeman.[45] As part of that forthcoming motion, Plaintiffs' counsel are offering to front the expenses for the litigation, with reimbursement of expenses contingent upon a recovery. Allowing Plaintiffs to pursue these claims will not burden or diminish the estate's limited resources if there is no recovery.

60.    As evidenced by the abysmal settlement submitted by the Litigation Trustee, if Plaintiffs are not granted standing to pursue these claims, the bondholders will never receive real redress from the Jones-Freeman-Jackson Walker conspiracy.

## CONCLUSION

61.    For the foregoing reasons, Plaintiffs respectfully request that this Court deny the Litigation Trustee's Motion for Entry of an Order Approving Settlement Agreement with Jackson Walker LLP. This Court should instead grant limited special appointment and/or derivative standing to Plaintiffs based on their forthcoming motion. Plaintiffs request such other and further relief to which they may be entitled at law or in equity.

Dated: October 24, 2025

---

[45] *Peterson*, ECF No. 1 at ¶ 142.

Respectfully submitted,

By:  /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
Bandas Law Firm, P.C.
555 N. Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

## Certificate of Service

I hereby certify that on October 24, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Mikell A. West*