United States District Court
Southern District of Texas
**ENTERED**
July 10, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No: 4:23-cv-4787** |
| **Professional Fee Matters Concerning the** | § | |
| **Jackson Walker Law Firm** | § | |

## REPORT AND RECOMMENDATION
## TO THE UNITED STATES DISTRICT COURT

**TO THE HONORABLE ALIA MOSES, CHIEF UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS**

### I.    INTRODUCTION

A court's authority ultimately depends on the public's confidence in the integrity of its proceedings. Concealing material facts undermines that confidence and invites doubt where transparency would inspire trust. That is why Justice Brandeis observed that "[s]unlight is said to be the best of disinfectants."[1] Former United States Bankruptcy Judge David R. Jones' undisclosed romantic relationship with Elizabeth Freeman, a former partner at Jackson Walker LLP, triggered a series of events that led the Fifth Circuit Court of Appeals to file a formal complaint against him, resulting in his resignation just days later. Subsequently, Kevin Epstein, the United States Trustee for Region 7, who covers both the Southern and Western Districts of Texas, filed motions for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 approving the retention and compensation applications of Jackson Walker LLP in thirty-three (33) separate bankruptcy cases, seeking vacatur of Jackson Walker

---

[1] Louis D. Brandeis, *Other People's Money—and How the Bankers Use It* 92 (1914).

LLP's retention and final fee orders, and seeking disgorgement of fees paid to Jackson Walker LLP.

Commencing on May 13, 2025, the bankruptcy estates of Brilliant Energy, LLC, The Seadrill Partners, LLC,  Sungard AS New Holdings, LLC, Old Copper Company Inc. f/k/a J. C. Penney Company Inc. and Copper Sub Corporation, Inc. f/k/a J. C. Penney Corporation, Inc., as Wind Down Debtors In J. C. Penney Direct Marketing Services LLC, Auto Plus Auto Sales LLC, Strike Liquidating Trust, GWG Litigation Trust, Stage Stores, Inc., Basic Energy Liquidation Trust, and 4E Brands Northamerica LLC all filed Motions For Order Approving Compromise And Settlement Pursuant To Bankruptcy Rule 9019.

In her January 5, 2026 Order, the Honorable Alia Moses, Chief United States District Judge for the Western District of Texas, tasked this Court with issuing a report and recommendation as to whether ten (10) pending settlement motions should be approved before adjudicating the merits of the United States Trustee's Vacatur Motions; or, whether an alternative to approval exists that would best serve the interests of the affected parties while preserving the merits of the Vacatur Motions.

## II.    EXECUTIVE SUMMARY

1.    **The GWG Withdrawn Settlement:** As a preliminary matter, the GWG Settlement Motion is unique. On January 22, 2026, this Court recommended to the District Court that the GWG Settlement Motion be heard concurrently with the U.S. Trustee's Vacatur Motions.[2] On February 5, 2026, the District Court issued an order adopting this Court's January 22, 2026, Report and Recommendation and held that the GWG Settlement Motion will be heard at the consolidated trial on the Vacatur Motions and will remain abated until this Court reviews Chief Bankruptcy Judge Rodriguez's forthcoming report and further recommendations on the consolidated trial.[3] On March 12, 2026, the GWG Trustee and Jackson Walker filed a joint notice (the "*Notice of Withdrawal*")[4] withdrawing the GWG Settlement Motion, all related exhibits filed therewith, and the "Litigation Trustee's Reply Brief In Support Of The Motion For Entry Of An Order Approving Settlement Agreement With Jackson Walker LLP,"[5] each without prejudice.[6] The Notice of Withdrawal further terminated the proposed GWG Settlement, while preserving any causes of action the GWG Trust has or may have against Jackson Walker.[7] Jackson Walker, in turn, reserved all of its rights, claims, and defenses.[8] As such, the Court finds that no action is needed at this time as to the terminated GWG Settlement between the GWG Trust and Jackson Walker.

---

[2] Case No. 4:23-cv-04787, ECF No. 169.

[3] Case No. 4:23-cv-4787, ECF No. 181.

[4] Case No. 4:23-cv-4787, ECF No. 232.

[5] Case No. 4:23-cv-4787, ECF No. 106.

[6] Case No. 4:23-cv-4787, ECF No. 232.

[7] Case No. 4:23-cv-4787, ECF No. 232.

[8] Case No. 4:23-cv-4787, ECF No. 232.

On March 17, 2026, the Court commenced an evidentiary hearing on the remaining nine (9) proposed Settlements and concluded the hearing on March 19, 2026. If the Settlements are approved, Jackson Walker will return $4,785,000.00 of the $10,799,028.80 in fees and expenses finally awarded to it in the nine bankruptcy estates, resulting in an overall recovery of approximately 44% for the beneficiaries of those estates. Accordingly, consistent with the Settlements Referral Order, the jurisdictional limits imposed by 28 U.S.C. § 157, *Stern v. Marshall*,[9] and Federal Rule of Bankruptcy Procedure 9033, and for the reasons set forth herein, the Court issues the instant Report and Recommendation. This Report and Recommendation constitutes the Court's proposed findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9033. As explained more fully below, the Court recommends as follows:

2.    **Global Resolution:** APPROVAL of the global resolution[10] of "The U.S. Trustee's Omnibus Objection to Approval of Private Party Settlements that Preempt Adjudication of the U.S. Trustee's Rule 60(b) Motion"[11] filed on August 15, 2025, by the U.S. Trustee. Summarized, the Global Resolution states that Jackson Walker contends that the Vacatur Motions assert claims belonging to the bankruptcy estates. The U.S. Trustee, by contrast, contends that the Vacatur Motions seek relief that is independent of, and distinct from, any claims the bankruptcy estates may possess. The Parties acknowledge and agree that the Settlement Agreements neither resolve nor adjudicate the issues identified in the preceding paragraph. The Parties further acknowledge that the Settlement Agreements do not limit, restrict, or otherwise affect any court's authority or obligation to adjudicate the

---

[9] *Stern v. Marshall*¸ 564 U.S. 462, 480 (2011).

[10] Case No. 4:23-cv-4787, ECF No. 255.

[11] Case No. 4:23-cv-4787, ECF No. 93.

Vacatur Motions. If, over Jackson Walker's pending objections to the U.S. Trustee's standing or any of Jackson Walker's other pending objections, a court awards monetary relief on the Vacatur Motions in any of the settling cases, the applicable post-confirmation entities and/or the chapter 7 estate of Brilliant Energy, LLC, shall not be precluded from accepting payment from Jackson Walker. Jackson Walker may seek to introduce any Settlement Agreement into evidence in connection with the trial of the Vacatur Motions, and the U.S. Trustee reserves the right to object to the admission of any such Settlement Agreement. Nothing herein requires or prohibits any court from considering a Settlement Agreement in adjudicating the relief sought by the U.S. Trustee in the Vacatur Motions. All rights, claims, arguments, and defenses of Jackson Walker and the U.S. Trustee with respect to the Vacatur Motions are expressly preserved.

3.      **The U.S. Trustee's Omnibus Objection:** OVERRULE the "The U.S. Trustee's Omnibus Objection To Approval Of Private Party Settlements That Preempt Adjudication Of The U.S. Trustee's Rule 60(B) Motions"[12] filed on August 15, 2025, by the U.S. Trustee.

4.      **20-20184 & 25-2002 – The J. C. Penney Settlement:** APPROVAL of the J. C. Penney Settlement. Jackson Walker and J. C. Penney have agreed to a $1.4 million settlement. Had J. C. Penney prevailed at trial, the maximum potential recovery from Jackson Walker would have been approximately $4.15 million, consisting of $3,341,785.10 in fees paid to Jackson Walker for pre-petition, bankruptcy, and post-confirmation services, plus at least $808,209.51 in litigation expenses incurred by J. C. Penney in pursuing claims against Jackson Walker. After deducting $808,209.51 in litigation expenses already incurred by J. C. Penney, the settlement would yield net

---

[12] Case No. 4:23-cv-4787, ECF No. 93.

proceeds of approximately $591,790.49 for J. C. Penney and its creditors. Based on the testimony of Alan Carr, the co-plan administrator, and the evidence in the record, including the J. C. Penney Settlement Agreement and Global Joint Stipulation, the Court finds that Mr. Carr exercised sound business judgment in approving the settlement. Mr. Carr appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the J. C. Penney Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by J. C. Penney against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude J. C. Penney from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the J. C. Penney Settlement prevents J. C. Penney from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $1.4 million settlement is less than the approximately $4.15 million that might have been recoverable through a final trial on the merits, it exceeds the $1,101,482.21 awarded to Jackson Walker under the J. C. Penney Final Fee Order and avoids the risks and costs of further litigation. Finally, the Court finds that approval of the

settlement will not moot the U.S. Trustee's Vacatur Motion and that J. C. Penney remains obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

5.    **21-90054 – The Strike Settlement:** that the "U.S. Trustee's Objection To The Strike Liquidating Trust's Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019"[13] filed on January 22, 2026, by the U.S. Trustee be OVERRULED and recommends APPROVAL of the Strike Settlement. Jackson Walker and the Strike Trustee have agreed to a $440,000 settlement. Had the Strike Trustee prevailed at trial, the maximum potential recovery from Jackson Walker would have been approximately $1,344,711.20, consisting of $1,214,711.2 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus approximately $130,000 in litigation expenses incurred by the Strike Trustee in pursuing claims against Jackson Walker. After deducting $130,000 in litigation expenses already incurred by the Strike Trustee, the settlement would provide net proceeds of approximately $310,000 to the Strike Trust and its beneficiaries. Based on the testimony of Patrick Bartels, the trustee of the Strike Trust, and the evidence in the record, including the Strike Settlement and the Global Joint Stipulation, the Court finds that Mr. Bartels exercised sound business judgment in approving the settlement. Mr. Bartels appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Strike Settlement would not

---

[13] Case No. 4:23-cv-04787, ECF No. 171.

impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Strike Trust against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Strike Trust from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court concludes that the Strike Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $440,000 settlement amount is less than the approximately $1,344,711.20 that could potentially be recovered through a final trial on the merits, it represents nearly 50% of the $887,357.41 awarded to Jackson Walker for pre-confirmation services performed for the Strike Case. The settlement also enables beneficiaries of the Strike Trust to receive distributions without the expense, delay, and uncertainty of a trial while reducing the costs associated with maintaining the Strike Trust. Finally, although approval of the Strike Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Strike Trust and the Strike Wind-Down Debtors remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

6.      **23-90055 – The Auto Plus Settlement:** that the "U.S. Trustee's Objection To Auto Plus Auto Sales, LLC's Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019"[14] filed on January 22, 2026, by the U.S.

---

[14] Case No. 4:23-cv-04787, ECF No. 170.

Trustee, be OVERRULED, and recommends APPROVAL of the Auto Plus Settlement. Jackson Walker and the Auto Plus Plan Agent have agreed to a $500,000 settlement. If the Auto Plus Plan Agent prevailed at trial, the maximum potential recovery, excluding any unknown amounts related to post-confirmation services, would have been approximately $4,824,390.49, consisting of $4,814,345.49 in expenses and fees paid to Jackson Walker for services during the pendency of the bankruptcy case, plus approximately $10,045 in fees incurred by the Auto Plus Plan Agent in pursuing claims against Jackson Walker. After deducting $10,045 in litigation expenses already incurred by the Auto Plus Plan Agent, the settlement would yield net proceeds of approximately $489,955 for the Auto Plus Wind Down Debtor and its creditors. After considering the testimony of Patrick Bartels, the plan agent for the Auto Plus Wind Down Debtor, and the evidence of record, including the Auto Plus Settlement and Global Joint Stipulation, the Court finds Mr. Bartels exercised sound business judgment in approving the settlement. Mr. Bartels appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Auto Plus Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Auto Plus Plan Agent against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Auto Plus Plan Agent from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit,

and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Auto Plus Settlement prevents the Auto Plus Plan Agent from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Auto Plus Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $500,000 settlement amount is substantially less than the approximately $4,824,390.49 that could potentially be recovered through litigation, it represents nearly 11% of the $4,739,576 awarded to Jackson Walker under the Final Fee Order and the Auto Plus Plan Agent reasonably considered the uncertainty created by the lack of involvement of Former Judge Jones as a presiding judge in the bankruptcy case and the risks attendant to continued litigation. The settlement also provides a prompt and certain recovery for creditors without the expense, delay, and uncertainty associated with a trial on the merits. Finally, although approval of the Auto Plus Settlement will not moot the U.S. Trustee's Vacatur Motion, the Auto Plus Plan Agent and the Auto Plus Wind Down Debtor remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

7.    **20-35740 & 21-30427 – The Seadrill Settlement:** APPROVAL of the Seadrill Settlement. Jackson Walker and Seadrill have agreed to a $485,000 settlement. If Seadrill prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $1,444,112.30, consisting of $1,344,112.30 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus approximately $100,000 in litigation expenses incurred by Seadrill in pursuing claims against Jackson

Walker. After deducting $100,000 in litigation expenses incurred by Seadrill, the settlement would yield net proceeds of approximately $385,000. After considering the credible testimony of Nicole Anderson, the representative of Seadrill, and Phillip Eisenberg, counsel for Seadrill, and the evidence of record, including the Seadrill Settlement and Global Joint Stipulation, the Court finds that Seadrill exercised sound business judgment in approving the settlement. Seadrill appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, as well as demonstrated that settlement serves the paramount interest of Seadrill without impacting creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Seadrill Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by Seadrill against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude Seadrill from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. Moreover, the Court finds that Seadrill may receive potential funds beyond the $485,000 settlement amount without the need to reopen its bankruptcy case if it has been closed. The Court concludes that the Seadrill Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $485,000 settlement amount is less than the approximately $1,444,112.30 that could potentially be recovered through

litigation, it represents approximately 60% of the $791,867.30 awarded to Jackson Walker under the Seadrill Partners Final Fee Order and Seadrill Limited Final Fee Order. The settlement also provides a prompt and certain recovery, avoids the expense and delay of continued litigation, and reduces the costs associated with keeping a bankruptcy estate open. Finally, although approval of the Seadrill Settlement will not moot the U.S. Trustee's Vacatur Motions, Seadrill remains obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

8.    **21-30936 – The Brilliant Energy Settlement:** that the "United States Trustee's Objection to the Chapter 7 Trustee's Settlement Motion,"[15] filed on May 21, 2025, by the U.S. Trustee, be OVERRULED and recommends APPROVAL of the Brilliant Energy Settlement. Jackson Walker and the Chapter 7 Trustee have agreed to a $100,000 settlement. If the Chapter 7 Trustee prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $244,487.63, consisting of $188,610.13 awarded to Jackson Walker pursuant to the Brilliant Energy Final Fee Order, plus $55,877.50 in legal fees incurred by the Chapter 7 Trustee in pursuing claims against Jackson Walker. After deducting $55,877.50 in litigation expenses, the settlement would yield net proceeds of approximately $44,122.50 for the benefit of the Brilliant Energy estate and its creditors. After considering the credible testimony of Randy Williams, the Chapter 7 Trustee of the Brilliant Energy estate, and the evidence of record, including the Brilliant Energy Settlement and Global Joint Stipulation, the Court finds that Mr. Williams exercised sound business judgment in approving the settlement. Mr. Williams appropriately weighed the

---

[15] Case No. 4:23-cv-04787, ECF No. 71.

uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Brilliant Energy Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Chapter 7 Trustee against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Brilliant Energy estate or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Brilliant Energy Settlement prevents the Chapter 7 Trustee from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Brilliant Energy Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the settlement amount is less than the approximately $244,487.63 that could potentially be recovered through litigation, it represents approximately 53% of the $188,610.13 awarded to Jackson Walker pursuant to the Brilliant Energy Final Fee Order. The settlement also provides a prompt and certain recovery while avoiding the expense, delay, and uncertainty associated with continued litigation. Finally, although approval of the Brilliant Energy Settlement will not moot the U.S. Trustee's Vacatur Motion, the Chapter 7 Trustee and the Brilliant Energy estate remain obligated to cooperate with both the U.S. Trustee and

Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

9. **20-32564 – The Stage Stores Settlement:** APPROVAL of the Stage Stores Settlement. Jackson Walker and the Stage Plan Administrator have agreed to a $75,000 settlement. If the Stage Plan Administrator prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $184,746.15, representing fees paid to Jackson Walker for services rendered during the pendency of the bankruptcy case. Consummation of the Stage Stores Settlement would result in net proceeds of $75,000, less an unknown amount of attorney's fees incurred in pursuing claims against Jackson Walker, for the benefit of Stage Stores and its creditors. After considering the credible testimony of Steven Balasiano, the plan administrator of Stage Stores, and the evidence of record, including the Stage Stores Settlement and Global Joint Stipulation, the Court finds that Mr. Balasiano exercised sound business judgment in approving the settlement. Mr. Balasiano appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Stage Stores Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by Stage Stores against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude Stage Stores or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and

(v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Stage Stores Settlement prevents the Stage Stores Plan Administrator from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Stage Stores Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $75,000 settlement amount is less than the approximately $184,746.15 that could potentially be recovered through litigation, it represents approximately 40% of the $184,746.15 awarded to Jackson Walker under the Stage Stores Final Fee Order. The Court further finds that the costs, delay, and uncertainty associated with continued litigation, together with the expense of keeping the Stage Stores estates open, could outweigh any additional recovery beyond the settlement amount. Finally, although approval of the Stage Stores Settlement will not moot the U.S. Trustee's Vacatur Motion, the Stage Plan Administrator and Stage Stores remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

   **10.    22-90018 – The Sungard Settlement:** APPROVAL of the Sungard Settlement. Jackson Walker and Sungard have agreed to a $385,000 settlement. If Sungard were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $660,461.46, consisting of the approximately $535, 461.46 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus approximately $125,000 in litigation expenses incurred by Sungard in pursuing claims against Jackson Walker. After deducting $125,000

in litigation expenses already incurred by Sungard, the settlement would yield net proceeds of approximately $260,000 to Sungard and its creditors. After considering the credible testimony of Timothy Daileader, the representative of the Sungard plan administrator, and the evidence now in the record, including the Sungard Settlement and Global Joint Stipulation, the Court finds that Mr. Daileader, on behalf of the Sungard plan administrator, exercised sound business judgment in approving the settlement. Mr. Daileader appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion.  Furthermore, the Court finds that the Sungard Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Sungard Settlement: (i) only released any claims Sungard has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Sungard Settlement; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude Sungard or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Sungard Settlement prevents the Sungard Plan Administrator from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Sungard Settlement is fair, equitable, and in the best interest of the estate and its creditors.

Although the $385,000 settlement is less than the approximately $660,461.46 that might have been recoverable through a final trial on the merits, it represents approximately 92% of the $420,461.46 awarded to Jackson Walker under the Sungard Final Fee Order. Moreover, the Sungard Settlement could allow the creditors of Sungard to receive distributions without the expense and delay associated with a trial on the merits. Finally, although approval of the Sungard Settlement will not moot the U.S. Trustee's Vacatur Motion, the Sungard Plan Administrator and Sungard remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

    **11.   22-50009 – The 4E Brands Settlement:** that the "United States Trustee's Objection to Plan Agent David Dunn's Settlement Motion"[16] filed on May 20, 2025, by the U.S. Trustee be OVERRULED and recommends APPROVAL of the 4E Brands Settlement. Jackson Walker and the 4E Brands Plan Agent have agreed to a $617,000 settlement. If the 4E Brands Plan Agent prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $1,539,966.30, consisting of $1,287,484.93 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus $252,481.37 in litigation expenses incurred by the 4E Brands Plan agent in pursuing claims against Jackson Walker. After deducting in $252,481.37 litigation expenses already incurred by the 4E Brands Plan Agent, the settlement would yield net proceeds of approximately $364,518.63 for the benefit of 4E Brands and its creditors. After considering the credible testimony of David Dunn, the plan agent of 4E Brands, and the evidence of record, including the 4E Brands Settlement and Global Joint Stipulation, the Court finds

---

[16] Case No. 4:23-cv-04787, ECF No. 69.

that Mr. Dunn exercised sound business judgment in approving the settlement. Mr. Dunn appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the 4E Brands Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by 4E Brands against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude 4E Brands or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the 4E Brands Settlement prevents the 4E Brands Plan Agent from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the 4E Brands Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $617,000 settlement amount is less than the approximately $1,539,966.30 that could potentially be recovered through litigation, it represents approximately 71% of the $866,726.31 awarded to Jackson Walker under the 4E Brands Final Fee Order. The settlement also provides a prompt and certain recovery for creditors while avoiding the expense, delay, and uncertainty associated with continued litigation. Finally, although approval of the 4E Brands Settlement will not moot the U.S. Trustee's Vacatur Motion, the 4E Brands Plan Agent and 4E Brands remain

obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

12.    **21-90002 – The Basic Energy Settlement**: that "The United States Trustee's Objection To The Liquidating Trustee David Dunn's Settlement Motion Approval"[17] filed on May 20, 2025, by the U.S. Trustee be OVERRULED and recommends APPROVAL of the Basic Energy Settlement. Jackson Walker and the Basic Energy Trustee have agreed to a $783,000 settlement. If the Basic Energy Trustee prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $2,093,137.17, consisting of $1,939,207.34 paid to Jackson Walker for services performed during bankruptcy and post-petition, plus $153,929.83 in litigation expenses incurred by the Basic Energy Trustee in pursuing claims against Jackson Walker. After deducting $153,929.83 in litigation expenses already incurred by the Basic Energy Trustee, the settlement would yield net proceeds of approximately $629,070.17 for the benefit of the Basic Energy Trust and its creditors. After considering the credible testimony of David Dunn, the liquidating trustee of the Basic Energy Trust, and the evidence of record, including the Basic Energy Settlement and Global Joint Stipulation, the Court finds that Mr. Dunn exercised sound business judgment in approving the settlement. Mr. Dunn appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Basic Energy Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the

---

[17] Case No. 4:23-cv-04787, ECF No. 68.

settlement: (i) releases only claims held by the Basic Energy Trust against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Basic Energy Trust or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Basic Energy Settlement prevents the Basic Energy Trustee from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Basic Energy Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the settlement amount is less than the approximately $2,093,137.17 that could potentially be recovered through litigation, it represents approximately 50% of the $1,543,432.34 awarded to Jackson Walker under the Basic Energy Final Fee Order. The settlement also provides a prompt and certain recovery for creditors while avoiding the expense, delay, and uncertainty associated with continued litigation. Finally, although approval of the Basic Energy Settlement will not moot the U.S. Trustee's Vacatur Motion, the Basic Energy Trustee remains obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

## III.  REPORT

### A.  Introduction

David Dunn ("*Mr. Dunn*" or the "*Basic Energy Trustee*"), the liquidation trustee for the Basic Energy Liquidation Trust ("*Basic Energy Trust*");[18] David Dunn ("*Mr. Dunn*" or the "*4E Brands Plan Agent*"), the plan agent and sole manager, sole director, sole officer, and sole representative of 4E Brands Northamerica LLC ("*4E Brands*");[19] Randy W. Williams, Chapter 7 trustee (the "*Chapter 7 Trustee*" or "*Mr. Williams*") for Brilliant Energy, LLC ("*Brilliant Energy*");[20] Seadrill Partners LLC, as reorganized debtors, ("*Seadrill Partners*") and Seadrill Limited, as reorganized debtors ("*Seadrill Limited*," together with Seadrill Partners, "*Seadrill*");[21] Sungard AS New Holdings, LLC, the wind-down debtor ("*Sungard*") by and through Drivetrain LLC, as the plan administrator of Sungard (the "*Sungard Plan Administrator*");[22] Old Copper Company Inc. F/K/A J. C. Penney Company Inc. and Copper Sub Corporation, Inc. F/K/A J. C. Penney Corporation, Inc., as wind down debtors in J. C. Penney Direct Marketing Services LLC ("*J. C. Penney*");[23] Patrick Bartels (the "*Auto Plus Plan Agent*" or "*Mr. Bartels*") as plan agent for the wind down debtor in *In re Auto Plus Auto Sales LLC* (formerly *In re IEH Auto Parts*

---

[18] Bankr. 21-90002, ECF No. 1884. "Bankr.__." refers to docket entries made in the Settling Parties' respective underlying bankruptcy cases. "Bankr. Adv.__." refers to docket entries made in the Settling Parties' respective underlying adversary cases. References to the instant civil case shall take the format of "Case No. 4:23-CV-4787, ECF No.__."

[19] Bankr. 22-50009, ECF No. 715.

[20] Bankr. 21-30936; Case No. 4:23-CV-4787, ECF No. 57.

[21] Bankr. 20-35740; Bankr. 21-30427; Case No. 4:23-CV-4787, ECF No. 90.

[22] Bankr. 22-90018; Case No. 4:23-CV-4787, ECF No. 90.

[23] Bankr. 20-20184; Bankr. Adv. No. 25-2002; Case No. 4:23-CV-4787, ECF No. 96.

*Holding, LLC, et al.*) ("*Auto Plus Wind Down Debtor*");[24] Patrick Bartels (the "*Strike Trustee*" or "*Mr. Bartels*") as the trustee for the Strike Liquidating Trust ("*Strike Trust*");[25] Steven Balasiano ("*Mr. Balasiano*" or the "*Stage Plan Administrator*") solely in his capacity as the plan administrator for Stage Stores, Inc., and certain of its affiliates as wind-down debtors ("*Stage Stores*") in their jointly administered cases[26] (collectively, the "*Settling Parties*"); and Michael I. Goldberg (the "*GWG Trustee*") in his capacity as the Trustee of the GWG Litigation Trust Litigation ("*GWG Trust*")[27] filed motions (collectively, the "*Settlement Motions*") seeking entry of an order from this Court approving settlements (collectively, the "*Settlement Agreements*") with Jackson Walker, LLP ("*Jackson Walker*") pursuant to Federal Rule of Bankruptcy Procedure ("*Bankruptcy Rule*") 9019. Kevin Epstein, the United States Trustee for Region 7 covering the Southern and Western Districts of Texas (the "*U.S. Trustee*") filed a series of objections to the Settlement Motions.[28]

On Tuesday, March 17, 2026, the Court commenced an evidentiary hearing on the remaining nine (9) Settlement Motions which concluded on Thursday, March 19, 2026, and for the reasons stated herein recommends to the Honorable United States District Court that the pending Settlement Motions be approved in advance of trial on the merits of the U.S. Trustee's Vacatur Motions because such approval would not impact the U.S. Trustee's ability to present evidence or witnesses on any particular case at trial with respect to its

---

[24] Bankr. 23-90055; Case No. 4:23-CV-4787, ECF No. 97.

[25] Case No. 4:23-CV-4787, ECF No. 98

[26] Bankr. 20-32564; Case No. 4:23-CV-4787, ECF No. 98.

[27] Bankr. 22-90032; Case No. 4:23-CV-4787, ECF No. 100.

[28] *See e.g.*, Case No. 4:23-CV-4787, ECF No. 93.

pending Vacatur Motions and fee application objections; not impact the U.S. Trustee's ability to seek non-monetary relief, subject to Jackson Walker's rights and objections thereto; not impact the U.S. Trustee's ability to argue that a monetary sanction equal to the disgorgement of fees beyond the amounts settled is appropriate, subject to Jackson Walker's rights and objections thereto (including Jackson Walker's objections based on standing and settlement releases); not impact the Court's inherent ability to impose sanctions (if it determined any sanctions were indeed appropriate); prevent the unnecessary incurrence of fees and expenses by various estate representatives who would otherwise be forced to attend a multi-week trial; allow some of the cases to close, thereby eliminating U.S. Trustee fees and related administrative burdens and costs; and allow for the expeditious payment to various estate beneficiaries under the pending Settlement Motions.

## B. Background

On October 13, 2023, the U.S. Court of Appeals for the Fifth Circuit ("*Fifth Circuit*"), Chief Judge Priscilla Richman presiding, issued a "Complaint Identified By The Chief Judge Of The Fifth Circuit Court Of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District Of Texas, Under The Judicial Improvements Act of 2002" (the "*Fifth Circuit Complaint*").[29] On October 15, 2023, former United States Bankruptcy Judge David R. Jones ("*Former Judge Jones*") submitted his resignation which was effective as of November 15, 2023.[30]  Starting on November 2, 2023, the U.S. Trustee filed a series of pleadings that include the following: (1) "United States Trustee's Motion For (1) Relief From Judgment Pursuant To Federal Rule of Civil Procedure 60(b)(6) and

---

[29] Complaint No. 5-24-90002 (5th Cir. Oct. 13, 2023).

[30] *See* Order, Complaint No. 5-24-90002 (5th Cir. Nov. 15, 2023).

Federal Rule of Bankruptcy Procedure 9024 Approving The Retention and Compensation Applications of Jackson Walker LLP, (herein "*Jackson Walker*") (2) Sanctions, and (3) Related Relief*"* in sixteen (16) contested matters[31] (the "*Initial Vacatur Motions*"); (2) "United States Trustee's Amended and Supplemental Motion For (1) Relief From Judgment Pursuant To Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving The Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief" (the "*Amended Vacatur Motions*" and together with the Initial Vacatur Motions, the "*Vacatur Motions*") in sixteen (16)[32] contested matters for a total of thirty-two (32) contested matters,  (together, the "*Affected Cases*"); (3) "United States Trustee's Motion (1) To Vacate The Fee Orders Approving The Interim Compensation Applications Of Jackson Walker LLP,  (2) For

---

[31] *See* 18-30155 EXCO Resources, Inc., ECF No 2358; 19-32112 Jones Energy, Inc., ECF No. 282; 19-34508 Sanchez Energy Corporation, ECF No. 2930; 20-30336 McDermott International, Inc., ECF No. 1141; 20-31886 Sheridan Production Partners, I-A, LP., ECF No. 10; 20-32680 Energy Services Puerto Rico, LLC, ECF No. 13; 20-33233 Chesapeake Energy Corporation, ECF No. 4514; 20-33295 Covia Holdings Corporation, ECF No. 1477; 20-33812 Denbury Holdings, Inc., ECF No. 14; 20-33916 TMW Merchants LLC, ECF No. 255; 20-34500 IQor Holdings Inc., ECF No. 326; 20-50082 Volusion, LLC, ECF No. 337; 22-90002 Seadrill Member LLC, ECF No. 11; 22-90126 LaForta - Gestao E Investmentos, ECF No. 311; 22-90129 Altera Infrastructure Project Services LLC, ECF No. 96; 23-90055 Auto Plus Auto Sales, LLC, ECF No. 50.

[32] *See* 18-35672 Westmoreland Coal Company, ECF No. 3377; 20-20184 JC Penney Company Direct Marketing Services LLC, ECF No. 1351; 20-32021 Whiting Petroleum Corporation, ECF No. 1465; 20-32519 Neiman Marcus Group LTD LLC, ECF No. 3224; 20-32564 Stage Stores, Inc., ECF No. 1241; 20-33302 Covia Finance Company, LLC, ECF No. 235; 20-34758 Tug Robert J. Bouchard Corporation, ECF No. 381; 20-35561 Mule Sky LLC, ECF No. 1089; 20-35740 Seadrill Partners LLC, ECF No. 877; 21-30427 Seadrill Limited, ECF No. 1621; 21-30936 Brilliant Energy, LLC, ECF No. 284; 21-31861 Katerra Inc., ECF No. 2093; 21-90002 Basic Energy Services Inc., ECF No. 1791; 21- 90054 Strike, LLC., ECF No. 1540; 22-50009 4E Brands Northamerica LLC., ECF No. 645; 22-90018 Sungard AS New Holdings, LLC. ECF No. 1043.

Sanctions, And (3) Related Relief"[33]; (4) "United States Trustee's Opposition To Jackson Walker's Final Fee Application As Co-Counsel To The Debtors And Motion For Sanctions And Related Relief"[34]; and (5) "United States Trustee's Objection To First And Final Fee Application Of The Law Office Of Liz Freeman For Allowance And Payment Of Fees And Expenses As Co-Counsel And Conflicts Counsel To The Debtors For The Period From January 31, 2023 Through June 16, 2023."[35]

On December 9, 2023, the Honorable Eduardo V. Rodriguez, Chief Bankruptcy Judge for the Southern District of Texas ("*Chief Bankruptcy Judge Rodriguez*") commenced the Miscellaneous Proceeding styled as *In re Professional Fee Matters Concerning the Jackson Walker Law Firm*, Misc. Proceeding No. 23-645 (the "*Miscellaneous Proceeding*").[36]  On April 4, 2025, the Basic Energy Trustee filed his "Motion for Order Approving Compromise and Settlement Pursuant to Bankruptcy Rule 9019" (the "*Basic Energy Settlement Motion*").[37] On April 7, 2025, the 4E Brands Plan Agent filed his "Motion for Order Approving Compromise and Settlement Pursuant to Bankruptcy Rule 9019" (the "*4E Brands Settlement Motion*"). [38] On April 9, 2025, the Honorable Alia Moses, Chief District Judge for the Western District of Texas ("*Chief Judge Moses*") issued her Memorandum Opinion and Order withdrawing the reference to the Bankruptcy Court in the Affected Cases (the "*Order Withdrawing the Reference*").[39]

---

[33] Bankr. 22-90035, ECF No. 1379.

[34] Bankr. 22-90032, ECF No. 2415.

[35] Bankr. 23-90054, ECF No. 1049.

[36] Case No. 4:23-cv-4787, Ex. 226-1 at 3, ¶13. *See also* Bankr. 23-645, ECF No. 1.

[37] Bankr. 21-90002, ECF No. 1884.

[38] Bankr. 22-50009, ECF No. 715.

[39] Case No. 4:23-cv-04787, ECF No. 31.

On April 25, 2025, the U.S. Trustee and the Basic Energy Trustee filed their "Stipulation Extending U.S. Trustee's Deadline to Respond to Motion."[40] On April 25, 2025, the U.S. Trustee and 4E Brands Plan Agent filed their "Stipulation Extending U.S. Trustee's Deadline to Respond to Motion."[41] On May 13, 2025, Brilliant Energy filed its "Motion For Order Approving Compromise And Settlement Pursuant To Bankruptcy Rule 9019" (the "*Brilliant Energy Settlement Motion*").[42] On May 20, 2025, the U.S. Trustee filed the "United States Trustee's Objection to the Liquidating Trustee David Dunn's Settlement Motion."[43] On May 20, 2025, the U.S. Trustee filed the "United States Trustee's Objection to Plan Agent David Dunn's Settlement Motion."[44] On May 21, 2025, the Basic Energy Trustee filed his "Reply Brief of David Dunn, 4E Plan Agent and Basic Energy Liquidation Trustee, in Support of Rule 9019 Settlement Motions."[45] On May 21, 2025, the U.S. Trustee filed the "United States Trustee's Objection to the Chapter 7 Trustee's Settlement Motion."[46] On May 21, 2025, the Basic Energy Trustee filed his "Reply Brief of David Dunn, 4E Plan Agent and Basic Energy Liquidation Trustee, in Support of Rule 9019 Settlement Motions."[47]

On July 25, 2025, Seadrill filed the "Motion for Order Approving Compromise and Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019" (the "*Seadrill*

[40] Bankr. 21-90002, ECF No. 1889.

[41] Bankr. 22-50009, ECF No. 716.

[42] Case No. 4:23-cv-4787, ECF No. 57.

[43] Case No. 4:23-cv-4787, ECF No. 68.

[44] Case No. 4:23-cv-4787, ECF No. 69.

[45] Case No. 4:23-cv-4787, ECF No. 70.

[46] Case No. 4:23-cv-4787, ECF No. 71.

[47] Case No. 4:23-cv-4787, ECF No. 70.

*Settlement Motion*").[48] On July 29, 2025, the Sungard Plan Administrator filed its "Motion for Order Approving Compromise and Settlement Pursuant to Bankruptcy Rule 9019" (the "*Sungard Settlement*").[49] On August 15, 2025, the U.S. Trustee filed "The U.S. Trustee's Omnibus Objection to Approval of Private Party Settlements that Preempt Adjudication of the U.S. Trustee's Rule 60(b) Motion" ("*Omnibus Objection*").[50] On September 5, 2025, Sungard filed "The Sungard Wind-Down Debtors' Response to the U.S. Trustee's Objection to Its Motion for Order Approving Compromise and Settlement Pursuant to Bankruptcy Rule 9019."[51]

On September 9, 2025, Seadrill Partners filed "Seadrill's Response to the U.S. Trustee's Omnibus Objection to Approval of Private Party Settlement that Preempt Adjudication of the U.S. Trustee's Rule 60(b) Motions."[52]  On September 11, 2025, J. C. Penney filed its "Motion for Order Approving Compromise and Settlement Pursuant to the Bankruptcy Rule 9019" (the "*J. C. Penney Settlement Motion*").[53] On September 24, 2025, the Auto Plus Plan Agent filed his "Motion for Entry of Order Approving Compromise of Controversy under Bankruptcy Rule 9019" (the "*Auto Plus Settlement Motion*").[54] On September 24, 2025, the Strike Trustee filed his "Motion for Entry of Order Approving Compromise of Controversy under Bankruptcy Procedure 9019" (the "*Strike Settlement Motion*").[55] On October 3, 2025, the GWG Trustee filed the "Trustee's Motion for Entry

---

[48] Case No. 4:23-cv-4787, ECF No. 90.

[49] Case No. 4:23-cv-4787, ECF No. 91.

[50] Case No. 4:23-cv-4787, ECF No. 93.

[51] Case No. 4:23-cv-4787, ECF No. 95.

[52] Case No. 4:23-cv-4787, ECF No. 94.

[53] Case No. 4:23-cv-4787, ECF No. 96.

[54] Case No. 4:23-cv-4787, ECF No. 97.

[55] Case No. 4:23-cv-4787, ECF No. 98.

of an Order Approving Settlement Agreement with Jackson Walker LLP" (the "*GWG Settlement Motion*").[56]

On October 24, 2025 Gary Peterson, Chris Nakashima, John English, Jaquetta English, LT-1 Exchange Trust, LT-2 Exchange Trust, LT-3 Exchange Trust, LT-4 Exchange Trust, LT-5 Exchange Trust, LT-6 Exchange Trust, LT-7 Exchange Trust, LT-8 Exchange Trust, LT-9 Exchange Trust, LT-12 Exchange Trust, LT-14 Exchange Trust, LT-15 Exchange Trust, LT-17 Exchange Trust, LT-18 Exchange Trust, LT-19 Exchange Trust, and LT-20 Exchange Trust (the "*GWG Objectors*") filed their "Objection to Litigation Trustee's Motion for Entry of an Order Approving Settlement Agreement with Jackson Walker LLP."[57] On November 10, 2025, the Stage Plan Administrator filed a "Motion for Order Approving Compromise and Settlement Pursuant to Bankruptcy Rule 9019" (the "*Stage Stores Settlement Motion*").[58]

On November 12, 2025, Chief Judge Moses issued her order referring the Vacatur Motions, and other certain miscellaneous motions filed in the Affected Cases and Adversary Proceeding 25-2002, (*Old Copper Company Inc. f/k/a JC Penney Company Inc. v Jackson Walker L.L.P*) ("*J. C. Penney Adversary Proceeding*") to the undersigned for a report and further recommendations and abated all pending Settlement Motions ("*Referral Order*").[59] On December 18, 2025, the "Notice of Withdrawal Of Motion To Return Fees Taken By Elizabeth Freeman As Wind Down Trustee" was filed by the GWG Objectors.[60]

---

[56] Case No. 4:23-cv-4787, ECF No. 100.

[57] Case No. 4:23-cv-4787, ECF No. 105.

[58] Case No. 4:23-cv-4787, ECF No. 108.

[59] Case No. 4:23-cv-04787, ECF No. 109.

[60] Bankr. 22-90032, ECF No. 2799.

On December 31, 2025, this Court issued an order stating that it would take evidence on the Settlement Motions but only if the District Court agreed.[61] On Monday, January 5, 2026, Chief Judge Moses issued her order referring the ten (10) pending Settlement Motions to the undersigned for a further report and recommendation ("*Settlements Referral Order*"). [62]

On Thursday, January 22, 2026, this Court issued a separate report ("*GWG Report and Recommendation*") recommending[63] to the District Court that the GWG Settlement Motion be heard concurrently with the consolidated trial on the U.S. Trustee's Vacatur Motions in the Affected Cases, which includes (i) "Jackson Walker's Fourth and Final Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from April 20, 2022 through June 20, 2023"[64] and (ii) "United States Trustee's Opposition to Jackson Walker's Final Fee Application as Co-Counsel to the Debtors and Motion for Sanctions and Related Relief."[65] On January 22, 2026, the U.S. Trustee filed the "U.S. Trustee's Objection To Auto Plus Auto Sales, LLC's Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019."[66] On January 22, 2026, the U.S. Trustee also filed the "U.S. Trustee's Objection To The Strike Liquidating Trust's Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019."[67] On January 22, 2026, the U.S. Trustee also

---

[61] Case No. 4:23-cv-04787, ECF No. 139.

[62] Case No. 4:23-cv-04787, ECF No. 140.

[63] Case No. 4:23-cv-04787, ECF No. 169.

[64] Bankr. 22-90032, ECF No. 2158.

[65] Bankr. 22-90032, ECF No. 2415.

[66] Case No. 4:23-cv-04787, ECF No. 170.

[67] Case No. 4:23-cv-04787, ECF No. 171.

filed the "U.S. Trustee's Objection To Stage Stores, Inc.'s Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019."[68] On January 28, 2026, the Stage Plan Administrator file his "Response of Plan Administrator For Stage Stores, Inc., et al. to the U.S. Trustee's Objection To His Motion For Order Approving Compromise And Settlement Pursuant To Bankruptcy Rule 9019."[69]

On January 29, 2026, Gary Peterson, Chris Nakashima, John English, Jaquetta English, LT-1 Exchange Trust, LT-2 Exchange Trust, LT-3 Exchange Trust, LT-4 Exchange Trust, LT-5 Exchange Trust, LT-6 Exchange Trust, LT-7 Exchange Trust, LT-8 Exchange Trust, LT-9 Exchange Trust, LT-12 Exchange Trust, LT-14 Exchange Trust, LT-15 Exchange Trust, LT- 17 Exchange Trust, LT-18 Exchange Trust, LT-19 Exchange Trust, and LT-20 Exchange Trust filed their "Objection In Response To Report And Recommendation To The United States District Court Judge (ECF No. 169) Pertaining To GWG Litiation [*Sic*] Trustee's Motion For Entry Approving Compromise And Settlement Pursuant To Bankruptcy Rule 9019."[70]

On January 29, 2026, the Strike Trustee filed his "Reply In Support of Motion For Entry of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019 In The Strike, LLC Bankruptcy Case."[71] On January 29, 2026, the Auto Plus Plan Agent filed his "Reply In Support of Motion For Entry of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019 In The IEH Auto Plus Bankruptcy Case."[72] On

---

[68] Case No. 4:23-cv-04787, ECF No. 172.

[69] Case No. 4:23-cv-04787, ECF No. 174.

[70] Case No. 4:23-cv-04787, ECF No. 176.

[71] Case No. 4:23-cv-04787, ECF No. 177.

[72] Case No. 4:23-cv-04787, ECF No. 178.

January 29, 2026, Jackson Walker filed "Jackson Walker LLP's Omnibus Reply To The U.S. Trustee's Objections To Motions For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019 Filed By The Settling Parties."[73] On February 5, 2026, Chief Judge Moses issued her order adopting this Court's GWG Report and Recommendation.[74]

On March 3, 2026, Seadrill filed its "Witness & Exhibit List" containing twenty-nine (29) exhibits consisting of one thousand four hundred and nineteen (1,419) pages.[75] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" containing nineteen (19) exhibits consisting of seven hundred and forty-seven (747) pages.[76] On March 3, 2026, J. C. Penney filed its "Witness & Exhibit List" containing thirty-three (33) exhibits consisting of one thousand three hundred sixty-eight (1,368) pages.[77] On March 3, 2026, the 4E Brands Plan Agent filed his "Witness & Exhibit List" containing fifty (50) exhibits consisting of eight hundred and forty (840) pages.[78] On March 3, 2026, the Stage Plan Administrator filed his "Witness & Exhibit List" containing twenty-four (24) exhibits consisting of one thousand two hundred ninety-three (1,293) pages.[79] On March 3, 2026, Brilliant Energy filed its "Witness & Exhibit List" containing nineteen (19) exhibits consisting of three hundred fifty-nine (359) pages.[80] On March 3, 2026, Sungard filed its "Witness & Exhibit List" containing twenty-six (26) exhibits consisting of one thousand

[73] Case No. 4:23-cv-04787, ECF No. 179.

[74] Case No. 4:23-cv-04787, ECF No. 181.

[75] Case No. 4:23-cv-04787, ECF No. 184.

[76] Case No. 4:23-cv-04787, ECF No. 185.

[77] Case No. 4:23-cv-04787, ECF No. 186.

[78] Case No. 4:23-cv-04787, ECF No. 187.

[79] Case No. 4:23-cv-04787, ECF No. 188.

[80] Case No. 4:23-cv-04787, ECF No. 189.

five hundred seventy-three (1,573) pages.[81] On March 3, 2026, the Basic Energy Trustee filed its "Witness & Exhibit List" containing forty-nine (49) exhibits consisting of one thousand one hundred sixty-four (1,164) pages.[82] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Stage Stores case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[83] and adding nine (9) additional exhibits consisting of four hundred and sixteen (416) pages.[84] On March 3, 2026, the Strike Trustee filed its "Witness & Exhibit List" containing fourteen (14) exhibits consisting of one thousand and sixty-nine (1,069) pages.[85] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the 4E Brands case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[86] and adding twelve (12) exhibits consisting of five hundred and fifty-two (552) pages.[87] On March 3, 2026, the Auto Plus Plan Agent filed his "Witness & Exhibit List" containing eleven (11) exhibits consisting of one thousand and forty-four (1,044) pages.[88] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Basic Energy case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[89] and adding eleven (11) exhibits consisting of three hundred twenty-three (323) pages.[90] On

---

[81] Case No. 4:23-cv-04787, ECF No. 190.

[82] Case No. 4:23-cv-04787, ECF No. 191.

[83] Case No. 4:23-cv-04787, ECF No. 185.

[84] Case No. 4:23-cv-04787, ECF No. 192.

[85] Case No. 4:23-cv-04787, ECF No. 193.

[86] Case No. 4:23-cv-04787, ECF No. 185.

[87] Case No. 4:23-cv-04787, ECF No. 194.

[88] Case No. 4:23-cv-04787, ECF No. 195.

[89] Case No. 4:23-cv-04787, ECF No. 185.

[90] Case No. 4:23-cv-04787, ECF No. 196.

March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Old Copper Co. case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[91] and adding nineteen (19) exhibits consisting of one thousand four hundred fifty-four (1,454) pages.[92]  On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Strike case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[93] and adding thirteen (13) exhibits consisting of five hundred forty-four (544) pages.[94]

On March 3, 2026, the U.S. Trustee filed his "Notice of Deposition Designations" containing nine (9) exhibits consisting of thirty-two (32) pages.[95] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Auto Plus case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[96] and adding fifteen (15) exhibits consisting of six hundred fifty-two (652) pages.[97] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Brilliant Energy case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[98] and adding seventeen (17) exhibits consisting of three hundred forty-one (341) pages.[99] On March 3, 2026, Brilliant Energy filed its "Amended Witness & Exhibit List" containing nineteen (19) exhibits consisting of three hundred fifty-nine (359)

---

[91] Case No. 4:23-cv-04787, ECF No. 185.

[92] Case No. 4:23-cv-04787, ECF No. 197.

[93] Case No. 4:23-cv-04787, ECF No. 185.

[94] Case No. 4:23-cv-04787, ECF No. 198.

[95] Case No. 4:23-cv-04787, ECF No. 199.

[96] Case No. 4:23-cv-04787, ECF No. 185.

[97] Case No. 4:23-cv-04787, ECF No. 200.

[98] Case No. 4:23-cv-04787, ECF No. 185.

[99] Case No. 4:23-cv-04787, ECF No. 201.

pages.[100] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Sungard case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[101] and adding fourteen (14) exhibits consisting of three hundred ninety-one (391) pages.[102] On March 3, 2026, the U.S. Trustee filed his "Witness & Exhibit List" in the Seadrill case relisting the nineteen (19) common exhibits consisting of seven hundred and forty-seven (747) pages[103] and adding twenty-one (21) exhibits consisting of seven hundred seventy-two (772) pages.[104]

On March 3, 2026, Jackson Walker filed its "Witness & Exhibit List" containing forty (40) exhibits consisting of three thousand six hundred sixty-four (3,664) pages.[105] On the same date, Jackson Walker filed an "Additional Witness & Exhibit List" containing fifty (50) exhibits consisting of three thousand and thirty-seven (3,037) pages.[106] On the same date, Jackson Walker filed an "Additional Witness & Exhibit List" containing forty (40) exhibits consisting of three thousand six hundred fifty-one (3,651) pages.[107] On March 3, 2026, Brilliant Energy filed its "Amended Witness & Exhibit List" but failed to attach any exhibits.[108] On March 4, 2026, the Court issued an order striking the "Witness & Exhibit List" filed at Civil Case 4:23-cv-04787, ECF No. 208.[109] On March 4, 2026, the

---

[100] Case No. 4:23-cv-04787, ECF No. 202.

[101] Case No. 4:23-cv-04787, ECF No. 185.

[102] Case No. 4:23-cv-04787, ECF No. 203.

[103] Case No. 4:23-cv-04787, ECF No. 185.

[104] Case No. 4:23-cv-04787, ECF No. 204.

[105] Case No. 4:23-cv-04787, ECF No. 205.

[106] Case No. 4:23-cv-04787, ECF No. 206.

[107] Case No. 4:23-cv-04787, ECF No. 207.

[108] Case No. 4:23-cv-04787, ECF No. 208.

[109] Case No. 4:23-cv-04787, ECF No. 209.

4E Brands Plan Agent filed his "Supplemental Witness & Exhibit" List containing one (1) exhibit consisting of five (5) pages.[110] On March 4, 2026, the Basic Energy Trustee filed his "Supplemental Witness & Exhibit List" containing one (1) exhibit consisting of five (5) pages.[111] On March 4, 2026, Brilliant Energy filed its "Amended Witness & Exhibit List" containing nineteen (19) exhibits consisting of three hundred sixty (360) pages.[112] On March 6, 2026, J. C. Penney filed its "Supplemental Witness & Exhibit List" containing one (1) exhibit consisting of six (6) pages.[113]

On March 9, 2026, the U.S. Trustee, Brilliant Energy, and Jackson Walker filed their "Notice Of Joint Stipulations Brilliant Energy, LLC."[114] On March 10, 2026, J. C. Penney filed its "Second Supplemental Witness & Exhibit List" containing one (1) exhibit consisting of twenty-eight (28) pages.[115] On March 10, 2026, the U.S. Trustee, the 4E Brands Plan Agent and Jackson Walker filed their "Notice Of Joint Stipulations 4E Brands Northamerica LLC."[116] On March 10, 2026, the U.S. Trustee, the Basic Energy Trustee and Jackson Walker filed their "Notice Of Joint Stipulations Basic Energy Services, Inc."[117] On March 10, 2026, the U.S. Trustee, the Stage Plan Administrator and Jackson Walker filed their "Notice Of Joint Stipulations Stage Stores, Inc."[118]

---

[110] Case No. 4:23-cv-04787, ECF No. 210.

[111] Case No. 4:23-cv-04787, ECF No. 211.

[112] Case No. 4:23-cv-04787, ECF No. 212.

[113] Case No. 4:23-cv-04787, ECF No. 217.

[114] Case No. 4:23-cv-04787, ECF No. 218.

[115] Case No. 4:23-cv-04787, ECF No. 219.

[116] Case No. 4:23-cv-04787, ECF No. 220.

[117] Case No. 4:23-cv-04787, ECF No. 221.

[118] Case No. 4:23-cv-04787, ECF No. 222.

On March 10, 2026, the U.S. Trustee, the Sungard Plan Administrator and Jackson Walker filed their "Notice Of Joint Stipulations Sungard AS New Holdings."[119] On March 10, 2026, the U.S. Trustee, Seadrill and Jackson Walker filed their "Notice Of Joint Stipulations Seadrill Partners, LLC, and Seadrill Limited."[120] On March 10, 2026, the U.S. Trustee, the Auto Plus Plan Agent and Jackson Walker filed their "Notice Of Joint Stipulations Auto Plus Auto Sales LLC."[121] On March 10, 2026, the U.S. Trustee, the Strike Trustee and Jackson Walker filed their "Notice Of Joint Stipulations Strike, LLC."[122] On March 10, 2026, the U.S. Trustee, J. C. Penney, and Jackson Walker filed their "Notice Of Joint Stipulations Old Copper Co. Inc."[123]

On March 10, 2026, the Stage Plan Administrator filed his "Notice Of Filing Of Revised Exhibit A (Settlement Agreement) To Motion Of Steve Balasiano, As Plan Administrator, For Order Approving Compromise And Settlement Pursuant To Bankruptcy Rule 9019."[124] On March 11, 2026, J. C. Penney and Jackson Walker filed "The Settling Parties' Objections To United States Trustee's Notice Of Deposition Designations And Counter-Designations."[125] On March 12, 2026, Sungard filed "The Sungard Wind-Down Debtors' Notice Of Entry Into Amendment No. 1 To Settlement Agreement And Release."[126] On March 12, 2026, the GWG Trustee filed a "Notice Of

---

[119] Case No. 4:23-cv-04787, ECF No. 223.

[120] Case No. 4:23-cv-04787, ECF No. 224.

[121] Case No. 4:23-cv-04787, ECF No. 225.

[122] Case No. 4:23-cv-04787, ECF No. 226.

[123] Case No. 4:23-cv-04787, ECF No. 227.

[124] Case No. 4:23-cv-04787, ECF No. 228.

[125] Case No. 4:23-cv-04787, ECF No. 229.

[126] Case No. 4:23-cv-04787, ECF No. 231.

Withdrawal Of Litigation Trustee's Motion For Entry Of An Order Approving Settlement Agreement With Jackson Walker LLP."[127]

On March 12, 2026, the Stage Plan Administrator filed his "Amended Witness & Exhibit List" containing twenty-five (25) exhibits consisting of one thousand three hundred and twenty (1,320) pages.[128] On March 12, 2026, Seadrill filed the "Notice Of Filing Amendment No. 1 To Settlement Agreement To Motion Of Seadrill For Order Approving Compromise And Settlement Pursuant To Federal Rule Of Bankruptcy Procedure 9019."[129] On March 16, 2026, the U.S. Trustee filed his "Amended Witness & Exhibit List" in the Auto Plus case containing one (1) exhibit consisting of three hundred and fifty-one (351) pages.[130] On March 16, 2026, Sungard filed its "Amended Witness & Exhibit List" containing twenty-seven (27) exhibits consisting of one thousand five hundred and seventy-three (1,573) pages.[131] On March 16, 2026, Seadrill filed a "Supplemental Witness & Exhibit List" containing one (1) exhibit consisting of two (2) pages.[132] On March 16, 2026, the Auto Plus Plan Agent filed his "Notice Of Amendment No. 1 To Settlement Agreement Related To Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019."[133] On March 16, 2026, the Auto Plus Plan Agent filed his "Supplemental Witness & Exhibit List" containing one (1) exhibit consisting of three (3) pages.[134] On March 16, 2026, the U.S. Trustee filed his "Omnibus

---

[127] Case No. 4:23-cv-04787, ECF No. 232.

[128] Case No. 4:23-cv-04787, ECF No. 233.

[129] Case No. 4:23-cv-04787, ECF No. 234.

[130] Case No. 4:23-cv-04787, ECF No. 238.

[131] Case No. 4:23-cv-04787, ECF No. 239.

[132] Case No. 4:23-cv-04787, ECF No. 240.

[133] Case No. 4:23-cv-04787, ECF No. 241.

[134] Case No. 4:23-cv-04787, ECF No. 242.

Response To The Settling Parties' Objections To United States Trustee's Notice Of Deposition Designations And Counter Designations."[135]

On March 17, 2026, the Court held a hearing on three (3) of the nine (9) remaining Settlement Motions. On March 17, 2026, Jackson Walker filed its "Notice Of Filing Of Illustrative Aids" attaching illustrative aids to be used for the March 17, 2026, hearing.[136] On March 18, 2026, Brilliant Energy and Jackson Walker filed their "Notice Of Entry Into Amendment No. 1 To Settlement Agreement And Release."[137] On March 18, 2026, Jackson Walker filed its "Supplemental Witness & Exhibit List" in the Brilliant Energy case containing one (1) exhibit consisting of two (2) pages.[138] On March 18, 2026, the Court held a hearing on four (4) of the nine (9) remaining Settlement Motions. On March 18, 2026, the Court entered its order for post-hearing briefing in connection with the March 17, 2026, hearing.[139] On March 19, 2026, the Court held a hearing on two (2) of the nine (9) remaining Settlement Motions. On March 19, 2026, the Court entered its order for post-hearing briefing in connection with the March 18, 2026, hearing.[140]  On March 19, 2025, the U.S. Trustee, Jackson Walker, and the Settling Parties filed their "Joint Stipulation" (the "*Global Joint Stipulation*").[141] On March 20, 2026, the Court entered its order for post-hearing briefing in connection with the March 19, 2026, hearing.[142]

---

[135] Case No. 4:23-cv-04787, ECF No. 243.

[136] Case No. 4:23-cv-04787, ECF No. 244.

[137] Case No. 4:23-cv-04787, ECF No. 246.

[138] Case No. 4:23-cv-04787, ECF No. 247.

[139] Case No. 4:23-cv-04787, ECF No. 247, ECF No 248.

[140] Case No. 4:23-cv-04787, ECF No. 254.

[141] Case No. 4:23-cv-04787, ECF No. 255.

[142] Case No. 4:23-cv-04787, ECF No. 266.

Following a three-day evidentiary hearing on the remaining nine (9) Settlement Motions, held from March 17, 2026, through March 19, 2026, the Court now issues this Report and Recommendation to the Honorable Alia Moses, Chief United States District Judge. As discussed *supra*, the Court was directed to consider whether the ten pending Settlement Motions should be approved before the merits of the U.S. Trustee's Vacatur Motions are adjudicated, or whether an alternative disposition would better protect the interests of affected parties while preserving the issues presented by the Vacatur Motions.[143] The Court considers each issue in turn.

### C. Whether an alternative to approval exists that would best serve the interests of the affected parties while preserving the merits of the Vacatur Motions

The U.S. Trustee, in his omnibus objection to the Settlement Motions,[144] asserts that the Settlement Motions prematurely and improperly short circuit the U.S. Trustee's prosecution of his Vacatur Motions.[145] The U.S. Trustee argues that any approval of a Settlement Motion ahead of a full trial on the merits of the U.S. Trustee's Vacatur Motions would circumvent this Court's review of Jackson Walker's retention orders in each Affected Case pursuant to 11 U.S.C. § 327 and each final fee order pursuant to 11 U.S.C. § 330(a)(1).[146] Additionally, asserts the U.S. Trustee, approval of a Settlement Motion under Bankruptcy Rule 9019 post confirmation is unnecessary.[147]

At the March 17, 2026 hearing, and in accordance with Chief Judge Moses' Settlements Referral Order, the Court entertained arguments on whether an alternative to

---

[143] Case No. 4:23-cv-4787, ECF No. 140.

[144] Case No. 4:23-cv-04787, ECF No. 93.

[145] Case No. 4:23-cv-04787, ECF No. 93 at 1.

[146] Case No. 4:23-cv-04787, ECF No. 93 at 2.

[147] Case No. 4:23-cv-04787, ECF No. 93 at 3.

approval of the Settlement Motions before trial on the merits of the Vacatur Motions exists. It was proposed to the Court by Seadrill's counsel at the March 17, 2026 hearing, like the U.S. Trustee proposed in prior pleadings, that as an alternative to court approval of the Settlement Motions, the parties should be permitted to enter into settlements without court approval.[148]

"Bankruptcy Rule 9019 . . . has a 'clear purpose . . . to prevent the making of concealed agreements which are unknown to the creditors and unevaluated by the court.'"[149] As has been reiterated by this Court and Chief Judge Moses, the need for transparency is particularly important here in light of the unprecedented nature of the underlying proceeding arising out of the intimate relationship between former Judge Jones and Elizabeth Freeman (the "*Jones-Freeman Relationship*").[150] As such, the Court finds that settlement without court approval, in this instance, is not an appropriate alternative and is rejected.

At the March 17, 2026 hearing, the U.S. Trustee also suggested that as an alternative to court approval of the Settlement Motions before a trial, any court order approving the Settlement Motions should include the following language:

> Notwithstanding any contrary provision in this Order or the Settlement Agreement: (1) The Settlement Agreement's approval shall not in any way affect any Vacatur Motion or the [Settling Party's] ability to accept or distribute funds the Court may order Jackson Walker LLP to pay as a result of a Vacatur Motion; and (2) No final fee order shall be entered until the Vacatur Motion is resolved.[151]

---

[148] Mar. 17, H'rg Tr., at 9; Case No. 4:23-cv-04787, ECF No. 93 at 3.

[149] *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007).

[150] Mar. 17, 2026 Hr'g Tr. at 60 (statement by the Court); Case No. 4:23-cv-4787, ECF No. 109 at 7.

[151] Mar. 17, 2026 Hr'g Tr. at 11–12; Case No. 4:23-cv-4787, ECF No. 185, Ex. 17.

The Global Joint Stipulation makes consideration of this proposed language unnecessary. On March 17, 2026, this Court began to take evidence on the Settlement Motions. After repeated admonitions by this Court, on March 19, 2026, the U.S. Trustee, the Settling Parties, and Jackson Walker reached a resolution to the U.S. Trustee's Objections and, as directed by the Court, filed their Global Joint Stipulation in connection with the evidentiary hearings on (I) "[w]hether an alternative [to approval] exists that would best serve the interests of the affected parties while preserving the merits of the Vacatur Motions"; and (II) the Settlement Motions.[152] In the Global Joint Stipulation, the U.S. Trustee, the Settling Parties and Jackson Walker stipulated as follows:

1. Jackson Walker contends that the Vacatur Motions assert estate claims. The U.S. Trustee contends that the Vacatur Motions seek independent and distinct relief from claims the estates may hold.

2. The Parties acknowledge and agree that the Settlement Agreements do not address or adjudicate the issues in the preceding paragraph.

3. The Parties recognize that the Settlement Agreements do not limit, restrict, or affect any court's duties or authority to adjudicate the Vacatur Motions. If the court orders monetary relief in the Vacatur Motions in any of the settling cases over Jackson Walker's pending objections to the U.S. Trustee's standing or Jackson Walker's other pending objections, the post-confirmation entities and/or the chapter 7 estate of Brilliant Energy, LLC, as applicable, will not be precluded from accepting payment of funds from Jackson Walker.

4. Jackson Walker may seek to introduce into evidence any Settlement Agreement at a trial on the Vacatur Motions, and the U.S. Trustee has the right to oppose such offer into evidence.

5. Nothing obligates nor precludes a court from considering the Settlement Agreement in adjudicating any relief sought by the U.S. Trustee in its Vacatur Motions, and both Jackson Walker's and the U.S. Trustee's rights are preserved in all respects.

---

[152] Case No. 4:23-cv-4787, ECF No. 255.

6. The stipulations made herein resolve the U.S. Trustee's objections to the Settlement Agreements entered into between Jackson Walker and the Settling Parties.[153]

Given that Court approval under Bankruptcy Rule 9019 is appropriate for parties to enter into the Settlement Agreements and that the U.S. Trustee announced in open court that the Global Joint Stipulation resolves their objections to the Settlements Motions, the Court will next consider whether the Settling Parties have met their burden to obtain approval of the Settlement Agreements pursuant to Bankruptcy Rule 9019.

**D. Whether the Settlement Motions should be approved before adjudicating the merits of the U.S. Trustee's Vacatur Motions**

   **i.    Introduction**

In reviewing settlement motions, the Court is cognizant of the fact that it should "make a well-informed decision, 'comparing the terms of the compromise with the likely rewards of litigation.'"[154] The Court will not substitute its own judgment for the trustee's, but instead reviews all the issues and determines "whether the settlement fall[s] below the lowest point in the range of reasonableness."[155] Before accepting a compromise, a trustee must reach "an informed judgment, after diligent investigation, as to whether it would be prudent to eliminate the inherent risks, delays, and expense of prolonged litigation in an uncertain cause."[156] Although the trustee bears the burden of establishing that the proposed compromise is in the best interest of the bankruptcy estate, compromises are a normal part

---

[153] ECF No. 255.

[154] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356 (citing *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)).

[155] *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

[156] *In re Mailman Steam Carpet Cleaning Corp.*, 212 F.3d 632, 635 (1st Cir. 2000) (citing *In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992)).

of the bankruptcy process and oftentimes a desirable and wise method of bringing to a close proceeding that are otherwise lengthy, complicated, and costly.[157]

As such, the trustee's burden is not high.[158] "The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'"[159] "In reviewing the settlement, the court cannot accept the propriety of the settlement on the mere assertion of its value by the proponents. It must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[160] In determining the trustee's business judgment, the Court is mindful that it should consider the trustee's process for reaching his decision to settle the claims and the information considered in making that decision.[161]

Finally, the Court may "give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise."[162] Put differently, "a court is neither to 'rubber stamp' the trustee's proposals nor to substitute its

---

[157] *In re Cajun Elec. Power Coop.*, 119 F.3d at 354; *In re Goodman Networks, Inc.*, No. 22-31641-MVL7, 2024 Bankr. LEXIS 285, at *24 (Bankr. N.D. Tex. Feb. 5, 2024).

[158] *In re Shankman*, No. 08-36327, 2010 WL 743297, at *3 (Bankr. S.D. Tex. Mar. 2, 2010).

[159] *Id.*

[160] *In re MCorp Fin.*, 160 B.R. 941, 950 (S.D. Tex. 1993) (citing *Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434 (1968)).

[161] *See In re Robertshaw US Holding Corp.*, 662 B.R. 300, 316 (discussing the settlement proponents' "separate investigations and evaluation of potential claims and causes of action").

[162] *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *In re LMCHH PCP LLC*, Nos. 17-10353, 17-10354, 2017 Bankr. LEXIS 3361, at *14 (Bankr. E.D. La. Oct. 2, 2017) (citing *In re Drexel*, 134 B.R. at 505).

judgment for the trustee's, but rather to 'canvass the issues' and determine whether the settlement falls 'below the lowest point in the range of reasonableness.'"[163]

### ii.    Legal Standard for a compromise pursuant to Bankruptcy Rule 9019

Bankruptcy Rule 9019 authorizes bankruptcy courts to approve compromises and settlements with the trustee.[164] Under Bankruptcy Rule 9019, the decision to approve the compromise of a controversy is within the sound discretion of the Court, but the compromise must be "fair and equitable."[165] In evaluating a Bankruptcy Rule 9019 settlement, a bankruptcy court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement."[166] Rather, the bankruptcy court must "apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision."[167]   There are two general standards against which a proposed compromise and settlement is to be assessed by the bankruptcy court: (i) whether the agreement is "fair and equitable," and (ii) whether the agreement is "in the best interests of the estate."[168]

---

[163] *Cook v. Waldron*, Nos. 04-81197-G3-7, H-05-3438, 2006 U.S. Dist. LEXIS 31411, at *10 (S.D. Tex. Apr. 18, 2006).

[164] Fed. R. Bankr. P. 9019(a).

[165] *See In re Aweco, Inc.*, 725 F.2d 293, 297 (5th Cir. 1984); *In re Cajun Elec. Power Coop.*, 119 F.3d at 355.

[166] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[167] *Id.*; *In re Am. Reserve Corp.*, 841 F.2d 159, 163 (7th Cir. 1987) ("Since a bankruptcy judge will normally be familiar with the governing law and the factual issues surrounding a settlement, setting out his reasons for approving the settlement should not be unduly burdensome. A bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision. The judge may make either written or oral findings; form is not important, so long as the findings show the reviewing court that the judge properly exercised his discretion.").

[168] *See In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006) (citing *TMT Trailer*, 390 U.S. at 424).

The Fifth Circuit teaches that in determining whether a settlement is "fair and equitable" and in "the best interest of the estate," the bankruptcy court "must evaluate and set forth in a comprehensible fashion" the following: "(1) [t]he probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) [t]he complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) [a]ll other factors bearing on the wisdom of the compromise."[169] "Under the rubric of the third, catch-all provision," the Fifth Circuit has articulated two additional factors that bear on the decision to approve a proposed settlement: "[f]irst, the court should consider the best interests of the creditors, 'with proper deference to their reasonable views.' Second, the court should consider 'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'"[170] As such, the Fifth Circuit dictates five factors for courts to consider: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, including the difficulties, if any, to be encountered in the matter of collection; (3) the paramount interest of the creditors with a proper deference to their reasonable views; (4) the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and (5) all other factors bearing on the wisdom of the compromise (the "*Jackson Brewing Factors*").[171]

---

[169] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *TMT Trailer*, 390 U.S. at 425); *DeepRock Venture Partners, L.P. v. Beach (In re Beach)*, 731 F. App'x 322, 325 (5th Cir. 2018); *Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015).

[170] *In re Cajun Elec. Power Coop.*, 119 F.3d at 355–56 (citing *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995)).

[171] *See Jackson Brewing*, 624 F.2d at 602 (holding that a bankruptcy judge "must evaluate and set forth in a

When evaluating the first Jackson Brewing Factor—the probability of success in the litigation with due consideration for the uncertainty in fact and law—"it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in [a] settlement."[172] Instead, the Court "need only apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision."[173] As to the second factor, the Court may consider the length of the trial required to resolve the claims covered by the proposed settlement, as well as the likely costs of litigating the specific issues involved, including costs of expert witness fees and witness preparation.[174] As to the third factor, the Court, "in considering whether a settlement is fair and equitable, [must] consider the reasonable views of a majority of the creditors."[175] But, the "desires of the creditors are not binding."[176] The test is "the best interests of the creditors, taking into account their reasonable views."[177] "[C]ase law is clear that in assessing whether to approve a proposed compromise, a bankruptcy court should consider not only the paramount interest of the creditors, but also 'whether other parties in interest support the settlement.'"[178] As to the

---

comprehensible fashion: (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise."); *see also Foster Mortgage*, 68 F.3d at 917–18 (holding that "other factors bearing on the wisdom of the compromise" includes the paramount interest of creditors with a proper deference to their reasonable views and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.").

[172] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[173] *Id.* (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)).

[174] *In re Beach*, 731 F. App'x 322 at 326.

[175] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[176] *Id.*

[177] *Id.*

[178] *In re DeRosa-Grund*, 567 B.R. 773, 790 (Bankr. S.D. Tex. 2017) (citing *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007)).

fourth factor, to determine whether a settlement was reached at arm's-length and was not the product of fraud, the Court can look to the presence, or lack thereof, of an insider relationship between parties to the settlement, the extent of non-settling party participation, and evidence of negotiations between the settling parties.[179] The last "catch-all provision" gives the Court flexibility in determining which factors are relevant.[180] The specific factors to be considered under this provision depends upon the specific settlement at issue.[181] In exercising its discretion, this Court can give more weight to one or more of the factors than to the other factors.[182] Importantly, the Court should consider whether the proposed settlement promotes the integrity of the judicial system.[183]

### iii.   The Settlement Motions

There are a total of ten (10) Settlement Motions. The Court will consider each in turn.

#### 1.   *22-90032 GWG Holdings, Inc.*

Of the ten Settlement Motions, the GWG Settlement Motion is unique. On April 20, 2022, GWG Holdings, Inc., GWG Life, LLC, and GWG Life USA, LLC (collectively,

---

[179] *See In re Foster Mortg. Corp.*, 68 F.3d at 918 (noting that when a debtor settles a claim with an insider without the participation of the creditors, "a bankruptcy court should carefully scrutinize the agreement"); *In re Howard*, 533 B.R. 532, 555 (Bankr. S.D. Miss. 2015) (reviewing evidence of settlement discussions in determining whether settlement was product of arms-length bargaining).

[180] *In re MCorp Fin.*, 160 B.R. at 951 ("In assessing a settlement, the factors must be tailored to the factual context and complexities of the particular settlement.").

[181] *Cook v. Waldron*, Nos. 04-81197-G3-7, H-05-3438, 2006 U.S. Dist. LEXIS 31411, at *7 (S.D. Tex. Apr. 18, 2006). *See also In re MCorp Fin.*, 160 B.R. at 951 (listing 12 factors).

[182] *In re DeRosa-Grund*, 567 B.R. at 785.

[183] *Id.* at 793; *In re Kallstrom*, 298 B.R. 753, 761 (B.A.P. 10th Cir. 2003) ("[B]ankruptcy courts, in exercising their discretion under Bankruptcy Rule 9019, may consider, *inter alia*, whether the proposed settlement promotes the integrity of the judicial system."); *In re Bates*, 211 B.R. 338, 343 (Bankr. D. Minn. 1997).

the "*Initial Debtors*"), and on October 31, 2022, GWG DLP Funding IV, LLC, GWG DLP Funding Holdings VI, LLC, and GWG DLP Funding VI, LLC (collectively, the "*DLP Entities*," together with the Initial Debtors, the "*GWG Debtors*"), commenced chapter 11 cases by filing voluntary petitions in the Bankruptcy Court.[184]

On May 19, 2022, the GWG Debtors filed an "Application to Retain Jackson Walker as Local Counsel and Conflicts Counsel for the Debtors and Debtors-in-Possession."[185] On June 15, 2022, the Bankruptcy Court entered an "Order Authorizing the Retention and Employment of Jackson Walker."[186] On August 21, 2023, Jackson Walker filed its "Fourth And Final Fee Application For Its Work As Co-Counsel And Conflicts Counsel To The Debtors," seeking final approval of $1,311,282.23 in fees and expenses.[187] On March 29, 2024, the U.S. Trustee filed the "United States Trustee's Opposition To Jackson Walker's Final Fee Application As Co-Counsel To The Debtors And Motion For Sanctions And Related Relief." [188] On October 3, 2025, the GWG Trustee filed the instant GWG Settlement Motion,[189] seeking approval of a settlement (the "*GWG Settlement*") that contemplates a single payment from Jackson Walker in the total amount of $405,000 to the GWG Trustee.[190]

On January 22, 2026, this Court recommended to the District Court that the GWG Settlement Motion be heard concurrently with the U.S. Trustee's Vacatur Motions.[191] On

---

[184] Bankr. 22-90032, ECF Nos. 1, 970; Bankr. 22-90336, ECF No. 1.

[185] Bankr. 22-90032, ECF No. 267.

[186] Bankr. 22-90032, ECF No. 410.

[187] Bankr. 22-90032, ECF No. 2158.

[188] Bankr. 22-90032, ECF No. 2415.

[189] Case No. 4:23-cv-4787, ECF No. 100.

[190] Case No. 4:23-cv-4787, ECF No. 100, Ex. 1.

[191] Case No. 4:23-cv-04787, ECF No. 169.

February 5, 2026, the District Court issued an order adopting this Court's January 22, 2026, Report and Recommendation and held that the GWG Settlement Motion will be heard at the consolidated trial on the Vacatur Motions and will remain abated until this Court reviews Chief Bankruptcy Judge Rodriguez's forthcoming report and further recommendations on the consolidated trial.[192]

On March 12, 2026, the GWG Trustee and Jackson Walker filed a joint notice (the "*Notice of Withdrawal*")[193] withdrawing the GWG Settlement Motion, all related exhibits filed therewith, and the "Litigation Trustee's Reply Brief In Support Of The Motion For Entry Of An Order Approving Settlement Agreement With Jackson Walker LLP,"[194] each without prejudice.[195] The Notice of Withdrawal further terminated the proposed GWG Settlement, while preserving any causes of action the GWG Trust has or may have against Jackson Walker.[196] Jackson Walker, in turn, reserved all of its rights, claims, and defenses.[197] As such, the Court finds that no action is needed at this time as to the terminated GWG Settlement between the GWG Trust and Jackson Walker.

2. *20-20184 & 25-2002* – **The J. C. Penney Settlement**

a. **Background**

---

[192] Case No. 4:23-cv-4787, ECF No. 181.

[193] Case No. 4:23-cv-4787, ECF No. 232.

[194] Case No. 4:23-cv-4787, ECF No. 106.

[195] Case No. 4:23-cv-4787, ECF No. 232.

[196] Case No. 4:23-cv-4787, ECF No. 232.

[197] Case No. 4:23-cv-4787, ECF No. 232.

On May 15, 2020 (the "*J. C. Penney Petition Date*"), the J. C. Penney Debtors[198] filed for chapter 11 relief in this Court.[199] No notice of designation of a complex case[200] was filed with the J. C. Penney Debtors' petitions.[201] On May 15, 2020, Former Judge Jones signed an order stating, "[t]he case qualifies for complex case status. The case shall immediately be randomly reassigned pursuant to General Order 2018-1, Order Regarding Complex Case Assignment."[202] The same day, on May 15, 2020, a docket entry stating the following was entered: "Involvement of Judge David R Jones Terminated. Case randomly reassigned to Judge David R Jones."[203] Also on May 15, 2020, Former Judge Jones signed an "Order Granting Complex Chapter 11 Bankruptcy Case Treatment."[204] On June 11, 2020, the J. C. Penney Debtors filed an "Application of Debtors and Debtors-in-Possession to Retain Jackson Walker as Co-Counsel and Conflicts Counsel for the Debtors and Debtors-in-Possession" (the "*J. C. Penney Retention Application*").[205] On July 2, 2020, Former Judge Jones issued an Order granting the J. C. Penney Retention Application (the

---

[198] "J. C. Penney Debtors" shall refer to the debtors in jointly administered Bankr. 20-20182 prior to the effective date of the J. C. Penney Reorganization Plan.

[199] Case No. 4:23-cv-4787, ECF No. 227, Ex. No. 1 at 1, ¶ 1. *See also* Bankr. 20-20182, ECF No. 1; Case No. 4:23-cv-4787, ECF No. 186, Ex. 20.

[200] *See Procedures for Complex Cases in the Southern District of Texas* (Effective Sept. 18, 2024) https://www.txs.uscourts.gov/sites/txs/files/Complex_11_Procedures_9_18_24_FINAL.

[201] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 2. *See also* Bankr. 20-20182, ECF No. 1.

[202] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 3. *See also* Bankr. 20-20182, ECF No. 9.

[203] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 4. *See also* Case No. 20-20182, 5/15/20 Min. Entry Between ECF Nos. 9, 10.

[204] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 5. *See also* Bankr. 20-20182, ECF No. 11.

[205] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 7. *See also* Bankr. 20-20182, ECF No. 685; Case No. 4:23-cv-4787, ECF No. 197, Ex. 4.

"*J. C. Penney Retention Order*").[206] On October 20, 2020, the J. C. Penney Debtors filed their chapter 11 plan of reorganization.[207] On November 23, 2020, the J. C. Penney Debtors filed their amended chapter 11 plan of reorganization (the "*J. C. Penney Reorganization Plan*").[208] On December 16, 2020 (the "*J. C. Penney Confirmation Date*"), Former Judge Jones entered an amended order confirming the J. C. Penney Reorganization Plan (the "*J. C. Penney Confirmation Order*").[209] On January 30, 2021, the J. C. Penney Debtors filed their fourth and final plan supplement[210] and the J. C. Penney Reorganization Plan became effective, converting the J. C. Penney Debtors into J. C. Penney as wind-down debtors.[211]

On February 5, 2021, Jackson Walker filed "Jackson Walker LLP's First Interim Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from May 15, 2020, Through August 31, 2020" ("*J. C. Penney First Interim Fee Application*").[212] On March 8, 2021, the Court approved the J. C. Penney First Interim Fee Application in the amount of $637,537.65. [213] On March 10, 2021, Jackson Walker filed a "Second Interim and Final Fee Application for Allowance and Payment of

---

[206] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 8. *See also* Bankr. 20-20182, ECF Nos. 963; Case No. 4:23-cv-4787, ECF No. 197, Ex. 6.

[207] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 9. *See also* Bankr. 20-20182, ECF No. 1591.

[208] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 10. *See also* Bankr. 20-20182, ECF No. 2022; Case No. 4:23-cv-4787, ECF No. 186, Ex. 21.

[209] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 11. *See also* Bankr. 20-20182, ECF No. 2169; Case No. 4:23-cv-4787, ECF Nos. 186, Ex. 22; 205, Ex. 3.

[210] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 12. *See also* Bankr. 20-20182, ECF No. 2507; Case No. 4:23-cv-4787, ECF No. 186, Ex. 23.

[211] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 13. *See also* Bankr. 20-20182, ECF No. 2508; Case No. 4:23-cv-4787, ECF No. 186, Ex. 24.

[212] Bankr. 20-20182, ECF No. 2561; Case No. 4:23-cv-4787, ECF No. 205, Ex. 4.

[213] Bankr. 20-20182, ECF No. 2721.

Fees and Expenses as Co-Counsel to the Debtors for the Period from May 15, 2020 through December 14, 2020" (the " *J. C. Penney Final Fee Application*").[214] On April 8, 2021, Former Judge Jones approved the J. C. Penney Final Fee Application for fees in the amount of $1,087,263 and reimbursable expenses in the amount of $14,219.21, totaling $1,101,482.21 (the "*J. C. Penney Final Fee Order*").[215]  On June 30, 2021, Former Judge Jones signed a final decree closing certain of the J. C. Penney Debtors' chapter 11 cases, except for J. C. Penney Direct Marketing Services, LLC, Case No. 20-20184.[216]

Former Judge Jones presided over the jointly administered J. C. Penney Debtors' chapter 11 cases until October 13, 2023.[217] However, after Former Judge Jones announced his resignation and on October 13, 2023, the J. C. Penney Debtor's chapter 11 cases were randomly reassigned to Judge Christopher M. Lopez ("*Judge Lopez*").[218]

On November 2, 2023, the U.S. Trustee filed his Initial Vacatur Motion in the J. C. Penney case.[219] The U.S. Trustee also filed the "United States Trustee's Motion for Withdrawal of the Reference and Referral of Motion for Relief under Vacatur Motion and

---

[214] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 14. *See also* Bankr. 20-20182, ECF No. 2739; Case No. 4:23-cv-4787, ECF No. 186, Exs. 25, 26.

[215] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 15. *See also* Bankr. 20-20182, ECF No. 2874; Case No. 4:23-cv-4787, ECF No. 186, Ex. 27.

[216] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 3, ¶ 16. *See also* Bankr. 20-20182, ECF No. 3167; Case No. 4:23-cv-4787, ECF No. 186, Ex. 28.

[217] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 6. *See also* Bankr. 20-20184, 10/13/23 entry between ECF Nos. 1229, 1230.

[218] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 2, ¶ 6. *See also* Bankr. 20-20184, 10/13/23 entry between ECF Nos. 1229, 1230.

[219] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4, ¶ 17. *See also* Bankr. 20-20184, ECF No. 1236; Case No. 4:23-cv-4787, ECF No. 186, Ex. 29.

Related Matters."[220] On February 29, 2024, the U.S. Trustee filed his Vacatur Motion in the J. C. Penney case.[221]

Jackson Walker filed a response to the Vacatur Motion, and both Jackson Walker and the U.S. Trustee filed replies.[222] On February 15, 2024, Jackson Walker filed a "Motion to Substitute Counsel and to Withdraw" (the "*Motion to Substitute*").[223] The Bankruptcy Court  entered an order granting the Motion to Substitute on February 21, 2024.[224] On January 16, 2025, J. C. Penney filed "Old Copper Company, Inc.'s Joinder of the United States Trustee's Amended and Supplemental Motion for (1) Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief" (the "*J. C. Penney Joinder*").[225]

On January 28, 2025, J. C. Penney initiated the J.C Penney Adversary Proceeding.[226] On April 9, 2025, Chief Judge Moses entered her "Order Withdrawing the Reference."[227] On April 10, 2025, Jackson Walker filed its first motion to dismiss the J. C.

---

[220] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4, ¶ 18. *See also* Bankr. 20-20184, ECF No. 1237.

[221] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4, ¶ 19. *See also* Bankr. 20-20184, ECF No. 1351.

[222] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4, ¶ 20. *See also* Bankr. 20-20184, ECF Nos. 1472, 1496, & 1534; Case No. 4:23-cv-4787, ECF No. 205, Ex. 11, 12, 13.

[223] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4, ¶ 21. *See also* Bankr. 20-20184, ECF No. 1336; Case No. 4:23-cv-4787, ECF No. 186, Ex. 31.

[224] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4, ¶22. *See also* Bankr. 20-20184, ECF No. 1337; Case No. 4:23-cv-4787, ECF No. 186, Ex. 32.

[225] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 4-5, ¶ 23. *See also* Bankr. 20-20184, ECF No. 1644; Case No. 4:23-cv-4787, ECF No. 186, Ex. 33.

[226] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 5, ¶ 24. *See also* Bankr. Adv. No. 25-02002, ECF No. 1; Case No. 4:23-cv-4787, ECF No. 205, Ex. 14.

[227] Case No. 4:23-cv-4787, ECF Nos. 227, Ex. 1 at 5, ¶ 25, 31.

Penney Adversary Proceeding.[228] On May 1, 2025, J. C. Penney filed an amended complaint in the Adversary Proceeding (the "*J. C. Penney Amended Complaint*").[229] Also on May 1, 2025, J. C. Penney filed an objection and response to Jackson Walker's first motion to dismiss the J. C. Penney Adversary Proceeding.[230] On May 15, 2025, Jackson Walker filed a motion to dismiss the J. C. Penney Amended Complaint (the "*Motion to Dismiss*").[231] On June 5, 2025, J. C. Penney filed a response to the Motion to Dismiss.[232]

In June of 2025, Jackson Walker and J. C. Penney agreed to mediate the disputes between them, including the J. C. Penney Joinder and related matters which are the subject of the J. C. Penney Adversary Proceeding, with the Honorable (Ret.) James Peck serving as mediator.[233] On September 11, 2025, J. C. Penney filed a "Motion for Order Approving Compromise and Settlement Pursuant to Bankruptcy Rule 9019" (the " *J. C. Penney Settlement Motion*").[234] The J. C. Penney Settlement Motion attached a settlement agreement and release signed by J. C. Penney  and Jackson Walker (the "*J. C. Penney*

---

[228] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 5, ¶ 26. *See also* Bankr. Adv. No. 25-02002, ECF No. 10; Case No. 4:23-cv-4787, ECF No. 205, Ex. 15.

[229] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 5, ¶ 27. *See also* Bankr. Adv. No. 25-02002, ECF No. 12; Case No. 4:23-cv-4787, ECF No. 186, Ex. 4.

[230] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 5, ¶ 28. *See also* Bankr. Adv. No. 25-02002, ECF No. 13; Case No. 4:23-cv-4787, ECF No. 186, Ex. 19.

[231] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 5, ¶ 29. *See also* Bankr. Adv. No. 25-02002, ECF No. 14; Case No. 4:23-cv-4787, ECF No. 186, Ex. 18.

[232] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 5, ¶ 30. *See also* Bankr. Adv. No. 25-02002, ECF No. 15; Case No. 4:23-cv-4787, ECF No. 186. Ex. 19.

[233] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 31.

[234] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 32. *See also* Case No. 4:23-cv-04787, ECF No. 96; ECF No. 197, Ex. 11; ECF No. 186, Ex. 1, 2.

*Settlement*").[235] The J. C. Penney Settlement contemplates a single payment from Jackson Walker to J. C. Penney in the amount of $1,400,000.[236] On March 5, 2026, J. C. Penney and Jackson Walker executed an amendment to the J. C. Penney Settlement (the "*J. C. Penney Settlement Amendment*").[237]

Jackson Walker billed, and the prospective J. C. Penney Debtors paid, not less than $210,417.80 for legal fees and expenses incurred prior to the J. C. Penney Petition Date relating to the J. C. Penney Debtors' proposed chapter 11 cases.[238] Jackson Walker billed, and the J. C. Penney Debtors paid, not less than $1,101,482.21 for legal fees and expenses incurred on and between the J. C. Penney Petition Date and the J. C. Penney Confirmation Date.[239] J. C. Penney paid Jackson Walker not less than $2,029,885.09 (inclusive of retainer amounts applied) for legal fees and expenses incurred after the J. C. Penney Confirmation Date.[240] J. C. Penney stipulates, and Jackson Walker does not dispute, that through September 30, 2025, J. C. Penney paid not less than $659,246.12 to the Streusand Landon Ozburn Lemmon LLP law firm (the "*Lemmon Law Firm*") for attorneys' fees and costs related to Jackson Walker.[241] J. C. Penney stipulates, and Jackson Walker does not dispute,

---

[235] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 33. *See also* Case No. 4:23-cv-04787, ECF No. 96, Ex. 1; ECF No. 197, Ex. 11; ECF No. 186, Ex. 3.

[236] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3.

[237] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 34. *See also* Case No. 4:23-cv-04787, ECF No. 217, Ex. 1.

[238] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 35.

[239] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 36. *See also* Case No. 4:23-cv-04787, ECF No. 186, Ex. 27.

[240] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 7, ¶ 37.

[241] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 7, ¶ 38.

that through January 31, 2026, J. C. Penney paid not less than $148,963.39 to the law firm of Haynes and Boone for attorneys' fees and costs related to Jackson Walker.[242]

### b. The March 17, 2026 hearing

For the J. C. Penney Settlement Motion hearing held on Tuesday, March 17, 2026 before Chief Bankruptcy Judge Rodriguez the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel, Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of J. C. Penney, Eli Columbus and Jordan Chavez, along with Alan Carr, the co-plan administrator.

### i. Evidence

The following exhibits were either admitted into evidence or judicially noticed under FRE 201.

### a. For J. C. Penney

Pursuant to a joint stipulation[243] dated March 10, 2026, the following exhibits are authentic, were either admitted into evidence or were noticed under Federal Rule of Evidence ("*FRE*") 201 at the March 17, 2026, hearing to wit:

  i.    Exhibits 1, 2 and 3 were admitted

  ii.   The Court took judicial notice under FRE 201 of Exhibits 4, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, and 33

  iii.  The Court took judicial notice under FRE 201 that Exhibits 6 through 17 were attached to the J. C. Penney Amended Complaint as exhibits

---

[242] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 7, ¶ 39.

[243] Case No. 4:23-cv-4787, ECF No. 227-2, referring to J. C. Penney's exhibits filed at ECF No. 186.

iv.    The Court took judicial notice under FRE 201 that Exhibit 5 (Ex. 1 to the J. C. Penney Amended Complaint[244]) was attached to J. C. Penney Amended Complaint as an exhibit and was filed as ECF No. 1 in Case No. 4:24-mc-01523 (S.D. Tex.)[245]

v.    The Court took judicial notice under FRE 201 of Exhibit 1 (Ex. No. 34)[246]

vi.    The Court took judicial notice under FRE 201 of Exhibit 1 (Ex. No. 35)[247]

b.  **For the U.S. Trustee:**

The following exhibits at ECF No. 185 were either admitted into evidence or judicially noticed as follows:

i.    Exhibits 1 and 2 were admitted

ii.    The Court admitted Exhibits 12 and 14 but not for the truth of the matter asserted therein;

iii.    The Court took judicial notice under FRE 201 of Exhibits 15, 16 and 17

Pursuant to a joint stipulation[248] dated March 10, 2026, the following exhibits are authentic, were either admitted into evidence or were noticed under FRE 201 at the March 17, 2026, hearing:

i.    The Court took judicial notice under FRE 201 of Exhibits 2, 3, 4, 5, 6, 7 and 11

ii.    The Court admitted Exhibit 13

iii.    The Court admitted Exhibit 19 as a demonstrative under FRE 107

---

[244] Bankr. Adv. No. 25-02002, ECF No. 12.

[245] Case No. 4:23-cv-4787, ECF No. 186.

[246] Case No. 4:23-cv-4787, ECF No. 217.

[247] Case No. 4:23-cv-4787, ECF No. 219.

[248] Case No. 4:23-cv-4787, ECF No. 227-2 referring to the U.S. Trustee's exhibits filed at ECF No. 197.

The following deposition excerpts of Ross Forbes' deposition taken on February 17, 2026,[249] were admitted into evidence:

    i.    No. 11: Deposition Page No. 38, Line 13 – Page No. 40, Line 18

    ii.    Counter Designations: Page No. 42, Line 1-10; Page No. 41, Lines 24-25

    iii.    No. 14: Deposition Page No. 47, Line 9 – Page No. 48, Line 10

    iv.    No. 15: Deposition Page No. 52, Line 23 – Page No. 53. Line 7

    v.    No. 16: Deposition Page No. 53, Lines 24 – Page No. 54: 15[250]

### c.  For Jackson Walker

Pursuant to a joint stipulation[251] dated March 10, 2026, the following exhibits are authentic, were either admitted into evidence or were noticed under FRE 201 at the March 17, 2026, hearing, to wit:

    i.    The Court took judicial notice under FRE 201 of Exhibits 3, 4, and 11, 12, 13, 14 and 15

    ii.    The Court admitted Exhibit 6

The Court admitted the exhibit at ECF No. 244 as follows:

    i.    The Court admitted Exhibit 1 as a demonstrative under FRE 107[252]

### ii.  Credibility of the witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[253] At the March 17, 2026, hearing, Alan Carr ("*Mr. Carr*"), the co-plan administrator of J. C. Penney

---

[249] Case No. 4:23-cv-4787, ECF No. 199, Ex. 1, referring to deposition transcript at ECF No. 185, Ex. 19.

[250] Case No. 4:23-cv-4787, ECF No. 199-1.

[251] Case No. 4:23-cv-4787, ECF No. 227-2 referring to Jackson Walker Exhibits filed at ECF No. 205.

[252] Case No. 4:23-cv-4787, ECF No. 244.

[253] *O'Connor v. Burg* (*In re Burg*), 641 B.R. 120 (Bankr. S.D. Tex. 2022); *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc*, 42 F.3d 312, 318 (5th Cir.

was sworn in and took the witness stand.[254] Mr. Carr holds a bachelor's degree from Brandeis University and a juris doctorate from Tulane Law School, *cum laude*.[255] He was a practicing bankruptcy attorney for approximately eight-and-a-half years at several different firms, most recently at a law firm named Skadden Arps in New York.[256] Then he worked for ten years at an investment firm called Strategic Value Partners where he invested in distressed credit, litigation claims, and other litigation-related matters.[257]

In 2013, Mr. Carr started a firm called Drivetrain which provides independent fiduciary services including wind-downs of estates, litigation and liquidating trusts, and he also serves in his individual capacity as an independent director for financially distressed companies.[258] Mr. Carr is the managing member and CEO of Drivetrain, but he is involved in J. C. Penney in his individual capacity.[259] Mr. Carr became co-plan administrator of J. C. Penney around January of 2021.[260] As co-plan administrator of J. C. Penney, his primary duty is to follow the requirements for wind-down of the estates under a chapter 11 plan, which includes resolving and objecting to claims, distributing proceeds, and receiving and liquidating remaining assets.[261] Mr. Carr has served as a plan administrator or similar roles, such as wind-down trustee, several other times.[262]

---

1995)).

[254] Mar. 17, 2026 Hr'g Tr. at 78.

[255] Mar. 17, 2026 Hr'g Tr. at 78.

[256] Mar. 17, 2026 Hr'g Tr. at 78.

[257] Mar. 17, 2026 Hr'g Tr. at 78–79.

[258] Mar. 17, 2026 Hr'g Tr. at 79.

[259] Mar. 17, 2026 Hr'g Tr. at 79.

[260] Mar. 17, 2026 Hr'g Tr. at 79.

[261] Mar. 17, 2026 Hr'g Tr. at 80.

[262] Mar. 17, 2026 Hr'g Tr. at 80.

At the hearing, Mr. Carr responded to questions clearly, competently and directly.[263] Thus, the Court finds that Mr. Carr is a credible witness and gives substantial weight to his testimony.

### iii.     Terms of the J. C. Penney Settlement[264]

The J. C. Penney Settlement, as amended by the J. C. Penney Settlement Amendment, provides, among other things:

> 2(b) Effective Date . . . For the avoidance of doubt, the Settlement Motion, Approval Order, and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Wind Down Debtors and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the JCP Bankruptcy Cases and the JCP Adversary Proceeding and that this Agreement meets the standards required for approval under rule 9019 of the Bankruptcy Rules;[265] *provided however,* that nothing herein shall prohibit or be deemed to prohibit the U.S. Trustee from seeking any non-monetary sanctions as part of its the U.S. Trustee Filings pending in the JCP Bankruptcy Cases and JW's rights and defenses to the same shall not be modified or impaired by this Agreement and are hereby preserved in all respects…

> 3. Settlement Payment. Within five (5) business days after the Approval Order becoming a Final Order, JW shall pay or cause to be paid to the Wind Down Debtors (receipt of which shall be promptly confirmed by the Wind Down Debtors) the sum of $1,400,000.00 USD (the "Settlement Payment"). The Settlement Payment shall be made payable to the Wind Down Debtors' account by wire transfer using the instructions provided in writing by the Wind Down Debtors to JW.

---

[263] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses to make credibility determinations).

[264] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3, ECF No. 217, Ex. 1.

[265] Case No. 4:23-cv-4787, ECF No. 217, Ex. 1. (deleting the clause "and that this Agreement adequately sanctions JW monetarily for an alleged violations of any law, rule, procedure, or statute;" and replacing the clause with "and that this Agreement meets the standards required for approval under rule 9019 of the Bankruptcy Rules;")

4(a) <u>Release in Favor of JW.</u> On the Effective Date, and for the consideration described herein, and except for those obligations created b or arising out of this Agreement, the Wind Down Debtors hereby release, acquit, and forever discharge JW and its respective predecessors in interest, successors, affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, reinsurers, attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses , liabilities, expenses. attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect. material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the JCP Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes, the JCP Adversary Proceeding, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Wind Down Debtors against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, disgorgement, fraud (or similar fraud based claims), and/ or requests for sanctions.

6. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Wind Down Debtors against JW or any other released parties as well as any possible claim by JW against the Wind Down Debtors or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and / or breach of this Agreement.

10. <u>Cooperation and Withdrawal / Dismissal with Prejudice.</u> The Parties will cooperate with each other to give effect to the Agreement, and the Wind Down Debtors shall, within three (3) business days after the Effective Date

withdraw its joinder to the U.S. Trustee Filings, and shall dismiss the JCP Adversary Proceeding, each with prejudice.

c.　**Application of the *Jackson Brewing* Factors to the J. C. Penney Settlement**

The Court will next review the J. C. Penney Settlement in accordance with the *Jackson Brewing* Factors.

### Factor 1: Probability of success in the litigation, with due consideration for the uncertainty in fact and law

The Court will now consider the probability of J. C. Penney's success in the litigation, with due consideration for the uncertainty in fact and law.[266]

The J. C. Penney Settlement provides a broad release from J. C. Penney in favor of Jackson Walker for all potential claims that J. C. Penney may have relating to the Jones-Freeman Relationship.[267] Mr. Carr testified about his process of investigating potential claims against Jackson Walker. Mr. Carr hired the Lemmon Law Firm to conduct this investigation, which included monitoring the Miscellaneous Proceeding and reviewing related discovery materials.[268] Based on the investigation, the Lemmon Law Firm informed Mr. Carr of its conclusion that Mr. Carr possessed a potential cause of action against Jackson Walker.[269] Subsequently, the Lemmon Law Firm sent a demand letter to Jackson Walker requesting monetary damages.[270] When Jackson Walker refused to comply with the demand, the Lemmon Law Firm initiated the J. C. Penney Adversary Proceeding in January 2025.[271]

---

[266] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[267] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3 at 4.

[268] Mar. 17, 2026 Hr'g Tr. at 82, 83.

[269] Mar. 17, 2026 Hr'g Tr. at 83.

[270] Mar. 17, 2026 Hr'g Tr. at 83.

[271] Mar. 17, 2026 Hr'g Tr. at 83-84.

Mr. Carr reviewed the J. C. Penney Amended Complaint before it was filed and approved its filing by the Lemmon Law Firm.[272] The J. C. Penney Amended Complaint alleges two causes of action against Jackson Walker: (1) breach of fiduciary duty and (2) negligence.[273] The primary relief sought is disgorgement of all legal fees paid to Jackson Walker in connection with the J. C. Penney Debtors' bankruptcy cases and additional damages for costs incurred due to the nondisclosure and subsequent investigations.[274]

In connection with the J. C. Penney Debtors' bankruptcy cases, Jackson Walker was paid a total of $3,341,785.10, consisting of $1,101,482.21 under the J. C. Penney Final Fee Order, $2,029,885.09 for post-confirmation services, and not less than $210,417.80 in prepetition fees and expenses.[275] Following the emergence of claims against Jackson Walker, J. C. Penney incurred significant costs in prosecuting those claims, including $659,246.12 paid to the Lemmon Law Firm and at least $148,963.39 paid to Haynes and Boone through January 21, 2026 for Jackson Walker-related matters, with additional unknown amounts incurred leading up to the March 17, 2026 hearing.[276] Notably, while Haynes and Boone was retained to replace Jackson Walker as counsel for J. C. Penney, the firm did not begin billing for matters related to the Jackson Walker causes of action until after taking over the J. C. Penney Settlement Motion.[277]

---

[272] Mar. 17, 2026 Hr'g Tr. at 85.

[273] Case No. 4:23-cv-4787, ECF No. 186, Ex. 4 at 31, 34.

[274] Case No. 4:23-cv-4787, ECF No. 186, Ex. 4 at 36.

[275] Case No. 4:23-cv-4787, ECF No. 186, Ex. 27; ECF No. 227, Ex. 1 at 6, 7.

[276] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 7; Mar. 17, 2026 Hr'g Tr. at 104–05.

[277] Mar. 17, 2026 Hr'g Tr. at 104–05.

Jackson Walker and J. C. Penney have reached a $1,400,000 settlement.[278] If J. C. Penney were to prevail in litigation rather than settle, the total amount of potentially recoverable fees from Jackson Walker would be approximately $4,149,994.61, representing both the fees paid to Jackson Walker and the subsequent costs paid to the Lemmon Law Firm and Haynes and Boone for pursuing claims against Jackson Walker.

The J. C. Penney Amended Complaint alleges Jackson Walker knew of the Jones-Freeman Relationship through multiple attorneys but deliberately concealed it from clients, the court, and other parties, violating bankruptcy disclosure requirements, professional conduct rules, and fiduciary duties.[279] Allegedly, after allegations surfaced in March 2021, Jackson Walker ignored advice from ethics counsel and crisis management professionals and engaged in a "cover-up" instead of making required disclosures.[280] The J. C. Penney Amended Complaint alleges that this failure to disclose rendered Jackson Walker not "disinterested" as required by the Bankruptcy Code, justifying complete fee disgorgement regardless of work quality.[281] J. C. Penney also seeks disgorgement of fees paid to Jackson Walker, based on the same factual underpinnings, through the J. C. Penney Joinder.[282]

Mr. Carr reviewed and approved the J. C. Penney Settlement Motion, and its attached J. C. Penney Settlement, before it was filed.[283] Mr. Carr testified that in the exercise of his business judgment, he considered the proceeds being received compared against his view of the strength of the causes of action being settled, the defenses that would

---

[278] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3 at 3.

[279] Case No. 4:23-cv-4787, ECF No. 186, Ex. 4 at 2–3.

[280] Case No. 4:23-cv-4787, ECF No. 186, Ex. 4 at 7–16.

[281] Case No. 4:23-cv-4787, ECF No. 186, Ex. 4 at 35–36.

[282] Case No. 4:23-cv-4787, ECF No. 186, Ex. 33.

[283] Mar 17, 2026 Hr'g Tr. at 89–90, 125.

be raised, the time and cost that would be taken to prosecute these claims, discovery, trial, and the collectability of those claims.[284] In Mr. Carr's view, the claims asserted against Jackson Walker are "strong claims but [are] not without risk of defense and cost."[285]

Mr. Carr relied extensively on the Lemmon Law Firm to inform his settlement decision and to educate himself on the relevant legal issues and facts.[286] In fact, Mr. Carr's testimony shows that he lacked familiarity with the details of discovery materials or pleadings related to the Jackson Walker fee dispute. For example, Mr. Carr admitted he did not attend any depositions, other than his own, or hearings related to the Jackson Walker fee dispute, and spent only one day personally reviewing discovery documents produced in connection with the Vacatur Motions.[287] Mr. Carr also could not recall reviewing certain documents, or considering certain factors that the U.S. Trustee believed were important in evaluating the likelihood of success of the litigation. For instance, the J. C. Penney Settlement Motion asserts there is a significant likelihood that the J. C. Penney Final Fee Order would be vacated, but Mr. Carr does not recall if he considered the probability of the J. C. Penney Retention Order being vacated.[288] Additionally, although Mr. Carr stated that he reviewed the J. C. Penney Amended Complaint, he does not recall whether he reviewed all the exhibits attached to it before it was filed.[289]

But the evidence shows that Mr. Carr possessed, at the time he entered into the J. C. Penney Settlement Agreement, a fundamental understanding of the claims he is settling

---

[284] Mar. 17, 2026 Hr'g Tr. at 90, 92.

[285] Mar. 17, 2026 Hr'g Tr. at 85.

[286] Mar. 17, 2026 Hr'g Tr. at 82–83.

[287] Mar. 17, 2026 Hr'g Tr. at 98, 99.

[288] Case No. 4:23-cv-4787, ECF No. 186, Ex. 1 at 8; Mar. 17, 2026 Hr'g Tr. at 101, 103.

[289] Mar. 17, 2026 Hr'g Tr. at 120.

and a familiarity with the risks involved in proceeding to trial. Mr. Carr personally reviewed the J. C. Penney Settlement and the J. C. Penney Amended Complaint.[290] Mr. Carr was aware of the claims and allegations being brought in the Amended Complaint and that vacating the J. C. Penney Final Fee Order would make it possible to disgorge fees from Jackson Walker.[291] Mr. Carr also knew that there is a pending motion to dismiss the J. C. Penney Adversary Proceeding and that no discovery had commenced in that adversary proceeding.[292] It was also not improper for Mr. Carr to rely on his counsel's review of discovery material to reach his decision to settle, especially given his experience in these types of matters. Mr. Carr explained that he has served as an investor in potential and actual causes of action, worked as an independent director investigating potential claims for estates in bankruptcy proceedings, and acted as a litigation trustee.[293] His experience includes prosecuting and settling claims for both plaintiffs and defendants.[294] In his experience as a plan agent, it is common for him to direct counsel to: investigate, review discovery, provide analysis, advise him, and to share with him relevant information from discovery.[295] Based on his experience, Mr. Carr believed the J. C. Penney Settlement with Jackson Walker was fair.[296]

Although the evidence demonstrates that Mr. Carr possessed familiarity with the claims he was settling on behalf of J. C. Penney, and associated risks, the Court "must

---

[290] Mar. 17, 2026 Hr'g Tr. at 85, 89–90.

[291] Mar. 17, 2026 Hr'g Tr. at 85, 89–90, 103.

[292] Mar. 17, 2026 Hr'g Tr. at 85, 87.

[293] Mar. 17, 2026 Hr'g Tr. at 95.

[294] Mar. 17, 2026 Hr'g Tr. at 95.

[295] Mar. 17, 2026 Hr'g Tr. at 133.

[296] Mar. 17, 2026 Hr'g Tr. at 95.

make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[297]

The Motion to Dismiss and Jackson Walker's response to the Vacatur Motions raise several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to J. C. Penney. For example, the Motion to Dismiss asserts, *inter alia*, that: (1) the J. C. Penney Reorganization Plan included a broad release and exculpation provisions protecting Jackson Walker from all known and unknown claims; (2) J. C. Penney's breach of fiduciary duty claim is barred by the anti-fracturing rule preventing conversion of professional negligence claims into breach of fiduciary duty claims; (3) Jackson Walker had no duty to disclose under Bankruptcy Rule 2014 because there was no duty to supplement disclosures after plan confirmation, which was before Jackson Walker had any indication of the Jones-Freeman Relationship; (4) a claim for breach of fiduciary cannot be supported by theories of imputed knowledge of the Jones-Freeman Relationship; and (5) J. C. Penney's negligence claim fails because there are no allegations of causation or damages.[298] Similarly, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[299]

---

[297] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[298] Case No. 4:23-cv-4787, ECF No. 186, Ex. 18 at 5.

[299] Case No. 4:23-cv-4787, ECF No. 205, Ex. 11 at 52, 57, 60, 94.

Although this Court will not now conduct a mini-trial of the merits of J. C. Penney's claims, it is clear from a canvassing of the J. C. Penney Amended Complaint, the Vacatur Motion, related pleadings, and the allegations therein, that the claims against Jackson Walker raise fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involve interpretation of a complex chapter 11 plan.[300]    A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented, and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Carr's credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Carr, the co-plan administrator of J. C. Penney, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and the J. C. Penney Adversary Proceeding and securing a judgment in an amount exceeding the $1,400,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the J. C. Penney Settlement.

**Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience, and delay**

---

[300] Case No. 4:23-cv-4787, ECF No. 186, Ex. 4.

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience, and delay associated with proceeding to trial as compared to consummating the J. C. Penney Settlement.[301]

As to a trial on the Vacatur Motions, although this Court has not conducted a pre-trial conference to determine the length of the trial,[302] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[303] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[304] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[305] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[306] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 2, 2023.[307] Although extensive discovery has been conducted on the Vacatur Motions, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[308] Moreover, the extent and timing of Jackson Walker's

---

[301] *See In re Beach*, 731 F. App'x 322 at 326.

[302] *See* Dec. 9, 2025 Min. Entry.

[303] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[304] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[305] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[306] Dec. 9, 2025 status conference (statements by the Court).

[307] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 186, Ex. 29.

[308] *See e.g.*, Case No. 23-645, ECF 516.

knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement. As such, a trial on the merits of the Vacatur Motions would be very lengthy and likely incur significant expenses for the parties involved. The J. C. Penney Adversary Proceeding and each of the Vacatur Motions stem from Jackson Walker's duty of disclosure regarding the Freeman-Jones Relationship.[309] Thus, if J. C. Penney is unable to settle its claims in the J. C. Penney Adversary Proceeding or the J. C. Penney Joinder, prosecution of J. C. Penney's claims would require J. C. Penney to participate in a lengthy trial and incur additional significant expenses.

J. C. Penney and Jackson Walker have previously agreed on record that Jackson Walker is entitled to a jury trial in the J. C. Penney Adversary Proceeding and that it should proceed on a separate timeline from the Vacatur Motions.[310] No trial date or pretrial conference has been set for the J. C. Penney Adversary Proceeding. The Motion to Dismiss was filed on May 15, 2025.[311] And on April 10, 2025, Jackson Walker filed a motion to strike a request for intervention in the J. C. Penney Adversary Proceeding (the "*Motion to Strike*").[312] No action has been taken by the Court on either the Motion to Dismiss or the Motion to Strike. With no trial date currently set and motions still pending, litigating the J. C. Penney Adversary Proceeding through trial would likely result in significant delays in any potential payments to the J. C. Penney estates compared to consummating a settlement.

---

[309] *See* Case No. 4:23-cv-4787, ECF No. 186, Ex. 4, 33.

[310] Dec. 9, 2025 Min. Entry.

[311] Case No. 25-2002, ECF No. 14.

[312] Case No. 25-2002, ECF No. 11.

And because the J. C. Penney Adversary Proceeding and the Vacatur Motions stem from the same factual underpinnings, any trial on the J. C. Penney Adversary Proceeding would entail similar complexities and costs as a trial on the Vacatur Motions, especially given that the trial on the J. C. Penney Adversary Proceeding will require a jury. Finally, Mr. Carr testified that in the exercise of his business judgment, he considered the time and cost associated with prosecuting claims against Jackson Walker, including discovery and trial.[313]

Accordingly, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Carr's credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Carr, the co-plan administrator of J. C. Penney, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $1,400,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the J. C. Penney Settlement.

**Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views**

Next, the Court will consider whether the J. C. Penney Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[314]

The settlement proceeds from the J. C. Penney Settlement would be distributed to the Holders of Allowed Class 4 First Lien Claims ("*Class 4 Creditors*"), as defined in the

---

[313] Mar. 17, 2026 Hr'g Tr. at 90, 92.

[314] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

J. C. Penney Plan of Reorganization.[315] Mr. Carr did not consult with any of the Class 4 Creditors about signing the J. C. Penney Settlement before he did so.[316] But, notice of the filing of the J. C. Penney Settlement Motion was sent out to creditors of J. C. Penney and no creditors objected to settlement.[317] The U.S. Trustee filed an objection[318] to the J. C. Penney Settlement Motion but that objection has been resolved through the Global Joint Stipulation.[319] Additionally, proceeds of the J. C. Penney Settlement will allow Mr. Carr to make final distributions to J. C. Penney estate stakeholders, wind up, and close any open J. C. Penney bankruptcy estates.[320] Other than the claims against Jackson Walker, there are no material remaining assets available for liquidation or collection by J. C. Penney.[321] There is also a fixed cost to keeping an estate open and Mr. Carr believes the causes of action against Jackson Walker are preventing the closing out of the J. C. Penney estates and preventing distributions of millions of dollars to J. C. Penney's creditors.[322] Although Mr. Carr previously made interim distributions to creditors, he testified that he cannot make further distributions due to the uncertain duration of the Jackson Walker-related litigation and the need to fund ongoing administrative expenses for monitoring and pursuing that litigation.[323]

---

[315] Mar. 17, 2026 Hr'g Tr. at 94; Case No. 4:23-cv-4787, ECF No. 186, Ex. 21, at 25.

[316] Mar. 17, 2026 Hr'g Tr. at 104.

[317] Mar. 17, 2026 Hr'g Tr. at 95; Case No. 4:23-cv-04787, ECF No. 219, Ex. 35.

[318] Case No. 4:23-cv-04787, ECF No. 99.

[319] Case No. 4:23-cv-04787, ECF No. 225 at 2, ¶ 6.

[320] Mar. 17, 2026 Hr'g Tr. at 94.

[321] Mar. 17, 2026 Hr'g Tr. at 93–94.

[322] Mar. 17, 2026 Hr'g Tr. at 134, 136.

[323] Mar. 17, 2026 Hr'g Tr. at 136.

The evidence admitted at the March 17, 2026 hearing therefore demonstrates that no creditors objected to the J. C. Penney Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow beneficiaries of the J.C. Penney estate to be paid sooner while reducing administrative expenses as compared to proceeding to trial on the merits.

Accordingly, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Carr's credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Carr, the co-plan administrator of J. C. Penney, gave due consideration to whether the J. C. Penney Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Therefore, the third factor weighs in favor of approving the J. C. Penney Settlement.

**Factor 4:** **The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

Next, the Court will consider the extent to which the J. C. Penney Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[324]

The Lemmon Law firm, in late 2024, sent a letter to Jackson Walker demanding monetary damages related to the Freeman-Jones Relationship.[325] In December 2024, Mr. Carr and co-plan administrator, Mr. Steven Panagos (collectivity, the "*Co-Plan Administrators*"), conducted a settlement conference with Jackson Walker's counsel but failed to reach a settlement.[326] Thereafter, J. C. Penney filed the J. C. Penney Joinder on

---

[324] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[325] Mar. 17, 2026 Hr'g Tr. at 83

[326] Mar. 17, 2026 Hr'g Tr. at 83.

January 16, 2026.[327] On January 28, 2025, J. C. Penney initiated the J. C. Penney Adversary Proceeding against Jackson Walker.[328] The Co-Plan Administrators renewed settlement discussions with Jackson Walker in or around June of 2025.[329] Also, in or around June 2025, Jackson Walker and the J. C. Penney wind-down debtors agreed to mediate the disputes between them, with the Honorable (Ret.) James Peck serving as mediator.[330] Both Co-Plan Administrators were involved in settlement negotiations and mediation and agreed to the terms of the J. C. Penney Settlement reached through the meditation.[331]

The extensive settlement negotiations and mediation between Jackson Walker and the Co-Plan Administrators demonstrate that the J. C. Penney Settlement was reached at arm's-length, and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 17, 2026 hearing, the Court finds that the J. C. Penney Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the J. C. Penney Settlement.

### Factor 5: All other factors bearing on the wisdom of the compromise

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn: (1) whether the J. C. Penney Settlement affects the integrity of the judicial system; (2) the difficulty of collecting a judgment from Jackson Walker; and (3)

---

[327] Case No. 4:23-cv-4787, Ex. 227-1 at 4-5, ¶ 23. *See also* Bankr. 20-20184, ECF No. 1644; Civil Case No. 4:23-cv-4787, ECF No. 186, Ex. 33.

[328] Mar. 17, 2026 Hr'g Tr. at 83–84; Case No. 4:23-cv-4787, Ex. 227-1 at 5, ¶ 24. *See also* Bankr. Adv. No. 25-02002, ECF No. 1; Case No. 4:23-cv-4787, ECF No. 205, Ex. 14.

[329] Mar. 17, 2026 Hr'g Tr. at 83.

[330] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 6, ¶ 31.

[331] Mar. 17, 2026 Hr'g Tr. at 88, 91.

whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motions, if any, may be accepted by J. C. Penney and its creditors.[332]

### i. Whether approval of the J. C. Penney Settlement will negatively impact or promote the integrity of the judicial system

The Court will now consider whether the J. C. Penney Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[333]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the J. C. Penney Settlement, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit J. C. Penney and its creditors from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[334] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[335]

In considering what impact, if any, the J. C. Penney Settlement could have on the Vacatur Motion, the Court will look first to the J. C. Penney Settlement's plain language.[336] Paragraph 4(a) of the J. C. Penney Settlement provides, in pertinent part, that:

---

[332] *See In re MCorp Fin.*, 160 B.R. at 951.

[333] *See In re Bates*, 211 B.R. at 345 (citing cases).

[334] Case No. 4:23-cv-04787, ECF No. 99 (incorporating ECF Nos. 68-69, 71, 93).

[335] Case No. 4:23-cv-04787, ECF No. 255.

[336] *Estate of Kokernot v. C.I.R.*, 112 F.3d 1290, 1294 (5th Cir. 1997) ("A settlement agreement is a contract . . . . If the language of the agreement is unambiguous, . . . the meaning will be determined from the terms encompassed within the proverbial four corners of the agreement. Where the language is not so clear, however, we will examine the language within the context of the circumstances surrounding the execution

"On the Effective Date, and for the consideration described herein, and except for those obligations created or arising out of this Agreement, [J. C. Penney] hereby release, acquit, and forever discharge [Jackson Walker] . . . from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses , liabilities, expenses, attorneys' fees and causes of action of any kind, . . . including but not limited to any and all claims and causes of action that relate to or arise from the JCP Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes, the JCP Adversary Proceeding, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by [J. C. Penney] against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, disgorgement, fraud (or similar fraud based claims), and/ or requests for sanctions.[337]

Although the language of paragraph 4(a) creates a broad release of claims, it expressly provides that J. C. Penney will only release claims that J. C. Penney may have against Jackson Walker.[338] Paragraph 4(a) does not provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[339]

Paragraph 6 of the J. C. Penney Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by [J. C. Penney] against [Jackson Walker] or any other released parties.[340]

Like paragraph 4(a), paragraph 6 of the J. C. Penney Settlement references possible claims by J. C. Penney against Jackson Walker and does not reference any relief sought by the U.S. Trustee.[341] Indeed, the U.S. Trustee is not identified as a releasing party and is not a

---

of the agreement.").

[337] Case No. 4:23-cv-04787, ECF No. 186, Ex. 3 at 4, ¶ 4(a).

[338] Case No. 4:23-cv-04787, ECF No. 186, Ex. 3 at 4, ¶ 4(a).

[339] Case No. 4:23-cv-04787, ECF No. 186, Ex. 3 at 4, ¶ 4(a).

[340] Case No. 4:23-cv-04787, ECF No. 186, Ex. 3 at 5, ¶ 6.

[341] Case No. 4:23-cv-04787, ECF No. 186, Ex. 3 at 4, ¶ 4(a); Ex. 3 at 5, ¶ 6.

signatory to the J. C. Penney Settlement. Thus, the Court finds that the J. C. Penney Settlement only provides for the release of any claims J. C. Penney may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the J. C. Penney Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by J. C. Penney, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates, such as the J. C. Penney estate, may hold.[342] But, through the Global Joint Stipulation, the U. S. Trustee, Jackson Walker and J. C. Penney all "acknowledge and agree" that the J. C. Penney Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[343] There is no language in the J. C. Penney Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the J. C. Penney Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[344] Thus, the Court finds that the J. C. Penney Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by J. C. Penney, or independent and distinct relief from claims the estates, such as the J. C. Penney estate, may hold.

---

[342] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[343] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[344] *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 583 (5th Cir. 2008) ("Whether a specific cause of action belongs to a bankruptcy estate is likewise a matter of law that we decide by reference to the facial allegations in the complaint.").

At the March 17, 2026 hearing, the U.S. Trustee asserted that Jackson Walker's counsel had previously represented to the Court that the J. C. Penney Settlement Motion would limit J. C. Penney's recovery to the $1,400,000 settlement amount.[345] For example, in a pleading filed in response to a December 9, 2025 status conference order, Jackson Walker stated that "Jackson Walker reserves all rights to argue that the settlement motions (if approved) would impact a settling estate's ability to receive amounts in excess of the settled amount in light of the release provisions set forth in each settlement agreement."[346] But, in the Global Joint Stipulation, Jackson Walker stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[347] Therefore, the Court finds that the J. C. Penney Settlement does not preclude J. C. Penney and its creditors from accepting funds in addition to the $1,400,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Additionally, there is no language in the J. C. Penney Settlement, as amended by the J. C. Penney Settlement Amendment,[348] that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

---

[345] Mar. 17, 2026 Hr'g Tr. at 20.

[346] Case No. 4:23-cv-04787, ECF No. 185, Ex. 16 at 2.

[347] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[348] Case No. 4:23-cv-4787, ECF No. 217, Ex. 1. (deleting the clause "and that this Agreement adequately sanctions JW monetarily for an alleged violations of any law, rule, procedure, or statute;" and replacing the clause with "and that this Agreement meets the standards required for approval under rule 9019 of the Bankruptcy Rules;").

Accordingly, after a review of the evidence now in the record, including the J. C. Penney Settlement and Global Joint Stipulation, the Court finds that the J. C. Penney Settlement: (i) only released any claims J. C. Penney has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the J. C. Penney Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by J. C. Penney, or independent and distinct relief from claims the estates, such as the J. C. Penney estate, may hold; (iv) does not preclude J. C. Penney and its creditors from accepting funds in addition to the $1,400,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Therefore, the Court finds that the J. C. Penney Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the J. C. Penney Settlement.

### ii.    Consideration of collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[349] Mr. Carr testified that, in reaching his decision to settle, he

---

[349] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, No. 21-70009, 2025 Bankr. LEXIS 1857, at *12 (Bankr. S.D. Tex. Aug. 4, 2025).

considered the "collectability of those claims" J. C. Penney asserted against Jackson Walker.[350] But, Mr. Carr admitted that, prior to entering into the J. C. Penney Settlement, he did not conduct any investigation or educate himself regarding Jackson Walker's ability to pay J. C. Penney.[351] Nor does Mr. Carr recall Jackson Walker making any representations to him regarding Jackson Walker's ability to satisfy any obligations it may have to J. C. Penney.[352]

A public article entitled "Jackson Walker Ranks Among Top 100 in 2025 Leopard Law Firm Index," dated February 27, 2025, and written by Leopards Solutions (the "*Leopards Solutions Article*"), recognizes Jackson Walker for its purported "consistent and stable growth, retention, and overall success" throughout 2024.[353] An article by the Texas Lawbook entitled "Lawbook 50: Eight Firms – All Texas, All the Time, All Profitable," dated May 20, 2025 (the "*Texas Lawbook Article*"), states that Jackson Walker reported $453.6 million in revenue in 2024.[354] Mr. Carr had no knowledge of either the Leopards Solutions Article or the Texas Lawbook Article. [355] Mr. Carr admitted that, at the time of signing the J. C. Penney Settlement, he was not aware of Jackson Walker's 2023 or 2024 revenue.[356]

Because Mr. Carr did not investigate the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency,

---

[350] Mar. 17, 2026 Hr'g Tr. at 90.

[351] Mar. 17, 2026 Hr'g Tr. at 107.

[352] Mar. 17, 2026 Hr'g Tr. at 115–16.

[353] Case No. 4:23-cv-04787, ECF No. 185, Ex, 12.

[354] Case No. 4:23-cv-04787, ECF No. 185, Ex, 14.

[355] Mar. 17, 2026 Hr'g Tr. at 115, 116.

[356] Mar. 17, 2026 Hr'g Tr. at 117.

or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the J. C. Penney Settlement.

### iii. Whether the bankruptcy estate of J. C. Penney may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment

At the March 17, 2026 hearing, Mr. Carr testified that consummation of a settlement would allow him to wind down and administratively close any wind-down estates of J. C. Penney that remained open and prevent additional accrual of administration fees associated with keeping an estate open.[357] In response, the Court, *sua sponte*, expressed concerns as to whether a bankruptcy estate could accept and distribute any additional funds over and above amounts in any of the Settlement Agreements, if ordered by the Court after a final trial on the merits of the Vacatur Motions, if a bankruptcy estate was wound down and closed administratively.[358] As a result, the Court entered its order for post-trial briefing[359] where the Court directed J. C. Penney and other parties to address the following questions posed by the Court, to wit:

> (1) whether the proposed settlements may be approved without impairing the United States Trustee's pending Vacatur Motions or the Court's inherent authority to order vacatur or additional relief; (2) in the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; and (3) if the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of [J. C. Penney] to the disposition of funds upon wind-down and closure, including where such funds would be distributed.[360]

---

[357] Mar. 17, 2026 Hr'g Tr. at 94.

[358] Mar. 17, 2026 Hr'g Tr. at 297.

[359] Case No. 4:23-cv-04787, ECF No 248.

[360] Case No. 4:23-cv-04787, ECF No 248.

On April 10, 2026, J. C. Penney filed "J. C. Penney Wind Down Debtors' Brief In Response To This Court's Order Regarding The Wind-Down Debtors' Settlement Motion" (the "*J. C. Penney Brief*").[361] On April 17, 2026, the U.S. Trustee filed the "United States Trustee's Post-Hearing Reply Brief" (the "*Post-Hearing Reply Brief*").[362] In the J. C. Penney Brief, J. C. Penney asserts that (1) the J. C. Penney Settlement may be approved without impairing the U.S. Trustee's Vacatur Motion; (2) if J. C. Penney obtains a final decree after approval and payment of the J. C. Penney Settlement, the bankruptcy case may be reopened to allow for distribution of additional funds, if any, ordered to be paid by Jackson Walker to J. C. Penney; and (3) even if the wind-down estates of J. C. Penney are not reopened, an alternative mechanism for distribution of additional funds exists.

A party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[363] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[364] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[365] Further, Bankruptcy Rule 5010 provides that the court may reopen a case upon a motion filed by the debtor or

---

[361] Case No. 4:23-cv-04787, ECF No 281.

[362] Case No. 4:23-cv-04787, ECF No 282.

[363] *See In re JCP Props.*, 540 B.R. 596, 605 (Bankr. S.D. Tex. 2015); *In re Lager*, No. 22-30072-MVL11, 2024 Bankr. LEXIS 1974, at *7 (Bankr. N.D. Tex. Aug. 22, 2024).

[364] Fed. R. Bankr. P. 3022.

[365] 11 U.S.C. § 350(b).

another party in interest.[366] Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[367] There is no pending motion to close or reopen the J. C. Penney Case. As explained *supra*, the J. C. Penney Settlement does not impact the ability of J. C. Penney to receive any additional funds that the Court may potentially order Jackson Walker to pay.[368] Moreover, there is nothing in the J. C. Penney Settlement that prevents J. C. Penney from filing a motion for a final decree or a motion to re-open the case, if it finds it appropriate to do so.

Thus, after a careful review of the J. C. Penney Brief, and the assertions made therein, the Court finds it unnecessary, as of this moment, to consider whether the bankruptcy estate would need to be closed or reopened for J. C. Penney to receive and distribute any additional funds ordered by the Court in excess of the $1,400,000 settlement.

However, the Court's finding that the J. C. Penney Settlement neither affects J. C. Penney's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $1,400,000 settlement, nor prevents J. C. Penney from filing a motion for a final decree or to re-open the J. C. Penney Case as it deems appropriate, supports approval of the J. C. Penney Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the J. C. Penney Settlement be approved

Jackson Walker and J. C. Penney have agreed to a $1,400,000 settlement.[369] If J. C. Penney were to prevail at trial rather than accept the settlement, the total amount of

---

[366] Fed. R. Bankr. P. 5010.

[367] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

[368] *See supra* Section I.D.c.2.c.5.i.

[369] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3 at 3.

potentially recoverable fees from Jackson Walker would be approximately $4,149,994.61, representing both the fees paid to Jackson Walker and the subsequent costs paid to the Lemmon Law Firm and Haynes and Boone for pursuing claims against Jackson Walker. Specifically, J. C. Penney paid Jackson Walker a total of $3,341,785.10, consisting of $1,101,482.21 under the J. C. Penney Final Fee Order, $2,029,885.09 for post-confirmation services, and not less than $210,417.80 in prepetition fees and expenses.[370] In pursuing claims against Jackson Walker, J. C. Penney paid $659,246.12 to the Lemmon Law Firm and paid at least $148,963.39 to Haynes and Boone through January 21, 2026, with additional unknown amounts incurred leading up to the March 17, 2026 hearing.[371] Thus, acceptance of the settlement amount of $1,400,000, less fees incurred by J. C. Penney to pursue litigation against Jackson Walker totaling at least $808,209.51, would result in net proceeds of approximately $591,790.49 to J. C. Penney and its creditors pursuant to the J. C. Penney Settlement.

After considering Mr. Alan Carr's credible testimony, the evidence now in the record, including the J. C. Penney Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgement, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement approval and that in the exercise of his business judgment, Mr. Carr, the co-plan administrator of J. C. Penney gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and the J. C. Penney Adversary Proceeding and securing a judgment in an amount exceeding the $1,400,000 settlement amount; gave due

---

[370] Case No. 4:23-cv-4787, ECF No. 186, Ex. 27; ECF No. 227, Ex. 1 at 6, 7.

[371] Case No. 4:23-cv-4787, ECF No. 227, Ex. 1 at 7; Mar. 17, 2026 Hr'g Tr. at 104–05.

consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $1,400,000 settlement amount; gave due consideration to whether the J. C. Penney Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the J. C. Penney Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the J. C. Penney Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the J. C. Penney Settlement: (i) only  released any claims J. C. Penney has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the J. C. Penney Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by J. C. Penney, or independent and distinct relief from claims the estates, such as J. C. Penney, may hold; (iv) does not preclude J. C. Penney and its creditors from accepting funds in addition to the $1,400,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the J. C. Penney Settlement that prevents J. C. Penney from filing a motion for a final decree or a motion to re-open the case, as it finds it appropriate to do so.

The Court further finds that the J. C. Penney Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[372] because although the proposed settlement amount of $1,400,000 to be paid to J. C. Penney by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $4,149,994.61 as stated *supra*,[373] representing both the fees paid to Jackson Walker and the subsequent costs paid to the Lemmon Law Firm and Haynes and Boone for pursuing claims against Jackson Walker, the proposed settlement amount of $1,400,000 exceeds the total amount of fees and expenses ($1,101,482.21)  awarded to Jackson Walker pursuant to the J. C. Penney Final Fee Order.

Finally, even though final approval of the J. C. Penney Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that J. C. Penney has a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U. S. Trustee's Vacatur Motion.

 Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[374] and Bankruptcy Rule 9033, the Court recommends approval of the J. C. Penney Settlement.[375]

### 3. *21-90054* – The Strike Settlement

### a. Background

---

[372] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

[373] *See supra* I.D.c.2.b.iii.c.iii.d.

[374] 564 U.S. 462, 480 (2011).

[375] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3, ECF No. 217, Ex. 1.

On September 19, 2021, Mr. Bartels was appointed as an independent manager to the board of managers of Strike Investment, LLC, the sole member of Strike Holdco, LLC.[376] On December 6, 2021 (the "*Strike Petition Date*") Strike, LLC ("*Strike*") and certain of its affiliates, including Strike Holdco, LLC (Strike together with its affiliates, the "*Strike Debtors*"), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code,[377] with the cases being jointly administered under Case No. 21-90054 (the "*Strike Case*").[378] On January 6, 2022, the Strike Debtors filed their "Application to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors and Debtors in Possession" ("*Strike Retention Application*").[379] On February 4, 2022, the Bankruptcy Court entered an "Order Authorizing the Retention and Employment of Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors and Debtors in Possession" ("*Strike Retention Order*").[380] On March 23, 2022, the Strike Debtors filed their chapter 11 plan of liquidation.[381] On May 16, 2022, the Strike Debtors filed their second amended chapter 11 plan of liquidation (the "*Strike Liquidation Plan*").[382] On May 17, 2022, the Court entered an order confirming the Strike Liquidation Plan (the "*Strike Confirmation Order*").[383] On June 6, 2022 (the "*Strike Plan Effective Date*") the Strike Liquidation Plan became effective.[384] On the Strike Plan Effective Date, Mr. Bartels became the trustee for

---

[376] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 1, ¶ 1

[377] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 1, ¶ 2. *See also* Bankr. 21-90054, ECF No. 1.

[378] Bankr. No. 21-90054, ECF No. 7.

[379] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 3. *See also* Bankr. 21-90054, ECF No. 363.

[380] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 4. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 2.

[381] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 5. *See also* Bankr. 21-90054, ECF No. 898.

[382] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 6. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 3.

[383] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 7. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 4.

[384] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 8. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 5.

the Strike Trust, and the Strike Debtors became wind-down debtors (the "*Strike Wind-Down Debtors*").[385] Subsequently, around September of 2022, Mr. Bartels also became the wind-down manager for the Strike Wind-Down Debtors.[386] Mr. Bartels continues to serve as the Strike Trustee and the wind-down manager of the Strike Wind-Down Debtors.[387] Mr. Bartels also remained an independent manager after the Strike Petition Date and through confirmation of the Strike Liquidation Plan.[388] On July 12, 2022, Jackson Walker filed its first intern fee application requesting $696,070.98 in compensation and reimbursement of fees (the "*Strike First Fee Application*").[389] On July 21, 2022, Jackson Walker filed "Jackson Walker LLP's Second And Final Fee Application For Allowance And Payment Of Fees And Expenses As Co-Counsel To The Debtors For The Period From December 6, 2021 Through May 17, 2022," (the "*Strike Final Fee Application*"), requesting final approval of attorneys' fees in the amount of $875,026 and reimbursement of expenses in the amount of $12,331.41.[390]

On August 18, 2022, the Bankruptcy Court entered its "Final Order Allowing Compensation And Reimbursement Of Expenses" ("*Strike Final Fee Order*") which stated that Jackson Walker is "allowed compensation and reimbursement of expenses in the amount of $191,286.43 for the period set forth in the [Strike Final Fee Application]."[391]

---

[385] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 8. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 5.

[386] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 8. *See also* Mar. 17, 2026 Hr'g Tr. at 202.

[387] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 8.

[388] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 2.

[389] Case No. 4:23-cv-4787, ECF No. 193, Ex. 6.

[390] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 2, ¶ 9. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 7.

[391] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 3, ¶ 10. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 8.

Former Judge Jones presided over the Strike Case until October 13, 2023, when the Strike Case was transferred to Bankruptcy Judge Marvin Isgur.[392] On November 3, 2023, the U.S. Trustee filed the Initial Vacatur Motion and a motion to withdraw the reference in the Strike Case.[393] On November 13, 2023, Jackson Walker filed its response to the Initial Vacatur Motion.[394]

On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous Proceeding.[395] On February 29, 2024, the U.S. Trustee filed his Vacatur Motion in the Strike Case.[396] Jackson Walker filed a response in opposition to the Vacatur Motion, and the U.S. Trustee and Jackson Walker filed a reply and sur-reply, respectively.[397] Jackson Walker represented the Strike Trustee as post-confirmation counsel and received fees and reimbursement of expenses totaling $327,353.79 for such representation.[398]

On January 12, 2024, the Strike Trustee filed a "Notice in Connection with the Jackson Walker, LLP Fee Dispute" ("*Strike Notice of Standing*") asserting standing and/or indispensable party status as to the Vacatur Motion.[399] Discovery in the Miscellaneous

---

[392] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 1-2, ¶ 2. *See also* Bankr. 21-90054, ECF No. 7; Min. Entry Between ECF Nos. 1451 and 1452.

[393] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 3, ¶ 11. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 9; Bankr. 21-90054, ECF No. 1472.

[394] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 3, ¶ 12. *See also* Bankr. 21-90054, ECF No. 1487.

[395] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 3, ¶ 13. *See also* Bankr. 23-645, ECF No. 1.

[396] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 3, ¶ 14. *See also* Case No. 4:23-cv-4787, ECF No. 193, Ex. 10.

[397] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 15. *See also* Case No. 4:23-cv-4787, ECF No. 205, Exs. 27, 28; ECF No. 193, Ex. 11.

[398] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 16.

[399] Case No. 4:23-cv-4787, ECF No. 193, Ex. 12.

Proceeding proceeded from May 2024 to December 2024.[400] On April 9, 2025, Chief Judge Moses entered her Order Withdrawing the Reference.[401] On September 24, 2025, the Strike Trustee filed the Strike Settlement Motion,[402] which attached a settlement agreement and release (the "*Strike Settlement*") executed by the Strike Trustee and Jackson Walker.[403] The Strike Settlement contemplates a single payment from Jackson Walker in the total sum of $440,000 to the Strike Trust.[404]

On November 12, 2025, Chief Judge Moses entered her Referral Order.[405] On December 9, 2025, the Court held a status conference in furtherance of the Referral Order. [406] On December 16, 2025, Jackson Walker filed "Jackson Walker, LLP's Statement in Response to the December 9, 2025 Status Conference."[407] On December 31, 2025, the Court issued an order stating that it would receive evidence on the Strike Settlement Motion but only if the District Court agreed.[408]

On January 5, 2026, Chief Judge Moses, in response to the Court's December 31, 2025 Order, issued her Settlements Referral Order.[409] The Strike Trustee represents and Jackson Walker does not dispute that approximately $130,000 in attorney's fees and

---

[400] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 17. *See also* Bankr. 23-645, ECF Nos. 57, 516, 520, 556.

[401] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 18; ECF No. 31.

[402] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 19; ECF No. 98.

[403] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 20; ECF No. 98, Ex. 1; ECF No. 193, Ex. 1.

[404] Case No. 4:23-cv-4787, ECF No. 97, Ex. 1.

[405] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 21; ECF No. 109.

[406] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 22; Dec. 9, 2025 Min. Entry.

[407] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 23; ECF No. 138.

[408] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 24; ECF No. 139.

[409] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 5, ¶ 25; ECF No. 140.

expenses have been paid to counsel representing the Strike Trustee in connection with the Miscellaneous Proceeding and related matters through January 2026.[410]

### b. The March 17, 2026, Hearing

For the Strike Settlement Motion hearing held on Tuesday, March 17, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel, Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of the Strike Trust, Rusty Woolley, Tim McCloskey, and Carissa Brewster, along with Mr. Bartels, the Strike Trustee.

### i. Evidence admitted

The following exhibits were either admitted into evidence or judicially noticed under FRE 201.

### a. For the Strike Trust

Pursuant to a joint stipulation[411] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 17, 2026 hearing:

    i.     Exhibits 1 and 2 were admitted

    ii.    The Court took judicial notice under FRE 201 of Exhibit 3

    iii.   Exhibit 4 was admitted

    iv.   The Court took judicial notice under FRE 201 of Exhibits 5, 6, and 7

---

[410] Case No. 4:23-cv-4787, ECF No. 226, Ex. 1 at 4, ¶ 26.

[411] Case No. 4:23-cv-4787, ECF No. 226, Ex. 2 referring to Strike Trust exhibits filed at ECF No. 193.

  v.  Exhibit 8 was admitted

  vi.  The Court took judicial notice under FRE 201 of Exhibits 9, 10, 11, 12, 13, and 14

### b. For the U. S. Trustee

The following exhibits at ECF No. 185 were either admitted into evidence or judicially noticed as follows:

  i.  Exhibits 1 and 2 were admitted

  ii.  Exhibits 9, 10, and 14 were admitted but not for the truth of the matter asserted therein

The following deposition excerpts of Ross Forbes' deposition taken on February 17, 2026,[412] were admitted into evidence:

  i.  No. 17: Deposition Page No. 47, Line 9 – Page No. 48, Line 10

  ii.  No. 18: Deposition Page No. 52, Line 23 – Page No. 53: Line 7

  iii.  No. 19: Deposition Page No. 53, Line 24 – Page No. 54, Line 15

### c. For Jackson Walker

Pursuant to a joint stipulation[413] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 17, 2026 hearing:

  i.  The Court took judicial notice under FRE 201 of Exhibits 21, 27 and 28

The Court admitted the exhibit at ECF No. 244 as follows:

  i.  The Court admitted Exhibit 2 as a demonstrative under FRE 107

### ii. Credibility of the witnesses

---

[412] Case No. 4:23-cv-4787, ECF No. 199, Ex. 2, referring to the U.S. Trustee's exhibit at ECF No. 185, Ex. 19.

[413] Case No. 4:23-cv-4787, ECF No. 226, Ex. 2 referring to Jackson Walker exhibits filed at ECF No. 205.

It is the Court's duty to assess and weigh the credibility of witnesses.[414] At the March 17, 2026 hearing, Mr. Bartels, as the Strike Trustee, was sworn in and took the witness stand. Mr. Bartels graduated from Bucknell University and began his career in accounting and financial analytics positions.[415] He then worked at Monarch Alternative Capital, a distressed debt hedge fund, for twenty years.[416] For the past eight years, he has served as an independent director to companies.[417] He has also served previously as a litigation liquidation plan administrator and plan agent on five to ten other occasions.[418] In September of 2021, Mr. Bartels was retained as independent director for Strike Investments, LLC, which was owned by Strike Holdings, LLC.[419] Several months after the Strike Plan Effective Date, around September of 2022, Mr. Bartels also became the wind-down manager of the Strike Wind-Down Debtors.[420] Mr. Bartels testified that in his role as liquidation trustee of the Strike Trust, his duties included recovering assets placed into the Strike Trust, supervising claim reconciliation and objections to proofs of claim, overseeing tax returns and administrative functions, prosecuting causes of action on behalf of the Strike Trust, using commercially reasonable efforts to settle or pursue trust assets, and making distributions.[421]

---

[414] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[415] Mar. 17, 2026 Hr'g Tr. at 175.

[416] Mar. 17, 2026 Hr'g Tr. at 175.

[417] Mar. 17, 2026 Hr'g Tr. at 175.

[418] Mar. 17, 2026 Hr'g Tr. at 175.

[419] Mar. 17, 2026 Hr'g Tr. at 176.

[420] Mar. 17, 2026 Hr'g Tr. at 202.

[421] Mar. 17, 2026 Hr'g Tr. at 179–80.

At the March 17, 2026 hearing, Mr. Bartels responded to questions clearly, competently and directly.[422] Thus, the Court finds that Mr. Bartels is a credible witness and gives substantial weight to his testimony.

### iii.    Terms of the Strike Settlement[423]

The Strike Settlement, among other things, provides:

2(b) Effective Date. With respect to the forgoing paragraph, the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith. and attending any related hearings related to approval of the Settlement Motion (defined below). Consistent with the preceding sentences, the Trustee will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, JW will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Trustee and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases, and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules.

3. Settlement Payment. Within three (3) business days after the Effective Date, JW shall pay or cause to be paid to the Trust (receipt of which shall be promptly confirmed by the Trustee) the sum of $440,000.00 (the "Settlement Payment") Payment shall be made payable to the Truste's account by wire transfer using wire transfer instructions separately provided to JW. The Settlement Payment shall be paid to the Trust and distributed pursuant to the terms of the confirmed plan in the Bankruptcy Cases.

---

[422] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[423] Case No. 4:23-cv-4787, ECF No. 193, Ex. 1.

4(a) <u>Mutual Releases.</u> *Release in Favor of JW.* Upon receipt of the entire Settlement Payment, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Trustee on behalf of the Trust hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors , affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, reinsurers,  attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent. liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Trust against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.

5. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Trust against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and /or breach of this Agreement.

10. <u>Cooperation and Dismissal or Withdrawal with Prejudice.</u> The Parties will cooperate with each other to give effect to the Agreement, including, without limitation, the Trustee shall withdraw the joinder to the U.S. Trustee Filings with prejudice within three (3) business days after receipt of the Settlement Payment.

    **c.   Application of the *Jackson Brewing* Factors to the Strike Settlement**

The Court will next review the Strike Settlement in accordance with the *Jackson Brewing* Factors.

### Factor 1: Probability of success in the litigation, with due consideration for the uncertainty in fact and law

The Court will now consider the probability of Strike Trust's success in the litigation, with due consideration for the uncertainty in fact and law.[424]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the Strike Case.[425] On January 12, 2024, the Strike Trustee filed the Strike Notice of Standing to assert standing and indispensable party status as to the Vacatur Motion filed in the Strike Case.[426]

In connection with the Strike Case, Jackson Walker was paid a total of $1,214,711.20, consisting of $191,286.43 under the Strike Final Fee Order,[427] $327,353.79 for post-confirmation services representing the Strike Trustee,[428] and $696,070.98 as requested in the Strike First Fee Application.[429] Following the emergence of claims against Jackson Walker, the Strike Trust paid approximately $130,000 to counsel representing the Strike Trust in connection with the Miscellaneous Proceeding and related matters through January 2026.[430] Notably, the Strike Final Fee Application requested a total of $887,357.41 in attorney's fees and expenses, but the Strike Final Fee Order only awarded $191,286.43

---

[424] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[425] Case No. 4:23-cv-4787, ECF No. 193, Ex. 10.

[426] Case No. 4:23-cv-4787, ECF No. 193, Ex. 12.

[427] Case No. 4:23-cv-4787, ECF No. 193, Ex. 8.

[428] Case No. 4:23-cv-4787, Ex. 226, Ex. 1 at 4, ¶ 16.

[429] Case No. 4:23-cv-4787, ECF No. 193, Ex. 6.

[430] Case No. 4:23-cv-4787, Ex. 226, Ex. 1 at 4, ¶ 26.

to Jackson Walker.[431] The difference between the $191,286.43 awarded and the $887,357.41 requested is $696,070.98, which is the amount of attorney's fees and expenses requested in the Jackson Walker  First Strike Fee Application.[432] Mr. Bartels' testimony confirmed that Jackson Walker did in fact receive payment of the $696,070.98 related to services performed during the pendency of the Strike Case as requested in the Strike First Fee Application.[433]

Thus, if the Strike Trust pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees would likely equal approximately $1,344,711.20, representing the amounts paid to Jackson Walker and for work performed in connection with the Strike Case and amounts paid to the Strike Trust's counsel in connection with the Jackson Walker fee dispute. In contrast, under the Strike Settlement, Jackson Walker would be required to pay the Strike Trust $440,000.[434]

The Strike Settlement provides a broad release from the Strike Trust in favor of Jackson Walker for all potential claims that the Strike Trust has or may have relating to the Jones-Freeman Relationship.[435] During his testimony, Mr. Bartels explained that he relied on his counsel, including Mr. Rusty Woolley of Mccloskey Roberson Woolley, PLLC, to investigate potential claims against Jackson Walker relating to the Jones-Freeman Relationship.[436] Mr. Bartels' counsel reviewed documents, attended meetings and advised

---

[431] Case No. 4:23-cv-4787, ECF No. 193, Ex. 7, 8.

[432] Case No. 4:23-cv-4787, ECF No. 193, Ex. 6.

[433] Mar. 17, 2026 Hr'g Tr. at 180, 188–89.

[434] Case No. 4:23-cv-4787, ECF No. 193, Ex. 1, ¶ 3.

[435] Case No. 4:23-cv-4787, ECF No. 193, Ex. 1, ¶ 4(a).

[436] Mar. 17, 2026 Hr'g Tr. at 184.

him along the various stages of the Miscellaneous Proceeding, including the related status conferences and hearings that took place.[437] Mr. Bartels' understanding of the discovery in the Miscellaneous Proceeding is that in addition to extensive document production, there were depositions of over 40 people, including Jackson Walker employees and Former Judge Jones.[438]

Mr. Bartels' testimony also demonstrates that he conducted a personal review of documents filed in connection with the Miscellaneous Proceeding and had familiarity with such documents and relevant procedural history. For example, Mr. Bartels considered the evidence related to the allegation that Former Judge Jones and Ms. Freeman owned real property together and that one of Jackson Walker's partners, Veronica Polnick, knew about this shared property ownership.[439] Mr. Bartels also understood that there was evidence, including testimony from Jackson Walker employees, to demonstrate that the Jones-Freeman Relationship started in at least 2021 and was ongoing in 2022.[440] Mr. Bartels also reviewed the Vacatur Motion itself along with Jackon Walker's response to the Vacatur Motion.[441] Further, Mr. Bartels testified that he believed and confirmed with counsel that Ms. Freeman, although she was working at Jackson Walker at the time Jackson Walker billed for the Strike Case, did not personally bill for any matters in the Strike Case.[442]

Mr. Bartels testified that based on the evidence and discovery he reviewed, he believes there is a high likelihood that the Strike Final Fee Order would be vacated because,

---

[437] Mar. 17, 2026 Hr'g Tr. at 184.

[438] Mar. 17, 2026 Hr'g Tr. at 184.

[439] Mar. 17, 2026 Hr'g Tr. at 188.

[440] Mar. 17, 2026 Hr'g Tr. at 188.

[441] Mar. 17, 2026 Hr'g Tr. at 183.

[442] Mar. 17, 2026 Hr'g Tr. at 181.

according to Mr. Bartels, "there was clearly a conflict that existed and was not disclosed" by Jackson Walker.[443] Mr. Bartels specifically estimated the likelihood of success as seventy (70%) percent or higher.[444] Mr. Bartels also testified that he considered the litigation risk of obtaining a judgement for the Strike Trust for recovery of all fees paid to Jackson Walker in the Strike Case.[445] Mr. Bartels' analysis considered the fact that no objections were filed to either the Strike Final Fee Application or the Strike Retention Application, and that in his opinion, Jackson Walker performed quality work in the Strike Case.[446] Mr. Bartels also considered the defenses Jackson Walker raised, such as Jackson Walker's assertation that it had no obligation to disclose any connections with a presiding judge under Bankruptcy Rule 2014.[447]

Although the evidence demonstrates that Mr. Bartels possessed familiarity with the claims he was settling on behalf of the Strike Trust, and associated risks, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[448]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to the Strike Trust. For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was

---

[443] Mar. 17, 2026 Hr'g Tr. at 187.

[444] Mar. 17, 2026 Hr'g Tr. at 203.

[445] Mar. 17, 2026 Hr'g Tr. at 193.

[446] Mar. 17, 2026 Hr'g Tr. at 193.

[447] Mar. 17, 2026 Hr'g Tr. at 193; Case No. 4:23-cv-4787, ECF No. 193, Ex. 11 at 61.

[448] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[449]

Although this Court will not now conduct a mini-trial of the merits of the Strike Trust's claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that the Strike Trust's recovery against Jackson Walker raises fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of a complex chapter 11 plan.[450]   Additionally, a trial on the Vacatur Motion in the Strike Case would  require consideration of whether Ms. Freeman's personal lack of billing in the Strike Case would have any effect on Jackson Walker's disclosure obligations.[451] A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Bartels' credible testimony and his familiarity with the claims he is settling,

---

[449] Case No. 4:23-cv-4787, ECF No. 193, Ex. 11 at 52, 57, 60, 94.

[450] Case No. 4:23-cv-4787, ECF No. 193, Ex. 10.

[451] Mar. 17, 2026 Hr'g Tr. at 180, 188–89. *See also* Case No. 4:23-cv-4787, ECF No. 193, Exs. 6, 7.

the Court finds that in the exercise of his business judgment, Mr. Bartels, the trustee of the Strike Trust, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $440,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Strike Settlement.

### **Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay**

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience, and delay associated with proceeding to trial as compared to consummating the Strike Settlement.[452]

The Strike Trustee has not filed a complaint or initiated an adversary proceeding against Jackson Walker, but through the Strike Notice of Standing, the Strike Trustee asserts that the fee dispute raised in the Vacatur Motion impacts the Strike Wind-Down Debtors and that the Strike Trustee should be allowed to be heard on all matters related to the Jackson Walker fee dispute.[453]   Additionally, the Strike Settlement includes a release of causes of actions related to the Jones-Freeman Relationship.[454] Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the Strike Settlement, the Court will consider the length, delay, and costs associated with a trial on the Vacatur Motion.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur

---

[452] *See In re Beach*, 731 F. App'x 322 at 326.

[453] Case No. 4:23-cv-4787, ECF No. 193, Ex. 12.

[454] Case No. 4:23-cv-4787, ECF No. 193, Ex. 1, ¶ 4(a).

Motions,[455] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[456] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[457] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[458] Mr. Bartels testified that based on conversations with his counsel, Mr. Bartels believes a trial related to the Jackson Walker fee dispute is expected to last between 20 and 24 days.[459] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[460] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 2, 2023.[461] Although extensive discovery has been conducted on the Vacatur Motions, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[462] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement. Mr. Bartels estimated that the amount of attorney's fees that

---

[455] *See* Dec. 9, 2025 Min. Entry.

[456] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[457] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[458] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[459] Mar. 17, 2026 Hr'g Tr. at 197.

[460] Dec. 9, 2025 status conference (statements by the Court).

[461] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 193, Ex. 9.

[462] *See e.g.*, Bankr. 23-645, ECF 516.

might be incurred if he is required to participate in a trial on the Vacatur Motions would be anywhere from $50,000 to $150,000.[463]As such, a trial on the merits of the Vacatur Motions would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of a trial date for the Vacatur Motions and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to the Strike Trust beneficiaries if the Strike Trustee was required to participate in a trial on the Vacatur Motions as compared to consummating a settlement. Finally, Mr. Bartels testified that in the exercise of his business judgment, he considered the time and costs associated with prosecuting claims against Jackson Walker, including the costs and length of a trial.[464]

Thus, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Bartels' credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Bartels, the trustee of the Strike Trust, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $440,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Strike Settlement.

**Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views**

---

[463] Mar. 17, 2026 Hr'g Tr. at 197.

[464] Mar. 17, 2026 Hr'g Tr. at 194, 195.

Next, the Court will consider whether the Strike Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[465]

The settlement proceeds from the Strike Settlement would be distributed to holders of general unsecured claims, as defined in the Strike Liquidation Plan (the "*GUC Claimants*").[466] Mr. Bartels admitted that he did not reach out to any of the GUC Claimants before entering into the Strike Settlement.[467] But, other than the U.S. Trustee's objection, which has been resolved through the Global Joint Stipulation, there were no other formal or informal objections to the Strike Settlement Motion.[468] Additionally, Mr. Bartels' testimony demonstrates that for each month that the Strike Trust remains open, additional expenses are incurred. These expenses average approximately $50,000 each month, and include expenses for directors and officers insurance policies and fees for legal counsel, financial advisors, and a liquidation trustee, as well as costs associated with maintaining the bankruptcy docket through a claims agent.[469] Mr. Bartels testified that if the Strike Trust remains open for another eight to ten months, any additional benefit that may be received from litigation, as opposed to settlement, would be minimized or eliminated by the ongoing costs needed to keep the Strike Trust open.[470] As to Mr. Bartels' remaining obligations before making final distributions, Mr. Bartels testified that the current Jackson Walker fee dispute represents the last major item to be completed, with only administrative tasks

---

[465] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[466] Mar. 17, 2026 Hr'g Tr. at 187; Case No. 4:23-cv-4787, ECF No. 193, Ex. 3 at 8, 12.

[467] Mar. 17, 2026 Hr'g Tr. at 255.

[468] Mar. 17, 2026 Hr'g Tr. at 199.

[469] Mar. 17, 2026 Hr'g Tr. at 195–96.

[470] Mar. 17, 2026 Hr'g Tr. at 196–97.

remaining thereafter, including preparing tax returns and effectuating the final dissolution of the trust.[471]

The evidence admitted at the March 17, 2026 hearing therefore demonstrates that no creditors objected to the Strike Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow beneficiaries of the Strike Trust to be paid sooner, while reducing administrative expenses, as compared to proceeding to a trial on the merits.

Thus, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Bartels' credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Bartels, the trustee of the Strike Trust, gave due consideration to whether the Strike Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Accordingly, the Court finds that the third factor weighs in favor of approving the Strike Settlement.

**Factor 4:** **The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

Next, the Court will consider the extent to which the Strike Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[472]

Mr. Bartels knew Ms. Freeman personally because he met her through industry events or similar dinners.[473] But, he did not learn of the Jones-Freeman Relationship until October 7, 2023, when he read an article about it in the Wall Street Journal.[474] On January

---

[471] Mar. 17, 2026 Hr'g Tr. at 195.

[472] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[473] Mar. 17, 2026 Hr'g Tr. at 181.

[474] Mar. 17, 2026 Hr'g Tr. at 181.

12, 2024, Mr. Bartels instructed his counsel to file the Strike Notice of Standing for purposes of effectuating standing to be heard in the Jackson Walker fee dispute because Mr. Bartels believed that the Strike Trust had claims against Jackson Walker related to the Jones-Freeman Relationship.[475] Mr. Bartels also replaced Jackson Walker as post-confirmation counsel in March 2024, although Mr. Bartels did not believe Ms. Freeman personally billed on any matter related to the Strike Case.[476] After close of discovery in the Miscellaneous Proceeding, in March 2025, Mr. Bartels participated in a mediation with Jackson Walker via phone, and Mr. Bartels' counsel attended the mediation,[477] which was mediated by two retired federal judges: Honorable W. Royal Furgeson, Jr. (Ret.) and Honorable Gary A. Feess (Ret.).[478] Mr. Bartels testified that although the mediation did not immediately result in a settlement, it made progress towards the Strike Settlement that was ultimately reached with Jackson Walker.[479] Mr. Bartels was represented by counsel in negotiations that followed the mediation, as was Jackson Walker.[480] Mr. Bartels testified that no one pressured him to enter into a settlement with Jackson Walker.[481] The extensive settlement negotiations and mediation between Jackson Walker and Mr. Bartels show that the Strike Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 17, 2026 hearing, the Court finds that the

---

[475] Mar. 17, 2026 Hr'g Tr. at 182; Case No. 4:23-cv-4787, ECF No. 193, Ex. 12.

[476] Mar. 17, 2026 Hr'g Tr. at 181, 183.

[477] Mar. 17, 2026 Hr'g Tr. at 185.

[478] Mar. 17, 2026 Hr'g Tr. at 185.

[479] Mar. 17, 2026 Hr'g Tr. at 185.

[480] Mar. 17, 2026 Hr'g Tr. at 201.

[481] Mar. 17, 2026 Hr'g Tr. at 201.

Strike Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Strike Settlement.

**Factor 5: All other factors bearing on the wisdom of the compromise**

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn, (i) whether the Strike Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motion, if any, may be accepted by the Strike Trust and its beneficiaries.[482]

i.    **Whether the approval of the Strike Settlement will negatively impact or promote the integrity of the judicial system**

The Court will now consider whether the Strike Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[483]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the Strike Settlement, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit the Strike Trust and its beneficiaries from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[484]  The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[485]

---

[482] *See In re MCorp Fin.*, 160 B.R. at 951.

[483] *See In re Bates*, 211 B.R. at 345.

[484] *See* Case No. 4:23-cv-04787, ECF No. 171.

[485] Case No. 4:23-cv-04787, ECF No. 255.

As explained more fully *infra*,[486] after a careful review of the Global Joint Stipulation and the Strike Settlement, the Court finds that the Strike Settlement in no way decides or precludes the issues raised in and related to the U.S. Trustee's Vacatur Motion. As such, the Court finds that the Strike Settlement does not harm the integrity of the judicial system, undermine the Court's inherent authority, or allow parties to circumvent the Bankruptcy Code.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Strike Settlement.

### ii.    Consideration of the collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[487]

Mr. Bartels testified that Jackson Walker would be able to pay for any judgment that may be entered for the benefit of the Strike Trust.[488] However, this assertion directly contradicts Mr. Bartels' subsequent testimony, in which he expressed concern that if Jackson Walker became liable under other settlements or Vacatur Motions, Jackson Walker would not be able to pay—and that because of this inability to pay, there would be a benefit to consummating a settlement now, as opposed to waiting for the Vacatur Motions to be resolved.[489] When questioned about his pre-settlement investigation into Jackson Walker's ability to pay a potential judgment, Mr. Bartels testified that he assumed Jackson Walker

---

[486] *See supra* Section I.D.c.3.c.5.iii.1.

[487] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[488] Mar. 17, 2026 Hr'g Tr. at 199.

[489] Mar. 17, 2026 Hr'g Tr. at 199.

could pay the $440,000 under the Strike Settlement because he believed Jackson Walker would not have agreed to settle if it could not afford to pay the $440,000.[490] However, Mr. Bartels' testimony reveals that he did not conduct any meaningful investigation to determine whether Jackson Walker could actually pay any judgment or to confirm his assumption that Jackson Walker could pay any settlement it entered into. For example, Mr. Bartels testified that Jackson Walker never represented that it was experiencing financial distress, nor did Jackson Walker or its agents ever indicate to Mr. Bartels that it would be unable to pay a judgment rendered in favor of the Strike Trust.[491] Additionally, Mr. Bartels acknowledged that he did not perform any internet research or review publicly available information regarding Jackson Walker's finances.[492]

Because Mr. Bartels did not investigate the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Strike Settlement.

iii.     **Whether the Strike Trust may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment**

At the March 17, 2026 hearing, Mr. Bartels testified that consummation of a settlement would allow him to more quickly wind down and administratively close the Strike Trust, as compared to proceeding to a trial,  and prevent additional accrual of administration fees associated with keeping a post-confirmation trust open.[493] In response,

---

[490] Mar. 17, 2026 Hr'g Tr. at 249.

[491] Mar. 17, 2026 Hr'g Tr. at 249.

[492] Mar. 17, 2026 Hr'g Tr. at 249-50.

[493] Mar. 17, 2026 Hr'g Tr. at 195.

the Court, *sua sponte*, expressed concerns as to whether a bankruptcy estate or a post-confirmation trust could accept and distribute any additional funds over and above amounts in any of the Settlement Agreements, if ordered by the Court after a final trial on the merits of the Vacatur Motions, if a bankruptcy estate or post-confirmation trust was wound down and closed administratively.[494] As a result, the Court entered its order for post-trial briefing[495] where the Court directed the Strike Trustee and other parties to address the following questions posed by the Court, to wit:

> (1) whether the proposed settlements may be approved without impairing the United States Trustee's pending Vacatur Motions or the Court's inherent authority to order vacatur or additional relief; (2) in the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; and (3) if the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of [the Strike Trustee] to the disposition of funds upon wind-down and closure, including where such funds would be distributed.[496]

On April 10, 2026, the Strike Trustee filed his "Post Hearing Brief In Support Of Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019 In The Strike, LLC Bankruptcy Case" (the "*Strike Trust Brief*").[497] On April 17, 2026, the U.S. Trustee filed his Post-Hearing Reply Brief.[498] In the Strike Trust Brief, the Strike Trustee asserts that (1) the Strike Settlement may may approved without impairing the U.S.

---

[494] Mar. 17, 2026 Hr'g Tr. at 297, 298.

[495] Case No. 4:23-cv-04787, ECF No 248.

[496] Case No. 4:23-cv-04787, ECF No 248.

[497] Case No. 4:23-cv-04787, ECF No 277.

[498] Case No. 4:23-cv-04787, ECF No 282.

Trustee's Vacatur Motion or the Court's inherent authority; (2) The Strike Trust, once closed, likely cannot be reopened; and (3) several alternatives exist that may achieve the goal of allowing for distribution of additional funds to the beneficiaries of the Strike Trust.[499] The Court will consider each in turn under the catch-all provision of the *Jackson Brewing* Factors.

### 1. Whether the Strike Settlement may be approved without impairing the U.S. Trustee's Vacatur Motion or the Court's inherent authority

In briefing, the Strike Trustee asserts that the Strike Settlement may may approved without impairing the U.S. Trustee's Vacatur Motion or the Court's inherent authority.[500]

In considering what impact, if any, the Strike Settlement could have on the Vacatur Motion, the Court will look first to the Strike Settlement's plain language.[501] Paragraph 2(b) of the Strike Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the [Strike Trustee] and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases.[502]

In a similar fashion, paragraph 4(a) provides in relevant part that:

> Upon receipt of the entire Settlement Payment, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the [Strike Trustee] on behalf of the Trust hereby releases, acquits, and forever discharges [Jackson Walker] . . . from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases the U.S. Trustee Filings, the

---

[499] Case No. 4:23-cv-04787, ECF No 277.

[500] Case No. 4:23-cv-04787, ECF No 277 at 7.

[501] *Estate of Kokernot*, 112 F.3d at 1294.

[502] Case No. 4:23-cv-04787, ECF No. 193, Ex. 1, ¶ 2(b).

Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Trust against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.[503]

Although the language of paragraph 2(b) and 4(a) creates a broad release of claims, the language expressly provides that the Strike Trustee will only release claims that the Strike Trust may have against Jackson Walker.[504] Neither paragraph 2(b) nor 4(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[505]

Paragraph 5 of the Strike Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Trust against [Jackson Walker] or any other released parties.[506]

Like paragraphs 2(b) and 4(a), paragraph 5 of the Strike Settlement references release of possible claims by *the Strike Trust* against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[507] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Strike Settlement. Moreover, Mr. Bartels, who signed the Strike Settlement, testified that he did not intend for the Strike Settlement to change any of the relief sought by the U.S. Trustee in his Vacatur Motions or release any claims the U.S. Trustee might have against Jackson Walker, nor did he

---

[503] Case No. 4:23-cv-04787, ECF No. 193, Ex. 1, ¶ 4(a).

[504] Case No. 4:23-cv-04787, ECF No. 193, Ex. 1, ¶¶ 2(b), 4(a).

[505] Case No. 4:23-cv-04787, ECF No. 193, Ex. 1, ¶¶ 2(b), 4(a).

[506] Case No. 4:23-cv-04787, ECF No. 193, Ex. 1, ¶ 5.

[507] Case No. 4:23-cv-04787, ECF No. 193, Ex. 1, ¶¶ 2(b), 4(a), 5.

believe that it could.[508] Thus, the Court finds that the Strike Settlement only provides for the release of any claims the Strike Trust may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Strike Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by the Strike Trust, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[509] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the Strike Trustee all "acknowledge and agree" that the Strike Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[510]

There is no language in the Strike Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the Strike Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[511] Thus, the Court finds that the Strike Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Strike Trust, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

---

[508] Mar. 17, 2026 Hr'g Tr. at 186.

[509] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[510] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[511] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

Additionally, in the Global Joint Stipulation, Jackson Walker stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[512] Therefore, the Court finds that the Strike Settlement does not preclude the Strike Trust and its beneficiaries from accepting funds in addition to the $440,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the Strike Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the Strike Settlement and Global Joint Stipulation, the Court finds that the Strike Settlement: (i) only released any claims the Strike Trust has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Strike Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Strike Trust, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude the Strike Trust and its beneficiaries from accepting funds in addition to the $440,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and

---

[512] Case No. 4:23-cv-04787, ECF No. 255 at 2.

compensation, nor could it. Therefore, the Court finds that the Strike Trust could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion.

The Court's finding that the Strike Trust may be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion weighs in favor of approving the Strike Settlement under the catch-all provision of the *Jackson Brewing* Factors.

**2. Whether the Strike Trust may be reopened, after entry of a final decree, to administer additional funds, if any, and if ordered by the Court, over and above the settlement amount of the Strike Settlement**

Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[513] Further, Bankruptcy Rule 5010 provides that a bankruptcy court may reopen a case upon a motion filed by the debtor or another party in interest.[514] But, 11 U.S.C. § 350(b) and Bankruptcy Rule 5010 refer to the reopening of a *bankruptcy case*, not a post-confirmation trust, such as the Strike Trust. The Strike Trustee asserts in his briefing that if the Strike Trust closes, it likely cannot be reopened because the Strike Trust is governed by a liquidating trust agreement (the "*Strike Trust Agreement*"),[515] which does not expressly authorize the Strike Trust to be reopened after it has been closed or provide a procedure for such reopening.[516] No evidence or legal authority has otherwise been presented to demonstrate that the Strike Trust, if closed, may be reopened. As such, the Court finds, based on evidence from the March 17, 2026 hearing, that once closed, the Strike Trust

---

[513] 11 U.S.C. § 350(b).

[514] Fed. R. Bankr. P. 5010.

[515] Bankr. 21-90054, ECF No. 1021.

[516] Case No. 4:23-cv-04787, ECF No. 277 at 8.

could not be reopened to receive potential court-ordered payments from Jackson Walker exceeding the $440,000 Strike Settlement amount.

The fact that the Strike Trust could not be re-opened to effectuate distribution of potential funds beyond the $440,000 settlement amount to beneficiaries of the Strike Trust, including the GUC, weighs against approval of the Strike Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### 3. Whether alternatives exist to reopening the Strike Trust to allow for additional distribution, if any, to the beneficiaries of the Strike Trust

In the Strike Trust Brief, the Strike Trustee outlined at least three possible alternatives to "achieve the goal of allowing for distribution of additional funds to the estates if so ordered."[517] First, the Strike Trustee asserts that the Strike Trust could be kept open in a limited capacity, and the Strike Trustee could either make an interim distribution with a holdback for any fees that may be incurred while waiting for a potential second recovery, or the Strike Trustee could wait and make a single distribution after the Vacatur Motion is finally resolved.[518] But the Strike Trustee asserts that this is not the preferred choice because it would not be in the best interest of the Strike Trust's beneficiaries given the costs associated with keeping the Strike Trust open.[519] The Strike Liquidation Plan sets a termination date for the Strike Trust of five years after the Strike Plan Effective Date.[520] Extensions are permitted, but capped at a total of two years, and require certain administrative steps, including Bankruptcy Court approval.[521] The fifth anniversary of the

---

[517] Case No. 4:23-cv-04787, ECF No. 277 at 8.

[518] Case No. 4:23-cv-04787, ECF No. 277 at 9.

[519] Case No. 4:23-cv-04787, ECF No. 277 at 9–11.

[520] Case No. 4:23-cv-04787, ECF No 193, Ex. 3 at 56, Article VIII.D.9.

[521] Case No. 4:23-cv-04787, ECF No 193, Ex. 3 at 56, Article VIII.D.9.

Strike Plan Effective Date will occur on June 6, 2027, and the seventh anniversary will occur on June 6, 2029.[522] As explained *supra*,[523] the evidence presented at the March 17, 2026 hearing demonstrates that for each month that the Strike Trust remains open, additional expenses are incurred at an average of approximately $50,000 per month,[524] which minimizes the benefit of keeping the Strike Trust open to receive potential court-ordered funds from Jackson Walker that exceed the $440,000 settlement amount.[525]

Second, the Strike Trustee asserts that he could market and sell the Strike Trust's right to receive any additional amount ordered to be paid by Jackson Walker, make a distribution to creditors that includes the proceeds of such sale, and close the Strike Trust.[526] The Strike Trust Agreement authorizes the Trustee to liquidate "Liquidating Trust Assets," as defined in the Strike Trust Agreement and Strike Liquidation Plan, through a sale.[527] The Trustee anticipates that he would market the right to potential additional payments from Jackson Walker to both the Strike Trust beneficiaries and interested third parties, with the goal of maximizing recovery for the Strike Trust beneficiaries.[528] However, the Strike Trustee has not provided any evidence regarding the proposed sale process or the expected proceeds from such a sale.

---

[522] *See* Case No. 4:23-cv-4787, ECF No. 193, Ex. 5.

[523] *See supra* Section I.D.c.3.c.3.

[524] Mar. 17, 2026 Hr'g Tr. at 195-96.

[525] Mar. 17, 2026 Hr'g Tr. at 196-97.

[526] Case No. 4:23-cv-04787, ECF No. 277 at 11.

[527] Bankr. 21-90054, ECF No. 1021 at 17, Article IV.4.6. *See also* Bankr. 21-90054, ECF No. 1021 at 6; Case No. 4:23-cv-04787, ECF No 193, Ex. 3 at 127, 131 (defining Liquidating Trust Assets).

[528] Case No. 4:23-cv-04787, ECF No. 277 at 11.

Finally, the Strike Trustee asserts that if he is unable to find a buyer, the Trust Strike Agreement authorizes the Strike Trustee to designate a charity to receive the money.[529] The Strike Liquidation Plan provides that if the Strike Trustee determines that the value of any remaining Liquidating Trust Asset is insufficient to justify the administrative cost of effecting a transfer to the Strike Trust beneficiaries, the Strike Trustee may distribute such assets to a charity of his selection.[530] A transfer of the Strike Trust's right to potential future distributions to charity would still require Jackson Walker to remit any payment ordered by the Court in full, but it would not allow the Strike Trust beneficiaries to receive any additional distributions beyond the $440,000 that the Court may order Jackson Walker to pay.

Accordingly, after considering the Strike Trust Post-Hearing Brief, and the evidence on the record and presented at the March 17, 2026 hearing, the Court finds that the Strike Trustee has not demonstrated the availability of a viable alternative to reopening the Strike Trust to effectuate additional distributions to beneficiaries of the Strike Trust. Nevertheless, the Strike Trustee has the discretion to present these along with any other alternatives to the Plan beneficiaries at the appropriate time in this proceeding should the opportunity present it self. Accordingly, the Court finds that consideration of whether an alternative exists to reopening the bankruptcy case to allow for additional distribution in amounts exceeding the $440,000 settlement amount, if any, to the Strike Trust and its beneficiaries, weighs against approval of the Strike Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the Strike Settlement be approved

---

[529] Case No. 4:23-cv-04787, ECF No. 277 at 11–12.

[530] Case No. 4:23-cv-04787, ECF No 193, Ex. 3 at 56, Article VIII.D.9.

Jackson Walker and the Strike Trustee have agreed to a $440,000 settlement.[531] If the Strike Trustee were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $1,344,711.20, consisting of $887,357.41 paid to Jackson Walker for services performed during the pendency of the Strike Case, $327,353.79 paid to Jackson Walker for post-confirmation services, and the approximately $130,000 paid to counsel representing the Strike Trustee in connection with the Miscellaneous Proceeding and related matters. Acceptance of the settlement amount of $440,000 less fees incurred by the Strike Trustee to pursue litigation against Jackson Walker, totaling at least $130,000, would result in net proceeds of approximately $310,000 to the Strike Trust and its beneficiaries pursuant to the Strike Settlement.

After considering Mr. Bartels' credible testimony, the evidence now in the record, including the Strike Settlement and Global Joint Stipulation, the Court finds that most of the *Jackson Brewing* Factors weigh in favor of approving the Strike Settlement. Only three *Jackson Brewing* Factors do not support approval, all falling under the final "catch-all" provision: the considerations of (1) the collectability of a judgement against Jackson Walker if the Strike Trust were to prevail in a trial; (2) the ability of the Strike Trust to be reopened to allow for additional distributions of funds the Court may order Jackson Walker to pay that exceed the $440,000 settlement amount; and (3) the availability of alternatives to reopening the Strike Trust for additional distributions exceeding the $440,000 settlement amount. But upon consideration of the rest of the relevant *Jackson Brewing* Factors, the

---

[531] Case No. 4:23-cv-4787, ECF No. 186, Ex. 3 at 3.

Court finds that in the exercise of his business judgment, Mr. Bartels, the trustee of the Strike Trust, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating claims in the Vacatur Motion and securing a judgment in an amount exceeding the $440,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $440,000 settlement amount; gave due consideration to whether the Strike Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the Strike Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the Strike Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Strike Settlement: (i) only released any claims the Strike Trust has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Strike Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Strike Trust, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) the Strike Settlement itself does not preclude the Strike Trust and its beneficiaries from accepting funds in addition to the $440,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

The Court further finds that the Strike Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[532] because although the proposed settlement amount of $440,000 to be paid to the Strike Trust by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $1,344,711.2, as stated *supra*, representing both the fees paid to Jackson Walker and the subsequent costs paid to the Strike Trustee's counsel for pursuing claims against Jackson Walker, the proposed settlement amount of $440,000 constitutes approximately 50% of the total amount of fees and expenses ($887,357.41) paid to Jackson Walker in connection with services performed for the Strike Case before the Strike Plan Effective Date, and the Strike Settlement could allow the beneficiaries of the Strike Trust to receive distributions without the expense and delay associated with a trial on the merits while reducing the costs of keeping the Strike Trust open.

Finally, even though final approval of the Strike Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Strike Trust and Strike Wind-Down Debtors have a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[533] and Bankruptcy Rule 9033, the Court recommends approval of the Strike Settlement.[534]

---

[532] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

[533] 564 U.S. 462, 480 (2011).

[534] Case No. 4:23-cv-4787, ECF No. 193, Ex. 1.

### 4. 23-90055 – The Auto Plus Settlement

### a. Background

On January 31, 2023, IEH Auto Parts Holding LLC and certain of its affiliates (the "*IEH Debtors*") filed for chapter 11 relief in the Bankruptcy Court.[535] These chapter 11 cases were jointly administered under Case No. 23-90054 with Judge Lopez presiding.[536] On March 2, 2023, the IEH Debtors filed an application to employ Jackson Walker as lead counsel (the "*Auto Plus Retention Application*").[537] On March 28, 2023, Judge Lopez approved the Auto Plus Retention Application (the "*Auto Plus Retention Order*").[538] On April 10, 2023, Judge Lopez entered an order appointing Former Judge Jones to serve as mediator in the IEH Debtors' chapter 11 cases.[539] On April 28, 2023, the IEH Debtors filed their initial chapter 11 plan of liquidation.[540] On April 28, 2023, the IEH Debtors filed "Debtors' Emergency Motion for Entry of An Order Approving the Settlement Between the IEH Debtors, AEP, Pep Boys, the Committee, and the Committee Members" (the "*2023 Settlement Motion*").[541] On May 2, 2023, Judge Lopez held a hearing on the 2023 Settlement Motion.[542] On May 2, 2023, Judge Lopez entered an order approving the 2023

---

[535] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 1. *See also* Bankr. 23-90054, ECF No. 1.

[536] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 1. *See also* Bankr. 23-90054, ECF No. 25.

[537] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 2. *See also* Case No. 4:23-cv-4787, ECF No. 200, Ex. 1.

[538] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 3. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 2.

[539] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 4. *See also* Bankr. 23-90054, ECF No. 356; Case No. 4:23-cv-4787, ECF No. 195, Ex. 10.

[540] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 5. *See also* Bankr. 23-90054, ECF No. 442; Case No. 4:23-cv-4787, ECF No. 195, Ex. 10.

[541] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 6. *See also* Bankr. 23-90054, ECF No. 444; Case No. 4:23-cv-4787, ECF No. 195, Ex. 10.

[542] Case No. 4:23-cv-4787, ECF No. 225, ECF No. 1 at 2, ¶ 7; Case No. 4:23-cv-4787, ECF No. 195, Ex. 10.

Settlement Motion and the settlement therein (the "*2023 Settlement*").[543] On June 16, 2023, the IEH Debtors filed their third amended chapter 11 plan of liquidation (the "*Auto Plus Plan*").[544] On June 16, 2023, Judge Lopez entered an order confirming the Auto Plus Plan (the "*Auto Plus Confirmation Order*").[545]

On September 29, 2023, Jackson Walker filed "Jackson Walker LLP's First And Final Fee Application For Allowance And Payment Of Fees And Expenses As Counsel To The Debtors For The Period From January 31, 2023 Through June 16, 2023" (the "*Auto Plus Final Fee Application*").[546] On October 6, 2023 (the "*Auto Plus Effective Date*"), the Auto Plus Plan became effective, converting the IEH Debtors to wind down debtors (the "*IEH Wind Down Debtors*").[547] Pursuant to the Auto Plus Plan, upon the Auto Plus Effective Date, Mr. Bartels became the plan agent for the IEH Wind Down Debtors.[548] On November 4, 2023, Judge Lopez entered an order approving the Auto Plus final Fee Application and awarding Jackson Walker compensation for attorneys' fees in the amount of $4,739,576 and reimbursement of expenses in the amount of $74,769.49, totaling $4,814,345.49, as counsel to the IEH Debtors (the "*Auto Plus Final Fee Order*").[549] On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous

---

[543] Case No. 4:23-cv-4787, Ex. 225-1 at 2, ¶ 8. *See also* Bankr. 23-90054, ECF No. 469; Case No. 4:23-cv-4787, ECF No. 195, Ex. 10.

[544] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 9. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 3.

[545] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 2, ¶ 10. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 4.

[546] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3, ¶ 11. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 6.

[547] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3, ¶ 12. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 5.

[548] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3, ¶ 13. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 4.

[549] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3, ¶ 14. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 7.

Proceeding.[550] On January 16, 2024, Judge Lopez entered a final decree closing the chapter 11 cases of the IEH Debtors except for the bankruptcy case of Auto Plus Auto Sales LLC, Case No. 23-90055 (the "*Auto Plus Case*") making Mr. Bartels the Auto Plus Plan Agent of the Auto Plus Wind Down Debtor.[551]

On March 29, 2024, the U.S. Trustee filed his Vacatur Motion for the Auto Plus Case.[552] Jackson Walker filed a response in opposition to the Vacatur Motion, and the U.S. Trustee and Jackson Walker filed a reply and sur-reply, respectively.[553] Discovery in the Miscellaneous Proceeding proceeded from May to December 2024.[554] On October 8, 2024, Judge Lopez entered a "Second Case Management Order" transferring the Vacatur Motion to the Miscellaneous Proceeding.[555]

On April 9, 2025, Chief Judge Moses entered her Order Withdrawing the Reference.[556] On September 24, 2025, the Auto Plus Plan Agent filed the Auto Plus Settlement Motion.[557] The Auto Plus Settlement Motion attached a settlement agreement and release (the "*Auto Plus Settlement*") executed by the Auto Plus Plan Agent and Jackson

---

[550] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3, ¶ 15. *See also* Bankr. 23-645, ECF No. 1.

[551] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3, ¶ 16. *See also* Bankr. 23-90054, ECF No. 1043; Case No. 4:23-cv-4787, ECF No. 195, 10.

[552] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3-4, ¶ 17. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 8.

[553] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 3-4, ¶ 18. *See also* Case No. 4:23-cv-4787, ECF No. 195, Ex. 9; ECF No. 205, Exs. 37, 38.

[554] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 4, ¶ 19. *See also* Bankr. 23-645, ECF Nos. 57, 516, 520, and 556.

[555] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 4, ¶ 20. *See also* Bankr. 23-90055, ECF No. 218.

[556] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 4, ¶ 21. *See also* Case No. 4:23-cv-4787, ECF No. 31.

[557] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 4, ¶ 22. *See also* Case No. 4:23-cv-4787, ECF No. 97.

Walker.[558] The Auto Plus Settlement contemplates a single payment from Jackson Walker in the total sum of $500,000 to the Auto Plus Plan Agent on behalf of the Auto Plus Wind Down Debtor.[559] On November 12, 2025, Chief Judge Moses entered her Referral Order.[560] On December 9, 2025, the Court held a status conference in furtherance of the Referral Order.[561] On December 16, 2025, Jackson Walker filed a statement in response to the December 9, 2025 status conference.[562] On December 31, 2025, the Court entered an order stating that it would take evidence on the Settlement Motions but only if the District Court agreed.[563] On January 5, 2026, Chief Judge Moses entered her Settlements Referral Order.[564] The Auto Plus Plan Agent represents and Jackson Walker does not dispute that approximately $10,045 in attorney's fees have been paid to counsel representing him in connection with the Miscellaneous Proceeding and related matters through January 2026.[565] On March, 16, 2026, the Auto Plus Plan Agent and Jackson Walker entered into the "Amendment No. 1 to Settlement Agreement and Release" (the "*Auto Plus Settlement Amendment*").[566]

### b. The March 17, 2026 Hearing

For the Auto Plus Settlement Motion hearing held on Tuesday, March 17, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit:

---

[558] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 4, ¶ 23. *See also* Case No. 4:23-cv-4787, ECF No. 97, Ex. 1; ECF No. 195, Ex. 1.

[559] Case No. 4:23-cv-4787, ECF No. 97, Ex. 1.

[560] Case No. 4:23-cv-4787, ECF N0.  225, Ex. 1 at 4, ¶ 24. *See also* Case No. 4:23-cv-4787, ECF No. 109.

[561] Case No. 4:23-cv-4787, Ex. 225-1 at 4, ¶ 25.

[562] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 4, ¶ 26. *See also* Case No. 4:23-cv-4787, ECF No. 138.

[563] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 5, ¶ 27. *See also* Case No. 4:23-cv-4787, ECF No. 139.

[564] Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 5, ¶ 28. *See also* Case No. 4:23-cv-4787, ECF No. 140.

[565] Case No. 4:23-cv-4787, ECF No.  225, Ex. 1 at 5, ¶ 29.

[566] Case No. 4:23-cv-4787, ECF No. 242, Ex. 1.

for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel, Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of the Auto Plus Wind Down Debtor, Rusty Woolley, Tim McCloskey, and Carissa Brewster, along with Mr. Bartels, as the plan agent of the Auto Plus Wind Down Debtor.

### i. Evidence admitted

On March 17, 2026, the Court held a hearing, where the following evidence was admitted:

### a. For the Auto Plus Wind Down Debtor

Pursuant to a joint stipulation[567] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 17, 2026 hearing:

i.    Exhibits 1 and 2 were admitted

ii.   The Court took judicial notice under FRE 201 of Exhibit 3

iii.  Exhibit 4 was admitted

iv.   The Court took judicial notice under FRE 201 of Exhibits 5 and 6

v.    Exhibit 7 was admitted

vi.   The Court took judicial notice under FRE 201 of the following Exhibits: 8, 9, 10, and 11

The following exhibit at ECF No. 242 was admitted as follows:

---

[567] Case No. 4:23-cv-4787, ECF No. 225, Ex. 2 referring to Auto Plus Wind Down Debtors' exhibits filed at ECF No. 195.

    i.      Exhibit 1 was admitted

**b. For the U.S. Trustee**

The following exhibits at ECF No. 200 were either admitted into evidence or judicially noticed as follows:

    i.      The Court took judicial notice under FRE 201 of Exhibit 1

    ii.      Exhibit 7 was admitted

The following deposition excerpts of Ross Forbes' deposition taken on February 17, 2026,[568] were admitted into evidence:

    i.      No. 17: Deposition Page No. 47, Line 9 – Page No. 48, Line 10

    ii.      No. 18: Deposition Page No. 52, Line 23 – Page No. 53, Line 7

    iii.      No. 19: Deposition Page No. 53, Line 24 – Page No. 54, Line 15

**c. For Jackson Walker**

Pursuant to a joint stipulation[569] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 17, 2026 hearing:

    i.      The Court took judicial notice under FRE 201 of Exhibits 37 and 38

The Court admitted the exhibit at ECF No. 244 as follows:

    ii.      The Court admitted Exhibit 3 as a demonstrative under FRE 107

**d. Incorporation of Mr. Bartel's prior testimony**

On April 2, 2026, the U.S. Trustee, the Auto Plus Plan Agent, and Jackson Walker filed a "Notice of Designation of Trial Testimony In The Matter Of Auto Plus Auto Sales

---

[568] Case No. 4:23-cv-4787, ECF No. 199, Ex. 3, referring to the U.S. Trustee's exhibit at ECF No. 185, Ex. 19.

[569] Case No. 4:23-cv-4787, ECF No. 225, Ex. 2 referring to Jackson Walker's exhibits filed at ECF No. 205.

LLC,"[570] in which the parties designated portions of Mr. Bartels' trial testimony in the hearing held for the Strike Settlement Motion,[571] which by stipulation applies to the instant Auto Plus Settlement Motion as follows:

    i.       No. 1: Strike Trust hearing transcript Page No. 175, Line 10 – Page No. 175, Line 24

    ii.      No. 2: Strike Trust hearing transcript Page No. 180, Line 24 – Page No. 181, Line 14

    iii.    No. 3: Strike Trust hearing transcript Page No. 181, Line 23 – Page No. 182, Line 3

    iv.    No. 4: Strike Trust hearing transcript Page No. 182, Line 4 – Page No. 182, Line 14

    v.     No. 5: Strike Trust hearing transcript Page No. 182, Line 25 – Page No. 183, Line 8

    vi.    No. 6: Strike Trust hearing transcript Page No. 184, Line 3 – Page No. 185, Line 2

    vii.   No. 7: Strike Trust hearing transcript Page No. 193, Line 20 – Page No. 194, Line 9

### ii.    Credibility of witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[572] At the March 17, 2026 hearing, Mr. Bartels, as the plan agent of the Auto Plus Wind-Down

---

[570] Case No. 4:23-cv-4787, ECF No. 274.

[571] Case No. 4:23-cv-4787, ECF No. 267.

[572] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

Debtor, was sworn in and took the witness stand.[573] Mr. Bartels graduated from Bucknell University and began his career in accounting and financial analytics positions.[574] He then worked at Monarch Alternative Capital, a distressed debt hedge fund, for twenty years.[575] For the past eight years, he has served as an independent director for various companies.[576] He has also previously served as a litigation plan administrator and plan agent on five to ten other occasions.[577] Upon the Auto Plus Effective Date of October 6, 2023, Mr. Bartels became the Auto Plus Plan Agent.[578] As Auto Plus Plan Agent, Mr. Bartels provided administrative services to the Auto Plus Wind Down Debtor, including claim reconciliation and dispute resolution, and hired post-confirmation counsel to assist him.[579] At the hearing, Mr. Bartels responded to questions clearly, competently and directly.[580] Thus, the Court finds that Mr. Bartels is a credible witness and gives substantial weight to his testimony.

### iii.    Terms of the Auto Plus Settlement[581]

The Auto Plus Settlement, as amended by the Auto Plus Settlement Amendment, provides, among other things:

> 2(b) Effective Date. With respect to the forgoing paragraph, the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith, and attending any related hearings related

---

[573] Mar. 17, 2026 Hr'g Tr. at 333.

[574] Mar. 17, 2026 Hr'g Tr. at 175.

[575] Mar. 17, 2026 Hr'g Tr. at 175.

[576] Mar. 17, 2026 Hr'g Tr. at 175.

[577] Mar. 17, 2026 Hr'g Tr. at 175.

[578] Mar. 17, 2026 Hr'g Tr. at 333, 338.

[579] Mar. 17, 2026 Hr'g Tr. at 340.

[580] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[581] Case No. 4:23-cv-4787, ECF No. 195. Ex. 1.

to approval of the Settlement Motion (defined below). Consistent with the preceding sentences, the Plan Agent will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, JW will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion[,] Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Plan Agent and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases, and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules.

3. <u>Settlement Payment.</u> Within three (3) business days after the Effective Date, JW shall pay or cause to be paid to the Plan Agent (receipt of which shall be promptly confirmed by the Plan Agent) the sum of $500,000.00 (the "Settlement Payment'"). Payment shall be made payable to the Plan Agent's account by wire transfer using wire transfer instructions separately provided to JW. The Settlement Payment shall be paid to the Plan Agent and distributed pursuant to the terms of the confirmed plan in the Bankruptcy Cases.

4(a) <u>Releases</u>. *Release in Favor of JW*. Upon receipt of the entire Settlement Payment, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Plan Agent on behalf of the Wind-Down Debtors hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors, affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, reinsurers, Attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, or related to,

based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Agent against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/ or requests for sanctions. Notwithstanding the forgoing, nothing is intended or shall be construed to release claims or causes of action related to legal services provided by Jackson Walker pursuant to its December 22, 2023 retention agreement.[582]

5. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Plan Agent or Wind-Down Debtors against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, nonperformance and/or breach of this Agreement.

### c. Application of the *Jackson Brewing* Factors to the Auto Plus Settlement

The Court will next review the Auto Plus Settlement in accordance with the *Jackson Brewing* factors.

### Factor 1: Probability of success in the litigation, with due consideration for the uncertainty in fact and law

The Court will now consider the probability of the Auto Plus Plan Agent's success in the litigation, with due consideration for the uncertainty in fact and law.[583]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the IEH Debtors' cases.[584] In connection with the IEH Debtors' cases, Jackson

---

[582] Case No. 4:23-cv-4787, ECF No. 242, Ex. 1 (adding the last sentence of paragraph 4(a) to the Auto Plus Settlement).

[583] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[584] Case No. 4:23-cv-4787, ECF No. 195, Ex. 8.

Walker was paid a total of $4,814,345.49, which is the amount awarded under the Auto Plus Final Fee Order for services as counsel to the IEH Debtors during the pendency of their bankruptcy cases.[585] Following the emergence of claims against Jackson Walker, approximately $10,045 in attorneys' fees have been paid to counsel representing the Auto Plus Plan Agent in connection with the Miscellaneous Proceeding and related matters through January 2026.[586] Notably, Jackson Walker was also hired as post-confirmation counsel for the Auto Plus Wind Down Debtor on December 22, 2023, but no evidence was presented to demonstrate the amount of fees paid to Jackson Walker post-confirmation.[587]

Thus, if the Auto Plus Plan Agent pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees, not including any amounts stemming from post-confirmation services by Jackson Walker, would likely equal approximately $4,824,390.49, representing the amounts paid to Jackson Walker for work performed in connection with the IEH Debtors' cases and amounts paid to the Auto Plus Plan Agents' counsel in connection with the Jackson Walker fee dispute.[588] In contrast, under the Auto Plus Settlement, Jackson Walker would be required to pay $500,000 to the Auto Plus Plan Agent.[589]

Paragraph 4(a) of the Auto Plus Settlement provides a broad release from the Auto Plus Plan Agent in favor of Jackson Walker for potential claims that the Auto Plus Plan Agent has or may have relating to the Jones-Freeman Relationship.[590] Notably, the amended version of the Auto

---

[585] Case No. 4:23-cv-4787, ECF No. 195, Ex. 7.

[586] Case No. 4:23-cv-4787, ECF No.  225, Ex. 1 at 5, ¶ 29.

[587] Mar. 17, 2026 Hr'g Tr. at 340–41; Case No. 4:23-cv-4787, ECF No. 200, Ex. 7.

[588] Case No. 4:23-cv-4787, ECF No. 195, Ex. 7; ECF No.  225, Ex. 1 at 5, ¶ 29.

[589] Case No. 4:23-cv-4787, ECF No. 195, Ex. 1, at 4, ¶ 3.

[590] Case No. 4:23-cv-4787, ECF No. 195, Ex. 1, at 4, ¶ 4(a).

Plus Settlement also provides that nothing in paragraph 4(a) of the Auto Plus Settlement "is intended or shall be construed to release claims or causes of action related to legal services provided by Jackson Walker pursuant to its December 22, 2023 retention agreement."[591]

During his testimony, Mr. Bartels explained that he relied on his counsel, including Mr. Rusty Woolley of Mccloskey Roberson Woolley, PLLC, to investigate potential claims against Jackson Walker relating to the Jones-Freeman Relationship on behalf of the Auto Plus Wind Down Debtor.[592] Mr. Bartels' counsel advised him of the discovery that was conducted in the Miscellaneous Proceeding.[593] Mr. Bartels' understanding of the discovery in the Miscellaneous Proceeding is that in addition to extensive document production, there were over 40 depositions conducted, including depositions of Ms. Freeman, Jackson Walker employees, and Former Judge Jones.[594]

Mr. Bartels' testimony also demonstrates that he conducted a personal review of documents filed in connection with the Miscellaneous Proceeding and had familiarity with such documents and relevant procedural history. For example, Mr. Bartels considered the evidence related to the allegation that Former Judge Jones and Ms. Freeman owned real property together and that one of Jackson Walker's partners, Veronica Polnick, knew about this shared property ownership.[595] Mr. Bartels also believed that there was evidence, including testimony from Jackson Walker employees, to demonstrate that the Jones-Freeman Relationship started in at least 2021 and was ongoing in 2022.[596] Mr. Bartels also reviewed the Vacatur Motion itself along with Jackon

---

[591] Case No. 4:23-cv-4787, ECF No. 242, Ex. 1.

[592] Mar. 17, 2026 Hr'g Tr. at 344.

[593] Mar. 17, 2026 Hr'g Tr. at 345.

[594] Mar. 17, 2026 Hr'g Tr. at 345.

[595] Mar. 17, 2026 Hr'g Tr. at 188, 359.

[596] Mar. 17, 2026 Hr'g Tr. at 188, 359.

Walker's response to the Vacatur Motion.[597] Further, Mr. Bartels testified that he believed that Ms. Freeman was no longer a partner or employee of Jackson Walker at the time the IEH Debtors filed their bankruptcy cases.[598]

Mr. Bartels further testified that based on the evidence and discovery he reviewed, he believes there is a high likelihood that the Auto Plus Final Fee Order would be vacated because, according to Mr. Bartels, there was an "existence of a conflict" by Jackson Walker.[599] Mr. Bartels specifically estimated the likelihood of success as seventy (70%) percent or higher.[600] However, Mr. Bartels testified that he believed certain "mitigating factors" reduced the likelihood of recovering 100% of the fees paid to Jackson Walker in the IEH Debtors' cases.[601] Mr. Bartels identified what he believed constituted mitigating circumstances: (1) Former Judge Jones did not preside over the IEH Debtors' cases; (2) Ms. Freeman had left Jackson Walker before the IEH Debtors' cases were filed; (3) Judge Lopez approved the 2023 Settlement that resulted from mediation where Former Judge Jones was the mediator; (4) Jackson Walker provided quality legal services to the IEH Debtors; and (5) the Auto Plus Plan contained releases potentially protecting Jackson Walker from liability related to the Jones-Freeman Relationship.[602]

Although the evidence demonstrates that Mr. Bartels possessed familiarity with the claims he was settling on behalf of the Auto Plus Wind Down Debtor, and associated risks, the Court

---

[597] Mar. 17, 2026 Hr'g Tr. at 342, 343.

[598] Mar. 17, 2026 Hr'g Tr. at 341.

[599] Mar. 17, 2026 Hr'g Tr. at 361, 348.

[600] Mar. 17, 2026 Hr'g Tr. at 361.

[601] Mar. 17, 2026 Hr'g Tr. at 356.

[602] Mar. 17, 2026 Hr'g Tr. at 356.

"must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[603]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to the Strike Trust. For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[604]  Although this Court will not now conduct a mini-trial of the merits of the Auto Plus Plan Agent's claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that the Auto Plus Plan Agent's recovery against Jackson Walker raises fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of a complex chapter 11 plan.[605]

This particular case also presents facts differing from other cases in which the U.S. Trustee filed a Vacatur Motion. Here, Former Judge Jones was not the presiding judge in the IEH Debtors' cases but was a mediator in a mediation that occurred and produced the 2023 Settlement that was approved in the bankruptcy case by Judge Lopez.[606] And although Ms. Freeman was not employed

---

[603] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[604] Case No. 4:23-cv-4787, ECF No. 195, Ex. 9 at 52, 57, 60, 94.

[605] Case No. 4:23-cv-4787, ECF No. 195, Ex. 8.

[606] Case No. 4:23-cv-4787, ECF No. 195, Ex. 10; Mar. 17, 2026 Hr'g Tr. at 335.

by Jackon Walker at the time the IEH Debtors' cases were filed, Ms. Freeman, through her independent law firm, performed services in the IEH Debtors' case as conflicts counsel.[607] Jackson Walker, in its engagement agreement attached to the Auto Plus Retention Application, stated that Jackson Walker "strongly recommends the engagement of the Law Offices of Liz Freeman as Conflicts Counsel."[608] Mr. Bartels testified that he is unaware of whether or not Ms. Freeman attended the mediation that Former Judge Jones mediated and no evidence was presented to confirm whether or not she did.[609] Thus, a trial on the Vacatur Motion in the Auto Plus Wind Down Debtor case would involve the factual and legal issues of what effect Former Judge Jones' role as a mediator had on Jackson Walker's disclosure obligations, what effect Ms. Freeman's legal services that she provided through her independent law firm had on Jackson Walker's disclosure obligations, whether Ms. Freeman was involved in the mediation, and if so, what effect that had on Jackson Walker's disclosure obligations.[610]

A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Bartels' credible testimony and his familiarity with the claims he is settling, the Court finds that in

---

[607] Bankr. 23-90054, ECF No. 320; Mar. 17, 2026 Hr'g Tr. at 356, 365.

[608] Case No. 4:23-cv-4787, ECF No. 200, Ex. 1 at 14.

[609] Mar. 17, 2026 Hr'g Tr. at 366.

[610] Mar. 17, 2026 Hr'g Tr. at 180, 188–89. *See also* Case No. 4:23-cv-4787, ECF No. 193, Exs. 6, 7.

the exercise of his business judgment, Mr. Bartels, the plan agent of the Auto Plus Wind Down Debtor, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $500,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Auto Plus Settlement.

**Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay**

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the Auto Plus Settlement.[611]

The Auto Plus Plan Agent has not filed a complaint or initiated an adversary proceeding against Jackson Walker, but through the Auto Plus Settlement Motion, the Auto Plus Plan Agent seeks to settle potential claims against Jackson Walker for its alleged disclosure violations related to the Jones-Freeman Relationship.[612] Specifically, the Auto Plus Settlement includes a release of causes of actions related to the Jones-Freeman Relationship "which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Agent against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/ or requests for sanctions."[613] As part of his analysis in reaching his decision to settle, Mr. Bartels considered the length, delay, and costs required to participate in a trial on the merits of the Vacatur Motion.[614] Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the Auto Plus

---

[611] *See In re Beach*, 731 F. App'x at 326.

[612] Case No. 4:23-cv-4787, ECF No. 97.

[613] Case No. 4:23-cv-4787, ECF No. 195, Ex. 1 at 4.

[614] *See* Mar. 17, 2026 Hr'g Tr. at 352–53.

Settlement, the Court will consider the length, delay, and costs associated with a trial on the Vacatur Motion.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[615] the U.S. Trustee estimated at a December 9, 2025, status conference that 15 days may be needed to put on his evidence.[616] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[617] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[618] Mr. Bartels believes that a trial related to the Jackson Walker fee dispute is expected to last between 20 and 24 days.[619] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[620] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that the Vacatur Motion in the Auto Plus case was filed over two years ago on March 29, 2024.[621] Although extensive discovery has been conducted in the Miscellaneous Proceeding, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[622] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive

---

[615] *See* Dec. 9, 2025 Min. Entry.

[616] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[617] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[618] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[619] Mar. 17, 2026 Hr'g Tr. at 352.

[620] Dec. 9, 2025 status conference (statements by the Court).

[621] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 195, Ex. 8.

[622] *See e.g.*, Bankr. 23-645, ECF 516.

issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement.

Mr. Bartels estimated that the amount of attorney's fees that might be incurred if Mr. Bartels is required to participate in a trial on the Vacatur Motions would be anywhere from $50,000 to $150,000.[623] As such, a trial on the merits of the Vacatur Motion would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of a trial date for the Vacatur Motion and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to the Auto Plus Wind Down Debtor and its creditors if the Auto Plus Plan Agent was required to participate in a trial on the Vacatur Motion as compared to consummating a settlement. Finally, Mr. Bartels testified that in the exercise of his business judgment, he considered the time and costs associated with prosecuting claims against Jackson Walker, including the costs and length of a trial.[624]

Thus, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Bartels' credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Bartels, the plan agent of the Auto Plus Wind Down Debtor, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $500,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Auto Plus Settlement.

**Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views**

---

[623] Mar. 17, 2026 Hr'g Tr. at 351–52.

[624] Mar. 17, 2026 Hr'g Tr. at 352–53.

Next, the Court will consider whether the Auto Plus Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[625]

The evidence presented, including Mr. Bartels' testimony and the Auto Plus Plan, show that the settlement proceeds from the Auto Plus Settlement would be distributed primarily to American Entertainment Properties ("*AEP*"), who is a secured creditor of the IEH Debtors and provided debtor in possession financing to them.[626] Mr. Bartels communicated with AEP to determine if it had any objections to the Auto Plus Settlement.[627] The Auto Plus Settlement Motion contains a representation that AEP supports the Auto Plus Settlement,[628] which Mr. Bartels obtained AEP's consent to include.[629]

Other than the U.S. Trustee's objection, which has been resolved through the Global Joint Stipulation, there were no other formal or informal objections to the Strike Settlement Motion.[630] Additionally, Mr. Bartels' testimony demonstrates that for each month that the estate of the Auto Plus Wind Down Debtor remains open, additional and variable expenses are incurred, including costs for legal counsel, financial advisors, and a plan agent.[631] Mr. Bartels also testified that, aside from minor administrative obligations, the only major matters than remain pending before the estate of the Auto Plus Wind Down Detor can close in the instant fee dispute with Jackson Walker and an ongoing dispute with an entity named "FMP."[632] Although the evidence presented does not

---

[625] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[626] Mar. 17, 2026 Hr'g Tr. at 337, 348, 333; Case No. 4:23-cv-4787, ECF No. 195, Ex. 3 at 89, 30; Ex. 4.

[627] Mar. 17, 2026 Hr'g Tr. at 353, 354.

[628] Case No. 4:23-cv-4787, ECF No. 97 at 8.

[629] Mar. 17, 2026 Hr'g Tr. at 354.

[630] Mar. 17, 2026 Hr'g Tr. at 353.

[631] Mar. 17, 2026 Hr'g Tr. at 195–96.

[632] Mar. 17, 2026 Hr'g Tr. at 351.

show the details of the dispute with FMP, Mr. Bartels described the dispute as significant but that it is likely to be resolved in a "couple more months."[633]

The U.S. Trustee filed an objection to a fee application filed by the Law Office of Liz Freeman (the "*Freeman Fee Objection*").[634] Mr. Bartels admits that the estate of the Auto Plus Wind Down Debtor would have to remain open as long as the Freeman Fee Objection remains pending.[635] At a December 9, 2025 status conference, Ms. Freeman's counsel and the U.S. Trustee disagreed about whether the Freeman Fee Objection should be heard separately from the trial on the merits of the Vacatur Motion.[636] The court has not yet made this determination. As such, given the ongoing FMP dispute and the pending Freeman Fee Objection, it is unclear as to whether consummation of the Auto Plus Settlement would allow the estate of the Auto Plus Wind Down Debtor to close any sooner than it could if the Auto Plan Agent proceeded to a trial on the merits of the Vacatur Motion. In any event, approval of the Auto Plus Settlement would likely reduce the attorney's fees that the Auto Plus Plan Agent would incur if it proceeded to trial. As of January 2026, approximately $10,000 in legal fees have been incurred in connection with the Jackson Walker fee dispute, and Mr. Bartels estimates that proceeding to a trial on the merits would likely cause him to incur an additional $50,000-$150,000 in attorney's fees.[637]

The evidence admitted at the March 17, 2026 hearing therefore demonstrates that no creditors objected to the Auto Plus Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow creditors of the Auto Plus Wind Down

---

[633] Mar. 17, 2026 Hr'g Tr. at 351.

[634] Bankr. 23-90054, ECF No. 1049.

[635] Mar. 17, 2026 Hr'g Tr. at 372.

[636] Dec. 9, 2025 Min. Entry.

[637] Mar. 17, 2026 Hr'g Tr. at 352; Case No. 4:23-cv-4787, ECF No. 225, Ex. 1 at 5, ¶ 29.

Debtor to be paid without incurring additional attorney's fees for prosecuting claims against Jackson Walker.

As such, after considering the evidence admitted at the March 17, 2026 hearing, Mr. Bartels' credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Bartels, the plan agent of the Auto Plus Wind Down Debtor, gave due consideration of whether the Auto Plus Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Accordingly, the Court finds that the third factor weighs in favor of approving the Auto Plus Settlement.

### Factor 4: The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion

Next, the Court will consider the extent to which the Auto Plus Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[638]

Mr. Bartels knew Ms. Freeman personally because he met her through industry events or similar dinners.[639] But, he did not learn of the Jones-Freeman Relationship until October 7, 2023, when he read an article about it in the Wall Street Journal.[640] Mr. Bartels retained Jackson Walker as post-confirmation counsel on December 22, 2023, despite his knowledge of the Jones-Freeman Relationship.[641] Although Mr. Bartels' retention of Jackson Walker as post-confirmation counsel—even after the Jones-Freeman Relationship came to light and while also engaging in settlement decisions with Jackson Walker for claims on behalf of the Auto Plus Wind Down

---

[638] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[639] Mar. 17, 2026 Hr'g Tr. at 181.

[640] Mar. 17, 2026 Hr'g Tr. at 181.

[641] Case No. 4:23-cv-4787, ECF No. 200, Ex. 7.

Debtor—gives this Court some pause, the evidence demonstrates that Jackson Walker's role as post-confirmation counsel did not have any impact on the settlement.

Mr. Bartels explained that he considered Jackson Walker a good fit as post-confirmation counsel because Jackson Walker possessed knowledge of the bankruptcy case and outstanding claims.[642] Mr. Bartels also stated that Former Judge Jones was not involved in the case post-confirmation.[643] Mr. Bartels eventually hired independent counsel to pursue claims against Jakson Walker given the conflict of interest that existed from Jackson Walker's role as post-confirmation counsel and the Auto Plus Plan Agent's claims against Jackson Walker.[644] Mr. Bartels directed his independent counsel to engage in settlement discussions with Jackson Walker.[645] Mr. Bartels did not have direct communication with Jackson Walker regarding the fee dispute, and only communicated to Jackson Walker's counsel handling the fee dispute.[646] The Auto Plus Settlement was ultimately reached through conversations between counsel for Jackson Walker and Mr. Bartels.[647] There is no evidence that Mr. Bartels' counsel had a conflict of interest with respect to the claims brought against Jackson Walker. Additionally, the evidence demonstrates that Mr. Bartels was transparent with his decision to keep Jackson Walker as post-confirmation counsel while pursuing settlement against Jackon Walker. Mr. Bartels' testimony established that he informed AEP of settlement discussions as they progressed, promptly notified AEP when a settlement agreement was reached, and advised AEP that Jackson Walker would continue

---

[642] Mar. 17, 2026 Hr'g Tr. at 340, 359.

[643] Mar. 17, 2026 Hr'g Tr. at 340.

[644] Mar. 17, 2026 Hr'g Tr. at 344

[645] Mar. 17, 2026 Hr'g Tr. at 346.

[646] Mar. 17, 2026 Hr'g Tr. at 355.

[647] Mar. 17, 2026 Hr'g Tr. at 355.

providing legal representation for the Auto Plus Wind Down Debtor.[648] Finally, Mr. Bartels testified that he maintained regular communication with AEP throughout the settlement process.[649]

Thus, Mr. Bartels' reliance on disinterested counsel to negotiate the settlement with Jackson Walker, Mr. Bartels' transparency in his continued retention of Jackson Walker, and the settlement negotiations between Jackson Walker and Mr. Bartels' counsel show that the Auto Plus Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 17, 2026 hearing, the Court finds that the Auto Plus Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Auto Plus Settlement.

### Factor 5: All other factors bearing on the wisdom of the compromise

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn, (i) whether the Auto Plus Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motion, if any, may be accepted by the estate of the Auto Plus Wind Down Debtor and its creditors.[650]

#### i.    Whether the approval of the Auto Plus Settlement will negatively impact or promote the integrity of the judicial system

The Court will now consider whether the Auto Plus Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[651]

---

[648] Mar. 17, 2026 Hr'g Tr. at 356.

[649] Mar. 17, 2026 Hr'g Tr. at 356.

[650] *See In re MCorp Fin.*, 160 B.R. at 951.

[651] *See In re Bates*, 211 B.R. at 345.

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the Auto Plus Settlement, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit the Auto Plus Wind Down Debtor and its creditors from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[652] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[653]

In considering what impact, if any, the Auto Plus Settlement could have on the Vacatur Motion, the Court will look first to the Auto Plus Settlement's plain language.[654] Paragraph 2(b) of the Auto Plus Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion[,] Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Plan Agent and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases.[655]

In a similar fashion, paragraph 4(a) provides in relevant part that:

> Upon receipt of the entire Settlement Payment, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Plan Agent on behalf of the Wind-Down Debtors hereby releases, acquits, and forever discharges [Jackson Walker]. . . from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases, the U .S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Agent against

---

[652] *See* Case No. 4:23-cv-04787, ECF No. 170.

[653] Case No. 4:23-cv-04787, ECF No. 255.

[654] *Estate of Kokernot*, 112 F.3d at 1294.

[655] Case No. 4:23-cv-04787, ECF No. 195, Ex. 1, ¶ 2(b).

[Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/ or requests for sanctions. Notwithstanding the forgoing, nothing is intended or shall be construed to release claims or causes of action related to legal services provided by Jackson Walker pursuant to its December 22, 2023 retention agreement.[656]

Although the language of paragraph 2(b) and 4(a) creates a broad release of claims, the language expressly provides that the Auto Plus Plan Agent will only release claims that the Auto Plus Plan Agent may have against Jackson Walker.[657] Neither paragraph 2(b) nor 4(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[658]

Paragraph 5 of the Auto Plus Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Plan Agent or Wind-Down Debtors against [Jackson Walker] or any other released parties.[659]

Like paragraphs 2(b) and 4(a), paragraph 5 of the Auto Plus Settlement references release of possible claims by *the Auto Plus Plan Agent* against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[660] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Auto Plus Settlement. Moreover, Mr. Bartels, who signed the Auto Plus Settlement, testified that he did not intend for the Auto Plus Settlement to change any of the relief sought by the U.S. Trustee in his Vacatur Motion or release any claims the U.S. Trustee might have against Jackson Walker.[661] Thus, the Court finds that the Auto Plus Settlement only provides for the release of any claims the Auto Plus Plan Agent may have against

---

[656] Case No. 4:23-cv-04787, ECF No. 195, Ex. 1, ¶ 4(a); ECF No. 242, Ex. 1.

[657] Case No. 4:23-cv-04787, ECF No. 195, Ex. 1, ¶¶ 2(b), 4(a).

[658] Case No. 4:23-cv-04787, ECF No. 195, Ex. 1, ¶¶ 2(b), 4(a).

[659] Case No. 4:23-cv-04787, ECF No. 195, Ex. 1, ¶ 5.

[660] Case No. 4:23-cv-04787, ECF No. 195, Ex. 1, ¶¶ 2(b), 4(a), 5.

[661] Mar. 17, 2026 Hr'g Tr. at 347.

Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Auto Plus Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by the Auto Plus Plan Agent, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[662] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the Auto Plus Plan Agent all "acknowledge and agree" that the Auto Plus Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[663]

There is no language in the Auto Plus Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the Auto Plus Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[664] Thus, the Court finds that the Auto Plus Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Auto Plus Plan Agent, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally, in the Global Joint Stipulation, Jackson Walker stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[665] Therefore, the Court finds that the Auto Plus Settlement does not preclude the Auto

---

[662] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[663] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[664] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

[665] Case No. 4:23-cv-04787, ECF No. 255 at 2.

Plus Wind Down Debtor and its creditors from accepting funds in addition to the $500,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the Auto Plus Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the Auto Plus Settlement and Global Joint Stipulation, the Court finds that the Auto Plus Settlement: (i) only released any claims the Auto Plus Plan Agent has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Auto Plus Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Auto Plus Plan Agent, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude the Auto Plus Wind Down Debtor and its creditors from accepting funds in addition to the $500,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Therefore, the Court finds that the Auto Plus Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Auto Plus Settlement.

### ii.    Considerations of collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[666]

Mr. Bartels testified that he considered his potential ability to collect on a judgement that may be entered in favor of the Auto Plus Wind Down Debtor after a trial.[667] Mr. Bartels believed Jackson Walker could pay the settlement of $500,000, but that if Jackon Walker also had to disgorge fees for all the Affected Cases—up to approximately $20 million—it could impact Jackson Walker's ability to pay each party entitled to disgorged fees.[668] Therefore, for Mr. Bartels, being one of the first parties to settle with Jackson Walker was important.[669]

However, Mr. Bartels' testimony reveals that Mr. Bartels did not conduct any meaningful investigation to determine whether Jackson Walker could pay any judgment entered at a final trial on the merits.[670] For example, Mr. Bartels testified that Jackson Walker never represented that it was experiencing financial distress, nor did Jackson Walker or its agents ever indicate to Mr. Bartels that it would be unable to pay a judgment rendered in favor of the Auto Plus Wind Down Debtor.[671] Additionally, Mr. Bartels acknowledged that he did not perform any internet research or review publicly available information regarding Jackson Walker's finances.[672]

Because Mr. Bartels did not investigate the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack

---

[666] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[667] Mar. 17, 2026 Hr'g Tr. at 352–53.

[668] Mar. 17, 2026 Hr'g Tr. at 353.

[669] Mar. 17, 2026 Hr'g Tr. at 354.

[670] Mar. 17, 2026 Hr'g Tr. at 370.

[671] Mar. 17, 2026 Hr'g Tr. at 249, 370.

[672] Mar. 17, 2026 Hr'g Tr. at 249, 250, 370.

thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Auto Plus Settlement.

      **iii.**        **Whether the Auto Plus Wind Down Debtor may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment**

At the March 17, 2026 hearing, Mr. Bartels testified that he desires to wind down and administratively close the estate of the Auto Plus Wind Down Debtor and that the Jackson Walker fee dispute is, among other things, a major impediment to winding down.[673] In response, the Court, *sua sponte*, expressed concerns as to whether a bankruptcy estate or a post-confirmation trust could accept and distribute any additional funds over and above amounts in any of the Settlement Agreements, if ordered by the Court after a final trial on the merits of the Vacatur Motions, if a bankruptcy estate or post-confirmation trust was wound down and closed administratively.[674] As a result, the Court entered its order for post-trial briefing[675] where the Court directed the Auto Plus Plan Agent and other parties to address the following questions posed by the Court, to wit:

> (1) whether the proposed settlements may be approved without impairing the United States Trustee's pending Vacatur Motions or the Court's inherent authority to order vacatur or additional relief; (2) in the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; and (3) if the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of [the Auto Plus Plan Agent] to the disposition of funds upon wind-down and closure, including where such funds would be distributed.[676]

---

[673] Mar. 17, 2026 Hr'g Tr. at 344, 351.

[674] Mar. 17, 2026 Hr'g Tr. at 297, 298.

[675] Case No. 4:23-cv-04787, ECF No 248.

[676] Case No. 4:23-cv-04787, ECF No 248.

On April 10, 2026, the Auto Plus Plan Agent filed his "Post Hearing Brief In Support Of Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019 In The Auto Plus Auto Sales LLC Bankruptcy Case" (the "*Auto Plus Brief*").[677] On April 17, 2026, the U.S. Trustee filed his Post-Hearing Reply Brief.[678] In the Auto Plus Brief, the Auto Plus Plan Agent asserts that (1) the Auto Plus Settlement may be approved without impairing the U.S. Trustee's Vacatur Motion or the Court's inherent authority; (2) the estate of the Auto Plus Wind Debtor, once closed, can be later reopened; and (3) as an alternative to reopening the estate of the Auto Plus Wind Debtor, Mr. Bartels could assign the right to receive any future distribution to the creditor who would receive such distribution.[679]

A party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[680] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[681] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[682] Further, Bankruptcy Rule 5010 provides that the court may reopen a case upon a motion filed by the debtor or another party in interest.[683] Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[684] There

---

[677] Case No. 4:23-cv-04787, ECF No 278.

[678] Case No. 4:23-cv-04787, ECF No 282.

[679] Case No. 4:23-cv-04787, ECF No 278 at 2.

[680] *See In re JCP Props*., 540 B.R. at 605; *In re Lager*, 2024 Bankr. LEXIS 1974, at *7.

[681] Fed. R. Bankr. P. 3022.

[682] 11 U.S.C. § 350(b).

[683] Fed. R. Bankr. P. 5010.

[684] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

is no pending motion to close or reopen the Auto Plus Case. As explained *supra*, the Auto Plus Settlement does not impact the ability of the Auto Plus Plan Agent to receive any additional funds that the Court may potentially order Jackson Walker to pay.[685] Moreover, there is nothing in the Auto Plus Settlement that prevents the Auto Plus Plan Agent from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

Thus, after a careful review of the Auto Plus Brief, and the assertions made therein, the Court finds it unnecessary, as of this moment, to consider whether the bankruptcy estate would need to be closed or reopened for the Auto Plus Plan Agent to receive and distribute any additional funds ordered by the Court in excess of the $500,000 settlement.

However, the Court's finding that the Auto Plus Settlement neither affects the Auto Plus Plan Agent's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $500,000 settlement, nor prevents the Auto Plus Plan Agent from filing a motion for a final decree or to re-open the Auto Plus Case as he deems appropriate, supports approval of the Auto Plus Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the Auto Plus Settlement be approved

Jackson Walker and the Auto Plus Plan Agent have agreed to a settlement of $500,000.[686] If the Auto Plus Plan Agent were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker, not including any amounts stemming from post-confirmation services by Jackson Walker, would be approximately $4,824,390.49, consisting of $4,814,345.49 paid to Jackson Walker for expenses and services performed during the pendency of the IEH Debtors' cases and the approximately $10,045 paid to counsel

---

[685] *See supra* Section I.D.c.4.c.5.i.

[686] Case No. 4:23-cv-4787, ECF No. 195, Ex. 1 at 4.

representing the Auto Plus Plan Agent in connection with the Miscellaneous Proceeding and related matters.[687] Acceptance of the settlement amount of $500,000 less fees incurred by the Auto Plus Plan Agent to pursue litigation against Jackson Walker, totaling at least $10,045, would result in net proceeds of approximately $489,955 to the Auto Plus Wind Down Debtor and its creditors pursuant to the Auto Plus Settlement.

After considering Mr. Bartels' credible testimony, the evidence now in the record, including the Auto Plus Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgement, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement approval and that in the exercise of his business judgment Mr. Bartels, the plan agent of the Auto Plus Wind Down Debtor, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating claims in the Vacatur Motion and securing a judgment in an amount exceeding the $500,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $500,000 settlement amount; gave due consideration to whether the Auto Plus Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the Auto Plus Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the Auto Plus Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Auto Plus Settlement: (i) only released any claims the Auto Plus Plan Agent has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion

---

[687] Case No. 4:23-cv-4787, ECF No. 195, Ex. 7; ECF No.  225, Ex. 1 at 5, ¶ 29.

that are distinct and independent from the claims being released in the Auto Plus Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Auto Plus Plan Agent, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude the Auto Plus Wind Down Debtor and its creditors from accepting funds in addition to the $500,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the Auto Plus Settlement that prevents the Auto Plus Agent from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

The Court further finds that the Auto Plus Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[688] because although the proposed settlement amount of $500,000 to be paid to the Auto Plus Plan Agent by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $4,824,390.49, as stated *supra*, representing both the fees paid to Jackson Walker pre-confirmation and the subsequent costs paid to the Auto Plus Plan Agent's counsel for pursuing claims against Jackson Walker, the Auto Plus Plan agent duly considered the uncertainty created by the lack of Former Judge Jones as a presiding judge in this case and the Auto Plus Settlement could allow the creditors of the Auto Plus Wind Down Debtor to receive distributions without the expense and delay associated with a trial on the merits.

Finally, even though final approval of the Auto Plus Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Auto Plus Plan Agent and the Auto Plus Wind

---

[688] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

Down Debtor have a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[689] and Bankruptcy Rule 9033, the Court recommends approval of the Auto Plus Settlement.[690]

### 5. 20-35740 & 21-30427 – The Seadrill Settlement

#### a. Background

On December 1, 2020, Seadrill Partners, LLC, and certain of its affiliates (the "*Seadrill Partners Debtors*") filed for chapter 11 relief in the Bankruptcy Court (the "*Seadrill Partners Bankruptcy Case*").[691] The Seadrill Partners Bankruptcy Case was jointly administered under Case No. 20-35740, with Former Judge Jones presiding until October 13, 2023.[692] On December 23, 2020, the Seadrill Partners Debtors filed an application to retain Jackson Walker as co-counsel and conflicts counsel ("*Seadrill Partners Retention Application*").[693] On January 15, 2021, the Bankruptcy Court approved the Seadrill Partners Retention Application (the "*Seadrill Partners Retention Order*").[694] On May 11, 2021, the Seadrill Partners Debtors filed their "Fourth Amended Joint Chapter 11 Plan of Reorganization of Seadrill Partners LLC and its Debtor Affiliates

---

[689] 564 U.S. 462, 480 (2011).

[690] Case No. 4:23-cv-4787, ECF No. 195, Ex. 1; ECF No. 242, Ex. 1.

[691] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 1, ¶ 2. *See also* Bankr. 20-35740, ECF No. 1.

[692] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 1-2, ¶ 2. *See also* Bankr. 20-35740, ECF No. 46; Min. Entry Between ECF Nos. 833, 834.

[693] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 3. *See also* Bankr. 20-35740, ECF No. 110.

[694] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 4. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 2.

Pursuant to Chapter 11 of the Bankruptcy Code" (the "*Seadrill Partners Plan*").[695] The Seadrill

Partners Plan states:

> [O]n the Effective Date, all property in each Debtor's Estate, all Causes of Action of the Debtors, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. [696]

On May 14, 2021, the Bankruptcy Court entered an order confirming the Seadrill Partners'

Plan.[697] On May 24, 2021, the Seadrill Partners Plan became effective (the "*Seadrill Partners*

*Effective Date*").[698] On June 8, 2021, the Bankruptcy Court entered a final decree closing certain

of the Seadrill Partners' chapter 11 cases.[699] On July 8, 2021, Jackson Walker filed an application

for final approval of compensation and reimbursement of expenses as co-counsel and conflicts

counsel to the Seadrill Partners Debtors for the period from December 1, 2020, through May 14,

2021 (the "*Seadrill Partner Final Fee Application*").[700] On August 10, 2021, the Bankruptcy Court

approved the Seadrill Partner Final Fee Application for final approval of compensation for

attorneys' fees in the amount of $286,885 and reimbursement of expenses in the amount of

$1,617.25, totaling $288,502.25, as co-counsel and conflicts counsel to the Seadrill Partners

Debtors (the "*Seadrill Partners Final Fee Order*").[701] On March 20, 2024, Seadrill Partners filed

---

[695] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 5. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 3.

[696] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 6. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 3 at 28, Art. IV.G.

[697] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 7. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 4.

[698] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 8. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 5.

[699] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 2, ¶ 9. *See also* Bankr. 20-35740, ECF No. 603.

[700] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 10. *See also* Case No. 4:23-cv-4787, ECF No. 206, Ex. 4.

[701] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 11. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 6.

its "Emergency Motion for Entry of a Final Decree in the Seadrill Partners, LLC Case and to Reopen Seadrill Operating CP LLC Case for Administration of Fee Dispute" ("*Administrative Motion*").[702] The Court granted the Administrative Motion on March 28, 2024, entered a final decree in the Seadrill Partners Bankruptcy Case, and opened the affiliate Case No. 20-35740.[703]

On February 10, 2021, Seadrill Limited and certain affiliates (the "*Seadrill Limited Debtors*") filed for chapter 11 relief in the Bankruptcy Court (the "*Seadrill Limited Bankruptcy Case*" and together with the Seadrill Partners Bankruptcy Case, the "*Seadrill Cases*"). [704] The Seadrill Limited Bankruptcy Case was jointly administered under Case No. 21-30427, with Former Judge Jones presiding until October 13, 2023.[705] On March 8, 2021, the Seadrill Limited Debtors filed an application to retain Jackson Walker as co-counsel and conflicts counsel (the "*Seadrill Limited Retention Application*").[706] On April 5, 2021, the Bankruptcy Court entered an order approving the Seadrill Limited Retention Application (the "*Seadrill Limited Retention Order*").[707] On October 22, 2021, the Seadrill Limited Debtors filed their "Second Amended Joint Chapter 11 Plan of Reorganization of Seadrill Limited and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code" (the "*Seadrill Limited Plan*").[708] The Seadrill Limited Plan provides that:

> On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action

---

[702] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 12. *See also* Bankr. 20-35740, ECF No. 881.

[703] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 13. *See also* Bankr. 20-35740, ECF No. 890.

[704] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 14. *See also* Bankr. 21-30427, ECF No. 1.

[705] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 15. *See also* Bankr. 21-30427, ECF No. 27; Min. Entry Between ECF Nos. 1585, 1586.

[706] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 16. *See also* Bankr. 21-30427, ECF No. 250.

[707] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 17. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 14.

[708] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 18. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 15.

without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.[709]

On October 26, 2021, the Bankruptcy Court entered an order confirming the Seadrill Limited Plan.[710] On December 8, 2021, Jackson Walker filed an application for final approval of compensation and reimbursement of expenses as co-counsel and conflicts counsel to the Seadrill Limited Debtors for the period from February 10, 2021, through October 26, 2021 (the "*Seadrill Limited Final Fee Application*").[711]

On January 7, 2022, the Bankruptcy Court approved the Seadrill Limited Final Fee Application for final approval of compensation for attorneys' fees in the amount of $501,242 and reimbursement of expenses in the amount of $2,123.05, totaling $503,365.05, as co-counsel and conflicts counsel to the Seadrill Limited Debtors (the "*Seadrill Limited Final Fee Order*").[712] On February 22, 2022, the Seadrill Limited Plan became effective (the "*Seadrill Limited Effective Date*").[713] After the Seadrill Limited Effective Date, Jackson Walker continued to represent Seadrill Limited in the Seadrill Limited Bankruptcy Case.[714] On October 7, 2023, an article was published entitled "Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer" in the *Wall Street Journal Pro*, relating to the Jones-Freeman Relationship.[715] On October 13, 2023, the Fifth Circuit Complaint was filed.[716] On October 16, 2023, Former Judge

---

[709] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 19. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 15 at 40–41, Art. IV.F.

[710] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 20. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 16.

[711] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 21. *See also* Case No. 4:23-cv-4787, ECF No. 206, Ex. 17.

[712] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 22. *See also* Case No. 4:23-cv-4787, ECF No. 184, Exs. 17, 18 and 19.

[713] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 23. *See also* Bankr. 21-30427, ECF No. 1399.

[714] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 5, ¶ 24.

[715] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 5, ¶ 25.

[716] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 5, ¶ 26.

Jones announced that he would resign from the bench, effective November 15, 2023.[717] On November 3, 2023, in the Seadrill Cases, the U.S. Trustee filed his Initial Vacatur Motion and a motion to withdraw the reference.[718]

On November 13, 2023, in the Seadrill Cases, Jackson Walker filed its preliminary response to the Initial Vacatur Motion.[719] On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous Proceeding.[720] On January 10, 2024, Seadrill Partners filed its "Notice in Connection with the Jackson Walker LLP Fee Dispute" (the "*Seadrill Partners Notice*"), asserting that under the Seadrill Partners Plan, Seadrill Partners are indispensable parties who have standing to appear and be heard in the fee dispute between the U.S. Trustee and Jackson Walker.[721] On February 29, 2024, the U.S. Trustee filed his Vacatur Motion in each of the Seadrill Cases.[722]

On March 1, 2024, Jackson Walker withdrew from representing Seadrill Limited in the Seadrill Limited Bankruptcy Case.[723] In connection with Jackson Walker's representation of Seadrill Limited post-confirmation, Jackson Walker received fees and reimbursement of expenses totaling $552,245.[724] On April 15, 2024, Seadrill Limited filed its "Notice in Connection with the Jackson Walker LLP Fee Dispute" (the "*Seadrill Limited Notice*"), asserting that under the Seadrill

---

[717] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 5, ¶ 27.

[718] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 5, ¶ 28. *See also* Bankr. 20-35740, ECF Nos. 834, 835; Bankr. 21-30427, ECF Nos. 1588, 1589; Case No. 4:23-cv-4787, ECF No. 184, Ex. 7.

[719] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 5, ¶ 29. *See also* Bankr. 20-35740, ECF No. 838; Bankr. 21-30427, ECF No. 1591.

[720] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 30. *See also* Bankr. 26-345, ECF No. 1.

[721] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 32. *See also* Bankr. 20-35740, ECF No. 857.

[722] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 33. *See also* Bankr. 20-35740, ECF No. 877; Bankr. 21-30427, ECF No. 1621; Case No. 4:23-cv-4787, ECF No. 184, Ex. 9.

[723] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 34. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 23.

[724] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 34.

Limited Plan, Seadrill Limited is an indispensable party who has standing to appear and be heard in the fee dispute between the U.S. Trustee and Jackson Walker.[725] Discovery in the Miscellaneous Proceeding proceeded from May 2024 through December 2024.[726] On May 22, 2024, Jackson Walker filed its response in opposition to the Vacatur Motion in each of the Seadrill Cases.[727] On July 1, 2024, the U.S. Trustee filed its reply in the Seadrill Cases, and on August 12, 2024, Jackson Walker filed its sur-reply.[728]

Seadrill represents, and Jackson Walker does not dispute, that Seadrill participated in the Miscellaneous Proceeding since its inception. Seadrill's counsel attended over 10 fact witness and expert depositions, propounded written discovery to Jackson Walker, reviewed thousands of documents produced, and attended numerous hearings.[729] Seadrill represents, and Jackson Walker does not dispute, that Seadrill, through counsel, has attended multiple meetings and participated in regular calls with the U.S. Trustee and other trustees, debtors, plan administrators and plan agents in other bankruptcy cases.[730]

On March 6, 2025, Jackson Walker and Seadrill participated in a mediation with Judge Royal Furgeson (Ret.) and Judge Gary Feess (Ret.) serving as mediators.[731] On April 9, 2025, Chief Judge Moses entered her Order Withdrawing the Reference.[732]

---

[725] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 35. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 24.

[726] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 36. *See also* Bankr. 23-645, ECF Nos. 57, 516, 520, 556.

[727] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 37. *See also* Case No. 4:23-cv-4787, ECF No. 184, Exs. 11, 25.

[728] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 38. *See also* Case No. 4:23-cv-4787, ECF No.184, Exs. 26, 27.

[729] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 40

[730] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 40.

[731] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 41.

[732] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 42; ECF No. 31.

On July 25, 2025, Seadrill filed the Seadrill Settlement Motion,[733] which attached a "Settlement Agreement and Release" executed by Seadrill and Jackson Walker (the "*Seadrill Settlement*") that contemplates a single payment from Jackson Walker in the total amount of $485,000 to Seadrill Limited.[734] On August 15, 2025, the U.S. Trustee filed its "Omnibus Objection to Approval of Private Party Settlements that Preempt Adjudication of the U.S. Trustee's Rule 60(b) Motions."[735] On March 16, 2026, Seadrill and Jackson Walker filed their "Amendment No 1. To Settlement Agreement And Release" (the "*Seadrill Settlement Amendment*").[736]

### b.  The March 18, 2026 Hearing

For the Seadrill Settlement Motion hearing held on Wednesday, March 18, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel, Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of Seadrill, Simon Mayer and Phillip Eisenberg, along with Nicole Anderson, the representative of Seadrill.

### i.    Evidence admitted

The following exhibits were either admitted into evidence or judicially noticed under Federal Rule of Evidence 201.

### a.  For Seadrill

---

[733] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 43; ECF No. 90; ECF No. 184, Ex. 1.

[734] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 44; ECF No. 184, Ex. 1.

[735] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 45; ECF No. 93; ECF No. 184, Ex. 29.

[736] Case No. 4:23-cv-4787, ECF No. 240, Ex. 1.

Pursuant to a joint stipulation[737] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026 hearing:

i.      Exhibits 1 and 2 were admitted

ii.     The Court took judicial notice under FRE 201 of Exhibit 3

iii.    Exhibit 4 was admitted

iv.     The Court took judicial notice under FRE 201 of Exhibit 5

v.      Exhibit 6 was admitted

vi.     The Court took judicial notice under FRE 201 of Exhibits 7, 8, and 9

vii.    Exhibit 10 was admitted

viii.   The Court took judicial notice under FRE 201 of Exhibits 11, 12 and 13

ix.     Exhibit 14 was admitted

x.      The Court took judicial notice under FRE 201 of Exhibit 15

xi.     Exhibits 16, 17, 18, and 19 were admitted

xii.    The Court took judicial notice under FRE 201 of Exhibits 20, 21, 22, 23, 24, 25, 26, 27, 28, and 29

The following exhibit at ECF No. 240 was admitted:

i.      Exhibit 1 was admitted

**b.  For the U.S. Trustee**

The following exhibit at ECF No. 185 was admitted:

i.      Exhibit 12 was admitted

**c.  For Jackson Walker**

---

[737] Case No. 4:23-cv-4787, ECF No. 224, Ex. 2 referring to Seadrill exhibits filed at ECF No. 184.

Pursuant to a joint stipulation[738] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026 hearing:

i.      The Court took judicial notice under FRE 201 of Exhibits 4, 13, 14, and 17

The following exhibit at ECF No. 205 was admitted

i.      Exhibit 40 was admitted

## ii.      Credibility of the witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[739] At the March 18, 2026 hearing, Ms. Nicole Anderson ("*Ms. Anderson*") and Mr. Philip Eisenberg ("*Mr. Eisenberg*") were sworn in and took the witness stand.

Ms. Anderson obtained legal training degrees from Robert Gordon University in Scotland, United Kingdom and recently sat for the bar in New York state but is not licensed to practice law in the United States or the United Kingdom at this time.[740] She has been employed by Seadrill Americas, Inc., an affiliate of Seadrill Limited and Seadrill Partners, since 2020 and her current role at Seadrill Americas, Inc., is senior legal counsel.[741] Her role as senior legal counsel at Seadrill Americas, Inc., includes overseeing the legal affairs of Seadrill Limited.[742] As explained more fully *infra*, Seadrill Partners merged into Seadrill Limited and Ms. Anderson was involved in Seadrill's decision to enter into the Seadrill Settlement, which provides for a settlement payout to Seadrill Limited.[743] Mr. Eisenberg is the lead counsel for Seadrill Limited in litigation against

---

[738] Case No. 4:23-cv-4787, ECF No. 224, Ex. 2 referring to Jackson Walker exhibits filed at ECF No. 206.

[739] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[740] Mar. 18, 2026 Hr'g Tr. at 25–26

[741] Mar. 18, 2026 Hr'g Tr. at 26.

[742] Mar. 18, 2026 Hr'g Tr. at 33, 27–28.

[743] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1 at 4.

Jackson Walker.[744] Mr. Eisenberg was initially retained post-confirmation to handle post-confirmation matters for Seadrill Partners.[745] Mr. Eisenberg was subsequently engaged to represent Seadrill Limited and continued to represent Seadrill Limited after the merger of Seadrill Partners and Seadrill Limited.[746] Mr. Eisenberg has been a licensed attorney since 1986 and maintains active licenses in New York, Louisiana, and Texas.[747]

At the hearing, Ms. Anderson and Mr. Eisenberg responded to questions clearly, competently, and directly.[748] Thus, the Court finds that Ms. Anderson and Mr. Eisenberg are credible witnesses and gives substantial weight to their testimonies.

### iii.    Terms of the Seadrill Settlement[749]

The Seadrill Settlement, as amended by the Seadrill Settlement Amendment, provides among other things:

> 2(b) <u>Effective Date.</u> With respect to the forgoing paragraph. the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith. and attending any related hearings. Consistent with the preceding sentences. Reorganized Debtors will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable: rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, JW will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Reorganized Debtors and JW, including all claims

---

[744] Mar. 18, 2026 Hr'g Tr. at 87.

[745] Mar. 18, 2026 Hr'g Tr. at 87.

[746] Mar. 18, 2026 Hr'g Tr. at 87.

[747] Mar. 17, 2026 Hr'g Tr. at 86-87.

[748] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[749] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1.

and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Seadrill Partners, LLC, et al. bankruptcy case and the Seadrill Limited, et al. bankruptcy case, and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules.[750] The Settlement Motion will be filed in the District Court under case number 4:23-cv-4787-AM.

3. <u>Settlement Payment.</u> Within five (5) business days after the Approval Order becoming a Final Order. JW shall pay or cause to be paid to Seadrill Limited (receipt of which shall be promptly confirmed by Seadrill Limited) the sum of $485,000.00 USD (the "Settlement Payment").

4(a) <u>Mutual Releases.</u> *Release in Favor of JW.* On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, Reorganized Debtors hereby releases, acquits and forever discharges JW and its respective predecessors in interest. successors, affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, reinsurers, attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Reorganized Debtors against JW related to any breach of fiduciary duty, negligence, gross negligence[,] malpractice, fraud (or similar fraud based claims)[,] and/or requests for sanctions.

6. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim

---

[750] Case No. 4:23-cv-4787, ECF No. 240, Ex. 1 (deleting the clause "and that this Agreement adequately sanctions JW for any alleged violations of any law, rule, procedure, or statute" and replacing with "and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules")

or cause of action under federal, state or other law relating to any possible claim by the Reorganized Debtors against JW or any other released parties as well as any possible claim by JW against the Reorganized Debtors or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, nonperformance and/or breach of this Agreement.

10. <u>Cooperation and Dismissal or Withdrawal with Prejudice.</u> The Parties will cooperate with each other to give effect to the Agreement, including, without limitation, and the Reorganized Debtors shall, within three (3) business days after the Effective Date, withdraw any related joinder or separate pleading or proceeding with prejudice, if any.

### c. Application of the *Jackson Brewing* Factors to the Seadrill Settlement

The Court will next review the Seadrill Settlement in accordance with the *Jackson Brewing* Factors.

<u>**Factor 1:**</u> **Probability of success in the litigation, with due consideration for the uncertainty in fact and law**

The Court will now consider the probability of Seadrill's success in the litigation, with due consideration for the uncertainty in fact and law.[751]

The Vacatur Motions filed in each of the Seadrill Cases seek disgorgement of all legal fees paid to Jackson Walker in connection with the Seadrill Cases.[752] On January 10, 2024, Seadrill Partners filed the Seadrill Partners Notice to assert standing and indispensable party status as to the Vacatur Motion.[753] And on April 15, 2024, Seadrill Limited filed the "Seadrill Limited Notice" to also assert standing and indispensable party status as to the Vacatur Motion.[754] Seadrill has not filed a joinder to the Vacatur Motions or a formal complaint against Jackson Walker.[755] But, the Seadrill

---

[751] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[752] Case No. 4:23-cv-4787, ECF No. 184, Ex. 22.

[753] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 32. *See also* Bankr. 20-35740, ECF No. 857.

[754] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 35. *See also* Case No. 4:23-cv-4787, ECF No. 184, Ex. 24.

[755] Mar. 18, 2026 Hr'g Tr. at 78.

Settlement provides a broad release from Seadrill in favor of Jackson Walker for all potential claims that Seadrill has or may have relating to the Jones-Freeman Relationship.[756] As such, when considering the probability of Seadrill's success in the litigation, the Court must consider the likelihood of success on the merits of the Vacatur Motion because the claims being settled by Seadrill are based on the same factual underpinnings as the relief being sought in the Vacatur Motions.

Post-bankruptcy, Seadrill Partners merged into Seadrill Limited.[757] Although both Seadrill Partners and Seadrill Limited have entered into the Seadrill Settlement, the Seadrill Settlement contemplates resolution of Seadrill Limited and Seadrill Partners' claims by a single payment to only Seadrill Limited on behalf of both the Seadrill entities.[758] Moreover, at the March 18, 2026 hearing, counsel for Seadrill represented that for purposes of the Seadrill Settlement, Seadrill Limited and Seadrill Partners should be treated as a single entity under Seadrill Limited.[759]

In connection with the Seadrill Cases, Jackson Walker was paid a total of $1,344,112.30, consisting of $288,502.25 under the Seadrill Partners Final Fee Order,[760] $503,365.05 under the Seadrill Limited Final Fee Order,[761] and $552,245 for post-confirmation services representing Seadrill Limited.[762] Additionally, Ms. Anderson testified that Seadrill has expended approximately $100,000 in attorney's fees in connection with pursuing the fee dispute against Jackson Walker.[763]

---

[756] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1, ¶ 4(a).

[757] Mar. 18, 2026 Hr'g Tr. at 31, 87.

[758] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1 at 4 (providing that "[t]he Settlement Payment shall be paid to Seadrill Limited and shall vest in the Reorganized Debtors pursuant to the terms of the confirmed plans in the Bankruptcy Case").

[759] Mar. 18, 2026 Hr'g Tr. at 17.

[760] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 3, ¶ 11; Case No. 4:23-cv-4787, ECF No. 184, Ex. 6.

[761] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 4, ¶ 22; Case No. 4:23-cv-4787, ECF No. 184, Exs. 17, 18, and 19.

[762] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 6, ¶ 34.

[763] Mar. 18, 2026 Hr'g Tr. at 83.

Thus, if Seadrill pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees would likely equal approximately $1,444,112.30, representing the total amounts paid to Jackson Walker for work performed in connection with the Seadrill Cases ($1,344,112.30) and the approximately $100,000 Seadrill spent on attorney's fees pursuing the Jackson Walker fee dispute. In contrast, under the Seadrill Settlement, Jackson Walker would be required to pay $485,000 to Seadrill Limited.[764]

As legal counsel to Seadrill, Ms. Anderson was responsible for managing the Jackson Walker fee dispute on behalf of Seadrill and relied on outside counsel, including Mr. Eisenberg, to manage such litigation.[765] Seadrill followed a formal corporate approval process for the Seadrill Settlement.[766] Todd Strickler ("*Mr. Strickler*"), the general counsel of Seadrill, executed the Seadrill Settlement on behalf of Seadrill.[767] Ms. Anderson reported to Mr. Strickler within the corporate hierarchy.[768] Throughout the negotiation process of the Seadrill Settlement, Ms. Anderson and Mr. Strickler regularly reported progress to an executive management team, with Mr. Strickler making regular presentations to keep management informed.[769] The executive management team, which consists of, among others, the chief executive officer, chief financial officer, chief commercial officer, and general counsel, ultimately approved the Seadrill Settlement based on these materials and presentations.[770] Ms. Anderson relied on information she received

---

[764] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1, ¶ 3.

[765] Mar. 18, 2026 Hr'g Tr. at 28, 39.

[766] Mar. 18, 2026 Hr'g Tr. at 43.

[767] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1 at 10.

[768] Mar. 18, 2026 Hr'g Tr. at 41.

[769] Mar. 18, 2026 Hr'g Tr. at 43.

[770] Mar. 18, 2026 Hr'g Tr. at 43.

from outside counsel and worked with internal counsel at Seadrill to compile the information in memorandum format, which was then approved by Mr. Strickler and subsequently presented to the executive management team.[771]

Ms. Anderson's testimony demonstrates that she was aware of the basic terms of the Seadrill Settlement and the key legal claims and defenses related to the fee dispute against Jackson Walker. For example, Ms. Anderson understood that the basis of the Vacatur Motions is that Jackson Walker knew about the Jones-Freeman Relationship but did not disclose it to any parties in bankruptcy.[772] She investigated, on behalf of Seadrill, whether Jackson Walker ever disclosed the Jones-Freeman Relationship in the Seadrill Cases and concluded that it did not.[773] She is aware that Jackson Walker contests the U.S. Trustee's standing to bring the Vacatur Motions and that Jackson Walker asserts that claims to recover attorney's fees may be barred by releases in the Seadrill Limited Plan or Seadrill Partners Plan.[774]

Mr. Eisenberg's testimony demonstrates his extensive involvement in the fee dispute between Jackson Walker and the U.S. Trustee. He attended depositions, reviewed documents and pleadings on a regular basis, and appeared in court during hearings and status conferences conducted in the Miscellaneous Proceeding.[775] Through this involvement, he became aware of both the U.S. Trustee's allegations and Jackson Walker's defenses.[776] Accordingly, Ms. Anderson

---

[771] Mar. 18, 2026 Hr'g Tr. at 43, 59, 60–61.

[772] Mar. 18, 2026 Hr'g Tr. at 32.

[773] Mar. 18, 2026 Hr'g Tr. at 40.

[774] Mar. 18, 2026 Hr'g Tr. at 72.

[775] Mar. 18, 2026 Hr'g Tr. at 88.

[776] Mar. 18, 2026 Hr'g Tr. at 88, 89.

appropriately relied on Mr. Eisenberg's knowledge when she prepared the memorandum recommending acceptance of the Seadrill Settlement to the executive management team.[777]

Although the evidence demonstrates that Ms. Andersen duly informed Seadrill of the claims Seadrill was settling, and associated risks, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[778]

Jackson Walker's response to the Vacatur Motions raises several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to Seadrill. For example, Jackson Walker's response to the Vacatur Motions includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motions are limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[779]

Although this Court will not now conduct a mini-trial of the merits of Seadrill's claims, it is clear from a canvassing of the Vacatur Motions, related pleadings, and the allegations therein, that Seadrill's recovery against Jackson Walker raises fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of complex chapter 11 plans.[780] A brief review of the foregoing, along with relevant authority, compels the conclusion

---

[777] *See* Mar. 18, 2026 Hr'g Tr. at 43, 59, 60–61.

[778] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[779] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 184, Ex. 25, at 52, 57, 60, 94.

[780] Case No. 4:23-cv-4787, ECF No. 184, Ex. 22.

that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 18, 2026 hearing, Ms. Anderson's and Mr. Eisenberg's credible testimony and their familiarity with the claims being settled, and Seadrill's reliance on Ms. Anderson and Mr. Eisenberg in reaching its decision to settle, the Court finds that in the exercise of its business judgment, Seadrill gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims being settled and securing a judgment in an amount exceeding the $485,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Seadrill Settlement.

### Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the Seadrill Settlement.[781]

Seadrill has not filed a complaint or initiated an adversary proceeding against Jackson Walker, nor did Seadrill file a joinder to the Vacatur Motions in the Seadrill Cases, but through the Seadrill Partners Notice and Seadrill Limited Notice, Seadrill asserts that the fee dispute raised in the Vacatur Motions impacts Seadrill and that Seadrill should be allowed to be heard in the

---

[781] *See In re Beach*, 731 F. App'x at 326.

Jackson Walker fee dispute raised by the U.S. Trustee.[782] Because the factual underpinnings of the Vacatur Motions are the same as the claims being settled under the Seadrill Settlement, the Court will consider the length, delay and costs associated with a trial on the Vacatur Motions.

As to a trial on the instant Vacatur Motions, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[783] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[784] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[785] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[786] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[787] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that the Vacatur Motions in the Seadrill Cases were filed over two years ago on February 29, 2024.[788] Although extensive discovery has been conducted on the Vacatur Motions through the Miscellaneous Proceeding, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[789] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed,

---

[782] Case No. 4:23-cv-4787, ECF No. 184, Exs. 8, 24.

[783] *See* Dec. 9, 2025 Min. Entry.

[784] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[785] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[786] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[787] Dec. 9, 2025 status conference (statements by the Court).

[788] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 184, Exs. 9, 22.

[789] *See e.g.*, Bankr., Case No. 23-645, ECF 516.

fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement.

Ms. Anderson prepared a memorandum that Seadrill's executive management team utilized in making its settlement decision.[790] In her testimony, Ms. Anderson stated that the memorandum included an analysis of the duration and costs associated with participating in trial proceedings on the Vacatur Motions.[791] The analysis estimated that proceeding to trial would cost between $500,000 and $1 million, inclusive of trial preparation costs and expenses related to attending a three- to four-week trial.[792] As such, a trial on the merits of the Vacatur Motions would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of a trial date for the Vacatur Motions and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to Seadrill if Seadrill was required to participate in a trial on the Vacatur Motions as compared to consummating a settlement.

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Ms. Anderson's and Mr. Eisenberg's credible testimony, their familiarity with the claims being settled, and Seadrill's reliance on Ms. Anderson and Mr. Eisenberg in reaching its decision to settle, the Court finds that in the exercise of its business judgment, Seadrill gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $485,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Seadrill Settlement.

---

[790] Mar. 18, 2026 Hr'g Tr. at 43–44, 53.

[791] Mar. 18, 2026 Hr'g Tr. at 63–64.

[792] Mar. 18, 2026 Hr'g Tr. at 53–54.

**Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views**

Next, the Court will consider whether the Seadrill Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[793]

The general unsecured creditors in the Seadrill Cases, as defined in the Seadrill Limited Plan and Seadrill Partners Plan,[794] were allocated specific reserve amounts for their respective distribution and have already received those distributions.[795] Pursuant to the terms of the Seadrill Limited Plan and Seadrill Partners Plan, the settlement proceeds will vest in Seadrill.[796] Thus if the Seadrill Settlement is approved, the settlement proceeds would be distributed to Seadrill Limited and would not need to be distributed to any creditors.[797]

Ms. Anderson's testimony shows that the cost of proceeding to trial is estimated to be between $500,000 to $1 million, while the total amount that Seadrill paid to Jackson Wallker was $1,344,112.30.[798] Moreover, if the Seadrill Settlement is not approved and consummated, it will take longer to close out Seadrill's bankruptcy case and require Seadrill to continue paying the U.S. Trustee's quarterly fees.[799] Since March 2024, the quarterly fees Seadrill Partners has paid is minimal, but Seadrill Limited has paid approximately $200,000 in quarterly fees since March 2024.[800] Given that the difference between the $1,344,112.30 paid to Jackson Walker and the

---

[793] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[794] Case No. 4:23-cv-4787, ECF No. 184, Ex. 4 at 77, Ex. 16 at 77.

[795] Case No. 4:23-cv-4787, ECF No. 184, Ex. 4 at 87, 89, Ex. 16 at 90, 97; Mar. 18, 2026 Hr'g Tr. at 43, 73–74.

[796] Case No. 4:23-cv-4787, ECF No. 184, Ex. 3 at 28, Ex. 15 at 40–41.

[797] Mar. 18, 2026 Hr'g Tr. at 43, 73, 74.

[798] Mar. 18, 2026 Hr'g Tr. at 55; Case No. 4:23-cv-4787, ECF No. 184, Exs. 6, 17, 18 and 19; ECF No. 224, Ex. 1 at 6, ¶ 34.

[799] Mar. 18, 2026 Hr'g Tr. at 71.

[800] Mar. 18, 2026 Hr'g Tr. at 72.

$485,000 settlement amount is $859,112.30, it is unlikely that the additional cost and delay of proceeding to trial would be economically justified by any further disgorgement that Seadrill may obtain through a trial.

As such, after considering the evidence admitted at the March 18, 2026 hearing, Ms. Anderson's and Mr. Eisenberg's credible testimony and their familiarity with the claims being settled, the Court finds that the Seadrill Settlement affects only Seadrill, not any creditors, and that the benefits of the Seadrill Settlement better serve the interest of Seadrill as compared to proceeding to a trial on the merits.

Accordingly, given that the Seadrill Settlement lacks an impact on creditors, the Court finds that the third factor is neutral as to the Seadrill Settlement.

**Factor 4: The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

Next, the Court will consider the extent to which the Seadrill Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[801]

On March 6, 2025, Jackson Walker and Seadrill participated in a mediation conducted at the office of Jackson Walker's counsel in Houston, with Honorable W. Royal Furgeson, Jr. (Ret.) and Honorable Gary A. Feess (Ret.) serving as mediators.[802] Ms. Anderson attended mediation as a representative of Seadrill and was represented by counsel at that mediation.[803] The mediation lasted approximately 5 hours.[804] Although it did not result in settlement that same day, the mediation progressed settlement discussions which culminated in the approval of the Seadrill

---

[801] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[802] Case No. 4:23-cv-4787, ECF No. 224, Ex. 1 at 7, ¶ 41; Mar. 18, 2026 Hr'g Tr. at 76, 77.

[803] Mar. 18, 2026 Hr'g Tr. at 76.

[804] Mar. 18, 2026 Hr'g Tr. at 77.

Settlement by the executive management team at Seadrill.[805] Ms. Anderson credibly testified that in her negotiations on behalf of Seadrill, no one pressured her to settle with Jackson Walker.[806]

Seadrill Limited retained Jackson Walker for post-confirmation services but Seadrill terminated Jackson Walker around March 2024.[807] Ms. Anderson explained that Jackson Walker was retained post confirmation because Seadrill needed Jackson Walker to finish the claim reconciliation process that was initiated by Jackson Walker.[808] There is no evidence that Jackson Walker's retention as post-confirmation counsel affected Seadrill's decision to settle with Jackson Walker or the terms of the Seadrill Settlement.

The extensive settlement negotiations and mediation between Jackson Walker and Seadrill show that the Seadrill Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 18, 2026 hearing, the Court finds that the Seadrill Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Seadrill Settlement.

**Factor 5: All other factors bearing on the wisdom of the compromise**

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn, (i) whether the Seadrill Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motions, if any, may be accepted by Seadrill if the bankruptcy estates of Seadrill are closed.[809]

---

[805] Mar. 18, 2026 Hr'g Tr. at 77.

[806] Mar. 18, 2026 Hr'g Tr. at 77.

[807] Mar. 18, 2026 Hr'g Tr. at 35.

[808] Mar. 18, 2026 Hr'g Tr. at 36.

[809] *See In re MCorp Fin.*, 160 B.R. at 951.

i.      **Whether the approval of the Seadrill Settlement will negatively impact or promote the integrity of the judicial system**

The Court will now consider whether the Seadrill Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[810]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including Seadrill, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) evade the relief sought by the U.S. Trustee in his Vacatur Motions; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[811] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[812]

In considering what impact, if any, the Seadrill Settlement could have on the Vacatur Motions, the Court will look first to the Seadrill Settlement's plain language.[813] Paragraph 2(b) of the Seadrill Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Reorganized Debtors and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Seadrill Partners, LLC, et al. bankruptcy case and the Seadrill Limited, et al. bankruptcy case.[814]

In a similar fashion, paragraph 4(a) provides in relevant part that:

---

[810] *See In re Bates*, 211 B.R. at 345.

[811] *See* Case No. 4:23-cv-04787, ECF No. 184, Ex. 29.

[812] Case No. 4:23-cv-04787, ECF No. 255.

[813] *Estate of Kokernot*, 112 F.3d at 1294.

[814] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1, ¶ 2(b).

On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, Reorganized Debtors hereby releases, acquits and forever discharges [Jackson Walker] . . . from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, . . . arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Reorganized Debtors against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence[,] malpractice, fraud (or similar fraud based claims)[,] and/or requests for sanctions.[815]

Although the language of paragraph 2(b) and 4(a) creates a broad release of claims, the language expressly provides that Seadrill will only release claims that Seadrill may have against Jackson Walker.[816] Neither paragraph 2(b) nor 4(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[817]

Paragraph 6 of the Seadrill Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Reorganized Debtors against [Jackson Walker] or any other released parties as well as any possible claim by [Jackson Walker] against the Reorganized Debtors or any other released parties.[818]

Like paragraphs 2(b) and 4(a), paragraph 6 of the Seadrill Settlement references release of possible claims by *Seadrill* against Jackson Walker and does not reference release of any potential claims

---

[815] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1, ¶ 4(a).

[816] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1, ¶¶ 2(b), 4(a).

[817] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1, ¶¶ 2(b), 4(a).

[818] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1, ¶ 6.

asserted by the U.S. Trustee.[819] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Seadrill Settlement. Moreover, Ms. Anderson, who was a legal representative of Seadrill and involved in settlement negotiations, testified that Seadrill did not intend for the Seadrill Settlement to settle any claims that may be held by the U.S. Trustee in his Vacatur Motions or circumvent the Court's ability to review an estate professional's conduct.[820] Thus, the Court finds that the Seadrill Settlement only provides for the release of any claims Seadrill may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motions that are distinct and independent from the claims being released in the Seadrill Settlement.

Jackson Walker contends that the Vacatur Motions assert estate claims, such as claims held by Seadrill, while the U.S. Trustee contends that the Vacatur Motions seek independent and distinct relief from claims the estates or post-confirmation trusts may hold.[821] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker, and Seadrill all "acknowledge and agree" that the Seadrill Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motions.[822]

There is no language in the Seadrill Settlement that expressly states whether the Vacatur Motions assert estate claims. In any event, the Seadrill Settlement could not determine the nature of the relief sought in the Vacatur Motions because the Court must look to the Vacatur Motions themselves to determine the nature of the relief sought in the Vacatur Motions.[823] Thus, the Court

---

[819] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1, ¶¶ 2(b), 4(a), 6.

[820] Mar. 18, 2026 Hr'g Tr. at 78.

[821] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[822] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[823] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

finds that the Seadrill Settlement does not address or determine whether the Vacatur Motions assert estate claims, such as claims held by Seadrill, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally,  in the Global Joint Stipulation, Jackson Walker  stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[824] Therefore, the Court finds that the Seadrill Settlement does not preclude Seadrill from accepting funds in addition to the $485,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motions.

Finally, there is no language in the Seadrill Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the Seadrill Settlement and Global Joint Stipulation, the Court finds that the Seadrill Settlement: (i) only released any claims Seadrill has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motions that are distinct and independent from the claims being released in the Seadrill Settlement; (iii) does not address or determine whether the Vacatur Motions assert estate claims, such as claims held by Seadrill, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude Seadrill from accepting funds in addition to the $485,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motions; and (v) does not limit this Court's ability to exercise its inherent authority and

---

[824] Case No. 4:23-cv-04787, ECF No. 255 at 2.

enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Seadrill Settlement.

### ii.    Consideration of collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[825]

Ms. Anderson admitted that she did not personally investigate the collectability of a judgment that may be entered against Jackson Walker.[826] Jackson Walker did not make any representations to Ms. Anderson regarding its ability to pay a settlement amount beyond the $485,000 set forth in the Seadrill Settlement.[827] There is otherwise no evidence to demonstrate that Seadrill investigated the collectability of a potential judgment against Jackson Walker.

Because there is no evidence that Seadrill investigated the difficulty in collecting a potential judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Seadrill Settlement.

### iii.    Whether Seadrill may receive any additional funds ordered by the Court in excess of the settlement arising from the collectability of a post-trial judgment if the bankruptcy estates of Seadrill are closed

At the March 18, 2026 hearing, Ms. Anderson testified that approval of the Seadrill Settlement would allow the bankruptcy estates in the Seadrill Cases to close, eliminating the fees

---

[825] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[826] Mar. 18, 2026 Hr'g Tr. at 85.

[827] Mar. 18, 2026 Hr'g Tr. at 68–69.

associated with keeping a bankruptcy estate open.[828] Seadrill will be entitled to proceeds of the Seadrill Settlement, not its creditors.[829] Pursuant to the Seadrill Partners Plan and Seadrill Limited Plan, the settlement proceeds will vest into Seadrill as reorganized debtors.[830] Therefore, Seadrill may receive distributions of assets regardless of whether the bankruptcy estates of Seadrill remain open or are closed. Additionally, there is no language in the Seadrill Settlement that expressly prohibits Seadrill from accepting any funds exceeding the $485,000 settlement amount that Jackson Walker may potentially be ordered to pay.[831] Accordingly, Seadrill may accept any funds exceeding the $485,000 settlement amount that the Court may order Jackson Walker to pay following a trial on the Vacatur Motions, even if Seadrill's bankruptcy estates have been closed and would not require reopening.

The fact that Seadrill could receive potential funds beyond the $485,000 settlement amount without the need to reopen a bankruptcy case weighs in favor of approval of the Seadrill Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the Seadrill Settlement be approved

Jackson Walker and Seadrill have agreed to a $485,000 settlement.[832] If Seadrill were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $1,444,112.30, consisting of $791,867.30 paid to Jackson Walker for services performed during the pendency of the Seadrill Cases, the $552,245 paid to Jackson Walker for post-confirmation services representing Seadrill Limited, and the

---

[828] Mar. 18, 2026 Hr'g Tr. at 71, 82–83.

[829] *See supra* text accompanying notes 784–87.

[830] Case No. 4:23-cv-4787, ECF No. 184, Ex. 3 at 28, Ex. 15 at 40–41.

[831] *See* Case No. 4:23-cv-04787, ECF No. 255 at 2, ¶ 3.

[832] Case No. 4:23-cv-04787, ECF No. 184, Ex. 1 at 4.

approximately $100,000 paid to counsel representing Seadrill in connection with the Miscellaneous Proceeding and related matters.[833] Acceptance of the settlement amount of $485,000 less fees incurred by Seadrill to pursue litigation against Jackson Walker, totaling at least $100,000, would result in net proceeds of approximately $385,000 to Seadrill pursuant to the Seadrill Settlement.

After considering Ms. Anderson's and Mr. Eisenberg's credible testimony, the evidence now in the record, including the Seadrill Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgement and the paramount interest of the creditors, which is a neutral factor, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement approval and that in the exercise of its business judgment, Seadrill gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating claims in the Vacatur Motions and securing a judgment in an amount exceeding the $485,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $485,000 settlement amount; demonstrated that the Seadrill Settlement serves the paramount interest of Seadrill and does not impact creditors; and demonstrated that the Seadrill Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the Seadrill Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motions because the Seadrill Settlement: (i) only released any claims Seadrill has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are

---

[833] Case No. 4:23-cv-4787, ECF No. 184, Exs. 6, 17, 18, 19; ECF No. 224, Ex. 1 at 6, ¶ 34; Mar. 18, 2026 Hr'g Tr. at 83.

distinct and independent from the claims being released in the Seadrill Settlement; (iii) does not address or determine whether the Vacatur Motions assert estate claims, such as claims held by Seadrill, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude Seadrill from accepting funds in addition to the $485,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motions; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, the Court finds that Seadrill may receive potential funds beyond the $485,000 settlement amount without the need to reopen its bankruptcy case if it has been closed.

The Court further finds that the Seadrill Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[834] because although the proposed settlement amount of $485,000 to be paid to Seadrill by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $1,344,711.30, as stated *supra*, representing both the fees paid to Jackson Walker and the subsequent costs paid to Seadrill's counsel for pursuing claims against Jackson Walker, the proposed settlement amount of $485,000 constitutes approximately 60% of the total amount of fees and expenses paid to Jackson Walker for services performed during the pendency of the Strike Cases ($791,867.30), and the Seadrill Settlement could allow Seadrill to receive distributions without the expense and delay associated with a trial on the merits while reducing the costs of keeping a bankruptcy estate open.

Finally, even though final approval of the Seadrill Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that Seadrill has a continuing obligation to cooperate

---

[834] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motions.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[835] and Bankruptcy Rule 9033, the Court recommends approval of the Seadrill Settlement.[836]

### 6.  21-30936 – The Brilliant Energy Settlement

#### a.  Background

On March 16, 2021, Brilliant Energy filed for chapter 7 relief (the "*Brilliant Energy Case*").[837] Former Judge Jones presided over the Brilliant Energy Case until October 17, 2023.[838] Mr. Williams was appointed as the Chapter 7 Trustee for the Brilliant Energy Case.[839] Jackson Walker commenced performance of legal services relating to the Brilliant Energy Case on or about March 20, 2021.[840] On April 13, 2021, the Chapter 7 Trustee filed an "Application to Employ Jackson Walker LLP as Special Counsel Pursuant to 11 U.S.C. § 327" (the "*Brilliant Energy Retention Application*").[841] On June 4, 2021, Former Judge Jones signed an order granting the Brilliant Energy Retention Application "*nunc pro tunc*" (the "*Brilliant Energy Retention Order*").[842] Mr. Bruce Ruzinsky ("*Mr. Ruzinsky*"), a partner at Jackson Walker, personally

---

[835] 564 U.S. 462, 480 (2011).

[836] Case No. 4:23-cv-4787, ECF No. 184, Ex. 1; ECF No. 240, Ex. 1.

[837] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 1. *See also* Bankr. 21-30936, ECF No. 1.

[838] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 2. *See also* Bankr. 21-30936, ECF No. 253.

[839] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 3.

[840] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 4. *See also* Bankr. 21-30936, ECF No. 149-2, at 3.

[841] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 5. *See also* Case No. 4:23-cv-4787, ECF No. 212, Ex. 6.

[842] Case No. 4:23-cv-4787 ECF No 218, Ex. 1 at2, ¶ 6. *See also* Case No. 4:23-cv-4787, ECF No. 212, Ex. 6.

provided "the vast majority of the legal work" contemplated by the Brilliant Energy Retention Order.[843]

On December 5, 2022, Jackson Walker filed a "Final Fee Application for Compensation of Fees and Reimbursement of Expenses as Special Counsel for Randy W. Williams, Chapter 7 Trustee for the Period from March 16, 2021 through November 28, 2022" (the "*Brilliant Energy Final Fee Application*") in the Brilliant Energy Case.[844] On December 30, 2022, Former Judge Jones signed an order approving the Brilliant Energy Final Fee Application for fees in the amount of $186,363.50 and reimbursable expenses in the amount of $2,246.63, totaling $188,610.13 (the "*Brilliant Energy Final Fee Order*").[845] On November 3, 2023, the U.S. Trustee filed his Initial Vacatur Motion in the Brilliant Energy Case.[846] The U.S. Trustee also filed his "Motion for Withdrawal of the Reference and Referral of Motion for Relief under Vacatur Motion and Related Matters" in the Brilliant Energy Case.[847]

On February 29, 2024, the U.S. Trustee filed his Vacatur Motion in the Brilliant Energy Case.[848] On March 12, 2024, the Chapter 7 Trustee filed a "Notice of Standing and Indispensable Party Status" (the "*Brilliant Energy Notice*") in the Brilliant Energy Case.[849] Jackson Walker filed a response to the Vacatur Motion, and the U.S. Trustee and Jackson Walker filed a reply and sur-

---

[843] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 7. *See also* Case No. 4:23-cv-4787, ECF No. 212, Ex. 1.

[844] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 8. *See also* Case No. 4:23-cv-4787, ECF No. 212, Ex. 7.

[845] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 9. *See also* Case No. 4:23-cv-4787, ECF No. 206, Ex. 28; ECF No. 212, Ex. 8.

[846] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 10. *See also* Case No. 4:23-cv-4787, ECF No. 212, Ex. 9.

[847] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 2, ¶ 11. *See also* Bankr. 21-30936, ECF No. 255.

[848] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 12. *See also* Case No. 4:23-cv-4787, ECF No. 212, Ex. 10.

[849] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 13. *See also* Bankr. 21-30936, ECF No. 285.

reply, respectively. [850] On March 12, 2025, the Chapter 7 Trustee and Jackson Walker reached a "settlement in principle" of potential claims held by Brilliant Energy.[851] On May 13, 2025, the Chapter 7 Trustee filed the Brilliant Energy Settlement Motion.[852] The Brilliant Energy Settlement Motion is based on a settlement agreement and release signed by the Chapter 7 Trustee, on behalf of Brilliant Energy, and Jackson Walker (the "*Brilliant Energy Settlement*"), which contemplates a single payment from Jackson Walker in the total sum of $100,000 to the Chapter 7 Trustee.[853] On March 18, 2026, the Chapter 7 Trustee and Jackson Walker filed an "Amendment No. 1 To Settlement Agreement And Release" (the "*Brilliant Energy Settlement Amendment*").[854]

### b. The March 18, 2026, hearing

For the Brilliant Energy Settlement Motion hearing held on Wednesday, March 18, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of Brilliant Energy, Randy Williams, Chapter 7 Trustee, *pro se*.

### i. Evidence admitted

On March 18, 2026, the Court held a hearing, where the following evidence was admitted:

### a. For Brilliant Energy

---

[850] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 14. *See also* Bankr. 21-30936, ECF No. 286; Case No. 4:23-cv-4787, ECF No. 206, Exs. 33, 34.

[851] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 15; ECF No. 57 at 4, ¶ 14.

[852] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 16; ECF No. 57; ECF No. 212, Ex. 1.

[853] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 17; ECF No. 212, Ex. 1.

[854] Case No. 4:23-cv-04787, ECF No. 246, Ex. 1; ECF No. 206, Ex. 26.

Pursuant to a joint stipulation[855] dated March 9, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026 hearing:

    i.        Exhibit 1 was admitted

    ii.      The Court took judicial notice under FRE 201 of Exhibits 2, 3, 4, 5, 6, and 7

    iii.    Exhibit 8 was admitted

    iv.    The Court took judicial notice under FRE 201 of Exhibits 9, 10, 13, and 14

    v.       Exhibit 15 was admitted

    vi.    The Court took judicial notice under FRE 201 of Exhibits 16, 17 and 18

**b. For the U.S. Trustee**

The following deposition excerpts of Ross Forbes' deposition taken on February 17, 2026,[856] were admitted into evidence:

    i.        No. 16: Deposition Page No. 47, Line 9 – Page No. 48, Line 10

    ii.      No. 17: Deposition Page No. 52, Line 23 – Page No. 53, Line 7

    iii.    No. 18: Deposition Page No. 53, Line 24 – Page No. 54, Line 15

           The exhibit at ECF No. 185 was admitted at follows:

    i.   Exhibit 12 was admitted but not for the truth of the matter asserted therein

**c. Jackson Walker**

Pursuant to a joint stipulation[857] dated March 9, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026 hearing:

    i.        Exhibit 26[858] was admitted

---

[855] Case No. 4:23-cv-4787, ECF No. 218, Ex. 2 referring to Brilliant Energy exhibits filed at ECF No. 212.

[856] Case No. 4:23-cv-4787, ECF No. 199, Ex. 5, referring to U.S. Trustee exhibit at ECF No. 185, Ex. 19.

[857] Case No. 4:23-cv-4787, ECF No. 218, Ex. 2 referring to Jackson Walker exhibits filed at ECF No. 206.

[858] Referring to a forthcoming document that was subsequently filed at ECF No. 246, Ex. 1.

    ii.      The Court took judicial notice under FRE 201 of Exhibit 27

    iii.     Exhibit 28 was admitted

    iv.     The Court took judicial notice under FRE 201 of Exhibits 33 and 34

### ii.       Credibility of the witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[859] At the March 18, 2026 hearing, the Court heard testimony from Mr. Williams as the Chapter 7 Trustee of the Brilliant Energy Case.[860] Mr. Williams has been serving as a chapter 7 trustee for Region 7, covering the Southern and Western Districts of Texas, since 1991.[861] At the hearing, Mr. Williams responded to questions clearly, competently, and directly.[862] Thus, the Court finds that Mr. Williams is a credible witness and gives substantial weight to his testimony.

### iii.       Terms of the Brilliant Energy Settlement[863]

The Brilliant Energy Settlement, as amended by the Brilliant Energy Settlement Amendment, provides, among other things:

> 2(b) Effective Date. With respect to the forgoing paragraph, the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith, and attending any hearings related to approval of the Settlement Motion (defined below). Consistent with the preceding sentences, JW will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, the Trustee will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion,

---

[859] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[860] Mar. 18, 2026 Hr'g Tr. at 119.

[861] Mar. 18, 2026 Hr'g Tr. at 152.

[862] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[863] Case No. 4:23-cv-4787, ECF No. 212, Ex. 1.

Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Trustee, for and on behalf of itself and the Debtor, and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Case, and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules.[864]

3. Settlement Payment. Within five (5) business days after the Effective Date, JW shall pay or cause to be paid to the Trustee (receipt of which shall be promptly confirmed by the Trustee or his counsel) the sum of $100,000.00 (the "Settlement Payment"). Payment shall be made payable by wire transfer to an escrow account designated by the Trustee or his counsel. The Settlement Payment shall be paid to the Trustee and distributed in accordance with the Bankruptcy Code.

5(a) Mutual Releases. *Release in Favor of JW.* On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Trustee, for and on behalf of itself and the Debtor and its estate, hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors, affiliates, estates, directors, officers employees, agents, heirs, executors, representatives, insurers, reinsurers, attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Trustee or the Debtor against JW related to any breach of fiduciary

---

[864] Case No. 4:23-cv-4787, ECF No. 246, Ex. 1. (deleting the clause "and that this Agreement adequately sanctions JW for any alleged violations of any law, rule, procedure, or statute" and replacing with clause "and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules" and deleting paragraph 4 of the Brilliant Energy Settlement).

duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.

7. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim held by the Trustee and the Debtor against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and/or breach of this Agreement.

### c.    Application of the *Jackson Brewing* Factors to the Brilliant Energy Settlement

The Court will next review the Brilliant Energy Settlement in accordance with the *Jackson Brewing* Factors.

### <u>Factor 1:</u> Probability of success in the litigation, with due consideration for the uncertainty in fact and law

The Court will now consider the probability of Brilliant Energy's success in the litigation, with due consideration for the uncertainty in fact and law.[865]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the Brilliant Energy Case on the basis of Jackson Walker's alleged disclosure violations related to the Jones-Freeman Relationship.[866] On January 12, 2024, the Chapter 7 Trustee filed the Brilliant Energy Notice to assert standing and indispensable party status as to the Vacatur Motion filed in the Brilliant Energy Case.[867] The Brilliant Energy Settlement provides a broad release from the Chapter 7 Trustee in favor of Jackson Walker for all potential claims that Brilliant Energy has or may have relating to the Jones-Freeman Relationship.[868] As such, when

---

[865] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[866] Case No. 4:23-cv-4787, ECF No. 212, Ex. 10.

[867] Case No. 4:23-cv-4787, ECF No 218, Ex. 1 at 3, ¶ 13. *See also* Bankr. 21-30936, ECF Nos. 281, 285.

[868] Case No. 4:23-cv-4787, ECF No. 212, Ex. 1, ¶ 5(a).

considering the probability of the Chapter 7 Trustee's success in the litigation, the Court must consider the likelihood of success on the merits of the Vacatur Motion because the claims being settled by the Chapter 7 Trustee are based on the same factual underpinnings as the relief being sought in the Vacatur Motion.

In connection with the Brilliant Energy Case, Jackson Walker was paid a total of $188,610.13 pursuant to the Brilliant Energy Final Fee Order.[869] Following the emergence of claims against Jackson Walker, the Chapter 7 Trustee paid approximately $55,877.50 to counsel representing him in connection with the Miscellaneous Proceeding and related matters through May 1, 2025.[870] Thus, if the Chapter 7 Trustee pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery would likely equal approximately $244,487.63, representing the amounts paid to Jackson Walker for services performed in connection with the Brilliant Energy Case and amounts paid to the Chapter 7 Trustee's counsel in connection with the Jackson Walker fee dispute. In contrast, under the Brilliant Energy Settlement, Jackson Walker would be required to pay $100,000 to the Chapter 7 Trustee.[871]

Mr. Williams testified that he believed the probability of the U.S. Trustee prevailing on his Vacatur Motion was high.[872] Mr. Williams explained that this belief was based on several factors, including his belief that Former Judge Jones violated his duty of disclosure as presiding judge over

---

[869] Case No. 4:23-cv-4787, ECF No. 206, Ex. 28; ECF No. 212, Ex. 8.

[870] Case No. 4:23-cv-4787, ECF No. 212, Ex. 15; Mar. 18, 2026 Hr'g Tr. at 147–48.

[871] Case No. 4:23-cv-4787, ECF No. 212, Ex. 1, ¶ 3.

[872] Mar. 18, 2026 Hr'g Tr. at 125, 129.

the Brilliant Energy Case and that Ms. Freeman had a duty not to assist Former Judge Jones in his disclosure violations.[873]

Additionally, in the adversary case styled *Michael Van Deelen vs. David Dickson, et al*, Case No. 20-3309, an anonymous letter was filed under seal that alleged the Jones-Freeman Relationship existed prior to the relationship becoming public knowledge.[874] Mr. Williams considered that this anonymous letter might have put Jackson Walker on notice of the existence of the Jones-Freeman Relationship.[875] Mr. Williams also believed that Jackson Walker learned of the Jones-Freeman Relationship in early 2022 but did not timely disclose either their knowledge of the relationship or the existence of the anonymous letter.[876]

However, Mr. Williams also considered factors that he believed did not support the U.S. Trustee prevailing on his Vacatur Motion.[877] Primarily, Mr. Williams noted that Bankruptcy Rule 2014, which requires certain disclosures by bankruptcy professionals, does not specifically require a bankruptcy professional to disclose personal connections to a judge.[878] Additionally, Mr. Williams testified that even if Jackson Walker did violate its disclosure duties under Bankruptcy Rule 2014(a), he believed there was a possibility that full disgorgement of fees by Jackson Walker may not be required.[879] Another consideration for Mr. Williams was that Ms. Freeman did not personally work or bill on the Brilliant Energy Case.[880]

---

[873] Mar. 18, 2026 Hr'g Tr. at 125.

[874] Mar. 18, 2026 Hr'g Tr. at 125; Case No. 4:23-cv-4787, ECF No. 212, Exs. 17, 18.

[875] Mar. 18, 2026 Hr'g Tr. at 125.

[876] Mar. 18, 2026 Hr'g Tr. at 127.

[877] Mar. 18, 2026 Hr'g Tr. at 127.

[878] Mar. 18, 2026 Hr'g Tr. at 127; Fed. R. Bankr. P. 2014(a).

[879] Mar. 18, 2026 Hr'g Tr. at 127.

[880] Mar. 18, 2026 Hr'g Tr. at 127; Case No. 4:23-cv-4787, ECF No. 212, Ex. 7.

Thus, Mr. Williams' testimony shows that he was aware of the legal and factual issues that would be involved in litigating claims for fee disgorgement against Jackson Walker. Although the evidence demonstrates that Mr. Williams possessed familiarity with the claims he was settling on behalf of Brilliant Energy, and the associated risks, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[881]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to the Chapter 7 Trustee. For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; and (2) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions amounting to 100% of the fees and expenses paid to Jackson Walker.[882]

Although this Court will not now conduct a mini-trial of the merits of the Chapter 7 Trustee's claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that the Chapter 7 Trustee's recovery against Jackson Walker raises fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and the legal issues regarding Jackson Walker's disclosure duties.[883] Additionally, a trial on the Vacatur Motion in the Brilliant Energy Case would require consideration of whether Ms. Freeman's personal lack of billing in the Brilliant Energy Case would

---

[881] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[882] Bankr. 21-30936, ECF No. 286 at 57, 60, 94.

[883] Case No. 4:23-cv-4787, ECF No. 212, Ex. 10.

have any effect on Jackson Walker's disclosure obligations.[884] A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Williams' credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Williams, the Chapter 7 Trustee of Brilliant Energy, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $100,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Brilliant Energy Settlement.

### Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the Brilliant Energy Settlement.[885]

The Chapter 7 Trustee has not filed a complaint or initiated an adversary proceeding against Jackson Walker, but through the Brilliant Energy Notice, the Chapter 7 Trustee asserts that the fee dispute raised in the Vacatur Motion impacts Brilliant Energy and that the Chapter 7 Trustee

---

[884] Mar. 18, 2026 Hr'g Tr. at 127; Case No. 4:23-cv-4787, ECF No. 212, Ex. 7.

[885] *See In re Beach*, 731 F. App'x at 326.

should be allowed to be heard on all matters related to the Jackson Walker fee dispute.[886] Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the Brilliant Energy Settlement, the Court will consider the length, delay, and costs associated with a trial on the Vacatur Motion.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[887] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[888] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[889] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[890] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[891] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 3, 2023.[892] Although extensive discovery has been conducted on the Vacatur Motion, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[893] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure

---

[886] Bankr. 21-30936, ECF Nos. 281, 285.

[887] *See* Dec. 9, 2025 Min. Entry.

[888] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[889] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[890] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[891] Dec. 9, 2025 status conference (statements by the Court).

[892] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 212, Ex. 9.

[893] *See e.g.*, Bankr. 23-645, ECF 516.

obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement.

As such, a trial on the merits of the Vacatur Motion would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of a trial date for the Vacatur Motion and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to the Brilliant Energy estate if the Chapter 7 Trustee was required to participate in a trial on the Vacatur Motion as compared to consummating a settlement. Finally, Mr. Williams testified that the anticipated complexity and protracted nature of the litigation concerning the Vacatur Motion was a significant factor in his decision to settle.[894]

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Williams' credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Williams, the Chapter 7 Trustee of Brilliant Energy, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $100,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Brilliant Energy Settlement.

### Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views

Next, the Court will consider whether the Brilliant Energy Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[895]

---

[894] Mar. 18, 2026 Hr'g Tr. at 131–32.

[895] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

The creditor DTE Energy Trading Inc. ("*DTE Energy*") holds over 90% of the approximately $65 million in claims filed in the Brilliant Energy Case.[896] DTE Energy also held a lien on Brilliant Energy's cash collateral, and all monies paid to Jackson Walker were derived from that cash collateral pursuant to a carveout for administrative fees.[897] Any fees paid to Jackson Walker and subsequently returned to the Brilliant Energy estate would remain DTE Energy's cash collateral since the fees originated as cash collateral before being paid to Jackson Walker.[898] Therefore, any fees disgorged from Jackson Walker, including the settlement proceeds, would be paid to DTE Energy.[899]

Mr. Williams informed DTE Energy's counsel of the Brilliant Energy Settlement and represented to DTE Energy's counsel that the $100,000 of settlement proceeds, less attorney's fees of $55,877.50 incurred in pursuing claims against Jackson Walker, would be paid to DTE Energy.[900] After this representation, Mr. Williams instructed his counsel to cease performing legal services related to the Jackson Walker fee dispute to prevent accrual of additional legal costs and ensure that DTE Energy had an accurate understanding of the net proceeds it would recover pursuant to the Brilliant Energy Settlement.[901] DTE Energy did not raise any objections to settlement.[902] Other than the U.S. Trustee's objection, which has been resolved through the Global Joint Stipulation, there were no other formal or informal objections to the Brilliant Energy

---

[896] Mar. 18, 2026 Hr'g Tr. at 130–31; Case No. 4:23-cv-4787, ECF No. 212, Ex. 14.

[897] Mar. 18, 2026 Hr'g Tr. at 120, 124, 147–48.

[898] Mar. 18, 2026 Hr'g Tr. at 120, 124.

[899] Mar. 18, 2026 Hr'g Tr. at 124.

[900] Mar. 18, 2026 Hr'g Tr. at 124; Case No. 4:23-cv-4787, ECF No. 212, Ex. 15.

[901] Mar. 18, 2026 Hr'g Tr. at 147–48.

[902] Mar. 18, 2026 Hr'g Tr. at 124; Case No. 4:23-cv-4787, ECF No. 212, Ex. 15.

Settlement Motion.[903] Mr. Williams testified that the Jackson Walker fee matter is the only remaining claim that would need to be administered prior to the Brilliant Energy Case closing.[904]

The evidence admitted at the March 18, 2026 hearing therefore demonstrates that no creditors objected to the Brilliant Energy Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow creditors of the Brilliant Energy estate to be paid sooner, while reducing administrative expenses, as compared to proceeding to a trial on the merits.

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Williams' credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Williams, the Chapter 7 Trustee of Brilliant Energy, gave due consideration to whether the Brilliant Energy Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Accordingly, the Court finds that the third factor weighs in favor of approving the Brilliant Energy Settlement.

**Factor 4: The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

Next, the Court will consider the extent to which the Brilliant Energy Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[905]

Mr. Williams did not learn of the Jones-Freeman Relationship until October 2023 when he read an article about it in the Wall Street Journal.[906] After learning of the Jones-Freeman Relationship and around March 2025, Mr. Williams reached an agreement in principle with

---

[903] Case No. 4:23-cv-4787, ECF No. 255.

[904] Mar. 18, 2026 Hr'g Tr. at 127.

[905] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[906] Mar. 18, 2026 Hr'g Tr. at 120–21.

Jackson Walker regarding settlement, which resulted in the filing of the Brilliant Energy Settlement Motion on May 13, 2025.[907] As to the settlement negotiation process, Mr. Williams testified that Jackson Walker prepared the initial draft of the settlement agreement.[908] Subsequently, Mr. Williams, along with his counsel, made changes to it, which culminated in the Brilliant Energy Settlement. [909] Mr. Williams confirmed that at no point during the negotiations was he "threatened or cajoled" into reaching the settlement and that the only financial consideration involved in the settlement is what is outlined in the Brilliant Energy Settlement itself.[910]

The extensive settlement negotiations between Jackson Walker and the Chapter 7 Trustee demonstrate that the Brilliant Energy Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 18, 2026 hearing, the Court finds that the Brilliant Energy Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Brilliant Energy Settlement.

### Factor 5: All other factors bearing on the wisdom of the compromise

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn: (i) whether the Brilliant Energy Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur

---

[907] Mar. 18, 2026 Hr'g Tr. at 122; Case No. 4:23-cv-4787, ECF No. 212, Ex. 1.

[908] Mar. 18, 2026 Hr'g Tr. at 177–78, 135.

[909] Mar. 18, 2026 Hr'g Tr. at 177–78.

[910] Mar. 18, 2026 Hr'g Tr. at 135–36.

Motion, if any, may be accepted by Brillant Energy or its creditors if the bankruptcy estate of Brilliant Energy is closed.[911]

### i. Whether the approval of the Brilliant Energy Settlement will negatively impact or promote the integrity of the judicial system

The Court will now consider whether the Brilliant Energy Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[912]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the Brilliant Energy Settlement, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) evade the relief sought by the U.S. Trustee in his Vacatur Motions; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[913] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[914]

In considering what impact, if any, the Brilliant Energy Settlement could have on the Vacatur Motion, the Court will look first to the Brilliant Energy Settlement's plain language.[915] Paragraph 2(b) of the Brilliant Energy Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Trustee, for and on behalf of itself and the Debtor, and [Jackson Walker], including all claims and causes of

---

[911] *See In re MCorp Fin.*, 160 B.R. at 951.

[912] *See In re Bates*, 211 B.R. at 345.

[913] *See* Case No. 4:23-cv-04787, ECF No. 71.

[914] Case No. 4:23-cv-04787, ECF No. 255.

[915] *Estate of Kokernot*, 112 F.3d at 1294.

action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Case.[916]

In a similar fashion, paragraph 4(a) provides in relevant part that:

> On the Effective Date, and for the consideration described herein, . . .  the Trustee, for and on behalf of itself and the Debtor and its estate, hereby releases, acquits, and forever discharges [Jackson Walker] . . .  from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Trustee or the Debtor against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.[917]

Although the language of paragraph 2(b) and 5(a) creates a broad release of claims, the language expressly provides that the Chapter 7 Trustee will only release claims that Brilliant Energy may have against Jackson Walker.[918] Neither paragraph 2(b) nor 5(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[919]

Paragraph 7 of the Brilliant Energy Settlement provides in relevant part that:

> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim held by the Trustee and the Debtor against [Jackson Walker] or any other released parties.[920]

---

[916] Case No. 4:23-cv-04787, ECF No. 212, Ex. 1, ¶ 2(b).

[917] Case No. 4:23-cv-04787, ECF No. 212, Ex. 1, ¶ 5(a).

[918] Case No. 4:23-cv-04787, ECF No. 212, Ex. 1, ¶¶ 2(b), 5(a).

[919] Case No. 4:23-cv-04787, ECF No. 212, Ex. 1, ¶¶ 2(b), 5(a).

[920] Case No. 4:23-cv-04787, ECF No. 212, Ex. 1, ¶ 7.

Like paragraphs 2(b) and 5(a), paragraph 7 of the Brilliant Energy Settlement references release of possible claims by the *Chapter 7 Trustee* against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[921] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Brilliant Energy Settlement. Thus, the Court finds that the Brilliant Energy Settlement only provides for the release of any claims the Chapter 7 Trustee may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motions that are distinct and independent from the claims being released in the Brilliant Energy Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by the Chapter 7 Trustee, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[922] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the Chapter 7 Trustee all "acknowledge and agree" that the Brilliant Energy Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[923]

There is no language in the Brilliant Energy Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the Brilliant Energy Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[924] Thus, the Court finds that the Brilliant Energy Settlement does not address or determine whether the

---

[921] Case No. 4:23-cv-04787, ECF No. 212, Ex. 1, ¶¶ 2(b), 5(a), 7.

[922] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[923] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[924] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

Vacatur Motion asserts estate claims, such as claims held by the Chapter 7 Trustee, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally, in the Global Joint Stipulation, Jackson Walker stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[925] Therefore, the Court finds that the Brilliant Energy Settlement does not preclude the Chapter 7 Trustee, on behalf of the Brilliant Energy estate, from accepting funds in addition to the $100,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the Brilliant Energy Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the Brilliant Energy Settlement and Global Joint Stipulation, the Court finds that the Brilliant Energy Settlement: (i) only released any claims the Chapter 7 Trustee has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Brilliant Energy Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Chapter 7 Trustee, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude the Chapter 7 Trustee from accepting, on behalf of the Brilliant Energy estate, funds in addition to the $100,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of

---

[925] Case No. 4:23-cv-04787, ECF No. 255 at 2.

the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Brilliant Energy Settlement.

### ii.  Consideration of the collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[926] At the March 18, 2026 hearing, Mr. Williams failed to present evidence to demonstrate that he personally investigated the collectability of a judgment that may be entered against Jackson Walker.[927] There is otherwise no evidence to demonstrate what the collectability of a potential judgment against Jackson Walker would be.

Because there is no evidence that Mr. Williams investigated the difficulty in collecting a potential judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Brilliant Energy Settlement.

### iii.  Whether the Chapter 7 Trustee, on behalf of the Brilliant Energy estate, may receive and distribute any additional funds ordered by the Court in excess of the settlement— arising from the collectability of a post-trial judgment

At the March 17, 2026 hearing, Mr. Williams testified that consummation of a settlement would allow him to more quickly wind down and administratively close the estate of Brilliant

---

[926] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[927] Mar. 18, 2026 Hr'g Tr. at 145–46.

Energy, as compared to proceeding to a trial.[928] When questioned by the Court, Mr. Williams stated that, in his understanding, once a final distribution is made and a final report is filed, any additional disgorged fees would be deemed abandoned by the Brilliant Energy estate.[929] Thus, according to Mr. Williams, he must decide on whether to make a final distribution upon receipt of the settlement proceeds, which would result in abandonment of any potential future disgorged funds, or delay a final distribution until after a final trial on the merits of the Vacatur Motion.[930]

Section 554(a)-(c) provides for three processes in which an estate may abandon property of the estate: (a) abandonment by the trustee after notice and a hearing, (b) court-ordered abandonment upon request of a party in interest, and (c) abandonment of property scheduled under § 521(a)(1) by operation of law upon the closing of the case.[931] But Section 544(d) provides that "[u]nless the court orders otherwise, property of the estate that is not abandoned under [section 544] and that is not administrated in the case remains property of the estate."

Further, a party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[932] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[933] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or

---

[928] Mar. 18, 2026 Hr'g Tr. at 127.

[929] Mar. 18, 2026 Hr'g Tr. at 181.

[930] Mar. 18, 2026 Hr'g Tr. at 182.

[931] *In re Wright*, 545 B.R. 541, 554 (Bankr. S.D. Tex. 2016).

[932] *See In re JCP Props.*, 540 B.R. at 605; *In re Lager*, 2024 Bankr. LEXIS 1974, at *7.

[933] Fed. R. Bankr. P. 3022.

for other cause."[934] Further, Bankruptcy Rule 5010 provides that the court may reopen a case upon a motion filed by the debtor or another party in interest.[935]  Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[936] There is no pending motion to close or reopen the Brilliant Energy Case, nor is there any pending motion to abandon property of the estate. As explained *supra*, the Brilliant Energy Settlement does not impact the ability of the Chapter 7 Trustee to receive any additional funds that the Court may potentially order Jackson Walker to pay.[937] Moreover, there is nothing in the Brilliant Energy Settlement that prevents the Chapter 7 Trustee from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

Thus, after a careful review of the Brilliant Energy Brief, and the assertions made therein, the Court finds it unnecessary, at this moment, to consider whether the bankruptcy estate would need to be closed or reopened for the Chapter 7 Trustee to receive and distribute any additional funds ordered by the Court in excess of the $100,000 settlement.

However, the Court's finding that the Brilliant Energy Settlement neither affects the Chapter 7 Trustee's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $100,000 settlement, nor prevents the Chapter 7 Trustee from filing a motion for a final decree or to re-open the Brilliant Energy Case as he deems appropriate, supports approval of the Brilliant Energy Settlement under the catch-all provision of the *Jackson Brewing* Factors.

   **d.  The Court recommends that the Brilliant Energy Settlement be approved**

---

[934] 11 U.S.C. § 350(b).

[935] Fed. R. Bankr. P. 5010.

[936] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

[937] *See supra* Section I.D.c.6.c.5.i.

Jackson Walker and the Chapter 7 Trustee have agreed to a settlement of $100,000.[938] If the Chapter 7 Trustee were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $244,487.63, representing both the fees paid to Jackson Walker and the subsequent costs paid to the Chapter 7 Trustee's counsel for pursuing claims against Jackson Walker. Specifically, the Chapter 7 Trustee paid Jackson Walker a total of $188,610.13 pursuant to the Brilliant Energy Final Fee Order.[939] In pursuing claims against Jackson Walker, the Chapter 7 Trustee incurred $55,877.50 in legal fees.[940] Thus, acceptance of the settlement amount of $100,000 less fees incurred by the Chapter 7 Trustee to pursue litigation against Jackson Walker, totaling approximately $55,877.50, would result in net proceeds of approximately $44,122.50 to Brilliant Energy and its creditors.

After considering Mr. Williams' credible testimony, the evidence now in the  record, including the Brilliant Energy Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgement, the Court finds that in the exercise of his business judgment, Mr. Williams, the Chapter 7 Trustee of Brilliant Energy gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $100,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $100,000 settlement amount; gave due consideration to whether the Brilliant Energy Settlement serves the paramount interest of creditors

---

[938] Case No. 4:23-cv-4787, ECF No. 212, Ex. 1.

[939] Case No. 4:23-cv-4787, ECF No. 206, Ex. 28; ECF No. 212, Ex. 8.

[940] Case No. 4:23-cv-4787, ECF No. 212, Ex. 15; Mar. 18, 2026 Hr'g Tr. at 147–48.

while giving proper deference to their reasonable views; and demonstrated that the Brilliant Energy Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the Brilliant Energy Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Brilliant Energy Settlement: (i) only released any claims the Chapter 7 Trustee has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Brilliant Energy Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Chapter 7 Trustee, or independent and distinct relief from claims the estates, such as the Chapter 7 Trustee, may hold; (iv) does not preclude the estate of Brilliant Energy and its creditors from accepting funds in addition to the $100,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the Brilliant Energy Settlement that prevents the Chapter 7 Trustee from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

The Court further finds that the Brilliant Energy Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[941] because although the proposed settlement amount of $100,000 to be paid to the Chapter 7 Trustee by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $244,487.63, as stated *supra*, representing both the fees paid to Jackson Walker and the subsequent costs paid to the Chapter 7

---

[941] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

Trustee's counsel for pursuing claims against Jackson Walker, the proposed settlement amount of $100,000 is equal to approximately 53% of the total amount of fees and expenses ($188,610.13) awarded to Jackson Walker pursuant to the Brilliant Energy Final Fee Order.

Finally, even though final approval of the Brilliant Energy Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Chapter 7 Trustee and Brilliant Energy have a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[942] and Bankruptcy Rule 9033, the Court recommends approval of the Brilliant Energy Settlement.[943]

### 7. 20-32564 – The Stage Stores Settlement

#### a. Background

On May 10, 2020, Stage Stores, Inc., and certain of its affiliates (prior to becoming wind-down debtors, the "*Stage Stores Debtors*") filed for chapter 11 relief in the Bankruptcy Court, with their cases being jointly administered under Case No. 20-32564 (the "*Stage Stores Case*").[944] Former Judge Jones presided over the Stage Stores Case until October 13, 2023.[945]

On June 4, 2020, the Stage Stores Debtors filed their "Application to Employ Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors and Debtors-in-Possession"

---

[942] 564 U.S. 462, 480 (2011).

[943] Case No. 4:23-cv-4787, ECF No. 212, Ex. 1; ECF No. 206, Ex. 21; ECF No. 246, Ex. 1.

[944] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 1. *See also* Bankr. 20-32564, ECF Nos. 1, 45; Case No. 4:23-cv-4787, ECF No. 188, Ex. 1.

[945] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 2. *See also* Bankr. 20-36564, ECF No. 45, Oct. 13, 2023 Docket Entry.

(the "*Stage Stores Retention Application*").[946] On July 10, 2020, the Stage Stores Retention Application was approved by Former Judge Jones (the "*Stage Stores Retention Order*").[947]

On August 13, 2020, the Stage Stores Debtors filed their second amended chapter 11 plan of reorganization (the "*Stage Stores Plan*").[948] On August 14, 2020, the Bankruptcy Court entered an order confirming the Stage Stores Plan.[949] On October 30, 2020 (the "*Stage Stores Effective Date*") the Stage Stores Plan became effective.[950] Pursuant to the Stage Stores Plan, on the Stage Stores Effective Date, Mr. Balasiano was appointed as the plan administrator of Stage Stores.[951]

On November 13, 2020, Jackson Walker filed its "First and Final Fee Application for Allowance and Payment of Fees and Expenses as Co-Counsel to the Debtors for the Period from May 10, 2020 through August 14, 2020" (the "*Stage Stores Final Fee Application*").[952] On December 16, 2020, the Stage Stores Final Fee Application was approved awarding compensation and reimbursement of expenses in the amount of $184,746.15 to Jackson Walker (the "*Stage Stores Final Fee Order*").[953] On November 2, 2023, the U.S. Trustee filed his Initial Vacatur Motion in the Stage Stores Case.[954] On November 13, 2023, Jackson Walker filed its preliminary response to the Initial Vacatur Motion.[955] On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous Proceeding.[956] On February 29, 2024, the U.S. Trustee filed his

---

[946] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  4. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 2.

[947] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  5. *See also* Case No. 4:23-cv-4787, ECF 188, Ex. 3.

[948] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  6. *See also* Case No. 4:23-cv-4787, ECF No. 206, Ex. 37.

[949] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  7. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 4.

[950] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  8. *See also* Bankr. 20-32564, ECF No. 898.

[951] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  9. *See also* Bankr. 20-32564, ECF No. 920.

[952] Case No. 4:23-cv-4787, ECF No.  222, Ex. 1 at 1, ¶  10. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 10.

[953] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 11. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 11.

[954] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 12. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 12.

[955] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 13. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 13.

[956] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 14. *See also* Bankr. 23-645, ECF No. 1.

Vacatur Motion in the Stage Stores Case.[957] Jackson Walker filed a response to the Vacatur Motion, and the U.S. Trustee and Jackson Walker filed a reply and sur-reply, respectively.[958] On April 12, 2024, Stage Stores filed their "Notice of Standing and Indispensable Party Status" (the "*Stage Store Notice*").[959] On December 16, 2024, Stage Stores filed their "Joinder to United States Trustee's Amended and Supplemental Motion for (1) Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(B)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief" (the "*Stage Stores Joinder*").[960] On February 20, 2025, counsel to the Stage Plan Administrator communicated with proposed mediator Judge Royal Furgeson and determined that formal mediation was not necessary.[961] The Stage Plan Administrator neither executed any formal mediation agreement nor participated in any formal mediation.[962]

On November 10, 2025, the Stage Plan Administrator filed the instant Stage Store Settlement Motion,[963] which attached a settlement agreement (the "*Stage Stores Settlement*") that contemplates a single payment from Jackson Walker in the total sum of $75,000 to the Stage Plan Administrator.[964] On March 10, 2026, the Stage Plan Administrator filed an amended version of the Stage Stores Settlement (the "*Stage Stores Settlement Amendment*").[965]

---

[957] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 15. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 14.

[958] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 16. *See also* Case No. 4:23-cv-4787, ECF No. 188, Exs. 15, 16, 17.

[959] Bankr. 20-32564, ECF No. 1253.

[960] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 17. *See also* Case No. 4:23-cv-4787, ECF No. 188, Ex. 18.

[961] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 18.

[962] Case No. 4:23-cv-4787, ECF No. 222, Ex. 1 at 1, ¶ 19.

[963] Case No. 4:23-cv-4787, ECF No. 108.

[964] Case No. 4:23-cv-4787, ECF No. 108, Ex. 1.

[965] Case No. 4:23-cv-4787, ECF No. 228, Ex. 1.

### b.  The March 18, 2026, Hearing

For the Stage Stores Settlement Motion hearing held on Wednesday, March 18, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of Stage Stores, Daniel Geoghan, Sarah Carnes, and Mark Tsukerman, along with Steve Balasiano, the plan administrator.

### i.    Evidence submitted

The following exhibits were either admitted into evidence or judicially noticed under FRE 201.

### a.  For Stage Stores

Pursuant to a joint stipulation[966] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026 hearing:

i.      The Court took judicial notice under FRE 201 of Exhibits 1 and 2

ii.     Exhibits 3 and 4 were admitted

iii.    The Court took judicial notice under FRE 201 of Exhibits 5, 6, 7, 8, 9 and 10

iv.     Exhibit 11 admitted

v.      The Court took judicial notice under FRE 201 of Exhibits 12, 13, 14, 15, 16, 17 and 18

vi.     Exhibit 19 was admitted

vii.    The Court took judicial notice under FRE 201 of Exhibits 20, 21, 22 and 24

The exhibits at ECF No. 233 were judicially noticed as follows:

---

[966] Case No. 4:23-cv-4787, ECF No. 222, Ex. 2 referring to Stage Stores exhibits filed at ECF No. 188.

    i.    The Court took judicial notice under FRE 201 of Exhibit 21.[967]

    **b. For the U.S. Trustee**

The following deposition excerpts of Steven Balasiano's deposition taken on February 11, 2026,[968] were admitted into evidence:

    i.    No. 1: Deposition Page No. 18, Line 18 – Page No. 19, Line 1

    ii.    No. 2: Deposition Page No. 20, Line 13 – Page No. 22, Line 1

    iii.    No. 3: Deposition Page No. 28, Line 21 – Page No. 29, Line 13

    iv.    No. 4: Deposition Page No. 31, Line 15 – Page No. 31, Line 20

    v.    No. 5: Deposition Page No. 34, Line 1 – Page No. 35, Line 4

    vi.    No. 6: Deposition Page No. 38, Line 8 – Page No. 39, Line 21

    vii.    No. 7: Deposition Page No. 42, Line 15 – Page No. 43, Line 5

    viii.    No. 8: Deposition Page No. 49, Line 17 – Page No. 50, Line 7

    ix.    No. 9: Deposition Page No. 52, Line 18 – Page No. 53, Line 4

    **c. For Jackson Walker**

Pursuant to a joint stipulation[969] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026 hearing:

    i.    The Court took judicial notice under FRE 201 of Exhibit 36, referencing the subsequently filed document at ECF No. 228, Ex. 1

    ii.    The Court took judicial notice under FRE 201 of Exhibit 37

    **ii.    Credibility of witnesses**

---

[967] Mar. 17, 2026 Hr'g Tr. at 18 (taking judicial notice of ECF No. 233, Ex. 21 for the March 18, 2026 hearing).

[968] Case No. 4:23-cv-4787, ECF No. 199, Ex. 6, referring to U.S. Trustee exhibit at ECF No. 192, Ex. 8.

[969] Case No. 4:23-cv-4787, ECF No. 222, Ex. 2 referring to Jackson Walker exhibits filed at ECF No. 206.

It is the Court's duty to assess and weigh the credibility of witnesses.[970] At the March 18, 2026 hearing, Mr. Balasiano, as the plan administrator of Stage Stores, was sworn in and took the witness stand.[971] Mr. Balasiano is a practicing attorney with extensive experience in both legal practice and business operations.[972] He is the principal of Balasiano & Associates, his own law firm, and operates a consulting business through which he provides advisory services to companies.[973] His legal practice focuses primarily on corporate transaction work and bankruptcy law, where he represents trade creditors in bankruptcy proceedings.[974] Mr. Balasiano's career began at major national law firms before transitioning to roles as in-house counsel.[975] His prior experience includes serving as general counsel at The Children's Place for twelve years.[976] Following his tenure at The Children's Place, Mr. Balasiano gained international business experience by managing factory bases and manufacturing facilities in Southeast Asia.[977] Upon returning to the United States approximately ten years ago, he established his current legal practice.[978] Currently, Mr. Balasiano serves as plan administrator or liquidating trustee in approximately 10 to 15 other bankruptcy cases, with each case at various stages of proceedings.[979] He became plan administrator of Stage Stores upon the plan becoming effective in October 2020.[980]

---

[970] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[971] Mar. 18, 2026 Hr'g Tr. at 225.

[972] Mar. 18, 2026 Hr'g Tr. at 223–25.

[973] Mar. 18, 2026 Hr'g Tr. at 223.

[974] Mar. 18, 2026 Hr'g Tr. at 223.

[975] Mar. 18, 2026 Hr'g Tr. at 224.

[976] Mar. 18, 2026 Hr'g Tr. at 224.

[977] Mar. 18, 2026 Hr'g Tr. at 224.

[978] Mar. 18, 2026 Hr'g Tr. at 224.

[979] Mar. 18, 2026 Hr'g Tr. at 225.

[980] Mar. 18, 2026 Hr'g Tr. at 225.

At the hearing, Mr. Balasiano responded to questions clearly, competently, and directly.[981]

Thus, the Court finds that Mr. Balasiano is a credible witness and gives substantial weight to his testimony.

### iii.    Terms of the Stage Stores Settlement[982]

The Stage Stores Settlement provides, among other things:

2(b) <u>Effective Date:</u> . . . For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Plan Administrator, Wind-Down Debtors and the bankruptcy estates of Stage Stores, Inc. and Specialty Retailers, Inc. and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases, and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules.[983]

3. <u>Settlement Payment.</u> Within five (5) business days after the Approval Order becoming a Final Order, JW shall pay or cause to be paid to the Wind-Down Debtors (receipt of which shall be promptly confirmed by the Plan Administrator) the sum of $75,000 (the "Settlement Payment'").

4 (a) Mutual Releases. *Release in Favor of JW.* On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Plan Administrator, the Debtors' estates, and the Wind-Down Debtors hereby release, acquit, and forever discharge JW and its respective predecessors in interest, successors, affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, Reinsurers, attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether

---

[981] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[982] Case No. 4:23-cv-4787, ECF No. 188, Ex. 19.

[983] Case No. 4:23-cv-4787, ECF No. 223, Ex. 1 (deleting the clause "adequately sanctions JW for any alleged violations of any law, rule, procedure, or statute" and replacing with "meets the standards required for approval under Rule 9019 of the Bankruptcy Rules").

fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Administrator, the Debtors' estates, or the Wind-Down Debtors against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud-based claims), and/or requests for sanctions.

6. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause or action under federal, state or other law relating to any possible claim by the Plan Administrator, the Debtors' estates, or the Wind-Down Debtors against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and/or breach of this Agreement.

11. <u>Cooperation and Dismissal or Withdrawal with Prejudice.</u> The Parties will cooperate with each other to give effect to the Agreement, including, without limitation, taking all such action as may be necessary to obtain the dismissal or withdrawal of the U.S. Trustee Filings as such relate to the Bankruptcy Cases, and the Plan Administrator and/or the Wind-Down Debtors shall, within three (3) business days after the Effective Date, withdraw any related joinder or separate pleading or proceeding with prejudice.

### c. **Application of the *Jackson Brewing* Factors to the Stage Stores Settlement**

The Court will next review the Stage Stores Settlement in accordance with the *Jackson Brewing* Factors.

**<u>Factor 1:</u> Probability of success in the litigation, with due consideration for the uncertainty in fact and law**

The Court will now consider the probability of the Stage Plan Administrator's success in the litigation, with due consideration for the uncertainty in fact and law.[984]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the Stage Stores Case.[985] Through the Stage Stores Joinder, Stage Stores, through the Stage Plan Administrator, joined and adopted the relief sought in the Vacatur Motion, including the allegations, arguments, and pleadings made or filed by the U.S. Trustee in support thereof, "to the extent of seeking (a) to vacate the orders approving the retention and compensation of Jackson Walker [] as Debtors' counsel, and (b) disgorgement of fees and expenses paid to Jackson Walker in the Stage Stores Chapter 11 Cases."[986] The Stage Store Settlement provides a broad release from Stage Stores and the Stage Stores Plan Administrator in favor of Jackson Walker for all potential claims they have or may have relating to the Jones-Freeman Relationship.[987] As such, when considering the probability of the Stage Plan Administrator's success in the litigation, the Court must consider the likelihood of success on the merits of the Vacatur Motion because the claims being settled by the Stage Plan Administrator are based on the same factual underpinnings as the relief being sought in the Vacatur Motion.

In connection with the Stage Stores Case, Jackson Walker was paid a total of $184,746.15 under the Stage Stores Final Fee Order.[988] Mr. Balasiano testified that following the emergence of claims against Jackson Walker, he paid and incurred legal fees to counsel representing Stage Stores in connection with the Miscellaneous Proceeding and related matters.[989] However, no evidence

---

[984] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[985] Case No. 4:23-cv-4787, ECF No. 188, Ex. 14.

[986] Case No. 4:23-cv-4787, ECF No. 188, Ex. 18 at 3.

[987] Case No. 4:23-cv-4787, ECF No. 188, Ex. 19 at 18, ¶ 4(a).

[988] Case No. 4:23-cv-4787, ECF No. 188, Ex. 11.

[989] Mar. 18, 2026 Hr'g Tr. at 230.

was offered to demonstrate the amount of such fees paid in prosecuting the claims against Jackson Walker. Thus, based on the evidence, if the Stage Plan Administrator pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees, not including litigation expenses incurred in pursuing claims against Jackson Walker, would likely equal approximately $184,746.15, representing the amounts paid to Jackson pursuant to the Stage Stores Final Fee Order. In contrast, under the Stage Stores Settlement, Jackson Walker would be required to pay $75,000 to Stage Stores.[990]

During his testimony, Mr. Balasiano stated that he was "minimally" aware of the claims being asserted by Stage Stores against Jackson Walker.[991] Yet, Mr. Balasiano was aware that the claims against Jackson Walker were based on ethical violations by Jackson Walker regarding the Jones-Freeman Relationship.[992] He also knew that extensive documentary discovery and depositions were conducted in the Miscellaneous Proceeding.[993] And critically, Mr. Balasiano believed that $184,746.15, representing the amount paid to Jackson Walker in the Stage Stores Case, was the maximum potential recovery for Stage Stores in their claims against Jackson Walker.[994] Mr. Balasiano explained that he expressly instructed his counsel to not review any of the discovery in the Miscellaneous Proceeding because he did not want to risk incurring legal fees that would outweigh the benefit of the maximum $184,746.15 that could be recovered from Jackson Walker.[995]

---

[990] Case No. 4:23-cv-4787, ECF No. 188, Ex. 19 at 18, ¶ 3.

[991] Mar. 18, 2026 Hr'g Tr. at 228.

[992] Mar. 18, 2026 Hr'g Tr. at 228.

[993] Mar. 18, 2026 Hr'g Tr. at 229.

[994] Mar. 18, 2026 Hr'g Tr. at 229.

[995] Mar. 18, 2026 Hr'g Tr. at 229.

As such, Mr. Balasiano's testimony demonstrates that although Mr. Balasiano did not gain more than a minimal understanding of the legal issues involved in the disgorgement claims against Jackson Walker, Mr. Balasiano exercised business judgment by intentionally choosing not to do so to preserve the value of the recovery Mr. Balasiano believed he could ultimately obtain through a trial or settlement. In any event, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[996]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to Stage Stores. For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[997]

Although this Court will not now conduct a mini-trial of the merits of Stage Stores' claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that Stage Stores' recovery against Jackson Walker raises factually intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of a complex chapter 11 plan.[998] A brief review of the foregoing, along with relevant authority, compels the

---

[996] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[997] Case No. 4:23-cv-4787, ECF No. 188, Ex. 15 at 52, 57, 60, 94.

[998] Case No. 4:23-cv-4787, ECF No. 188, Ex. 14.

conclusion that there is significant "uncertainty in fact and law" regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Balasiano's credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Balasiano, the plan administrator of Stage Stores, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $75,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Stage Stores Settlement.

### Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the Stage Stores Settlement.[999]

Through the Stage Stores Joinder, Stage Stores joined and adopted the relief sought in the Vacatur Motion.[1000] Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the Stage Stores Settlement, the Court will consider the length, delay and costs associated with a trial on the Vacatur Motion.

---

[999] *See In re Beach*, 731 F. App'x at 326.

[1000] Case No. 4:23-cv-4787, ECF No. 188, Ex. 18 at 3.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[1001] the U.S. Trustee estimated at a December 9, 2025, status conference that 15 days may be needed to put on his evidence.[1002] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[1003] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[1004] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[1005] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 2, 2023.[1006] Although extensive discovery has been conducted on the Vacatur Motions, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[1007] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement. As such, a trial on the merits of the Vacatur Motion would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of

---

[1001] *See* Dec. 9, 2025 Min. Entry.

[1002] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[1003] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1004] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1005] Dec. 9, 2025 status conference (statements by the Court).

[1006] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 188, Ex. 12.

[1007] *See e.g.*, Bankr. 23-645, ECF 516.

a trial date for the Vacatur Motion and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to the Stage Stores creditors if the Stage Plan Administrator was required to participate in a trial on the Vacatur Motion as compared to consummating a settlement. Finally, Mr. Balasiano's testimony shows that the legal fees that would be incurred by participating in a trial on the Vacatur Motion, and the possibility that such fees would exceed the maximum potential recovery from Jackson, was a significant factor in his decision to settle.[1008]

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Balasiano's credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Balasiano, the plan administrator of Stage Stores, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $75,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Stage Stores Settlement.

### Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views

Next, the Court will consider whether the Stage Stores Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[1009]

The settlement proceeds from the Stage Stores Settlement would be distributed to general unsecured creditors.[1010] Other than the U.S. Trustee's objection, which has been resolved through

---

[1008] Mar. 18, 2026 Hr'g Tr. at 229, 230.

[1009] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[1010] Mar. 18, 2026 Hr'g Tr. at 230.

the Global Joint Stipulation, there were no other formal or informal objections to the Strike Settlement Motion.[1011] Mr. Balasiano testified that consummation of the Stage Stores Settlement would allow him to close and wind-down the estates of Stage Stores and allow recovery to general unsecured creditors without the excessive legal fees that would be incurred if he participated in a trial.[1012] Mr. Balasiano explained that he believed settling for $75,000 was a prudent and economical decision because the costs of proceeding to trial would have to be weighed against the potential additional recovery of only $109,746.15, the difference between the $75,000 settlement and the maximum possible recovery of $184,746.15.[1013]

The evidence admitted at the March 18, 2026 hearing therefore demonstrates that no creditors objected to the Stage Stores Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow creditors of Stage Stores to be paid sooner, while reducing administrative expenses, as compared to proceeding to a trial on the merits.

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Balasiano's credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Balasiano, the plan administrator of Stage Stores, gave due consideration to whether the Stage Stores Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Accordingly, the Court finds that the third factor weighs in favor of approving the Stage Stores Settlement.

> **Factor 4: The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

---

[1011] Case No. 4:23-cv-4787, ECF No. 255.

[1012] Mar. 18, 2026 Hr'g Tr. at 230.

[1013] Mar. 18, 2026 Hr'g Tr. at 230.

Next, the Court will consider the extent to which the Stage Stores Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[1014]

Mr. Balasiano credibly testified that he does not have any personal relationships with Jackson Walker, Ms. Freeman, Former Judge Jones or Jackon Walker's counsel.[1015] Thus, the Stage Stores Settlement was negotiated between non-insiders.[1016] On February 20, 2025, counsel to the Stage Plan Administrator communicated with proposed mediator Judge Royal Furgeson and determined that formal mediation was not necessary.[1017] Consequently, the Stage Plan Administrator did not execute a formal mediation agreement or participate in any formal mediation proceedings.[1018] Mr. Balasiano's goal of keeping attorney's fees to a minimum, a major factor in his decision to settle, is consistent with his decision to forgo formal mediation.[1019]

No evidence was presented to show that the settlement was entered into for an improper purpose, that the settlement was not reached at arm's-length, or that the terms of the settlement were affected by any fraud or collusion.[1020] The evidence therefore demonstrates that the Stage Stores Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. After considering the evidence admitted at the March 18, 2026 hearing, the Court finds that the Stage Stores Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Stage Stores Settlement.

---

[1014] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[1015] Mar. 18, 2026 Hr'g Tr. at 226.

[1016] *In re Foster Mortg. Corp.*, 68 F.3d at 918 (considering whether a settlement was between insiders when reviewing an approval of a settlement).

[1017] Case No. 4:23-cv-4787, Ex. 222-1 at 1, ¶ 18.

[1018] Case No. 4:23-cv-4787, Ex. 222-1 at 1, ¶ 19.

[1019] Mar. 18, 2026 Hr'g Tr. at 229–30.

[1020] *See In re Myers*, 546 B.R. 363, 380 (Bankr. S.D. Miss. 2016) (granting approval of settlement after finding a lack of evidence of fraud or collusion in reaching settlement).

**Factor 5:** **All other factors bearing on the wisdom of the compromise**

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn, (i) whether the Stage Stores Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motion, if any, may be accepted by Stage Stores and its creditors.[1021]

### i.    Whether approval of the Stage Stores Settlement will negatively impact or promote the integrity of the judicial system

The Court will now consider whether the Stage Stores Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[1022]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including Stage Stores, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit Stage Stores and its creditors from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[1023] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[1024]

---

[1021] *See In re MCorp Fin.*, 160 B.R. at 951.

[1022] *See In re Bates*, 211 B.R. at 345.

[1023] *See e.g.*, Case No. 4:23-cv-04787, ECF No. 188, Ex. 20.

[1024] Case No. 4:23-cv-04787, ECF No. 255.

In considering what impact, if any, the Stage Stores Settlement could have on the Vacatur

Motion, the Court will look first to the Stage Stores Settlement's plain language.[1025] Paragraph

2(b) of the Stage Stores Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Plan Administrator, Wind-Down Debtors and the bankruptcy estates of Stage Stores, Inc. and Specialty Retailers, Inc. and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases.[1026]

In a similar fashion, paragraph 4(a) provides in relevant part that:

> On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Plan Administrator, the Debtors' estates, and the Wind-Down Debtors hereby release, acquit, and forever discharge [Jackson Walker] . . .  from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Administrator, the Debtors' estates or the Wind-Down Debtors against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud-based claims), and/or requests for sanctions.[1027]

Although the language of paragraph 2(b) and 4(a) creates a broad release of claims, the

language expressly provides that the Stage Plan Administrator will only release claims that Stage

---

[1025] *Estate of Kokernot*, 112 F.3d at 1294.

[1026] Case No. 4:23-cv-04787, ECF No. 188, Ex. 19, ¶ 2(b).

[1027] Case No. 4:23-cv-04787, ECF No. 188, Ex. 19, ¶ 4(a).

Stores may have against Jackson Walker.[1028] Neither paragraph 2(b) nor 4(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[1029]

Paragraph 6 of the Stage Stores Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause or action under federal, state or other law relating to any possible claim by the Plan Administrator, the Debtors' estates, or the Wind-Down Debtors against [Jackson Walker] or any other released parties.[1030]

Like paragraphs 2(b) and 4(a), paragraph 6 of the Stage Stores Settlement references release of possible claims by *Stage Stores* against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[1031] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Stage Stores Settlement. Moreover, Mr. Balasiano, who signed the Stage Stores Settlement, testified that he did not intend for the Stage Stores Settlement to release any claims the U.S. Trustee might have against Jackson Walker, nor did he believe that it could.[1032] Thus, the Court finds that the Stage Stores Settlement only provides for the release of any claims Stage Stores may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Stage Stores Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by Stage Stores, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[1033] But, through the

---

[1028] Case No. 4:23-cv-04787, ECF No. 188, Ex. 19, ¶¶ 2(b), 4(a).

[1029] Case No. 4:23-cv-04787, ECF No. 188, Ex. 19, ¶¶ 2(b), 4(a).

[1030] Case No. 4:23-cv-04787, ECF No. 188, Ex. 19, ¶ 6.

[1031] Case No. 4:23-cv-04787, ECF No. 188, Ex. 19, ¶¶ 2(b), 4(a), 6.

[1032] Mar. 18, 2026 Hr'g Tr. at 228.

[1033] Case No. 4:23-cv-04787, ECF No. 255 at 1.

Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the Stage Plan Administrator all "acknowledge and agree" that the Stage Stores Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[1034]

There is no language in the Stage Stores Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the Stage Stores Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[1035] Thus, the Court finds that the Stage Stores Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by Stage Stores, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally, in the Global Joint Stipulation, Jackson Walker  stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[1036] Therefore, the Court finds that the Stage Stores Settlement does not preclude Stage Stores and its creditors from accepting funds in addition to the $75,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the Stage Stores Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

---

[1034] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[1035] *In re Seven Seas Petroleum, Inc*., 522 F.3d at 583.

[1036] Case No. 4:23-cv-04787, ECF No. 255 at 2.

Accordingly, after a review of the evidence now in the record, including the Stage Stores Settlement and Global Joint Stipulation, the Court finds that the Stage Stores Settlement: (i) only released any claims Stage Stores has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Stage Stores Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by Stage Stores, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude Stage Stores and its creditors from accepting funds in addition to the $75,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Therefore, the Court finds that the Stage Stores Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Stage Stores Settlement.

### ii.    Consideration of collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[1037]  At the March 18, 2026 hearing, no evidence was offered to demonstrate that any investigation was conducted as to the collectability of a judgment against Jackson Walker.

---

[1037] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

Because there is no evidence that Mr. Balasiano investigated the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Stage Stores Settlement

### iii. Whether Stage Stores may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment

At the March 18, 2026 hearing, Mr. Balasiano testified that consummation of a settlement would allow him to more quickly wind down and administratively close the Stage Stores estates, as compared to proceeding to a trial, and prevent additional accrual of administration fees associated with keeping a bankruptcy estate open.[1038] In response, the Court, *sua sponte*, expressed concerns as to whether a bankruptcy estate could accept and distribute any additional funds over and above amounts in any of the Settlement Agreements, if ordered by the Court after a final trial on the merits of the Vacatur Motions, if a bankruptcy estate was wound down and closed administratively.[1039] As a result, the Court entered its order for post-trial briefing[1040] where the Court directed the Stage Stores Plan Administrator and other parties to address the following questions posed by the Court, to wit:

> (a) whether the proposed settlements may be approved without impairing the United States Trustee's pending Vacatur Motions or the Court's inherent authority to order vacatur or additional relief; (b) in the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; (c) if the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of [the Stage Plan Administrator] to the disposition of funds upon

---

[1038] Mar. 18, 2026 Hr'g Tr. at 230.

[1039] Mar. 18, 2026 Hr'g Tr. at 240.

[1040] Case No. 4:23-cv-04787, ECF No 254.

wind-down and closure, including where such funds would be distributed; and (d) The legal and practical feasibility of monetizing any residual claims for disgorgement or additional sanctions, including proposed procedures for the sale, assignment, or other transfer of such claims to a third party, and how such a transaction would be structured to maximize value for the estates.[1041]

On April 10, 2026, the Stage Stores Administrator filed his "Statement Of Plan Administrator For Stage Stores, Inc., Et Al. In Response To The Court's Order Entered On March 19, 2026" (the "*Strike Stores Brief*").[1042] On April 17, 2026, the U.S. Trustee filed his Post-Hearing Reply Brief.[1043] In the Stages Stores Brief, the Stage Stores Plan Administrator asserts that (1) the Stage Stores Settlement may be approved without impairing the U.S. Trustee's Vacatur Motion or the Court's inherent authority; (2) the estates of Stage Stores, once closed, may be reopened to allow for distribution of additional funds to the estates but advises that doing so would not be in the best interest of the estates and (3) should any additional funds come in, donating the additional funds to a charitable or non-profit organization would be the most judicious option so that the value remaining in these estates can be maintained.[1044]

A party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[1045] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[1046] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or

---

[1041] Case No. 4:23-cv-04787, ECF No 254.

[1042] Case No. 4:23-cv-04787, ECF No 279.

[1043] Case No. 4:23-cv-04787, ECF No 282.

[1044] Case No. 4:23-cv-04787, ECF No 279.

[1045] *See In re JCP Props*., 540 B.R. at 605; *In re Lager*, 2024 Bankr. LEXIS 1974, at *7.

[1046] Fed. R. Bankr. P. 3022.

for other cause."[1047] Further, Bankruptcy Rule 5010 provides that the court may reopen a case upon a motion filed by the debtor or another party in interest.[1048] Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[1049] There is no pending motion to close or reopen the Stage Stores Case. As explained *supra*, the Stage Stores Settlement does not impact the ability of the Stage Stores Plan Administrator to receive any additional funds that the Court may potentially order Jackson Walker to pay.[1050] Moreover, there is nothing in the Stage Stores Settlement that prevents the Stage Stores Plan Administrator from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

Thus, after a careful review of the Stage Stores Brief, and the assertions made therein, the Court finds it unnecessary, as of this moment, to consider whether the bankruptcy estate would need to be closed or reopened for the Stage Stores Plan Administrator to receive and distribute any additional funds ordered by the Court in excess of the $75,000 settlement.

However, the Court's finding that the Stage Stores Settlement neither affects the Stage Stores Plan Administrator's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $75,000 settlement, nor prevents the Stage Stores Plan Administrator from filing a motion for a final decree or to re-open the Stage Stores Case as he deems appropriate, supports approval of the Stage Stores Settlement under the catch-all provision of the *Jackson Brewing* Factors.

   **d. The Court recommends that the Stage Stores Settlement be approved**

---

[1047] 11 U.S.C. § 350(b).

[1048] Fed. R. Bankr. P. 5010.

[1049] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

[1050] *See supra* Section I.D.c.7.c.5.i.

Jackson Walker and the Stage Plan Administrator have agreed to a $75,000 settlement.[1051] If the Stage Plan Administrator were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker, not including amounts for litigation expenses incurred in pursuing claims against Jackson Walker, would be approximately $184,746.15, representing the amount paid to Jackson Walker for services performed during the pendency of the Stage Stores Case.[1052] Consummation of the Stage Stores Settlement would result in net proceeds of $75,000, less an unknown amount of attorney's fees incurred in pursuing litigation against Jackson Walker, to Stage Stores and its creditors.[1053]

After considering Mr. Balasiano's credible testimony, the evidence now in the record, including the Stage Stores Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgement, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement approval and that in the exercise of his business judgment, Mr. Balasiano, the plan administrator of Stage Stores, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $75,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $75,000 settlement amount; gave due consideration to whether the Stage Stores Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the Stage Stores Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

---

[1051] Case No. 4:23-cv-4787, ECF No. 188, Ex. 19, ¶ 3.

[1052] Case No. 4:23-cv-4787, ECF No. 188, Ex. 11.

[1053] Mar. 18, 2026 Hr'g Tr. at 230.

Furthermore, the Court finds that the Stage Stores Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Stage Stores Settlement: (i) only released any claims Stage Stores has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Stage Stores Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by Stage Stores, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude Stage Stores and its creditors from accepting funds in addition to the $75,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the Stage Stores Settlement that prevents the Stage Stores Plan Administrator from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

The Court further finds that the Stage Stores Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[1054] because although the proposed settlement amount of $75,000 to be paid to Stage Stores by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $184,746.15, representing the fees paid to Jackson Walker, the proposed settlement amount of $75,000 constitutes approximately 40% of the $184,746.15 paid to Jackson Walker in connection with services performed for Stage Stores,

---

[1054] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

and the remainder of $109,746.15 would likely fail to outweigh the cost of proceeding to trial and keeping the Stage Stores estates open.

Finally, even though final approval of the Stage Stores Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Stage Plan Administrator and Stage Stores have a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case, including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[1055] and Bankruptcy Rule 9033, the Court recommends approval of the Stage Stores Settlement.[1056]

### 8.   22-90018 – The Sungard Settlement

#### a.   Background

On April 11, 2022, Sungard AS New Holdings, LLC and certain of its affiliates (prior to becoming reorganized debtors, the "*Sungard Debtors*") filed voluntary petitions for relief under chapter 11 in the Bankruptcy Court.[1057] The Sungard Debtors' chapter 11 cases were jointly administered under Case No. 22-90018 (the "*Sungard Case*") with Former Judge Jones presiding until October 13, 2023.[1058] On May 10, 2022, the Sungard Debtors filed their "Application to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors" (the "*Sungard Retention Application*").[1059] On June 6, 2022, the Sungard Retention Application was approved.[1060] On October 17, 2022, the Sungard Debtors filed their second amended chapter 11 plan of

---

[1055] 564 U.S. 462, 480 (2011).

[1056] Case No. 4:23-cv-4787, ECF No. 188, Ex. 19; ECF No. 228, Ex. 1.

[1057] Case No. 4:23-cv-4787, ECF No. 190, Ex. 1.

[1058] Bankr. No. 22-90018, ECF No. 27; Oct. 13, 2023 Docket Entry.

[1059] Case No. 4:23-cv-4787, ECF No. 190, Ex. 2.

[1060] Case No. 4:23-cv-4787, ECF No. 190, Ex. 3.

reorganization (the "*Sungard Plan*").[1061] On October 17, 2022, the Court entered an order confirming the Sungard Plan.[1062] The effective date of the Sungard Plan occurred on November 9, 2022.[1063] Drivetrain, LCC, became the plan administrator for Sungard on the effective date of the confirmed Sungard Plan.[1064]

On November 29, 2022, Jackson Walker filed "Jackson Walker LLP's Final Fee Application for Allowance and Payment of Fees and Expenses as Counsel to the Debtor for the Period from April 11, 2022 Through November 9, 2022" (the "*Sungard Final Fee Application*").[1065] On December 30, 2022, the Bankruptcy Court entered an order approving the Sungard Final Fee Application and awarding Jackson Walker $420,461.46 in fees and reimbursement of expenses in connection with its representation of the Sungard Debtors (the "*Sungard Final Fee Order*").[1066] On November 3, 2023, the U.S. Trustee filed his Initial Vacatur Motion in the Sungard Case.[1067] On November 13, 2023, Jackson Walker filed its preliminary response to the Initial Vacatur Motion.[1068] On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous Proceeding.[1069] On February 29, 2024, the U.S. Trustee filed his Vacatur Motion in the Sungard Case.[1070] Jackson Walker filed a response to the Vacatur Motion, and the U.S. Trustee and Jackson Walker filed a reply and sur-reply, respectively.[1071] On

---

[1061] Bankr. 22-90018, ECF No. 751.

[1062] Case No. 4:23-cv-4787, ECF No. 190, Ex. 6.

[1063] Bankr. 22-90018, ECF No. 835.

[1064] Case No. 4:23-cv-4787, ECF No. 223, Ex. 1, at 2, ¶ 8.

[1065] Case No. 4:23-cv-4787, ECF No. 190, Ex. 9.

[1066] Case No. 4:23-cv-4787, ECF No. 190, Exs. 5, 10, 11.

[1067] Case No. 4:23-cv-4787, ECF No. 190, Ex. 12.

[1068] Case No. 4:23-cv-4787, ECF No. 190, Ex. 13.

[1069] Bankr. 23-645, ECF No. 1.

[1070] Case No. 4:23-cv-4787, ECF No. 190, Ex. 14.

[1071] Case No. 4:23-cv-4787, ECF No. 190, Exs. 15, 16, 17.

April 15, 2024, the Sungard Plan Administrator, on behalf of itself and Sungard, filed a "Notice of Standing and/or Indispensable Party Status" (the "*Sungard Notice*")[1072] On December 16, 2024, Sungard filed a joinder to the Vacatur Motion (the "*Sungard Joinder*").[1073] On June 19, 2024, Jackson Walker filed a notice of withdrawal as Sungard's counsel.[1074] Jackson Walker received approximately $115,000 in fees and reimbursement of expenses in connection with its representation of the Sungard Plan Administrator.[1075]

On July 29, 2025, the Sungard Plan Administrator filed the instant Sungard Settlement Motion[1076] which attached a settlement agreement (the "*Sungard Settlement*") that contemplates a single payment from Jackson Walker in the total sum of $385,000 to Sungard.[1077] On March 5, 2026, the Sungard Plan Administrator and Jackson Walker executed an amendment to the Sungard Settlement (the "*Sungard Settlement Amendment*").[1078]

### b. The March 18, 2026 hearing

For the Sungard Settlement Motion hearing held on Wednesday, March 18, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee

---

[1072] Bankr. Case No. 22-90018, ECF No. 1053.

[1073] Case No. 4:23-cv-4787, ECF No. 190, Ex. 19.

[1074] Case No. 4:23-cv-4787, ECF No. 190, Ex. 26.

[1075] Case No. 4:23-cv-4787, ECF No. 223, Ex. 1, at 2, ¶ 18.

[1076] Case No. 4:23-cv-4787, ECF No. 91.

[1077] Case No. 4:23-cv-4787, ECF No. 91, Ex. 1 at 6, ¶ 3.

[1078] Case No. 4:23-cv-4787, ECF No. 239, Ex. 27.

Kevin Epstein; and on behalf of Sungard, Daniel Geoghan and Sarah Carnes, along with Timothy Daileader, representative for Drivetrain, LLC, the plan administrator for Sungard.

**i.   Evidence admitted**

The following exhibits were either admitted into evidence or judicially noticed under FRE 201.

**a.  For Sungard**

Pursuant to a joint stipulation[1079] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 18, 2026, hearing:

i.    The Court took judicial notice under FRE 201 of Exhibits 1 and 2

ii.   Exhibits 3 was admitted

iii.  The Court took judicial notice under FRE 201 of Exhibit 4

iv.   Exhibits 5 and 6 were admitted

v.    The Court took judicial notice under FRE 201 of Exhibits 7, 8 and 9

vi.   Exhibits 10 and 11 were admitted

vii.  The Court took judicial notice under FRE 201 of Exhibits 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 26

The following exhibits at ECF No. 239 were either admitted into evidence or judicially noticed as follows:

i.    The Court took judicial notice under FRE 201 of Exhibit 22

ii.   Exhibit 27 was pre-admitted at the March 17, 2026 hearing

**b.  For the U.S. Trustee**

---

[1079] Case No. 4:23-cv-4787, ECF No. 223, Ex. 2, referring to Sungard exhibits filed at ECF No. 190.

The following excerpts of Timothy Daileader's deposition taken on February 10, 2026,[1080] were admitted into evidence:

 i.  No. 1: Deposition Page No. 9, Line 18 – Page No. 9, Line 22

 ii.  No. 2: Deposition Page No. 11, Line 9 – Page No. 11, Line 12

 iii.  No. 3: Deposition Page No. 11, Line 21 – Page No. 13, Line 25

 iv.  No. 4: Deposition Page No. 14, Line 21 – Page No. 15, Line 5

 v.  No. 5: Deposition Page No. 15, Line 22 – Page No. 16, Line 16

 vi.  No. 6: Deposition Page No. 16, Line 23 – Page No. 17, Line 24

 vii.  No. 7: Deposition Page No. 20, Line 12 – Page No. 24, Line 3

 viii.  No. 8: Deposition Page No. 24, Line 17 – Page No. 25, Line 17

 ix.  No. 9: Deposition Page No. 26, Line 7 – Page No. 27, Line 4

 x.  No. 10: Deposition Page No. 28, Line 23 – Page No. 30, Line 17

 xi.  No. 11: Deposition Page No. 31, Line 9 – Page No. 33, Line 25

 xii.  No. 12: Deposition Page No. 35, Line 15 – Page No. 35, Line 17

 xiii.  No. 13: Deposition Page No. 43, Line 15 – Page No. 45, Line 6

 xiv.  No. 14: Deposition Page No. 46, Line 24 – Page No. 47, Line 10

 xv.  No. 15: Deposition Page No. 54, Line 15 – Page No. 56, Line 7

 xvi.  No. 16: Deposition Page No. 60, Line 11 – Page No. 60, Line 24

 xvii.  No. 17: Deposition Page No. 69, Line 22 – Page No. 71, Line 16

 xviii.  No. 18: Deposition Page No. 72, Line 15 – Page No. 82, Line 5

 xix.  No. 19: Deposition Page No. 82, Line 24 – Page No. 86, Line 11

  **c. For Jackson Walker**

---

[1080] Case No. 4:23-cv-4787, ECF No. 199, Ex. 7, referring to the U.S. Trustee's exhibit at ECF No. 203, Ex. 13.

Pursuant to a joint stipulation[1081] dated March 10, 2026, the following exhibit was admitted into evidence:

i.     Exhibit 48 was admitted

Pursuant to a joint stipulation[1082] dated March 10, 2026, the following exhibit was noticed under FRE 201:

i.     The Court took judicial notice under FRE 201 of Exhibit 1

## ii.     Credibility of the witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[1083] At the March 18, 2026 hearing, Mr. Timothy Daileader ("*Mr. Daileader*"), partner at Drivetrain, LLC, the plan administrator of Sungard was sworn in and took the witness stand.[1084] Mr. Daileader is a Georgetown University graduate and has been with Drivetrain, LLC, for ten years.[1085] Drivetrain, LLC, provides comprehensive fiduciary services, including serving as plan administrator, post-bankruptcy trustee, and performing creditor-related work.[1086] As a partner at Drivetrain, LLC, Mr. Daileader's primary responsibility is overseeing the firm's post-bankruptcy operations.[1087] In this capacity, he collaborates with other experienced professionals at Drivetrain, LLC, to oversee post-bankruptcy roles and administer post-bankruptcy estates.[1088] Relevant to the present matter, Drivetrain, LLC, since November 2022, serves as the plan administrator for Sungard, with Mr.

---

[1081] Case No. 4:23-cv-4787, ECF No. 223, Ex. 2 referring to Jackson Walker exhibits filed at ECF No. 206.

[1082] Case No. 4:23-cv-4787, ECF No. 223, Ex. 2 referring to Jackson Walker exhibits filed at ECF No. 207.

[1083] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[1084] Mar. 18, 2026 Hr'g Tr. at 251.

[1085] Mar. 18, 2026 Hr'g Tr. at 250–51.

[1086] Mar. 18, 2026 Hr'g Tr. at 250.

[1087] Mar. 18, 2026 Hr'g Tr. at 250.

[1088] Mar. 18, 2026 Hr'g Tr. at 251.

Daileader acting on behalf of Drivetrain, LLC, in connection with the instant Sungard Settlement.[1089]

At the hearing, Mr. Daileader responded to questions clearly, competently and directly.[1090] Thus, the Court finds that Mr. Daileader is a credible witness and gives substantial weight to his testimony.

### iii.     Terms of the Sungard Settlement[1091]

The Sungard Settlement, as amended by the Sungard Settlement Amendment,[1092] provides, among other things:

> 2(b) <u>Effective Date.</u>  With respect to the forgoing paragraph, the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith, and attending any related hearings related to approval of the Settlement Motion (defined below). Consistent with the preceding sentences, the Wind-Down Debtors and/or the Plan Administrator, as applicable will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, JW will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Wind-Down Debtors, the Plan Administrator, and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases, and that this Agreement meets the standards required for approval under Rule 9019 of the Bankruptcy Rules. The Settlement Motion will be filed in the District Court under case number 4:23-cv-4787 AM. For the further avoidance of doubt, the Wind-Down Debtors and the Plan Administrator have agreed to file a

---

[1089] Mar. 18, 2026 Hr'g Tr. at 251; Case No. 4:23-cv-4787, ECF No. 190, Ex. 20 at 26.

[1090] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[1091] Case No. 4:23-cv-4787, ECF No. 190, Ex. 20.

[1092] Case No. 4:23-cv-4787, ECF No. 239, Ex. 27 (deleting paragraph 4 of the Sungard Settlement).

Settlement Motion seeking approval of their entry into this Agreement out of an abundance of caution and without prejudice to the express terms of the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan or Sungard AS New Holdings, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 751] (the "Confirmed Plan"), which specifically waives the requirement that the Wind-Down Debtors and the Plan Administrator seek approval of any compromise or settlement of Claims (as that term is defined in the Confirmed Plan) or Causes of Action (as that term is defined in the Confirmed Plan) pursuant to Bankruptcy Rule 9019.

3. <u>Settlement Payment</u>. Within five (5) business days after the Effective Date, JW shall pay or cause to be paid to the Wind-Down Debtors (receipt of which shall be promptly confirmed by the Plan Administrator) the sum of $385,000.00 (the "Settlement Payment"). Payment shall be made payable to the Wind-Down Debtors' account by wire transfer using wire transfer instructions separately provided to JW. The Settlement Payment shall be paid to the Wind-Down Debtors and distributed pursuant to the terms of the Confirmed Plan in the Bankruptcy Case.

5(a) <u>Mutual Releases.</u> *Release in Favor of JW.* Upon receipt of the entire Settlement Payment, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Plan Administrator on behalf of itself and the Wind-Down Debtors hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors, affiliates, estates, directors, officers, employees, agents, heirs, executors, representatives, insurers, reinsurers, attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenant contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Wind-Down Debtors or the Plan Administrator against JW

related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.

7. Bar. The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Wind-Down Debtors or the Plan Administrator against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and/or breach of this Agreement.

12. Cooperation and Dismissal or Withdrawal with Prejudice. The Parties will cooperate with each other to give effect to the Agreement, including, without limitation, the Wind-Down Debtors shall withdraw the joinder to the U.S. Trustee Filings with prejudice within three (3) business days after receipt of the Settlement Payment.

### c.  Application of the *Jackson Brewing* Factors to the Sungard Settlement

The Court will next review the Sungard Settlement in accordance with the *Jackson Brewing* Factors.

### Factor 1: Probability of success in the litigation, with due consideration for the uncertainty in fact and law

The Court will now consider the probability of Sungard's success in the litigation, with due consideration for the uncertainty in fact and law.[1093]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the Sungard Case.[1094] Through the Sungard Notice, Sungard asserts indispensable party status and standing in the Vacatur Motion and joins the relief sought in the Vacatur Motion through the Sungard Joinder.[1095] The Sungard Settlement provides a broad release from the

---

[1093] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[1094] Case No. 4:23-cv-4787, ECF No. 190, Ex. 19.

[1095] Bankr. No. 22-90018, ECF No. 1053; Case No. 4:23-cv-4787, ECF No. 190, Ex. 19.

Sungard Plan Administrator, on behalf of itself and Sungard, in favor of Jackson Walker for all potential claims that they have or may have relating to the Jones-Freeman Relationship.[1096] As such, when considering the probability of Sungard's success in the litigation, the Court must consider the likelihood of success on the merits of the Vacatur Motion because the claims being settled by Sungard are based on the same factual underpinnings as the relief being sought in the Vacatur Motion.

In connection with the Sungard Case, Jackson Walker was paid a total of approximately $535,461.46 consisting of $420,461.46 under the Sungard Final Fee Order,[1097] and approximately $115,000 for post-confirmation services representing Sungard.[1098] Following the emergence of claims against Jackson Walker, Sungard paid approximately $125,000 to counsel representing Sungard in connection with the Miscellaneous Proceeding and related matters.[1099]

Thus, if Sungard pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees would likely equal approximately $660,461.46 representing the amounts paid to Jackson Walker for services performed in connection with the Sungard Case and amounts paid to Sungard's counsel in connection with the Jackson Walker fee dispute. In contrast, under the Sungard Settlement, Jackson Walker would be required to pay $385,000 to Sungard.[1100]

During his testimony, Mr. Daileader explained that he had a general understanding of the facts underlying the relief sought against Jackson Walker in the Miscellaneous Proceeding.[1101] In

---

[1096] Case No. 4:23-cv-4787, ECF No. 190, Ex. 20, ¶ 5(a).

[1097] Case No. 4:23-cv-4787, ECF No. 190, Exs. 5, 10, 11.

[1098] Case No. 4:23-cv-4787, ECF No. 223, Ex. 1 at 2, ¶ 18.

[1099] Mar. 18, 2026 Hr'g Tr. at 262–63.

[1100] Case No. 4:23-cv-4787, ECF No. 190, Ex. 20, ¶ 3.

[1101] Mar. 18, 2026 Hr'g Tr. at 258.

reaching his decision to settle, Mr. Daileader relied on a September 20, 2024 letter (the "*Disciplinary Letter*")[1102] written by Bankruptcy Judge Marvin Isgur pursuant to Rule 6 of the Southern District of Texas Rules of Discipline.[1103] In the Disciplinary Letter, Judge Isgur set forth facts that Judge Isgur understood to not be disputed by Jackson Walker, one of which was that that a partner at Jackson Walker first learned that the Jones-Freeman Relationship was ongoing on February 1, 2022.[1104] The Sungard Case was later filed on April 11, 2022.[1105] Based on his review of the Disciplinary Letter and his knowledge of the Sungard Case, Mr. Daileader concluded that the Sungard Case was filed when a Jackson Walker partner had knowledge of the Jones-Freeman Relationship, which promoted Mr. Daileader to review Jackson Walker's fee applications to determine if Ms. Freeman billed for services relating to the Sungard Case.[1106] Based on Mr. Daileader's review of the Disciplinary Letter, the various fee applications in the Sungard Case, and his extensive experience in bankruptcy litigation, Mr. Daileader concluded that the probability of success in prevailing in the underlying litigation against Jackson Walker was high.[1107] But Mr. Daileader testified that in his experience, litigation inherently involves risk and unknown costs.[1108] And although Mr. Daileader was aware that extensive documentary discovery and depositions were conducted in the Miscellaneous Proceeding, he instructed Sungard's counsel to not review the discovery to prevent additional accrual of attorney's fees.[1109]

---

[1102] Case No. 4:23-cv-4787, ECF No. 190, Ex. 23.

[1103] S.D. Tex. Local Rules, Appendix A: Rules of Discipline, R. 6.

[1104] Case No. 4:23-cv-4787, ECF No. 190, Ex. 23.

[1105] Case No. 4:23-cv-4787, ECF No. 190, Ex. 1.

[1106] Mar. 18, 2026 Hr'g Tr. at 259–260.

[1107] Mar. 18, 2026 Hr'g Tr. at 260.

[1108] Mar. 18, 2026 Hr'g Tr. at 264.

[1109] Mar. 18, 2026 Hr'g Tr. at 260, 261.

Although the evidence demonstrates that Mr. Daileader possessed familiarity with the claims being settled on behalf of Sungard, and associated risks, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[1110]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to Sungard. For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[1111]

Although this Court will not now conduct a mini-trial of the merits of Sungard's claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that Sungard's recovery against Jackson Walker raises factually intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of a complex chapter 11 plan.[1112] A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinnings of the claims being settled—the

---

[1110] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[1111] Case No. 4:23-cv-4787, ECF No. 190, Ex. 15 at 52, 57, 60, 94.

[1112] Case No. 4:23-cv-4787, ECF No. 190, Ex. 14.

Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Daileader's credible testimony and his familiarity with the claims being settled, the Court finds that in the exercise of his business judgment, Mr. Daileader, acting on behalf of the Sungard Plan Administrator, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating the claims in the Vacatur Motion and securing a judgment in an amount exceeding the $385,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Sungard Settlement.

**Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay**

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the Sungard Settlement.[1113]

Neither Sungard nor the Sungard Plan Administrator has filed a complaint or initiated an adversary proceeding against Jackson Walker, but through the Sungard Notice, Sungard asserts indispensable party status and standing in the Vacatur Motion and joins the relief sought in the Vacatur Motion through the Sungard Joinder.[1114]  Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the Sungard Settlement, the Court will consider the length, delay and costs associated with a trial on the Vacatur Motion.

---

[1113] *See In re Beach*, 731 F. App'x at 326.

[1114] Bankr. Case No. 22-90018, ECF No. 1053; Case No. 4:23-cv-4787, ECF No. 190, Ex. 19.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[1115] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[1116] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[1117] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[1118] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[1119] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 3, 2023.[1120] Although extensive discovery has been conducted on the Vacatur Motion, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[1121] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement. As such, a trial on the merits of the Vacatur Motion would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of

---

[1115] *See* Dec. 9, 2025 Min. Entry.

[1116] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[1117] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1118] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1119] Dec. 9, 2025 status conference (statements by the Court).

[1120] *See e.g.,* Case No. 4:23-cv-4787, ECF No. 190, Ex. 12.

[1121] *See e.g.*, Bankr. 23-645, ECF 516.

a trial date for the Vacatur Motion and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to Sungard creditors if the Sungard Plan Administrator was required to participate in a trial on the Vacatur Motion as compared to consummating a settlement.

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Daileader's credible testimony, and his familiarity with the claims being settled, the Court finds that in the exercise of his business judgment, Mr. Daileader, on behalf of the Sungard Plan Administrator, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $385,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Sungard Settlement.

### Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views

Next, the Court will consider whether the Sungard Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[1122]

The settlement proceeds from the Sungard Settlement would be distributed to the holders of Class 3 claims, as defined in the Sungard Plan, which consist of first lien claims that total approximately $108 million.[1123] Other than the U.S. Trustee's objection, which has been resolved through the Global Joint Stipulation, there were no other formal or informal objections to the Sungard Settlement Motion.[1124] Mr. Daileader's testimony demonstrates that the additional

---

[1122] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[1123] Mar. 18, 2026 Hr'g Tr. at 253, 258; Case No. 4:23-cv-4787, ECF No. 190, Ex. 6 at 64, 80, 81.

[1124] Case No. 4:23-cv-4787, ECF No. 255.

recoverable amount from Jackson Walker through a trial would likely not outweigh the costs of proceeding to trial. Specifically, Mr. Daileader estimated that approximately $29,000 of additional fees awarded to Jackson Walker under the Sungard Final Fee Order may be disgorged through a trial and that the costs of proceeding to trial would likely exceed such amount.[1125]

The evidence admitted at the March 18, 2026 hearing therefore demonstrates that no creditors objected to the Sungard Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow creditors of Sungard to receive distributions sooner, while reducing legal expenses, as compared to proceeding to a trial on the merits.

Thus, after considering the evidence admitted at the March 18, 2026 hearing, Mr. Daileader's credible testimony and his familiarity with the claims being settled, the Court finds that in the exercise of his business judgment, Mr. Daileader, on behalf of the Sungard Plan Administrator, gave due consideration to whether the Sungard Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Accordingly, the Court finds that the third factor weighs in favor of approving the Sungard Settlement.

### Factor 4: The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion

Next, the Court will consider the extent to which the Sungard Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[1126]

Mr. Daileader credibly testified that he does not have any personal relationships with Jackson Walker, Ms. Freeman, Former Judge Jones or Jackon Walker's counsel.[1127] Thus, the

---

[1125] Mar. 18, 2026 Hr'g Tr. at 262.

[1126] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[1127] Mar. 18, 2026 Hr'g Tr. at 256, 257.

Sungard Settlement was negotiated between non-insiders.[1128] Jackson Walker served as post-confirmation counsel for Sungard.[1129] Mr. Daileader explained that Jackson Walker was retained as post-confirmation counsel because of Jackson Walker's familiarity with the underlying bankruptcy case and claims involved in the post-confirmation process.[1130] Mr. Daileader, on behalf of the Sungard Plan Administrator, engaged counsel to manage the conflict that existed in the light of the Jones-Freeman Relationship becoming public.[1131] Jackson Walker ultimately withdrew from its representation of Sungard after the Jones-Freeman relationship become public and was replaced with the same counsel who is currently pursuing claims against Jackson Walker on behalf of Sungard.[1132]

No evidence was presented to show that the Sungard Settlement was entered into for an improper purpose, that the settlement was not reached at arm's-length, or that the terms of the settlement were affected by any fraud or collusion.[1133] The evidence therefore demonstrates that the Sungard Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. After considering the evidence admitted at the March 18, 2026 hearing, the Court finds that the Sungard Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Sungard Settlement.

**Factor 5: All other factors bearing on the wisdom of the compromise**

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn, (i) whether the Sungard Settlement affects the integrity of the judicial system;

---

[1128] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[1129] Mar. 18, 2026 Hr'g Tr. at 254.

[1130] Mar. 18, 2026 Hr'g Tr. at 254.

[1131] Mar. 18, 2026 Hr'g Tr. at 254.

[1132] Mar. 18, 2026 Hr'g Tr. at 254; Case No. 4:23-cv-4787, ECF No. 190, Ex. 26.

[1133] *See In re Myers*, 546 B.R. at 380.

(ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motion, if any, may be accepted by Sungard and its creditors.[1134]

### i. Whether the approval of the Sungard Settlement will negatively impact or promote the integrity of the judicial system

The Court will now consider whether the Sungard Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[1135]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the Sungard Settlement, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit Sungard and its creditors from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[1136] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[1137]

In considering what impact, if any, the Sungard Settlement could have on the Vacatur Motion, the Court will look first to the Sungard Settlement's plain language.[1138] Paragraph 2(b) of the Sungard Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this

---

[1134] *See In re MCorp Fin.*, 160 B.R. at 951.

[1135] *See In re Bates*, 211 B.R. at 345.

[1136] *See e.g.*, Case No. 4:23-cv-04787, ECF No. 93.

[1137] Case No. 4:23-cv-04787, ECF No. 255.

[1138] *Estate of Kokernot*, 112 F.3d at 1294.

Agreement resolves all issues and claims between the Wind-Down Debtors, the Plan Administrator, and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Cases.[1139]

In a similar fashion, paragraph 5(a) provides in relevant part that:

Upon receipt of the entire Settlement Payment, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Plan Administrator on behalf of itself and the Wind-Down Debtors hereby releases, acquits , and forever discharges [Jackson Walker] . . . from any and all actions, suits, debts, covenant contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Cases, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Wind-Down Debtors or the Plan Administrator against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.[1140]

Although the language of paragraph 2(b) and 5(a) creates a broad release of claims, the language expressly provides that the Sungard Plan Administrator will only release claims that Sungard may have against Jackson Walker.[1141] Neither paragraph 2(b) nor 5(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[1142]

Paragraph 7 of the Sungard Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by

---

[1139] Case No. 4:23-cv-04787, ECF No. 190, Ex. 20, ¶ 2(b).

[1140] Case No. 4:23-cv-04787, ECF No. 190, Ex. 20, ¶ 5(a).

[1141] Case No. 4:23-cv-04787, ECF No. 190, Ex. 20, ¶¶ 2(b), 5(a).

[1142] Case No. 4:23-cv-04787, ECF No. 190, Ex. 20, ¶¶ 2(b), 5(a).

the Wind-Down Debtors or the Plan Administrator against [Jackson Walker] or any other released parties.[1143]

Like paragraphs 2(b) and 5(a), paragraph 7 of the Sungard Settlement references release of possible claims by *Sungard* against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[1144] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Sungard Settlement. Moreover, Mr. Daileader, who signed the Sungard Settlement, testified that he did not intend for the Sungard Settlement to change any of the relief sought by the U.S. Trustee in his Vacatur Motions or release any claims the U.S. Trustee might have against Jackson Walker, nor did he believe that it did.[1145] Thus, the Court finds that the Sungard Settlement only provides for the release of any claims Sungard may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Sungard Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by the Sungard, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[1146] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the Sungard Plan Administrator all "acknowledge and agree" that the Sungard Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[1147]

There is no language in the Sungard Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the Sungard Settlement could not determine the nature

---

[1143] Case No. 4:23-cv-04787, ECF No. 193, Ex. 20, ¶ 7.

[1144] Case No. 4:23-cv-04787, ECF No. 190, Ex. 20, ¶¶ 2(b), 5(a), 7.

[1145] Mar. 18, 2026 Hr'g Tr. at 258.

[1146] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[1147] Case No. 4:23-cv-04787, ECF No. 255 at 2.

of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[1148] Thus, the Court finds that the Sungard Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by Sungard, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally,  in the Global Joint Stipulation, Jackson Walker  stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[1149] Therefore, the Court finds that the Sungard Settlement does not preclude Sungard and its creditors from accepting funds in addition to the $385,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the Sungard Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the Sungard Settlement and Global Joint Stipulation, the Court finds that the Sungard Settlement: (i) only released any claims Sungard has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Sungard Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by Sungard, or independent

---

[1148] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

[1149] Case No. 4:23-cv-04787, ECF No. 255 at 2.

and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude Sungard and its creditors from accepting funds in addition to the $385,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Therefore, the Court finds that the Sungard Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Sungard Settlement.

### ii.    Consideration of the collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[1150] At the March 18, 2026 hearing, no evidence was offered to demonstrate that any investigation was conducted as to the collectability of a judgment against Jackson Walker. Indeed, Mr. Daileader admitted that he did not conduct any thorough investigation into the collectability of a potential judgment against Jackson Walker.[1151]

Because there is no evidence that Mr. Daileader investigated the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Sungard Settlement.

### iii.    Whether Sungard may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment

---

[1150] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[1151] Mar. 18, 2026 Hr'g Tr. at 261.

At the March 18, 2026 hearing, the Court, *sua sponte,* expressed concerns as to whether a bankruptcy estate or a post-confirmation trust could accept and distribute any additional funds over and above amounts in any of the Settlement Agreements, if ordered by the Court after a final trial on the merits of the Vacatur Motions, if a bankruptcy estate or post-confirmation trust was wound down and closed administratively.[1152] As a result, the Court entered its order for post-trial briefing[1153] where the Court directed the Sungard Plan Administrator and other parties to address the following questions posed by the Court, to wit:

> (a) whether the proposed settlements may be approved without impairing the United States Trustee's pending Vacatur Motions or the Court's inherent authority to order vacatur or additional relief; (b) in the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; (c) if the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of [the Sungard Plan Administrator] to the disposition of funds upon wind-down and closure, including where such funds would be distributed; and (d) The legal and practical feasibility of monetizing any residual claims for disgorgement or additional sanctions, including proposed procedures for the sale, assignment, or other transfer of such claims to a third party, and how such a transaction would be structured to maximize value for the estates.[1154]

On April 10, 2026, the Sungard Plan Administrator filed "The Sungard Wind-Down Debtors' Statement Addressing The Questions Identified In Court's Order Dated March 19, 2026" (the "*Sungard Brief*").[1155] On April 17, 2026, the U.S. Trustee filed his Post-Hearing Reply Brief.[1156] In the Sungard Brief, the Sungard Plan Administrator asserts that (1) the Sungard Settlement may

---

[1152] Mar. 18, 2026 Hr'g Tr. at 271–72.

[1153] Case 4:23-cv-04787, ECF No 254.

[1154] Case No. 4:23-cv-04787, ECF No 254.

[1155] Case No. 4:23-cv-04787, ECF No 280.

[1156] Case No. 4:23-cv-04787, ECF No 282.

be approved without impairing the U.S. Trustee's Vacatur Motion or the Court's inherent authority; (2) the estates of Sungard, once closed, can be reopened to allow for distribution of any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment; and (3) because reopening of the Sungard estates is possible, the Court need not consider whether alternatives exist that may achieve the goal of allowing for distribution of additional funds to the creditors of Sungard.[1157]

A party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[1158] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[1159] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[1160] Further, Bankruptcy Rule 5010 provides that the Court may reopen a case upon a motion filed by the debtor or another party in interest.[1161] Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[1162] There is no pending motion to close or reopen the Sungard Case. As explained *supra*, the Sungard Settlement does not impact the ability of the Sungard Plan Administrator to receive any additional funds that the Court may potentially order Jackson Walker to pay.[1163] Moreover, there

---

[1157] Case No. 4:23-cv-04787, ECF No 280.

[1158] *See In re JCP Props*., 540 B.R. at 605; *In re Lager*, 2024 Bankr. LEXIS 1974, at *7.

[1159] Fed. R. Bankr. P. 3022.

[1160] 11 U.S.C. § 350(b).

[1161] Fed. R. Bankr. P. 5010.

[1162] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

[1163] *See supra* Section I.D.c.8.c.5.i.

is nothing in the Sungard Settlement that prevents the Sungard Plan Administrator from filing a motion for a final decree or a motion to re-open the case, if it finds it appropriate to do so.

Thus, after a careful review of the Sungard Brief, and the assertions made therein, the Court finds it unnecessary, at this moment, to consider whether the bankruptcy estate would need to be closed or reopened for the Sungard Plan Administrator to receive and distribute any additional funds ordered by the Court in excess of the $385,000 settlement.

However, the Court's finding that the Sungard Settlement neither affects the Sungard Plan Administrator's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $385,000 settlement, nor prevents the Sungard Plan Administrator from filing a motion for a final decree or to re-open the Sungard Case as it deems appropriate, supports approval of the Sungard Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the Sungard Settlement be approved

Jackson Walker and Sungard have agreed to a settlement of $385,000.[1164] If Sungard were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $660,461.46, consisting of $420,461.46 paid to Jackson Walker for services performed during the pendency of the Sungard Case, approximately $115,000 paid to Jackson Walker for post-confirmation services, and the approximately $125,000 paid to counsel representing Sungard in connection with the Miscellaneous Proceeding and related matters.[1165] Acceptance of the settlement amount of $385,000 less fees incurred by Sungard to pursue litigation against Jackson Walker, totaling approximately $125,000, would result in net

---

[1164] Case No. 4:23-cv-4787, ECF No. 190, Ex. 20, ¶ 3.

[1165] Case No. 4:23-cv-4787, ECF No. 190, Exs. 5, 10, 11; ECF No. 223, Ex. 1, at 2, ¶ 18; Mar. 18, 2026 Hr'g Tr. at 262–63.

proceeds of approximately $260,000 to Sungard and its creditors pursuant to the Sungard Settlement.

After considering Mr. Daileader's credible testimony, the evidence now in the record, including the Sungard Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgement, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement and that in the exercise of his business judgment, Mr. Daileader, on behalf of the Sungard Plan Administrator, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating claims in the Vacatur Motion and securing a judgment in an amount exceeding the $385,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $385,000 settlement amount; gave due consideration to whether the Sungard Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the Sungard Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the Sungard Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Sungard Settlement: (i) only released any claims Sungard has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Sungard Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Sungard, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude Sungard and its creditors from accepting funds in addition to the

$385,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the Sungard Settlement that prevents the Sungard Plan Administrator from filing a motion for a final decree or a motion to re-open the case, if it finds it appropriate to do so.

The Court further finds that the Sungard Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[1166] because although the proposed settlement amount of $385,000 to be paid to Sungard by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $660,461.46, as stated *supra*, representing both the fees paid to Jackson Walker and the subsequent costs paid to Sungard's counsel for pursuing claims against Jackson Walker, the proposed settlement amount of $385,000 constitutes approximately 92% the total amount of fees and expenses ($420,461.46) paid to Jackson Walker pursuant to the Sungard Final Fee Order, and the Sungard Settlement could allow the creditors of Sungard to receive distributions without the expense and delay associated with a trial on the merits.

Finally, even though final approval of the Sungard Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that Sungard and the Sungard Plan Administrator have a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

---

[1166] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[1167] and Bankruptcy Rule 9033, the Court recommends approval of the Sungard Settlement.[1168]

### 9.  22-50009 – The 4E Brands Settlement

#### a.  Background

On February 22, 2022, 4E Brands filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of Texas, initiating Case No. 22-50009 (the "*4E Brands Case*").[1169] Former Judge Jones presided over the 4E Brands Case until October 13, 2023.[1170]

On March 24, 2022, the Debtor filed its "Application to Retain Jackson Walker LLP as Counsel for the Debtor and Debtor-in-Possession" (the "*4E Brands Retention Application*"),[1171] which was granted by Former Judge Jones on May 2, 2022.[1172] On October 25, 2022, 4E Brands filed its amended chapter 11 plan of liquidation (the "*4E Brands Plan*").[1173] On October 27, 2022, the Court entered an order confirming the 4E Brands Plan (the "*4E Brands Confirmation Order*").[1174] The 4E Brands Confirmation Order provided that as of the plan effective date Mr. Dunn would serve as the plan agent and act as the sole manager, sole director, and sole officer of

---

[1167] 564 U.S. 462, 480 (2011).

[1168] Case No. 4:23-cv-4787, ECF No. 190, Ex. 20; ECF No. 239, Ex. 27.

[1169] Bankr. 22-50009. ECF No. 1.

[1170] Bankr. 22-50009, Oct. 13, 2025 Docket Entry.

[1171] Case No. 4:23-cv-4787, ECF No. 187, Ex. 29.

[1172] Case No. 4:23-cv-4787, ECF No. 187, Ex. 30.

[1173] Case No. 4:23-cv-4787, ECF No. 187, Ex. 31.

[1174] Case No. 4:23-cv-4787, ECF No. 187, Ex. 32.

4E Brands.[1175] On November 1, 2022, the 4E Brands Plan became effective.[1176] Jackson Walker continued to act as counsel for 4E Brands post-confirmation until February 6, 2024.[1177]

On December 1, 2022, Jackson Walker filed its "Final Fee Application for Allowance and Payment of Fees and Expenses as Counsel to the Debtor for the Period from February 22, 2022 Through October 26, 2022" (the "*4E Brands Final Fee Application*").[1178] The 4E Brands Final Fee Application was approved on December 29, 2022, for a final award of fees and expenses to Jackson Walker in the amount of $866,726.31 (the "*4E Brands Final Fee Order*").[1179] On November 3, 2023 the U.S. Trustee filed his Initial Vacatur Motion in the 4E Brands Case.[1180] On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous Proceeding.[1181] On January 10, 2024, the 4E Brands Plan Agent filed his "Notice of Standing and Indispensable Party" (the "*4E Brands Notice*").[1182] On February 6, 2024, Jackson Walker filed a notice withdrawing as counsel for the 4E Brands Plan Agent.[1183] The 4E Brands Plan Agent paid Jackson Walker approximately $420,758.62 for post-confirmation attorneys' fees and expenses.[1184] On February 14, 2024, the 4E Brands Plan Agent filed his motion to modify the 4E Brands Plan (the "*Motion to Modify*").[1185] On February 27, 2024, the 4E Brands Plan Agent filed his joinder to the U.S.

---

[1175] Case No. 4:23-cv-4787, ECF No. 187, Ex. 32 at 8, 46.

[1176] Case No. 4:23-cv-4787, ECF No. 187, Ex. 33.

[1177] Case No. 4:23-cv-4787, ECF No. 220, Ex. 1 at 2, ¶ 10.

[1178] Case No. 4:23-cv-4787, ECF No. 187, Ex. 34.

[1179] Case No. 4:23-cv-4787, ECF No. 187, Ex. 35.

[1180] Case No. 4:23-cv-4787, ECF No. 187, Ex. 37.

[1181] Bankr. 23-645, ECF No. 1.

[1182] Case No. 4:23-cv-4787, ECF No. 187, Ex. 6.

[1183] Bankr. 22-50009, ECF No. 624.

[1184] Case No. 4:23-cv-4787, ECF No. 220, Ex. 1 at 4, ¶ 25.

[1185] Case No. 4:23-cv-4787, ECF No. 187, Ex. 46.

Trustee's relief sought in the Initial Vacatur Motion (the "*4E Brands Joinder*").[1186] On February 29, 2024, the U.S. Trustee filed the Vacatur Motion in the 4E Brands Case.[1187] On April 1, 2024, Bankruptcy Judge Marvin Isgur entered his order granting the Motion to Modify (the "*Modification Order*").[1188]

On April 7, 2025, the 4E Brands Plan Agent filed the instant 4E Brands Settlement Motion,[1189] which attached a settlement agreement (the "*4E Brands Settlement*") that contemplates a single payment from Jackson Walker in the total sum of $617,000 to the 4E Brands Plan Agent.[1190] On March 4, 2026, the 4E Brands Plan Agent and Jackson Walker entered into an amendment of the 4E Brands Settlement (the "*4E Brands Settlement Amendment*").[1191]

### b. The March 19, 2026 Hearing

For the 4E Brands Settlement Motion hearing held on Thursday, March 19, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; on behalf of the 4E Brands Plan Agent, Ken Green and Aaron Guerrero, with David Dunn present; and on behalf of the largest unsecured creditor and wrongful death beneficiary, David Odegard.

### i. Evidence admitted

### a. For 4E Brands

---

[1186] Case No. 4:23-cv-4787, ECF No. 187, Ex. 40.

[1187] Case No. 4:23-cv-4787, ECF No. 187, Ex. 36.

[1188] Case No. 4:23-cv-4787, ECF No. 187, Ex. 47.

[1189] Bankr. 22-50009, ECF No. 715.

[1190] Bankr. 22-50009, ECF No. 715, Ex. 1 at 3. *See also* Case No. 4:23-cv-4787, ECF No. 187, Ex. 47, 20.

[1191] Case No. 4:23-cv-4787, ECF No. 210, Ex. 1.

Pursuant to a joint stipulation[1192] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 19, 2026 hearing:

i.        Exhibits 1, 2, 3, 4 and 5 were admitted

ii.       The Court took judicial notice under FRE 201 of Exhibit 6

iii.      Exhibits 7, 8, 9 and 10 were admitted

iv.      The Court took judicial notice under FRE 201 of Exhibit 11

v.       Exhibits 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26 and 27 were admitted

vi.      The Court took judicial notice under FRE 201 of Exhibits 28, 29, 30, 31, 32, 33 and 34

vii.     Exhibit 35 was admitted

viii.    The Court took judicial notice under FRE 201 of Exhibits 36, 37, 38, 39 and 40

ix.      Exhibits 41 and 42 were admitted

x.       The Court took judicial notice under FRE 201 of Exhibits 43, 44, 45 and 46

xi.      Exhibit 47 was admitted

The exhibit at ECF No. 210 was admitted as follows:

i.        Exhibit 1 was admitted

**b.  For the U.S. Trustee**

The following excerpts of the David Dunn deposition taken on February 11, 2026,[1193] were admitted into evidence:

i.        No. 1: Deposition Page No. 18, Line 14 – Page No. 19, Line 7

ii.       No. 2: Deposition Page No. 21, Line 5 – Page No. 21, Line 8

iii.      No. 3: Deposition Page No. 27, Line 11 – Page No. 27, Line 17

---

[1192] Case No. 4:23-cv-4787, ECF No. 220, Ex. 2 referring to 4E Brands exhibits filed at ECF No. 187.

[1193] Case No. 4:23-cv-4787, ECF No. 199, Ex. 8, referring to the U.S. Trustee's exhibit at ECF No. 194, Ex. 11.

iv.      No. 4: Deposition Page No. 42, Line 1 – Page No. 43, Line 3

v.      No. 5: Deposition Page No. 43, Line 20 – Page No. 43, Line 25

vi.      No. 6: Deposition Page No. 44, Line 2 – Page No. 44, Line 8

vii.      No. 7: Deposition Page No. 46, Line 12 – Page No. 47, Line 13

viii.      No. 8: Deposition Page No. 48, Line 1 – Page No. 48, Line 12

ix.      No. 9: Deposition Page No. 49, Line 17 – Page No. 51, Line 6

x.      No. 10: Deposition Page No. 57, Line 2 – Page No. 57, Line 7

xi.      No. 11: Deposition Page No. 57, Line 8 – Page No. 58, Line 23

xii.      No. 12: Deposition Page No. 62, Line 4 – Page No. 63, Line 2

xiii.      No. 13: Deposition Page No. 67, Line 7 – Page No. 67, Line 14

xiv.      No. 14: Deposition Page No. 67, Line 23 – Page No. 67, Line 25

xv.      No. 15: Deposition Page No. 68, Line 22 – Page No. 69, Line 6

xvi.      No. 16: Deposition Page No. 75, Line 1 – Page No. 75, Line 7

xvii.      No. 17: Deposition Page No. 78, Line 10 – Page No. 78, Line 13

xviii.      No. 18: Deposition Page No. 80, Line 9 – Page No. 80, Line 24

xix.      No. 19: Deposition Page No. 85, Line 13 – Page No. 85, Line 18

xx.      No. 20: Deposition Page No. 86, Line 3 – Page No. 86, Line 12

**c.  For Jackson Walker**

Pursuant to a joint stipulation[1194] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 19, 2026 hearing:

i.      The Court took judicial notice under FRE 201 of Exhibit 15

ii.      Exhibit 20 was admitted

---

[1194] Case No. 4:23-cv-4787, ECF No. 220, Ex. 2 referring to Jackson Walker's exhibits filed at ECF No. 207.

iii.    The Court took judicial notice under FRE 201 of Exhibit 21

iv.    Exhibit 23 was admitted

**ii.    Credibility of the witnesses**

It is the Court's duty to assess and weigh the credibility of witnesses.[1195] At the March 19, 2026 hearing, the Court heard testimony from Mr. Dunn, the plan agent and sole manager, sole director, sole officer and sole representative of 4E Brands.[1196] Mr. Dunn was a restructuring attorney for approximately 10 years at several prominent law firms.[1197] Following his career as a corporate restructuring attorney, Mr. Dunn joined the Province Firm where he is currently in his sixth year of tenure.[1198] In his role at the Province Firm, Mr. Dunn has handled a broad range of engagements, with particular emphasis on fiduciary matters. Specifically, he has been involved in more than 20 fiduciary engagements, encompassing wind-down engagements, trustee engagements, plan administrator roles, and plan agent engagements, including the present matter.[1199] Mr. Dunn testified to his substantial experience in plan administration, stating that he has handled litigation claims of all types, both historically and currently, with an aggregate value of several billion dollars.[1200] His experience encompasses the settlement and litigation of fiduciary duty, directors and officers, and professional liability claims, including legal malpractice matters.[1201] He served as the chief restructuring officer of 4E Brands during the pendency of its bankruptcy case.[1202]

---

[1195] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[1196] Mar. 19, 2026 Hr'g Tr. at 13.

[1197] Mar. 19, 2026 Hr'g Tr. at 9.

[1198] Mar. 19, 2026 Hr'g Tr. at 9.

[1199] Mar. 19, 2026 Hr'g Tr. at 9.

[1200] Mar. 19, 2026 Hr'g Tr. at 10.

[1201] Mar. 19, 2026 Hr'g Tr. at 10.

[1202] Mar. 19, 2026 Hr'g Tr. at 13.

At the hearing, Mr. Dunn responded to questions clearly, competently, and directly.[1203] Thus, the Court finds that Mr. Dunn is a credible witness and gives substantial weight to his testimony.

### iii.    Terms of the 4E Brands Settlement[1204]

The 4E Brands Settlement, as revised by the 4E Brands Settlement Amendment,[1205] provides, among other things:

> 2(b) Effective Date. With respect to the forgoing paragraph, the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith, and attending any related hearings. Consistent with the preceding sentences, the Plan Agent will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, JW will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Plan Agent and the bankruptcy estate of 4E Brands Northamerica LLC and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Case, that this Agreement is fair, reasonable, and equitable pursuant to the requirements established under Rule 9019 of the Bankruptcy Rules.

> 3. Settlement Payment. No later than one (3) business days after the Effective Date, JW shall pay or cause to be paid to the Plan Agent (receipt of which shall be promptly confirmed by the Plan Agent) the sum of $617,000.00 (the "Settlement Payment").

> 5(a) Mutual Releases. *Release in Favor of JW.* On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising

---

[1203] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[1204] Case No. 4:23-cv-4787, ECF No. 187, Ex. 20.

[1205] Case No. 4:23-cv-4787, ECF No. 210, Ex. 1 (among other things, deleting paragraph 4 of the 4E Brands Settlement).

out of this Agreement, the Plan Agent, on behalf of 4E Brands Northamerica LLC, hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors, affiliates, directors, officers, employees, agents, heirs, executors , representatives , insurers , reinsurers , attorneys, partners, associates, staff members, and assigns from any and all actions , suits, debts, covenants, contracts, controversies , agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries , losses, liabilities, expenses, attorneys ' fees and causes of action of any kind, whether arising in contract, in tort, by statute, at law, in equity, or otherwise , and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential. direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Agent and the estate of 4E Brands Northamerica LLC against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions .

6. <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before an y court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Plan Agent or 4E Brands Northamerica LLC and its estate against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and/or breach of this Agreement.

11. <u>Cooperation and Withdrawal with Prejudice.</u> The Parties will cooperate with each other to give effect to the Agreement, including, without limitation, the Plan Agent withdrawing the joinder to the U.S. Trustee Filings with prejudice within three (3) business days after the Effective Date.

c.    **Application of the *Jackson Brewing* Factors to the 4E Brands Settlement**

The Court will next review the 4E Brands Settlement in accordance with the *Jackson Brewing* Factors.

**<u>Factor 1</u>: Probability of success in the litigation, with due consideration for the uncertainty in fact and law**

The Court will now consider the probability of 4E Brand's success in the litigation, with due consideration for the uncertainty in fact and law.[1206]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the 4E Brands Case.[1207] Through the 4E Brands Notice, the 4E Brands Plan Agent asserts indispensable party status and standing in the Vacatur Motion and joins the relief sought in the Vacatur Motion through the 4E Brands Joinder.[1208] The 4E Brands Settlement provides a broad release from the 4E Brands Plan Agent in favor of Jackson Walker for all potential claims that 4E Brands has or may have relating to the Jones-Freeman Relationship.[1209] As such, when considering the probability of the 4E Brand Plan Agent's success in the litigation, the Court must consider the likelihood of success on the merits of the Vacatur Motion because the claims being settled by the 4E Brand Plan Agent are based on the same factual underpinnings as the relief being sought in the Vacatur Motion.

In connection with the 4E Brands Case, Jackson Walker was paid a total of approximately $1,287,484.93 consisting of $866,726.31 under the 4E Brands Final Fee Order,[1210] and approximately $420,758.62 for post-confirmation services representing the 4E Brands Plan Agent.[1211] Following the emergence of claims against Jackson Walker, the 4E Brands Plan Agent incurred $252,481.37 in fees and costs to counsel representing the 4E Brands Plan Agent in

---

[1206] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[1207] Case No. 4:23-cv-4787, ECF No. 187, Ex. 36.

[1208] Case No. 4:23-cv-4787, ECF No. 187, Exs. 6, 40.

[1209] Case No. 4:23-cv-4787, ECF No. 187, Ex. 20, ¶ 5(a).

[1210] Case No. 4:23-cv-4787, ECF No. 187, Ex. 35; Mar. 19, 2026 Hr'g Tr. at 19–20.

[1211] Case No. 4:23-cv-4787, ECF No. 220, Ex. 1 at 4, ¶ 25.

connection with the Miscellaneous Proceeding and related matters up through February of 2026.[1212]

Thus, if the 4E Brands Plan Agent pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees would likely equal approximately $1,539,966.30, representing the amounts paid to Jackson Walker for pre-confirmation and post-confirmation services performed in connection with the 4E Brands Case and amounts paid to the 4E Brands Plan Agent's counsel in connection with the Jackson Walker fee dispute. In contrast, under the 4E Brands Settlement, Jackson Walker would be required to pay $617,000 to the 4E Brands Plan Agent.[1213]

During his testimony, Mr. Dunn testified that he reviewed and analyzed the Vacatur Motion and carefully considered the facts alleged in it and the relief sought.[1214] Mr. Dunn was also extensively involved in the discovery process in the Miscellaneous Proceeding, including attending depositions in person, reviewing a large volume of produced documents, and participating in numerous meetings with representatives from Jackson Walker, the U.S. Trustee's office, and various other counsel, trustees, and plan administrators similarly affected by the Jones-Freeman Relationship.[1215] Mr. Dunn explained that through his extensive review of discovery materials and active participation in the discovery process, he obtained sufficient information to analyze and evaluate 4E Brands' claims against Jackson Walker.[1216] Ultimately, Mr. Dunn had doubt as to whether 100% of the fees paid to Jackson Walker could be disgorged.[1217] From his

---

[1212] Mar. 19, 2026 Hr'g Tr. at 44.

[1213] Case No. 4:23-cv-4787, ECF No. 187, Ex. 20, ¶ 3.

[1214] Mar. 19, 2026 Hr'g Tr. at 23.

[1215] Mar. 19, 2026 Hr'g Tr. at 26.

[1216] Mar. 19, 2026 Hr'g Tr. at 26–27.

[1217] Mar. 19, 2026 Hr'g Tr. at 33.

review of the Vacatur Motion, related pleadings and discovery, Mr. Dunn concluded that the relief sought in the Vacatur Motion raised "novel facts" and "somewhat tested law" but presented "unique circumstances to be sure."[1218]

Mr. Dunn's understanding was that the amounts paid to Jackson Walker pursuant to the 4E Brands Final Fee Order were the fees and expenses encompassed in the Vacatur Motion, and that the Vacatur Motion did not address any fees paid to Jackson Walker post-confirmation.[1219] Mr. Dunn believed, based on his review of the Vacatur Motion and related pleadings and discovery, that a separate adversary proceeding would likely be required to prosecute claims related to post-confirmation fees.[1220] Nonetheless, in reviewing the likelihood of success on the merits of the underlying litigation, Mr. Dunn testified that he considered both the likelihood of succeeding in the relief sought in the Vacatur Motion, which Mr. Dunn believed was limited to fees incurred during the pendency of the bankruptcy, and the likelihood of succeeding in a separate litigation to recover post-confirmation fees.[1221]

Although the evidence demonstrates that Mr. Dunn possessed familiarity with the claims being settled on behalf of 4E Brands, and associated risks, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[1222]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to the 4E Brands Plan Agent.

---

[1218] Mar. 19, 2026 Hr'g Tr. at 33.

[1219] Mar. 19, 2026 Hr'g Tr. at 28.

[1220] Mar. 19, 2026 Hr'g Tr. at 26, 28, 33, 35.

[1221] Mar. 19, 2026 Hr'g Tr. at 32–33.

[1222] *In re MCorp Fin*., 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions accounting to 100% of the fees and expenses paid to Jackson Walker.[1223]

Although this Court will not now conduct a mini-trial of the merits of the 4E Brands Plan Agent's claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that the 4E Brands Plan Agent's recovery against Jackson Walker raises fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of a complex chapter 11 plan.[1224] A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear insight on the likely outcome of the claims or defenses. The factual underpinning of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 19, 2026 hearing, Mr. Dunn's credible testimony and his familiarity with the claims being settled, the Court finds that in

---

[1223] Case No. 4:23-cv-4787, ECF No. 187, Ex. 43 at 52, 57, 60, 94.

[1224] Case No. 4:23-cv-4787, ECF No. 187, Ex. 36.

the exercise of his business judgment, Mr. Dunn, as the plan agent for 4E Brands, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in the claims being settled and securing a judgment in an amount exceeding the $617,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the 4E Brands Settlement.

**Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay**

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the 4E Brands Settlement.[1225]

The 4E Brands Plan Agent has not filed a complaint or initiated an adversary proceeding against Jackson Walker, but through the 4E Brands Notice, the 4E Brands Plan Agent asserts indispensable party status and standing in the Vacatur Motion and joins the relief sought in the Vacatur Motion through the 4E Brands Joinder.[1226] Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the 4E Brands Settlement, the Court will consider the length, delay and costs associated with a trial on the Vacatur Motion.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[1227] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[1228] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee

---

[1225] *See In re Beach*, 731 F. App'x at 326.

[1226] Case No. 4:23-cv-4787, ECF No. 187, Exs. 6, 40.

[1227] *See* Dec. 9, 2025 Min. Entry.

[1228] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

and Jackson Walker have an equal amount of time to present their respective cases and defenses.[1229] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[1230] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[1231] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 3, 2023.[1232] Although extensive discovery has been conducted on the Vacatur Motion, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[1233] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement. As such, a trial on the merits of the Vacatur Motion would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of a trial date for the Vacatur Motion and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to the 4E Brands creditors if the 4E Brands Plans Agent was required to participate in a trial on the Vacatur Motion as compared to consummating a settlement. Finally, Mr. Dunn testified that in the exercise of his business judgment, he considered the time and costs associated with prosecuting claims against Jackson Walker to a final judgment.[1234]

---

[1229] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1230] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1231] Dec. 9, 2025 status conference (statements by the Court).

[1232] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 187, Ex. 37.

[1233] *See e.g.*, Bankr. 23-645, ECF 516.

[1234] Mar. 19, 2026 Hr'g Tr. at 33.

Thus, after considering the evidence admitted at the March 19, 2026 hearing, Mr. Dunn's credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Dunn, as the plan agent of 4E Brands, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $617,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the 4E Brands Settlement.

**Factor 3: Whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views**

Next, the Court will consider whether the 4E Brands Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[1235]

The settlement proceeds from the 4E Brands Settlement would be distributed to Holders of Class 4 General Unsecured Claims, as defined in the 4E Brands Plan (the "*4E GUC*").[1236] The 4E Brands Plan provides for a fund of $2.6 million reserved for pro rata distribution to the 4E GUC.[1237] The Modification Order clarified that any proceeds recovered from a settlement or judgment against Jackson Walker arising from the Jones-Freeman Relationship will be distributed to the 4E GUC in addition to the $2.6 million distribution fund.[1238] Additionally, although 4E Brands' parent company provided debtor-in-possession financing that was used to fund Jackson Walker's fees

---

[1235] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[1236] Mar. 19, 2026 Hr'g Tr. at 37; Case No. 4:23-cv-4787, ECF No. 187, Ex. 32 at 56, 61, Ex. 47.

[1237] Case No. 4:23-cv-4787, ECF No. 187, Ex. 31 at 28, 15.

[1238] Case No. 4:23-cv-4787, ECF No. 187, Ex. 47; Mar. 19, 2026 Hr'g Tr. at 37, 45.

and expenses, the Modification Order clarifies that the parent company is not entitled to any proceeds recovered from Jackson Walker.[1239]

The 4E GUC includes Barry Green as the wrongful death representative of the estate of Joshua Maestas and Carolina Maestas (collectively, the "*Maestas Parties*"),[1240] who previously filed an adversary action against 4E Brands seeking to revoke confirmation of the 4E Brands Plan due to the Jones-Freeman Relationship.[1241] The adversary proceeding filed by the Maestas Parties was eventually dismissed.[1242]

Mr. Dunn testified that he noticed all creditors of the filing of the 4E Brands Settlement.[1243] Other than the U.S. Trustee's objection, which has been resolved through the Global Joint Stipulation, there were no other formal or informal objections to the 4E Brands Settlement Motion. Mr. Dunn also discussed the terms of the 4E Brands Settlement and his reason for entering into the 4E Brands Settlement with the Maestas Parties' counsel.[1244] Mr. Dunn believes the 4E GUC support the 4E Brands Settlement and prefer to receive distributions from the claims against Jackson Walker in a timely manner.[1245] In his view, consummation of the settlement would allow for earlier distributions of proceeds than would be achievable through a trial on the merits.[1246] Additionally, Mr. Dunn's testimony demonstrates that the claims against Jackson Walker are the

---

[1239] Case No. 4:23-cv-4787, ECF No. 187, Ex. 47; Mar. 19, 2026 Hr'g Tr. at 18, 20, 37.

[1240] Mar. 19, 2026 Hr'g Tr. at 40.

[1241] Bankr. 23-05008, ECF No. 1; Mar. 19, 2026 Hr'g Tr. at 24.

[1242] Mar. 19, 2026 Hr'g Tr. at 24.

[1243] Mar. 19, 2026 Hr'g Tr. at 39.

[1244] Mar. 19, 2026 Hr'g Tr. at 39.

[1245] Mar. 19, 2026 Hr'g Tr. at 42–43.

[1246] Mar. 19, 2026 Hr'g Tr. at 43, 55.

final assets that would need to be administered before the 4E Brands Case and estate can be closed.[1247]

The evidence admitted at the March 19, 2026 hearing therefore demonstrates that no creditors objected to the 4E Brands Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and approval of a settlement will allow creditors of 4E Brands to be paid sooner, while reducing administrative expenses, as compared to proceeding to a trial on the merits.

Thus, after considering the evidence admitted at the March 19, 2026 hearing, Mr. Dunn's credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Dunn, as the plan agent of 4E Brands, gave due consideration to whether the 4E Brands Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

Accordingly, the Court finds that the third factor weighs in favor of approving the 4E Brands Settlement.

> **Factor 4: The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

Next, the Court will consider the extent to which the 4E Brands Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[1248]

In his role as chief restructuring officer of 4E Brands, Mr. Dunn was involved in the selection of Jackson Walker as debtor's counsel.[1249] At the time Jackson Walker was retained as bankruptcy counsel, however, no disclosure had been made to Mr. Dunn of any potential judicial conflict or of the Jones-Freeman Relationship.[1250] The first court filing Mr. Dunn reviewed with

---

[1247] Mar. 19, 2026 Hr'g Tr. at 43.

[1248] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[1249] Mar. 19, 2026 Hr'g Tr. at 13–14.

[1250] Mar. 19, 2026 Hr'g Tr. at 17.

respect to the Jones-Freeman Relationship was the Initial Vacatur Motion, which caused him great concern.[1251] In response, he sought the advice of counsel from the law firm of Bonds Ellis Eppich Schafer Jones LLP ("*Bond Ellis*"), ultimately joined the relief sought in the Vacatur Motion, and retained Bond Ellis to pursue claims against Jackson Walker.[1252] Bond Ellis was also retained to replace Jackson Walker as general post-confirmation counsel.[1253]

Mr. Dunn explained the extensive settlement process with Jackson Walker. On March 13, 2024, Mr. Dunn, through his counsel, sent a demand letter to Jackson Walker that requested the full amount of fees and expenses ($866,726.31) paid to Jackson Walker under the 4E Brands Final Fee Order.[1254] He received a written response to this first demand letter but not a specific monetary offer.[1255] On January 23, 2025, Mr. Dunn sent a second demand letter to Jackson Walker that demanded repayment of $420,758.62 in fees and expenses paid to Jackson Walker post-confirmation, in addition to the $866,726.31 previously demanded.[1256]

Following the second demand letter, Mr. Dunn engaged in preliminary settlement discussions with Jackson Walker through counsel, in which he directly participated.[1257] Mr. Dunn eventually attended an in-person mediation with Jackson Walker on March 5, 2025.[1258] The presiding mediators were Honorable W. Royal Furgeson, Jr. (Ret.) and Honorable Gary A. Feess

---

[1251] Mar. 19, 2026 Hr'g Tr. at 22.

[1252] Mar. 19, 2026 Hr'g Tr. at 22.

[1253] Mar. 19, 2026 Hr'g Tr. at 23.

[1254] Mar. 19, 2026 Hr'g Tr. at 28; Case No. 4:23-cv-4787, ECF No. 187, Ex. 41.

[1255] Mar. 19, 2026 Hr'g Tr. at 28–29.

[1256] Mar. 19, 2026 Hr'g Tr. at 29; Case No. 4:23-cv-4787, ECF No. 187, Ex. 42.

[1257] Mar. 19, 2026 Hr'g Tr. at 30.

[1258] Mar. 19, 2026 Hr'g Tr. at 30.

(Ret.).[1259] Multiple offers were exchanged by and through the mediators.[1260] Mr. Dunn ultimately agreed to the $617,000 settlement offer produced through the mediation.[1261] In agreeing to accept it, Mr. Dunn considered the mediators' views of the strength and weaknesses of the parties' respective cases.[1262] Mr. Dunn also believed that the $617,000 offer was in the range of reasonableness according to the analysis he and his counsel had conducted leading up to the mediation.[1263]

The extensive settlement negotiations and mediation between Jackson Walker and Mr. Dunn show that the 4E Brands Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 19, 2026 hearing, the Court finds that the 4E Brands Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the 4E Brands Settlement.

**Factor 5: All other factors bearing on the wisdom of the compromise**

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn: (i) whether the 4E Brands Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motion, if any, may be accepted by 4E Brands and its creditors.[1264]

    **i.    Whether the approval of the 4E Brands Settlement will negatively impact or promote the integrity of the judicial system**

---

[1259] Mar. 19, 2026 Hr'g Tr. at 30–31.

[1260] Mar. 19, 2026 Hr'g Tr. at 31.

[1261] Mar. 19, 2026 Hr'g Tr. at 31.

[1262] Mar. 19, 2026 Hr'g Tr. at 31–32.

[1263] Mar. 19, 2026 Hr'g Tr. at 32.

[1264] *See In re MCorp Fin.*, 160 B.R. at 951.

The Court will now consider whether the 4E Brands Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[1265]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the 4E Brands Settlement, would, *inter alia*, (1) circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit the 4E Brands and its creditors from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[1266] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[1267]

In considering what impact, if any, the 4E Brands Settlement could have on the Vacatur Motion, the Court will look first to the 4E Brands Settlement's plain language.[1268] Paragraph 2(b) of the 4E Brands Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Plan Agent and the bankruptcy estate of 4E Brands Northamerica LLC and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Case.[1269]

In a similar fashion, paragraph 5(a) provides in relevant part that:

> On the Effective Date, . . . the Plan Agent, on behalf of 4E Brands Northamerica LLC, hereby releases, acquits, and forever discharges [Jackson Walker] . . . from

---

[1265] *See In re Bates*, 211 B.R. at 345.

[1266] *See* Case No. 4:23-cv-04787, ECF No. 69.

[1267] Case No. 4:23-cv-04787, ECF No. 255.

[1268] *Estate of Kokernot*, 112 F.3d at 1294.

[1269] Case No. 4:23-cv-04787, ECF No. 187, Ex. 20, ¶ 2(b).

> any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes, or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Plan Agent and the estate of 4E Brands Northamerica LLC against [Jackson Walker] related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.[1270]

Although the language of paragraph 2(b) and 5(a) creates a broad release of claims, the language expressly provides that the 4E Brands Plan Agent will only release claims that 4E Brands may have against Jackson Walker.[1271] Neither paragraph 2(b) nor 5(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[1272]

Paragraph 6 of the 4E Brands Settlement provides in relevant part that:

> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Plan Agent or 4E Brands Northamerica LLC and its estate against [Jackson Walker] or any other released parties.[1273]

Like paragraphs 2(b) and 5(a), paragraph 6 of the 4E Brands Settlement references release of possible claims by 4E Brands against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[1274] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the 4E Brands Settlement. Moreover, Ms. Dunn, who signed the 4E Brands Settlement on behalf of 4E Brands, believed that the releases in the 4E Brands

---

[1270] Case No. 4:23-cv-04787, ECF No. 187, Ex. 20, ¶ 5(a).

[1271] Case No. 4:23-cv-04787, ECF No. 187, Ex. 20, ¶¶ 2(b), 5(a).

[1272] Case No. 4:23-cv-04787, ECF No. 187, Ex. 20, ¶¶ 2(b), 5(a).

[1273] Case No. 4:23-cv-04787, ECF No. 187, Ex. 20, ¶ 6.

[1274] Case No. 4:23-cv-04787, ECF No. 187, Ex. 20, ¶¶ 2(b), 5(a), 6.

Settlement only apply to estate claims.[1275] Thus, the Court finds that the 4E Brands Settlement only provides for the release of any claims 4E Brands may have against Jackson Walker and does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the 4E Brands Settlement.

Jackson Walker contends that the Vacatur Motion asserts estate claims, such as claims held by 4E Brands, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[1276] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the 4E Brands Plan Agent all "acknowledge and agree" that the 4E Brands Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motion.[1277]

There is no language in the 4E Brands Settlement that expressly states whether the Vacatur Motion asserts estate claims. In any event, the 4E Brands Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[1278] Thus, the Court finds that the 4E Brands Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by 4E Brands, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally, in the Global Joint Stipulation, Jackson Walker stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson

---

[1275] Mar. 19, 2026 Hr'g Tr. at 35.

[1276] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[1277] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[1278] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

Walker."[1279] Therefore, the Court finds that the 4E Brands Settlement does not preclude the 4E Brands Plan Agent from accepting funds in addition to the $617,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the 4E Brands Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the 4E Brands Settlement and Global Joint Stipulation, the Court finds that the 4E Brands Settlement: (i) only released any claims 4E Brands has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the 4E Brands Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by 4E Brands, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude the 4E Brands Plan Agent from accepting funds in addition to the $617,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the 4E Brands Settlement.

---

[1279] Case No. 4:23-cv-04787, ECF No. 255 at 2.

### ii.    Consideration of the collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[1280]  At the March 19, 2026 hearing, no evidence was offered to demonstrate that any investigation was conducted as to the collectability of a judgment against Jackson Walker.

Because there is no evidence that Mr. Dunn investigated the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the 4E Brands Settlement.

### iii.    Whether 4E Brands may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment

On March 20, 2026, the Court, *sua sponte*, entered its order for post-trial briefing[1281] where the Court directed the 4E Brands Plan Agent and other parties to address the following questions posed by the Court, to wit:

a. In the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker LLP is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; and

b. If the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of the [4E Brands Plan Agent] to the disposition of funds upon wind-down and closure, including where such funds would be distributed.[1282]

On April 10, 2026, the 4E Brands Plan Agent filed his "Post-Hearing Brief Of David Dunn, Plan Agent Of 4e Brands Northamerica LLC, Addressing The Issues Set Forth In The Order Entered

---

[1280] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[1281] Case No. 4:23-cv-04787, ECF No 254.

[1282] Case No. 4:23-cv-04787, ECF No 266.

March 20, 2026" (the "*4E Brands Brief*").[1283] On April 17, 2026, the U.S. Trustee filed his Post-Hearing Reply Brief.[1284] In the 4E Brands Brief, the 4E Brands Plan Agent asserts that the 4E Brand Plan Agent can accept additional sanctions or disgorgement for distributions to the 4E GUC whether the 4E Brands Case remains open, is closed or is reopened.[1285]

A party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[1286] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[1287] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[1288] Further, Bankruptcy Rule 5010 provides that the court may reopen a case upon a motion filed by the debtor or another party in interest.[1289] Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[1290] There is no pending motion to close or reopen the 4E Brands Case. As explained *supra*, the 4E Brands Settlement does not impact the ability of the 4E Plans Agent to receive any additional funds that the Court may potentially order Jackson Walker to pay.[1291] Moreover, there

---

[1283] Case No. 4:23-cv-04787, ECF No 276.

[1284] Case No. 4:23-cv-04787, ECF No 282.

[1285] Case No. 4:23-cv-04787, ECF No 276 at 3.

[1286] *See In re JCP Props*., 540 B.R. at 605; *In re Lager*, 2024 Bankr. LEXIS 1974, at *7.

[1287] Fed. R. Bankr. P. 3022.

[1288] 11 U.S.C. § 350(b).

[1289] Fed. R. Bankr. P. 5010.

[1290] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

[1291] *See supra* Section I.D.c.9.c.5.i.

is nothing in the 4E Brands Settlement that prevents the 4E Plans Agent from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

Thus, after a careful review of the 4E Brands Brief, and the assertions made therein, the Court finds it unnecessary, as of this moment, to consider whether the bankruptcy estate would need to be closed or reopened for the 4E Brands Plan Agent to receive and distribute any additional funds ordered by the Court in excess of the $617,000 settlement.

However, the Court's finding that the 4E Brands Settlement neither affects the 4E Brands Plan Agent's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $617,000 settlement, nor prevents the 4E Brands Plan Agent from filing a motion for a final decree or to re-open the 4E Brands Case as he deems appropriate, supports approval of the 4E Brands Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the 4E Brands Settlement be approved

Jackson Walker and the 4E Brands Plan Agent have agreed to a $617,000 settlement.[1292] If the 4E Brands Plan Agent were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $1,539,966.30, consisting of $866,726.31 paid to Jackson Walker for services performed during the pendency of the 4E Brands Case, $420,758.62 paid to Jackson Walker for post-confirmation services, and the $252,481.37 paid to counsel representing the 4E Brands Plan Agent in connection with the Miscellaneous Proceeding and related matters up to February 2026.[1293] Acceptance of the settlement amount of $617,000 less fees incurred by the 4E Brands Plan Agent to pursue litigation against Jackson Walker, totaling at least $252,481.37, would result in net proceeds of

---

[1292] Case No. 4:23-cv-4787, ECF No. 187, Ex. 20, ¶ 3.

[1293] Case No. 4:23-cv-4787, ECF No. 187, Ex. 35; Mar. 19, 2026 Hr'g Tr at 44, 19–20; ECF No. 220, Ex. 1 at 4, ¶ 25.

approximately $364,518.63 to the 4E Brands and its creditors pursuant to the 4E Brands Settlement.

After considering Mr. Dunn's credible testimony, the evidence now in the record, including the 4E Brands Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgment, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement approval and that in the exercise of his business judgment, Mr. Dunn, the plan agent of 4E Brands gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating claims in the Vacatur Motion and securing a judgment in an amount exceeding the $617,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $617,000 settlement amount; gave due consideration to whether the 4E Brands Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the 4E Brands Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the 4E Brands Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the 4E Brands Settlement: (i) only released any claims 4E Brands has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the 4E Brands Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the 4E Brands, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude 4E Brands and its creditors from accepting funds in addition to

the $617,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the 4E Brands Settlement that prevents the 4E Plans Agent from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

The Court further finds that the 4E Brands Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[1294] because although the proposed settlement amount of $617,000 to be paid to the 4E Brands Plan Agent by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $1,539,966.30, as stated *supra*, representing both the fees paid to Jackson Walker and the subsequent costs paid to the 4E Brands Plan Agent's counsel for pursuing claims against Jackson Walker, the proposed settlement amount of $617,000 constitutes approximately 71% of the total amount of fees and expenses ($866,726.31) paid to Jackson Walker in connection with services performed for the 4E Brands Case before the 4E Brands Plan's effective date, and the 4E Brands Settlement could allow the creditors of 4E Brands to receive distributions without the expense and delay associated with a trial on the merits.

Finally, even though final approval of the 4E Brands Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the 4E Brands Plan Agent and 4E Brands have a continuing obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

---

[1294] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[1295] and Bankruptcy Rule 9033, the Court recommends approval of the 4E Brands Settlement.[1296]

### 10. 21-90002 – The Basic Energy Settlement

#### a. Background

On August 17, 2021, Basic Energy Services, Inc. and certain of its affiliates (the "*Basic Energy Debtors*") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, initiating Case No. 21-90002 (the "*Basic Energy Case*").[1297] Former Judge Jones presided over the Basic Energy Case until October 13, 2023.[1298]

On December 13, 2021, the Basic Energy Debtors filed their "Application for Entry of an Order Authorizing the Retention and Employment of Jackson Walker LLP as Counsel to the Debtors" (the "*Basic Energy Retention Application*").[1299] On January 19, 2022, the Basic Energy Retention Application was approved by Former Judge Jones.[1300] On January 31, 2022, Jackson Walker filed an application on behalf of the Basic Energy Debtors to employ Mr. Dunn as wind-down director of the Basic Energy Debtors.[1301] On March 7, 2022, Former Judge Jones entered an order approving Mr. Dunn as wind-down director.[1302] On August 9, 2022, the Basic Energy

---

[1295] 564 U.S. 462, 480 (2011).

[1296] Case No. 4:23-cv-4787, ECF No. 187, Ex. 20; ECF No. 210, Ex. 1.

[1297] Case No. 4:23-cv-4787, ECF No. 191, Ex. 25.

[1298] Bankr. 21-90002, Oct. 3, 2023 Docket Entry.

[1299] Case No. 4:23-cv-4787, ECF No. 191, Ex. 27.

[1300] Case No. 4:23-cv-4787, ECF No. 191, Ex. 28.

[1301] Bankr. 21-90002, ECF No. 1038.

[1302] Bankr. 21-90002, ECF No. 1109.

Debtors filed their amended chapter 11 plan of liquidation (the "*Basic Energy Plan*").[1303] On August 9, 2022, Former Judge Jones entered an order confirming the Basic Energy Plan.[1304] On August 26, 2022, the Basic Energy Plan became effective.[1305] Pursuant to the Basic Energy Plan, upon the effective date, Mr. Dunn was appointed as the liquidation trustee of the Basic Energy Liquidation Trust.[1306] Upon his appointment as liquidation trustee, Mr. Dunn retained Jackson Walker to provide post-confirmation services with respect to administration of the Basic Energy Liquidation Trust.[1307]

On September 2, 2022, Jackson Walker filed its "First and Final Fee Application for Allowance and Payment of Fees and Expenses as Counsel to the Debtors for the Period from November 10, 2021 through August 9, 2022" (the "*Basic Energy Final Fee Application*").[1308] On September 29, 2022, the Basic Energy Fee Application was approved by Former Judge Jones, awarding compensation and reimbursement of expenses in the amount of $1,543,432.34 to Jackson Walker (the "*Basic Energy Final Fee Order*").[1309] On November 3, 2023, the U.S. Trustee filed his Initial Vacatur Motion in the Basic Energy Case.[1310] On December 9, 2023, Chief Bankruptcy Judge Rodriguez commenced the Miscellaneous Proceeding.[1311] The Basic Energy Trustee paid Jackson Walker approximately $395,775 for post-confirmation attorneys' fees and expenses.[1312]

---

[1303] Case No. 4:23-cv-4787, ECF No. 191, Ex. 29.

[1304] Case No. 4:23-cv-4787, ECF No. 191, Ex. 30.

[1305] Case No. 4:23-cv-4787, ECF No. 191, Ex. 31.

[1306] Case No. 4:23-cv-4787, ECF No. 191, Ex. 30 at 69.

[1307] Case No. 4:23-cv-4787, ECF No. 221, Ex. 1 at 3, ¶ 13.

[1308] Case No. 4:23-cv-4787, ECF No. 191, Ex. 32.

[1309] Case No. 4:23-cv-4787, ECF No. 191, Ex. 33.

[1310] Case No. 4:23-cv-4787, ECF No. 191, Ex. 34.

[1311] Bankr. 23-645, ECF No. 1.

[1312] Case No. 4:23-cv-4787, ECF No. 221 Ex. 1 at 5, ¶ 23.

On February 28, 2024, the Basic Energy Trustee filed his joinder to the relief sought in Initial Vacatur Motion (the "*Basic Energy Joinder*").[1313] The next day, on February 29, 2024, the U.S. Trustee filed the Vacatur Motion in the Basic Energy Case.[1314] On April 12, 2024, the Basic Energy Trustee filed his "Notice of Standing and Indispensable Party" (the "*Basic Energy Notice*"), asserting that he is an indispensable party with standing with respect to any proceeding seeking the return of compensation paid to Jackson Walker and any related matters.[1315]

On April 4, 2025, the Basic Energy Trustee filed the instant Basic Energy Settlement Motion,[1316] which attached a settlement agreement (the "*Basic Energy Settlement*") that contemplates a single payment from Jackson Walker in the total sum of $783,000 to the Basic Energy Trust.[1317] On March 4, 2026, the Basic Energy Trustee and Jackson Walker entered into an amendment of the Basic Energy Settlement (the "*Basic Energy Settlement Amendment*").[1318]

### b. The March 19, 2026 Hearing

For the Basic Energy Settlement Motion hearing held on Thursday, March 19, 2026 before Chief Bankruptcy Judge Rodriguez, the following appearances were entered, to wit: for Jackson Walker, Jason Boland, Julie Harrison, Maria Mokryzycka, Rusty Hardin, Emily Smith, and Jackson Walker's General Counsel Williams Jenkins; for the U.S. Trustee, Laura Steele, Joel Charboneau, Brian Thill, Vianey Garza, and Millie Sall, along with the United States Trustee Kevin Epstein; and on behalf of the Basic Energy Trustee, Ken Green and Aaron Guerrero, with David Dunn present.

---

[1313] Case No. 4:23-cv-4787, ECF No. 191, Ex. 36.

[1314] Case No. 4:23-cv-4787, ECF No. 191, Ex. 35.

[1315] Case No. 4:23-cv-4787, ECF No. 191, Ex. 47

[1316] Bankr. 21-90002, ECF No. 1884.

[1317] Case No. 4:23-cv-4787, ECF No. 191, Ex. 16.

[1318] Case No. 4:23-cv-4787, ECF No. 211, Ex. 1.

### i.    Evidence admitted

### a.  For the Basic Energy Trustee

Pursuant to a joint stipulation[1319] dated March 10, 2026, the following exhibits were either admitted into evidence or were noticed under FRE 201 at the March 19, 2026 hearing:

i.      Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 22, 23 and 24 were admitted

ii.     The Court took judicial notice under FRE 201 of Exhibit 25

iii.    Exhibit 26 was admitted

iv.     The Court took judicial notice under FRE 201 of Exhibit 27

v.      Exhibit 28 was admitted

vi.     The Court took judicial notice under FRE 201 of Exhibit 29

vii.    Exhibit 30 was admitted

viii.   The Court took judicial notice under FRE 201 of Exhibits 31 and 32

ix.     Exhibit 33 was admitted

x.      The Court took judicial notice under FRE 201 of Exhibits 34, 35, 36, 37 and 38

xi.     Exhibits 39 and 40 were admitted

xii.    The Court took judicial notice under FRE 201 of Exhibits 41, 42, 43 and 45

xiii.   Exhibit 46 was admitted

xiv.    The Court took judicial notice under FRE 201 of Exhibits 47

The exhibit at ECF No. 211 was admitted as follows:

i.      Exhibit 1 was admitted

### b.  For the U.S. Trustee

---

[1319] Case No. 4:23-cv-4787, ECF No. 221, Ex. 2 referring to the Basic Energy Trustee exhibits filed at ECF No. 191.

The following excerpts of the David Dunn deposition taken on February 11, 2026,[1320] were admitted into evidence:

i.      No. 1: Deposition Page No. 13, Line 6 – Page No. 13, Line 10

ii.     No. 2: Deposition Page No. 16, Line 18 – Page No. 17, Line 19

iii.    No. 3: Deposition Page No. 19, Line 17 – Page No. 21, Line 7

iv.     No. 4: Deposition Page No. 21, Line 8 – Page No. 21, Line 12

v.      No. 5: Deposition Page No. 23, Line 2 – Page No. 23, Line 19

vi.     No. 6: Deposition Page No. 25, Line 15 – Page No. 25, Line 17

vii.    No. 7: Deposition Page No. 26, Line 8 – Page No. 26, Line 19

viii.   No. 8: Deposition Page No. 28, Line 13 – Page No. 28, Line 21

ix.     No. 9: Deposition Page No. 29, Line 9 – Page No. 29, Line 18

x.      No. 10: Deposition Page No. 29, Line 25 – Page No. 30, Line 12

xi.     No. 11: Deposition Page No. 32, Line 1 – Page No. 32, Line 9

xii.    No. 12: Deposition Page No. 39, Line 1 – Page No. 39, Line 13

xiii.   No. 13: Deposition Page No. 41, Line 11 – Page No. 41, Line 23

### ii.      Credibility of witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[1321] At the March 19, 2026 hearing, the Court heard testimony from Mr. Dunn, the liquidation trustee of the Basic Energy Trust.[1322] Mr. Dunn was a restructuring attorney for approximately 10 years at several prominent law firms.[1323] Following his career as a corporate restructuring attorney, Mr. Dunn joined the

---

[1320] Case No. 4:23-cv-4787, ECF No. 199, Ex. 9, referring to the U.S. Trustee's exhibit at ECF No. 196, Ex. 10.

[1321] *In re Burg*, 641 B.R. at 128; *In re Bigler LP*, 458 B.R. at 367 (citing *Port Arthur Towing Co.*, 42 F.3d at 318).

[1322] Mar. 19, 2026 Hr'g Tr. at 60.

[1323] Mar. 19, 2026 Hr'g Tr. at 9, 60–61.

Province Firm where he is currently in his sixth year of tenure.[1324] In his role at Province Firm, Mr. Dunn has handled a broad range of engagements, with particular emphasis on fiduciary matters. Specifically, he has been involved in more than 20 fiduciary engagements, encompassing wind-down engagements, trustee engagements, plan administrator roles, and plan agent engagements, including the present matter.[1325] Mr. Dunn testified to his substantial experience in plan administration, stating that he has handled litigation claims of all types, both historically and currently, with an aggregate value of several billion dollars.[1326] His experience encompasses the settlement and litigation of fiduciary duty, directors and officers, and professional liability claims, including legal malpractice matters.[1327] Mr. Dunn was appointed as the wind-down director of the Basic Energy Debtors but is now the trustee of the Basic Energy Trust.[1328] According to Mr. Dunn, his roles as wind-down director and liquidation trustee are substantially the same.[1329]

At the hearing, Mr. Dunn responded to questions clearly, competently, and directly.[1330] Thus, the Court finds that Mr. Dunn is a credible witness and gives substantial weight to his testimony.

### iii.    Terms of the Basic Energy Settlement[1331]

The Basic Energy Settlement, as revised by the Basic Energy Settlement Amendment,[1332] provides, among other things:

---

[1324] Mar. 19, 2026 Hr'g Tr. at 9.

[1325] Mar. 19, 2026 Hr'g Tr. at 9.

[1326] Mar. 19, 2026 Hr'g Tr. at 10.

[1327] Mar. 19, 2026 Hr'g Tr. at 10.

[1328] Mar. 19, 2026 Hr'g Tr. at 63, 67.

[1329] Mar. 19, 2026 Hr'g Tr. at 67.

[1330] *See, e.g.*, *In re Ali*, 2015 Bankr. LEXIS 2443, at *4.

[1331] Case No. 4:23-cv-4787, ECF No. 191, Ex. 16.

[1332] Case No. 4:23-cv-4787, ECF No. 211, Ex. 1 (among other things, deleting paragraph 4 of the Basic Energy

2(b) <u>Effective Date.</u> With respect to the forgoing paragraph, the Parties will in good faith exercise all reasonable efforts required of such Party to obtain the entry of the Approval Order, including executing and delivering any motions, declarations, testimony, or other items of support reasonably required in connection therewith, and attending any related hearings. Consistent with the preceding sentences, the Liquidation Trustee will promptly prepare a motion to approve compromise of controversy pursuant to Federal Rule of Bankruptcy Procedure 9019 or such other applicable rule(s) as may be applicable (the "Settlement Motion"). Before the Settlement Motion is filed, JW will be given an opportunity to review and comment on the Settlement Motion. The Settlement Motion and related Approval Order shall be in form and substance acceptable to both Parties. For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Liquidation Trustee and the bankruptcy estates of Basic Energy Servies, Inc. and its affiliated debtors and JW, including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Case, that this Agreement is fair, reasonable, and equitable pursuant to the requirements established under Rule 9019 of the Bankruptcy Rules.

3. <u>Settlement Payment.</u> No later than one (3) business days after the Effective Date, JW shall pay or cause to be paid to the Basic Energy Liquidation Trust (receipt of which shall be promptly confirmed by the Liquidation Trustee) the sum of $783,000.00 (the "Settlement Payment").

5(a) <u>Mutual Releases</u>. *Release in Favor of JW.* On the Effective Date, and for the consideration described herein, and except for those obligations created by or arising out of this Agreement, the Liquidation Trustee, on behalf of the Basic Energy Liquidation Trust, hereby releases, acquits, and forever discharges JW and its respective predecessors in interest, successors, affiliates, directors, officers, employees, agents, heirs, executors, representatives, insurers, reinsurers attorneys, partners, associates, staff members, and assigns from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations, claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, whether arising in contract, in tort, by statute. at law, in equity, or otherwise, and whether fixed or contingent, liquidated or unliquidated, known or unknown, concealed or revealed, discovered or undiscovered, actual or potential, direct or indirect, material or immaterial, disputed or undisputed, arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or

---

Settlement).

arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Basic Energy Liquidation Trust and the estates of Basic Energy Services, Inc. and its affiliated debtors against JW related to any breach of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.

6 <u>Bar.</u> The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Liquidation Trustee or the estates of Basic Energy Services Inc. and its affiliated debtors against JW or any other released parties, except that this Agreement may not be pleaded as a bar to any claims or causes of action that arise in connection with performance, non-performance and/or breach of this Agreement.

### c.  Application of the *Jackson Brewing* Factors to the Basic Energy Settlement

The Court will next review the Basic Energy Settlement in accordance with the *Jackson Brewing* Factors.

### Factor 1: Probability of success in the litigation, with due consideration for the uncertainty in fact and law

The Court will now consider the probability of the Basic Energy Trustee's success in the litigation, with due consideration for the uncertainty in fact and law.[1333]

The Vacatur Motion seeks disgorgement of all legal fees paid to Jackson Walker in connection with the Basic Energy Case.[1334] Through the Basic Energy Notice, the Basic Energy Trustee asserts indispensable party status and standing in the Vacatur Motion and joins the relief sought in the Vacatur Motion through the Basic Energy Joinder.[1335] The Basic Energy Settlement provides a broad release from the Basic Energy Trust in favor of Jackson Walker for all potential

---

[1333] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[1334] Case No. 4:23-cv-4787, ECF No. 191, Ex. 35.

[1335] Case No. 4:23-cv-4787, ECF No. 191, Exs. 36, 47.

claims that the Basic Energy Trust has or may have relating to the Jones-Freeman Relationship.[1336] As such, when considering the probability of the Basic Energy Trustee's success in the litigation, the Court must consider the likelihood of success on the merits of the Vacatur Motion because the claims being settled by Basic Energy Trustee are based on the same factual underpinnings as the relief being sought in the Vacatur Motion.

In connection with the Basic Energy Case, Jackson Walker was paid a total of approximately $1,939,207.34 consisting of $1,543,432.34 under the Basic Energy Final Fee Order,[1337] and approximately $395,775 for post-confirmation services representing the Basic Energy Trustee.[1338] Following the emergence of claims against Jackson Walker, the Basic Energy Trustee incurred $153,929.83 in fees and costs to counsel representing the 4E Brands Plan Agent in connection with the Miscellaneous Proceeding and related matters up until February 2026.[1339]

Thus, if the Basic Energy Trustee pursued all potential claims against Jackson Walker related to the Jones-Freeman Relationship through a final trial, the potential maximum recovery of legal fees would likely equal approximately $2,093,137.17, representing the amounts paid to Jackson Walker for pre-confirmation and post-confirmation work performed in connection with the Basic Energy Case and amounts paid to the Basic Energy Trustee's counsel in connection with the Jackson Walker fee dispute. In contrast, under the Basic Energy Settlement, Jackson Walker would be required to pay $783,000 to the Basic Energy Trust.[1340]

---

[1336] Case No. 4:23-cv-4787, ECF No. 191, Ex. 16, ¶ 5(a).

[1337] Case No. 4:23-cv-4787, ECF No. 191, Ex. 33.

[1338] Case No. 4:23-cv-4787, ECF No. 221, Ex. 1 at 5, ¶ 23; Mar. 19, 2026 Hr'g Tr. at 75.

[1339] Mar. 19, 2026 Hr'g Tr. at 71–73, 87.

[1340] Case No. 4:23-cv-4787, ECF No. 191, Ex. 16, ¶ 3.

Mr. Dunn testified that he reviewed and analyzed the Vacatur Motion and carefully considered the facts alleged in it and the relief sought.[1341] Mr. Dunn was also extensively involved in the discovery process in the Miscellaneous Proceeding, including attending depositions in person, reviewing a large volume of produced documents, and participating in numerous meetings with representatives from Jackson Walker, the U.S. Trustee's office, and various other counsel, trustees, and plan administrators similarly affected by the Jones-Freeman Relationship.[1342] Mr. Dunn explained that through his extensive review of discovery materials and active participation in the discovery process, he obtained sufficient information to analyze and evaluate the estates' claims against Jackson Walker, as well as Jackson Walker's defenses.[1343] Mr. Dunn believed he had achieved an informed view of whether the $783,000 settlement amount accurately reflected the value of the claims against Jackson Walker, having considered, among other things, the probability of success on what he regarded as novel issues.[1344]

Mr. Dunn believed, based on his review of the Vacatur Motion and his prior experience administering causes of action, that a separate adversary proceeding would likely be required to prosecute claims related to post-confirmation fees.[1345] Nonetheless, in reviewing the likelihood of success on the merits of the underlying litigation, Mr. Dunn testified that he considered both the likelihood of succeeding in the relief sought in the Vacatur Motion, which Mr. Dunn believed was limited to fees incurred during the pendency of the bankruptcy, and the likelihood of succeeding in a separate litigation to recover post-confirmation fees.[1346]

---

[1341] Mar. 19, 2026 Hr'g Tr. at 70–71.

[1342] Mar. 19, 2026 Hr'g Tr. at 73–74.

[1343] Mar. 19, 2026 Hr'g Tr. at 74.

[1344] Mar. 19, 2026 Hr'g Tr. at 75.

[1345] Mar. 19, 2026 Hr'g Tr. at 77, 75.

[1346] Mar. 19, 2026 Hr'g Tr. at 77, 75.

Although the evidence demonstrates that Mr. Dunn possessed familiarity with the claims being settled on behalf of the Basic Energy Trust, and associated risks, the Court "must make an independent, thorough examination of the rewards gained in settling the claim and the potential benefits lost to the estate in ending the litigation."[1347]

Jackson Walker's response to the Vacatur Motion raised several defenses that, if successful, would defeat or limit Jackson Walker's potential liability to the Basic Energy Trust. For example, Jackson Walker's response to the Vacatur Motion includes the following defenses: (1) Jackson Walker did not violate the Bankruptcy Code, Bankruptcy Rules, or the Texas Disciplinary Rules of Professional Conduct because Jackson Walker was disinterested and did not hold or represent an adverse interest; (2) the relief sought in the Vacatur Motion is limited by the applicable plans of reorganization; and (3) the unprecedented facts, mitigating circumstances, and overall equities do not warrant sanctions amounting to 100% of the fees and expenses paid to Jackson Walker.[1348]

Although this Court will not now conduct a mini-trial of the merits of the Basic Energy Trust's claims, it is clear from a canvassing of the Vacatur Motion, related pleadings, and the allegations therein, that the Basic Energy Trustee's recovery against Jackson Walker raises fact-intensive issues regarding the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and legal issues regarding Jackson Walker's disclosure duties, and involves interpretation of a complex chapter 11 plan.[1349] A brief review of the foregoing, along with relevant authority, compels the conclusion that there is significant uncertainty in fact and law regarding the outcome of the underlying litigation. No rulings have been made in this proceeding that bear

---

[1347] *In re MCorp Fin.*, 160 B.R. at 950 (citing *TMT Trailer*, 390 U.S. at 434).

[1348] Case No. 4:23-cv-4787, ECF No. 191, Ex. 41 at 52, 57, 60, 94.

[1349] Case No. 4:23-cv-4787, ECF No. 191, Ex. 35.

insight on the likely outcome of the claims or defenses. The factual underpinning of the claims being settled—the Jones-Freeman Relationship that potentially affected 33 complex bankruptcy cases over multiple years—are unprecedented and there is no binding opinion on all fours with the instant facts.

Accordingly, after considering the evidence admitted at the March 19, 2026 hearing, Mr. Dunn's credible testimony and his familiarity with the claims being settled, the Court finds that in the exercise of his business judgment, Mr. Dunn, as the liquidation trustee of the Basic Energy Trust, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in the claims being settled and securing a judgment in an amount exceeding the $783,000 settlement amount. Therefore, the Court finds that the first factor weighs in favor of approving the Basic Energy Settlement.

### Factor 2: Complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay

The Court will now consider the complexity, likely duration of the litigation, and any attendant expense, inconvenience or delay associated with proceeding to trial as compared to consummating the Basic Energy Settlement.[1350]

The Basic Energy Trustee has not filed a complaint or initiated an adversary proceeding against Jackson Walker, but through the Basic Energy Notice, the Basic Energy Trustee asserts indispensable party status and standing in the Vacatur Motion and joins the relief sought in the Vacatur Motion through the Basic Energy Joinder.[1351] Because the factual underpinnings of the Vacatur Motion are the same as the claims being settled under the Basic Energy Settlement, the Court will consider the length, delay and costs associated with a trial on the Vacatur Motion.

---

[1350] *See In re Beach*, 731 F. App'x at 326.

[1351] Case No. 4:23-cv-4787, ECF No. 191, Exs. 36, 47.

As to a trial on the instant Vacatur Motion, although this Court has not conducted a pre-trial conference to determine the length of the trial on the entirety of the Vacatur Motions,[1352] the U.S. Trustee estimated at a December 9, 2025 status conference that 15 days may be needed to put on his evidence.[1353] At that same conference, Jackson Walker represented that over 20 days of evidence and witness testimony would likely be needed and requested that both the U.S. Trustee and Jackson Walker have an equal amount of time to present their respective cases and defenses.[1354] Jackson Walker also estimated that a trial on the Vacatur Motions would likely involve approximately 40 witnesses.[1355] As this Court stated at the December 9, 2025 status conference, it will provide each of the parties ample time to present their cases and defenses.[1356] Neither a trial date nor a pre-trial conference date has been set, notwithstanding that some of the Initial Vacatur Motions were filed over two years ago on November 3, 2023.[1357] Although extensive discovery has been conducted on the Vacatur Motions, the Court has yet to make any findings of fact or law that bear on the key issues in the underlying claims in this case.[1358] Moreover, the extent and timing of Jackson Walker's knowledge of the Jones-Freeman Relationship and its attendant disclosure obligations to the Court present disputed, fact-intensive issues, along with legal questions concerning the effect that vacatur of any retention and fee orders would have on any disgorgement. As such, a trial on the merits of the Vacatur Motion would be very lengthy and likely incur significant expenses for the parties involved. Because of the lack of

---

[1352] *See* Dec. 9, 2025 Min. Entry.

[1353] *See* ECF No. 130 at 4; Dec. 9, 2025 status conference (statements by U.S. Trustee's counsel).

[1354] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1355] Dec. 9, 2025 status conference (statements by Jackson Walker's counsel).

[1356] Dec. 9, 2025 status conference (statements by the Court).

[1357] *See e.g.*, Case No. 4:23-cv-4787, ECF No. 191, Ex. 34.

[1358] *See e.g.*, Bankr. 23-645, ECF 516.

a trial date for the Vacatur Motion and the complexity and expenses that would be involved in such a trial, there would be significant delays in any potential payments to the Basic Energy Trust beneficiaries if the Basic Energy Trustee was required to participate in a trial on the Vacatur Motion as compared to consummating a settlement. Finally, Mr. Dunn testified that in the exercise of his business judgment, he considered the time and costs associated with prosecuting claims against Jackson Walker to a final judgment.[1359]

Thus, after considering the evidence admitted at the March 19, 2026 hearing, Mr. Dunn's credible testimony, and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Dunn, as the liquidation trustee of the Basic Energy Trust, gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $783,000 settlement amount.

Accordingly, the Court finds that the second factor weighs in favor of approving the Basic Energy Settlement.

### Factor 3: whether the compromise serves the paramount interest of creditors with proper deference to their reasonable views

Next, the Court will consider whether the Basic Energy Settlement serves the paramount interest of creditors, with proper deference to their reasonable views.[1360]

As demonstrated by Mr. Dunn's testimony, there are three other litigation claims, unrelated to Jackson Walker, held by the Basic Energy Trust that constitute significant trust assets and still need to be liquidated, litigated, or collected (the "*Litigation Assets*").[1361] Additionally, there are

---

[1359] Mar. 19, 2026 Hr'g Tr. at 77.

[1360] *In re Cajun Elec. Power Coop.*, 119 F.3d at 358.

[1361] Mar. 19, 2026 Hr'g Tr. at 82–83.

priority unsecured claims against the Basic Energy Trust that are disputed and unreconciled.[1362] Priority unsecured claims have priority in distributions from the settlement proceeds and Litigation Assets, with general unsecured creditors next in the distribution waterfall.[1363] Mr. Dunn testified that the amount of the disputed priority unsecured claims remains uncertain pending reconciliation, and that the value of the Litigation Assets remains uncertain pending liquidation.[1364] Thus, whether the $783,000 settlement proceeds are distributed to priority unsecured creditors or general unsecured creditors will depend on two presently unresolved factors: the outcome of the pending priority unsecured claims disputes and the amount available for distribution from the Litigation Assets.[1365] In any event, Mr. Dunn's testimony and the Basic Energy Plan show that the $783,000 settlement proceeds would be distributed to either priority unsecured creditors or general unsecured creditors, depending on the outcome of the pending claims disputes and litigation.[1366]

On August 9, 2022, the Basic Energy Trustee filed a plan supplement with a final version of the liquidation trustee agreement (the "*Basic Energy Trust Agreement*").[1367] The Basic Energy Trust Agreement required the Basic Energy Trustee to obtain prior consent of the oversight committee of the Basic Energy Trust (the "*Trust Committee*") before settling a cause of action in which more than $1 million in damages is sought.[1368] The Basic Energy Trust Agreement also sets forth the procedures required to properly obtain consent from the Trust Committee.[1369] The

---

[1362] Mar. 19, 2026 Hr'g Tr. at 88–89.

[1363] Mar. 19, 2026 Hr'g Tr. at 88, 90.

[1364] Mar. 19, 2026 Hr'g Tr. at 83–84, 87–88.

[1365] Mar. 19, 2026 Hr'g Tr. at 88–90.

[1366] Mar. 19, 2026 Hr'g Tr. at 87–90; Case No. 4:23-cv-4787, ECF No. 191, Ex. 29 at 31–37.

[1367] Case No. 4:23-cv-4787, ECF No. 191, Ex. 45; Mar. 19, 2026 Hr'g Tr. at 78.

[1368] Case No. 4:23-cv-4787, ECF No. 191, Ex. 45 at 31, ¶ 11.4

[1369] Case No. 4:23-cv-4787, ECF No. 191, Ex. 45; Mar. 19, 2026 Hr'g Tr. at 78.

members of the Trust Committee included representatives of secured noteholders, creditor committee members and others representatives appointed by the creditor committee.[1370]

Mr. Dunn explained that he engaged in a fulsome discussion with the Trust Committee regarding the terms of the Basic Energy Settlement and the strength and weaknesses of the claims being settled.[1371] Mr. Dunn testified that he followed the specific process set forth in the Basic Energy Trust Agreement to obtain consent from the Trustee Committee to settle, and that the Trustee Committee's approval was unanimous.[1372] This unanimous support was a key factor in Mr. Dunn's decision to accept the $783,000 settlement amount.[1373] Other than the U.S. Trustee's objection, which has been resolved through the Global Joint Stipulation, there were no other formal or informal objections to the Basic Energy Settlement Motion.

The evidence admitted at the March 19, 2026 hearing therefore demonstrates that no creditors objected to the Basic Energy Settlement Motion, the sole objection by the U.S. Trustee has been resolved, and that the Trust Committee unanimously supported the settlement after being fully informed of its terms.

Thus, after considering the evidence admitted at the March 19, 2026 hearing, Mr. Dunn's credible testimony and his familiarity with the claims he is settling, the Court finds that in the exercise of his business judgment, Mr. Dunn, as liquidation trustee of the Basic Energy Trust, gave due consideration to whether the Basic Energy Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views.

---

[1370] Mar. 19, 2026 Hr'g Tr. at 78–79.

[1371] Mar. 19, 2026 Hr'g Tr. at 79.

[1372] Mar. 19, 2026 Hr'g Tr. at 79–80.

[1373] Mar. 19, 2026 Hr'g Tr. at 80.

Accordingly, the Court finds that the third factor weighs in favor of approving the Basic Energy Settlement.

**Factor 4:** **The extent to which the settlement is truly the product of arm's-length bargaining and not of fraud or collusion**

Next, the Court will consider the extent to which the Basic Energy Settlement is truly the product of arm's-length bargaining and not fraud or collusion.[1374]

Jackson Walker was non-lead debtor's counsel in the Basic Energy Case when Mr. Dunn was appointed as wind-down director.[1375] Mr. Dunn subsequently filed the Basic Energy Retention Application to employ Jackson Walker as lead debtor's counsel.[1376] At the time Jackson Walker was retained as lead bankruptcy counsel, however, no disclosure had been made to Mr. Dunn of any potential judicial conflict or the Jones-Freeman Relationship.[1377] Nor was there any such disclosure to Mr. Dunn at the time the Basic Energy Final Fee Application was filed.[1378]

Mr. Dunn became concerned when he first reviewed the Initial Vacatur Motion given that it was filed in a case in which he served as liquidation trustee.[1379] In response, he sought the advice of counsel from the law firm of Bond Ellis, ultimately joined the relief sought in the Vacatur Motion, and retained Bond Ellis to pursue claims against Jackson Walker [1380] Bond Ellis was also retained to replace Jackson Walker as general post-confirmation counsel.[1381]

---

[1374] *See In re Foster Mortg. Corp.*, 68 F.3d at 918.

[1375] Mar. 19, 2026 Hr'g Tr. at 64.

[1376] Mar. 19, 2026 Hr'g Tr. at 64.

[1377] Mar. 19, 2026 Hr'g Tr. at 64–65.

[1378] Mar. 19, 2026 Hr'g Tr. at 69.

[1379] Mar. 19, 2026 Hr'g Tr. at 70.

[1380] Mar. 19, 2026 Hr'g Tr. at 70–71.

[1381] Mar. 19, 2026 Hr'g Tr. at 70.

Mr. Dunn explained the extensive settlement process with Jackson Walker. On March 13, 2024, Mr. Dunn, through his counsel, sent a demand letter to Jackson Walker that requested the full amount of fees and expenses ($1,543,432.34) paid to Jackson Walker under the Basic Energy Final Fee Order.[1382] Mr. Dunn did not receive a written offer in response to this first demand letter.[1383] On January 23, 2025, Mr. Dunn sent a second demand letter to Jackson Walker that demanded repayment of $395,775 in fees and expenses paid to Jackson Walker post-confirmation, in addition to the $1,543,432.34 previously demanded.[1384]

Following the second demand letter, Mr. Dunn engaged in preliminary settlement discussions with Jackson Walker through counsel, in which he directly participated.[1385] Mr. Dunn eventually attended an in-person mediation with Jackson Walker on March 5, 2025.[1386] The presiding mediators were Honorable W. Royal Furgeson, Jr. (Ret.) and Honorable Gary A. Feess (Ret.).[1387] Multiple offers were exchanged by and through the mediators.[1388] Mr. Dunn ultimately agreed to the $783,000 settlement offer produced through the mediation.[1389] In agreeing to accept it, Mr. Dunn considered the mediators' views of the parties' strength and weaknesses of their respective cases.[1390] Mr. Dunn also believed that the $738,000 offer was in the range of

---

[1382] Mar. 19, 2026 Hr'g Tr. at 74; Case No. 4:23-cv-4787, ECF No. 191, Ex. 39.

[1383] Mar. 19, 2026 Hr'g Tr. at 74–75.

[1384] Mar. 19, 2026 Hr'g Tr. at 75; Case No. 4:23-cv-4787, ECF No. 191, Ex. 41.

[1385] Mar. 19, 2026 Hr'g Tr. at 75.

[1386] Mar. 19, 2026 Hr'g Tr. at 75.

[1387] Mar. 19, 2026 Hr'g Tr. at 76.

[1388] Mar. 19, 2026 Hr'g Tr. at 76.

[1389] Mar. 19, 2026 Hr'g Tr. at 76.

[1390] Mar. 19, 2026 Hr'g Tr. at 76.

reasonableness according to the analysis he and his counsel had conducted leading up to the mediation.[1391]

The extensive settlement negotiations and mediation between Jackson Walker and Mr. Dunn show that the Basic Energy Settlement was reached through arm's-length negotiations and that there was no fraud or collusion. No evidence has been presented to suggest otherwise. Therefore, after considering the evidence admitted at the March 19, 2026 hearing, the Court finds that the Basic Energy Settlement resulted from good-faith, independent negotiations rather than fraud or collusion. Accordingly, the fourth factor supports approving the Basic Energy Settlement.

**Factor 5: All other factors bearing on the wisdom of the compromise**

Under the last "catch-all provision" of the *Jackson Brewing* Factors, the Court will now consider, in turn, (i) whether the Basic Energy Settlement affects the integrity of the judicial system; (ii) the difficulty of collecting a judgment from Jackson Walker; and (iii) whether additional disgorgement ordered by this Court after a final trial on the merits of the Vacatur Motion, if any, may be accepted by the Basic Energy Trust and its creditors.[1392]

**i.    Whether the approval of the Basic Energy Settlement will negatively impact or promote the integrity of the judicial system**

The Court will now consider whether the Basic Energy Settlement negatively impacts or promotes the integrity of the judicial system by examining if it would circumvent or be contrary to the Bankruptcy Code.[1393]

Concerns have been raised by the U.S. Trustee that the settlements between the Settling Parties and Jackson Walker, including the Basic Energy Settlement, would, *inter alia*, (1)

---

[1391] Mar. 19, 2026 Hr'g Tr. at 76–77.

[1392] *See In re MCorp Fin.*, 160 B.R. at 951.

[1393] *See In re Bates*, 211 B.R. at 345.

circumvent the Bankruptcy Code's requirements for professional compensation and the Court's inherent authority; (2) limit the Basic Energy Trust and its creditors from receiving additional money from Jackson Walker that exceeds the amount of a settlement; and (3) otherwise allow Jackson Walker to avoid accountability for its alleged wrongdoing and injure the integrity of the bankruptcy system.[1394] The U.S. Trustee has stipulated that these concerns have been resolved through the Global Joint Stipulation.[1395]

In considering what impact, if any, the Basic Energy Settlement could have on the Vacatur Motion, the Court will look first to the Basic Energy Settlement's plain language.[1396] Paragraph 2(b) of the Basic Energy Settlement provides, in pertinent part, that:

> For the avoidance of doubt, the Settlement Motion, Approval Order and any related arguments or testimony provided in support of the same shall make clear that this Agreement resolves all issues and claims between the Liquidation Trustee and the bankruptcy estates of Basic Energy Servies, Inc. and its affiliated debtors and [Jackson Walker], including all claims and causes of action related to the allegations contained in the U.S. Trustee Filings as to the Bankruptcy Case.[1397]

In a similar fashion, paragraph 5(a) provides in relevant part that:

> On the Effective Date, . . . the Liquidation Trustee, on behalf of the Basic Energy Liquidation Trust, hereby releases, acquits, and forever discharges [Jackson Walker] . . . from any and all actions, suits, debts, covenants, contracts, controversies, agreements, promises, duties, obligations. claims, sanctions, issues, demands, damages, injuries, losses, liabilities, expenses, attorneys' fees and causes of action of any kind, . . . arising out of, related to, based upon, by reason of, or in any way involving any act, matter, transaction, occurrence, or event before the Effective Date, including but not limited to any and all claims and causes of action that relate to or arise from the Bankruptcy Case, the U.S. Trustee Filings, the Bankruptcy Disputes or the relationship between Ms. Freeman and former Judge Jones, which for the avoidance of doubt includes all such claims, causes of action and allegations that may be held by the Basic Energy Liquidation Trust and the estates of Basic Energy Services, Inc. and its affiliated debtors against [Jackson Walker] related to any breach

---

[1394] *See* Case No. 4:23-cv-04787, ECF No. 68.

[1395] Case No. 4:23-cv-04787, ECF No. 255.

[1396] *Estate of Kokernot*, 112 F.3d at 1294.

[1397] Case No. 4:23-cv-04787, ECF No. 191, Ex. 16, ¶ 2(b).

of fiduciary duty, negligence, gross negligence, malpractice, fraud (or similar fraud based claims), and/or requests for sanctions.[1398]

Although the language of paragraph 2(b) and 5(a) creates a broad release of claims, the language expressly provides that the Basic Energy Trustee will only release claims that the Basic Energy Trust may have against Jackson Walker.[1399] Neither paragraph 2(b) nor 5(a) provide for the release of any claims or distinct forms of relief held by the U.S. Trustee.[1400]

Paragraph 6 of the Basic Energy Settlement provides in relevant part that:

The Parties agree that this Agreement may be pleaded as a complete bar to any action or suit before any court or administrative body, with respect to any claim or cause of action under federal, state or other law relating to any possible claim by the Liquidation Trustee or the estates of Basic Energy Services Inc. and its affiliated debtors against [Jackson Walker] or any other released parties.[1401]

Like paragraphs 2(b) and 5(a), paragraph 6 of the Basic Energy Settlement references release of possible claims by *the Basic Energy Trust* against Jackson Walker and does not reference release of any potential claims asserted by the U.S. Trustee.[1402] Indeed, the U.S. Trustee is not identified as a releasing party and is not a signatory to the Basic Energy Settlement. Moreover, Ms. Dunn, who signed the Basic Energy Settlement on behalf of the Basic Energy Trust, believed that the releases in the Basic Energy Settlement only apply to estate claims.[1403] Thus, the Court finds that the Basic Energy Settlement only provides for the release of any claims the Basic Energy Trust may have against Jackson Walker and does not release any claims or relief contained in the U.S.

---

[1398] Case No. 4:23-cv-04787, ECF No. 191, Ex. 16, ¶ 5(a).

[1399] Case No. 4:23-cv-04787, ECF No. 191, Ex. 16, ¶¶ 2(b), 5(a).

[1400] Case No. 4:23-cv-04787, ECF No. 191, Ex. 16, ¶¶ 2(b), 5(a).

[1401] Case No. 4:23-cv-04787, ECF No. 191, Ex. 16, ¶ 6.

[1402] Case No. 4:23-cv-04787, ECF No. 191, Ex. 16, ¶¶ 2(b), 5(a), 6.

[1403] Mar. 19, 2026 Hr'g Tr. at 81.

Trustee's Vacatur Motions that are distinct and independent from the claims being released in the Basic Energy Settlement.

Jackson Walker contends that the Vacatur Motions assert estate claims, such as claims held by the Basic Energy Trust, while the U.S. Trustee contends that the Vacatur Motion seeks independent and distinct relief from claims the estates or post-confirmation trusts may hold.[1404] But, through the Global Joint Stipulation, the U.S. Trustee, Jackson Walker and the Basic Energy Trustee all "acknowledge and agree" that the Basic Energy Settlement does not "address or adjudicate" this issue of the nature of the U.S. Trustee's requested relief in the Vacatur Motions.[1405]

There is no language in the Basic Energy Settlement that expressly states whether the Vacatur Motions assert estate claims. In any event, the Basic Energy Settlement could not determine the nature of the relief sought in the Vacatur Motion because the Court must look to the Vacatur Motion itself to determine the nature of the relief sought in the Vacatur Motion.[1406] Thus, the Court finds that the Basic Energy Settlement does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Basic Energy Trust, or independent and distinct relief from claims the estates or post-confirmation trusts may hold.

Additionally, in the Global Joint Stipulation, Jackson Walker stipulated that "[i]f the court orders monetary relief in the Vacatur Motions in any of the settling cases . . . , the post-confirmation entities . . . will not be precluded from accepting payment of any additional funds from Jackson Walker."[1407] Therefore, the Court finds that the Basic Energy Settlement does not preclude the Basic Energy Trustee from accepting funds in addition to the $783,000 settlement amount if the

---

[1404] Case No. 4:23-cv-04787, ECF No. 255 at 1.

[1405] Case No. 4:23-cv-04787, ECF No. 255 at 2.

[1406] *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583.

[1407] Case No. 4:23-cv-04787, ECF No. 255 at 2.

Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion.

Finally, there is no language in the Basic Energy Settlement that expressly limits the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, after a review of the evidence now in the record, including the Basic Energy Settlement and Global Joint Stipulation, the Court finds that the Basic Energy Settlement: (i) only released any claims the Basic Energy Trust has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Basic Energy Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Basic Energy Trust, or independent and distinct relief from claims the estates or post-confirmation trusts may hold; (iv) does not preclude the Basic Energy Trustee from accepting funds in addition to the $783,000 settlement amount if the Court orders Jackson Walker to disgorge any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit this Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it.

Accordingly, the Court finds that the consideration of judicial integrity under the last catch-all provision of the *Jackson Brewing* Factors weighs in favor of approving the Basic Energy Settlement.

### ii.      Consideration of the collectability of a judgment

Next, the Court will consider the difficulty in collecting any potential judgement from Jackson Walker.[1408] At the March 19, 2026 hearing, no evidence was offered to demonstrate that any investigation was conducted as to the collectability of a judgment against Jackson Walker.

Because there is no evidence that Mr. Dunn investigated the difficulty in collecting a judgment against Jackson Walker and no evidence was presented to demonstrate Jackson Walker's solvency, or lack thereof, the Court finds that the collectability factor under the catch-all provision of the *Jackson Brewing* Factors weighs against approving the Basic Energy Settlement.

### iii. Whether the Basic Energy Trustee may receive and distribute any additional funds ordered by the Court in excess of the settlement—arising from the collectability of a post-trial judgment

On March 20, 2026, the Court, *sua sponte*, entered its order for post-trial briefing[1409] where the Court directed the Basic Energy Trustee and other parties to address the following questions posed by the Court, to wit:

a. In the event the Settlements are approved and funds pursuant to the Settlements are paid to the estates, the estates are wound down and closed, and Jackson Walker LLP is subject to additional sanctions or disgorgement, whether the estates (or any trusts established thereunder) may be reopened to allow for the distribution of additional funds to the estates and, if so, the anticipated procedures and associated costs; and

b. If the estates or trusts cannot be reopened to allow receipt of additional funds, if so ordered, the position and recommendation of the [Basic Energy Trustee] to the disposition of funds upon wind-down and closure, including where such funds would be distributed.[1410]

On April 10, 2026 the Basic Energy Trustee filed his "Post-Hearing Brief Of David Dunn, Liquidation Trustee Of The Basic Energy Liquidation Trust, Addressing The Issues Set Forth In

---

[1408] *In re DeRosa-Grund*, 567 B.R. at 784; *In re Josiahs Trucking, LLC*, 2025 Bankr. LEXIS 1857, at *12.

[1409] Case No. 4:23-cv-04787, ECF No 254.

[1410] Case No. 4:23-cv-04787, ECF No 266.

The Order Entered March 20, 2026" (the "*Basic Energy Brief*").[1411] On April 17, 2026, the U.S. Trustee filed his Post-Hearing Reply Brief.[1412] In the Basic Energy Brief, the Basic Energy Trustee Agent asserts that he can accept additional sanctions or disgorgement for distributions to creditors whether the Basic Energy Case remains open, is closed or is reopened.[1413]

A party in interest may request that a bankruptcy court enter a final decree closing a bankruptcy case.[1414] Bankruptcy Rule 3022 provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court . . . shall enter a final decree closing the case."[1415] Section 350(a) provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b) provides that "a case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."[1416] Further, Bankruptcy Rule 5010 provides that the court may reopen a case upon a motion filed by the debtor or another party in interest.[1417] Any party in interest with standing would have notice and an opportunity to object to any request to close or reopen a bankruptcy case.[1418] There is no pending motion to close or reopen the Basic Energy Case. As explained *supra*, the Basic Energy Settlement does not impact the ability of the Basic Energy Trustee to receive any additional funds that the Court may potentially order Jackson Walker to pay.[1419] Moreover, there

---

[1411] Case No. 4:23-cv-04787, ECF No 275.

[1412] Case No. 4:23-cv-04787, ECF No 282.

[1413] Case No. 4:23-cv-04787, ECF No 275 at 3.

[1414] *See In re JCP Props*., 540 B.R. at 605; *In re Lager*, 2024 Bankr. LEXIS 1974, at *7.

[1415] Fed. R. Bankr. P. 3022.

[1416] 11 U.S.C. § 350(b).

[1417] Fed. R. Bankr. P. 5010.

[1418] *See* 11 U.S.C. § 1109; Fed. R. Bankr. P. 9014(b).

[1419] *See supra* Section I.D.c.10.c.5.i.

is nothing in the Basic Energy Settlement that prevents the Basic Energy Trustee from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

Thus, after a careful review of the Basic Energy Brief, and the assertions made therein, the Court finds it unnecessary, as of this moment, to consider whether the bankruptcy estate would need to be closed or reopened for the Basic Energy Trustee to receive and distribute any additional funds ordered by the Court in excess of the $783,000 settlement.

However, the Court's finding that the Basic Energy Settlement neither affects the Basic Energy Trustee's ability to recover any additional funds the Court may order Jackson Walker to pay in excess of the $783,000 settlement, nor prevents the Basic Energy Trustee from filing a motion for a final decree or to re-open the Basic Energy Case as he deems appropriate, supports approval of the Basic Energy Settlement under the catch-all provision of the *Jackson Brewing* Factors.

### d. The Court recommends that the Basic Energy Settlement be approved

Jackson Walker and the Basic Energy Trustee have agreed to a $783,000 settlement.[1420] If the Basic Energy Trustee were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $2,093,137.17, consisting of $1,543,432.34 paid to Jackson Walker for services performed during the pendency of the Basic Energy Case, $395,775 paid to Jackson Walker for post-confirmation services, and the $153,929.83 paid to counsel representing the Basic Energy Trustee in connection with the Miscellaneous Proceeding and related matters up to February 2026.[1421] Acceptance of the settlement amount of $783,000 less fees incurred by the Basic Energy Trustee to pursue litigation

---

[1420] Case No. 4:23-cv-4787, ECF No. 191, Ex. 16, ¶ 3.

[1421] Case No. 4:23-cv-4787, ECF No. 191, Ex. 33; ECF No. 221, Ex. 1 at 5, ¶ 23; Mar. 19, 2026 Hr'g Tr at 71–73, 75, 87.

against Jackson Walker, totaling at least $153,929.83, would result in net proceeds of approximately $629,070.17 to the Basic Energy Trust and its creditors pursuant to the Basic Energy Settlement.

After considering Mr. Dunn's credible testimony, the evidence now in the record, including the Basic Energy Settlement and Global Joint Stipulation, and except for consideration of collectability of a judgment, the Court finds that the *Jackson Brewing* Factors weigh in favor of settlement approval and that in the exercise of his business judgment, Mr. Dunn, the liquidation trustee of the Basic Energy Trust, gave due consideration to the uncertainty in fact and law and properly considered the probability of success in litigating claims in the Vacatur Motion and securing a judgment in an amount exceeding the $783,000 settlement amount; gave due consideration to the complexity of proceeding to trial, the likely duration of the litigation and any attendant expense, and the inconvenience and delay associated with securing a judgment in an amount exceeding the $783,000 settlement amount; gave due consideration to whether the Basic Energy Settlement serves the paramount interest of creditors while giving proper deference to their reasonable views; and demonstrated that the Basic Energy Settlement resulted from good-faith, independent negotiations rather than fraud or collusion.

Furthermore, the Court finds that the Basic Energy Settlement can be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Basic Energy Settlement: (i) only released any claims the Basic Energy Trust has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Basic Energy Settlement; (iii) does not address or determine whether the Vacatur Motion asserts estate claims, such as claims held by the Basic Energy Trust, or independent and distinct relief from claims the estates or post-

confirmation trusts may hold; (iv) does not preclude the Basic Energy Trust and its creditors from accepting funds in addition to the $783,000 settlement amount if the Court orders Jackson Walker to pay any such additional funds after a trial on the merits of the Vacatur Motion; and (v) does not limit the Court's ability to exercise its inherent authority and enforce the Bankruptcy Code's requirements for professional employment and compensation, nor could it. Moreover, there is nothing in the Basic Energy Settlement that prevents the Basic Energy Trustee from filing a motion for a final decree or a motion to re-open the case, if he finds it appropriate to do so.

The Court further finds that the Basic Energy Settlement is "fair and equitable" and in the "best interest of the estate and creditors"[1422] because although the proposed settlement amount of $783,000 to be paid to the Basic Energy Trust by Jackson Walker is less than the total amount of potentially recoverable fees from Jackson Walker of approximately $2,093,137.17, as stated *supra*, representing both the fees paid to Jackson Walker and the subsequent costs paid to the Basic Energy Trustee's counsel for pursuing claims against Jackson Walker, the proposed settlement amount of $783,000 constitutes approximately 50% of the total amount of fees and expenses ($1,543,432.34) paid to Jackson Walker in connection with services performed for the Basic Energy Case before the Basic Energy Plan's effective date, and the Basic Energy Settlement could allow the creditors of the Basic Energy Trust to receive distributions without the expense and delay associated with a trial on the merits.

Finally, even though final approval of the Basic Energy Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Basic Energy Trustee has a continuing

---

[1422] *See In re Aweco, Inc.*, 725 F.2d at 298; *In re Cajun Elec. Power Coop.*, 119 F.3d at 355; *TMT Trailer*, 390 U.S. at 424.

obligation to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings in this case including a final trial on the merits of the U.S. Trustee's Vacatur Motion.

Accordingly, consistent with the Settlements Referral Order, the limits of this Court's jurisdiction under 28 U.S.C. § 157 and *Stern v. Marshall*,[1423] and Bankruptcy Rule 9033, the Court recommends approval of the Basic Energy Settlement.[1424]

---

[1423] 564 U.S. 462, 480 (2011).

[1424] 564 U.S. 462, 480 (2011).

## IV.    RECOMMENDATION

Commencing on May 13, 2025, the bankruptcy estates of Brilliant Energy, LLC, The Seadrill Partners, LLC,  Sungard AS New Holdings, LLC, Old Copper Company Inc. f/k/a J. C. Penney Company Inc. and Copper Sub Corporation, Inc. f/k/a J. C. Penney Corporation, Inc., as Wind Down Debtors In J. C. Penney Direct Marketing Services LLC,  Auto Plus Auto Sales LLC, Strike Liquidating Trust, GWG Litigation Trust, Stage Stores, Inc., Basic Energy Liquidation Trust, and 4E Brands Northamerica LLC all filed Motions For Order Approving Compromise And Settlement Pursuant To Bankruptcy Rule 9019.

In her January 5, 2026 Order, the Honorable Alia Moses, Chief United States District Judge for the Western District of Texas, tasked this Court with issuing a report and recommendation as to whether ten (10) pending settlement motions should be approved before adjudicating the merits of the United States Trustee's Vacatur Motions; or, whether an alternative to approval exists that would best serve the interests of the affected parties while preserving the merits of the Vacatur Motions.

1.    **The GWG Withdrawn Settlement:** As a preliminary matter, the GWG Settlement Motion is unique. On January 22, 2026, this Court recommended to the District Court that the GWG Settlement Motion be heard concurrently with the U.S. Trustee's Vacatur Motions.[1425] On February 5, 2026, the District Court issued an order adopting this Court's January 22, 2026, Report and Recommendation and held that the GWG Settlement Motion will be heard at the consolidated trial on the Vacatur Motions and will remain abated until this Court reviews Chief Bankruptcy Judge Rodriguez's forthcoming report and further recommendations on the consolidated trial.[1426]

---

[1425] Case No. 4:23-cv-04787, ECF No. 169.

[1426] Case No. 4:23-cv-4787, ECF No. 181.

On March 12, 2026, the GWG Trustee and Jackson Walker filed a joint notice (the "*Notice of Withdrawal*")[1427] withdrawing the GWG Settlement Motion, all related exhibits filed therewith, and the "Litigation Trustee's Reply Brief In Support Of The Motion For Entry Of An Order Approving Settlement Agreement With Jackson Walker LLP,"[1428] each without prejudice.[1429] The Notice of Withdrawal further terminated the proposed GWG Settlement, while preserving any causes of action the GWG Trust has or may have against Jackson Walker.[1430] Jackson Walker, in turn, reserved all of its rights, claims, and defenses.[1431] As such, the Court finds that no action is needed at this time as to the terminated GWG Settlement between the GWG Trust and Jackson Walker.

On March 17, 2026, the Court commenced an evidentiary hearing on the remaining nine (9) proposed Settlements and concluded the hearing on March 19, 2026. If the Settlements are approved, Jackson Walker will return $4,785,000.00 of the $10,799,028.80 in fees and expenses finally awarded to it in the nine bankruptcy estates, resulting in an overall recovery of approximately 44% for the beneficiaries of those estates. Accordingly, consistent with the Settlements Referral Order, the jurisdictional limits imposed by 28 U.S.C. § 157, *Stern v. Marshall*,[1432] and Federal Rule of Bankruptcy Procedure 9033, and for the reasons set forth herein, the Court issues the instant Report and Recommendation. This Report and Recommendation constitutes the Court's proposed findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 9033. As explained more fully below, the Court recommends as follows:

---

[1427] Case No. 4:23-cv-4787, ECF No. 232.

[1428] Case No. 4:23-cv-4787, ECF No. 106.

[1429] Case No. 4:23-cv-4787, ECF No. 232.

[1430] Case No. 4:23-cv-4787, ECF No. 232.

[1431] Case No. 4:23-cv-4787, ECF No. 232.

[1432] *Stern v. Marshall*¸ 564 U.S. 462, 480 (2011).

**2.**    **Global Resolution:** APPROVAL of the global resolution[1433] of "The U.S. Trustee's Omnibus Objection to Approval of Private Party Settlements that Preempt Adjudication of the U.S. Trustee's Rule 60(b) Motion"[1434] filed on August 15, 2025, by the U.S. Trustee. Summarized, the Global Resolution states that Jackson Walker contends that the Vacatur Motions assert claims belonging to the bankruptcy estates. The U.S. Trustee, by contrast, contends that the Vacatur Motions seek relief that is independent of, and distinct from, any claims the bankruptcy estates may possess. The Parties acknowledge and agree that the Settlement Agreements neither resolve nor adjudicate the issues identified in the preceding paragraph. The Parties further acknowledge that the Settlement Agreements do not limit, restrict, or otherwise affect any court's authority or obligation to adjudicate the Vacatur Motions. If, over Jackson Walker's pending objections to the U.S. Trustee's standing or any of Jackson Walker's other pending objections, a court awards monetary relief on the Vacatur Motions in any of the settling cases, the applicable post-confirmation entities and/or the chapter 7 estate of Brilliant Energy, LLC, shall not be precluded from accepting payment from Jackson Walker. Jackson Walker may seek to introduce any Settlement Agreement into evidence in connection with the trial of the Vacatur Motions, and the U.S. Trustee reserves the right to object to the admission of any such Settlement Agreement. Nothing herein requires or prohibits any court from considering a Settlement Agreement in adjudicating the relief sought by the U.S. Trustee in the Vacatur Motions. All rights, claims, arguments, and defenses of Jackson Walker and the U.S. Trustee with respect to the Vacatur Motions are expressly preserved.

---

[1433] Case No. 4:23-cv-4787, ECF No. 255.

[1434] Case No. 4:23-cv-4787, ECF No. 93.

3.    **The U.S. Trustee's Omnibus Objection:** OVERRULE the "The U.S. Trustee's Omnibus Objection To Approval Of Private Party Settlements That Preempt Adjudication Of The U.S. Trustee's Rule 60(B) Motions"[1435] filed on August 15, 2025, by the U.S. Trustee.

4.    **20-20184 & 25-2002 – The J. C. Penney Settlement:** APPROVAL of the J. C. Penney Settlement. Jackson Walker and J. C. Penney have agreed to a $1.4 million settlement. Had J. C. Penney prevailed at trial, the maximum potential recovery from Jackson Walker would have been approximately $4.15 million, consisting of $3,341,785.10 in fees paid to Jackson Walker for pre-petition, bankruptcy, and post-confirmation services, plus at least $808,209.51 in litigation expenses incurred by J. C. Penney in pursuing claims against Jackson Walker. After deducting $808,209.51 in litigation expenses already incurred by J. C. Penney, the settlement would yield net proceeds of approximately $591,790.49 for J. C. Penney and its creditors. Based on the testimony of Alan Carr, the co-plan administrator, and the evidence in the record, including the J. C. Penney Settlement Agreement and Global Joint Stipulation, the Court finds that Mr. Carr exercised sound business judgment in approving the settlement. Mr. Carr appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the J. C. Penney Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by J. C. Penney against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude J. C. Penney from receiving additional funds if the

---

[1435] Case No. 4:23-cv-4787, ECF No. 93.

Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the J. C. Penney Settlement prevents J. C. Penney from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $1.4 million settlement is less than the approximately $4.15 million that might have been recoverable through a final trial on the merits, it exceeds the $1,101,482.21 awarded to Jackson Walker under the J. C. Penney Final Fee Order and avoids the risks and costs of further litigation. Finally, the Court finds that approval of the settlement will not moot the U.S. Trustee's Vacatur Motion and that J. C. Penney remains obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

5.    **21-90054 – The Strike Settlement:** that the "U.S. Trustee's Objection To The Strike Liquidating Trust's Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019"[1436] filed on January 22, 2026, by the U.S. Trustee be OVERRULED and recommends APPROVAL of the Strike Settlement. Jackson Walker and the Strike Trustee have agreed to a $440,000 settlement. Had the Strike Trustee prevailed at trial, the maximum potential recovery from Jackson Walker would have been approximately $1,344,711.20, consisting of $1,214,711.2 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus approximately $130,000 in litigation expenses incurred by the Strike Trustee in pursuing claims against Jackson Walker. After deducting $130,000 in litigation expenses already incurred by the Strike Trustee, the settlement would provide net proceeds of approximately

---

[1436] Case No. 4:23-cv-04787, ECF No. 171.

$310,000 to the Strike Trust and its beneficiaries. Based on the testimony of Patrick Bartels, the trustee of the Strike Trust, and the evidence in the record, including the Strike Settlement and the Global Joint Stipulation, the Court finds that Mr. Bartels exercised sound business judgment in approving the settlement. Mr. Bartels appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Strike Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Strike Trust against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Strike Trust from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court concludes that the Strike Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $440,000 settlement amount is less than the approximately $1,344,711.20 that could potentially be recovered through a final trial on the merits, it represents nearly 50% of the $887,357.41 awarded to Jackson Walker for pre-confirmation services performed for the Strike Case. The settlement also enables beneficiaries of the Strike Trust to receive distributions without the expense, delay, and uncertainty of a trial while reducing the costs associated with maintaining the Strike Trust. Finally, although approval of the Strike Settlement will not moot the U.S. Trustee's Vacatur Motion, the Court finds that the Strike Trust and the Strike Wind-Down Debtors remain obligated to cooperate with both the U.S. Trustee

and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

6.     **23-90055 – The Auto Plus Settlement:** that the "U.S. Trustee's Objection To Auto Plus Auto Sales, LLC's Motion For Entry Of Order Approving Compromise Of Controversy Under Bankruptcy Rule 9019"[1437] filed on January 22, 2026, by the U.S. Trustee, be OVERRULED, and recommends APPROVAL of the Auto Plus Settlement. Jackson Walker and the Auto Plus Plan Agent have agreed to a $500,000 settlement. If the Auto Plus Plan Agent prevailed at trial, the maximum potential recovery, excluding any unknown amounts related to post-confirmation services, would have been approximately $4,824,390.49, consisting of $4,814,345.49 in fees paid to Jackson Walker for services during the pendency of the bankruptcy case, plus approximately $10,045 in fees incurred by the Auto Plus Plan Agent in pursuing claims against Jackson Walker. After deducting $10,045 in litigation expenses already incurred by the Auto Plus Plan Agent, the settlement would yield net proceeds of approximately $489,955 for the Auto Plus Wind Down Debtor and its creditors. After considering the testimony of Patrick Bartels, the plan agent for the Auto Plus Wind Down Debtor, and the evidence of record, including the Auto Plus Settlement and Global Joint Stipulation, the Court finds Mr. Bartels exercised sound business judgment in approving the settlement. Mr. Bartels appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Auto Plus Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Auto

---

[1437] Case No. 4:23-cv-04787, ECF No. 170.

Plus Plan Agent against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Auto Plus Plan Agent from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Auto Plus Settlement prevents the Auto Plus Plan Agent from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Auto Plus Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $500,000 settlement amount is substantially less than the approximately $4,824,390.49 that could potentially be recovered through litigation, it represents nearly 11% of the $4,739,576  awarded to Jackson Walker under the Final Fee Order and the Auto Plus Plan Agent reasonably considered the uncertainty created by the lack of involvement of Former Judge Jones as a presiding judge in the bankruptcy case and the risks attendant to continued litigation. The settlement also provides a prompt and certain recovery for creditors without the expense, delay, and uncertainty associated with a trial on the merits. Finally, although approval of the Auto Plus Settlement will not moot the U.S. Trustee's Vacatur Motion, the Auto Plus Plan Agent and the Auto Plus Wind Down Debtor remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

7. **20-35740 & 21-30427 – The Seadrill Settlement:** APPROVAL of the Seadrill Settlement. Jackson Walker and Seadrill have agreed to a $485,000 settlement. If Seadrill prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately

$1,444,112.30, consisting of $1,344,112.30 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus approximately $100,000 in litigation expenses incurred by Seadrill in pursuing claims against Jackson Walker. After deducting $100,000 in litigation expenses incurred by Seadrill, the settlement would yield net proceeds of approximately $385,000. After considering the credible testimony of Nicole Anderson, the representative of Seadrill, and Phillip Eisenberg, counsel for Seadrill, and the evidence of record, including the Seadrill Settlement and Global Joint Stipulation, the Court finds that Seadrill exercised sound business judgment in approving the settlement. Seadrill appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, as well as demonstrated that settlement serves the paramount interest of Seadrill without impacting creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Seadrill Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by Seadrill against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude Seadrill from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. Moreover, the Court finds that Seadrill may receive potential funds beyond the $485,000 settlement amount without the need to reopen its bankruptcy case if it has been closed. The Court concludes that the Seadrill Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $485,000 settlement amount is less than the approximately

$1,444,112.30 that could potentially be recovered through litigation, it represents approximately 60% of the $791,867.30 awarded to Jackson Walker under the Seadrill Partners Final Fee Order and Seadrill Limited Final Fee Order. The settlement also provides a prompt and certain recovery, avoids the expense and delay of continued litigation, and reduces the costs associated with keeping a bankruptcy estate open. Finally, although approval of the Seadrill Settlement will not moot the U.S. Trustee's Vacatur Motions, Seadrill remains obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

8.     **21-30936 – The Brilliant Energy Settlement:** that the "United States Trustee's Objection to the Chapter 7 Trustee's Settlement Motion,"[1438] filed on May 21, 2025, by the U.S. Trustee, be OVERRULED and recommends APPROVAL of the Brilliant Energy Settlement. Jackson Walker and the Chapter 7 Trustee have agreed to a $100,000 settlement. If the Chapter 7 Trustee prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $244,487.63, consisting of $188,610.13 awarded to Jackson Walker pursuant to the Brilliant Energy Final Fee Order, plus $55,877.50 in legal fees incurred by the Chapter 7 Trustee in pursuing claims against Jackson Walker. After deducting $55,877.50 in litigation expenses, the settlement would yield net proceeds of approximately $44,122.50 for the benefit of the Brilliant Energy estate and its creditors. After considering the credible testimony of Randy Williams, the Chapter 7 Trustee of the Brilliant Energy estate, and the evidence of record, including the Brilliant Energy Settlement and Global Joint Stipulation, the Court finds that Mr. Williams exercised sound business judgment in approving the settlement. Mr. Williams appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued

---

[1438] Case No. 4:23-cv-04787, ECF No. 71.

litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Brilliant Energy Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Chapter 7 Trustee against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Brilliant Energy estate or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Brilliant Energy Settlement prevents the Chapter 7 Trustee from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Brilliant Energy Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the settlement amount is less than the approximately $244,487.63 that could potentially be recovered through litigation, it represents approximately 53% of the $188,610.13 awarded to Jackson Walker pursuant to the Brilliant Energy Final Fee Order. The settlement also provides a prompt and certain recovery while avoiding the expense, delay, and uncertainty associated with continued litigation. Finally, although approval of the Brilliant Energy Settlement will not moot the U.S. Trustee's Vacatur Motion, the Chapter 7 Trustee and the Brilliant Energy estate remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

9.    **20-32564 – The Stage Stores Settlement:** APPROVAL of the Stage Stores Settlement. Jackson Walker and the Stage Plan Administrator have agreed to a $75,000 settlement. If the Stage Plan Administrator prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $184,746.15, representing fees paid to Jackson Walker for services rendered during the pendency of the bankruptcy case. Consummation of the Stage Stores Settlement would result in net proceeds of $75,000, less an unknown amount of attorney's fees incurred in pursuing claims against Jackson Walker, for the benefit of Stage Stores and its creditors. After considering the credible testimony of Steven Balasiano, the plan administrator of Stage Stores, and the evidence of record, including the Stage Stores Settlement and Global Joint Stipulation, the Court finds that Mr. Balasiano exercised sound business judgment in approving the settlement. Mr. Balasiano appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion.   The Court further finds that approval of the Stage Stores Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by Stage Stores against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude Stage Stores or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Stage Stores Settlement prevents the Stage Stores Plan Administrator from seeking entry of a final decree

or moving to reopen the case if circumstances warrant. The Court concludes that the Stage Stores Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $75,000 settlement amount is less than the approximately $184,746.15 that could potentially be recovered through litigation, it represents approximately 40% of the $184,746.15 awarded to Jackson Walker under the Stage Stores Final Fee Order. The Court further finds that the costs, delay, and uncertainty associated with continued litigation, together with the expense of keeping the Stage Stores estates open, could outweigh any additional recovery beyond the settlement amount. Finally, although approval of the Stage Stores Settlement will not moot the U.S. Trustee's Vacatur Motion, the Stage Plan Administrator and Stage Stores remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

10.    **22-90018 – The Sungard Settlement:** APPROVAL of the Sungard Settlement. Jackson Walker and Sungard have agreed to a $385,000 settlement. If Sungard were to prevail at trial rather than accept the settlement, the total amount of potentially recoverable fees from Jackson Walker would be approximately $660,461.46, consisting of the approximately $535, 461.46 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus approximately $125,000 in litigation expenses incurred by Sungard in pursuing claims against Jackson Walker. After deducting $125,000 in litigation expenses already incurred by Sungard, the settlement would yield net proceeds of approximately $260,000 to Sungard and its creditors. After considering the credible testimony of Timothy Daileader, the representative of the Sungard plan administrator, and the evidence now in the record, including the Sungard Settlement and Global Joint Stipulation, the Court finds that Mr. Daileader, on behalf of the Sungard plan administrator, exercised sound business judgment in approving the settlement. Mr. Daileader appropriately

weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion.  Furthermore, the Court finds that the Sungard Settlement could be approved without impairing the relief sought by the U.S. Trustee in his Vacatur Motion because the Sungard Settlement: (i) only released any claims Sungard has or may have against Jackson Walker; (ii) does not release any claims or relief contained in the U.S. Trustee's Vacatur Motion that are distinct and independent from the claims being released in the Sungard Settlement; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude Sungard or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Sungard Settlement prevents the Sungard Plan Administrator from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Sungard Settlement is fair, equitable, and in the best interest of the estate and its creditors. Although the $385,000 settlement is less than the approximately $660,461.46 that might have been recoverable through a final trial on the merits, it represents approximately 92% of the $420,461.46 awarded to Jackson Walker under the Sungard Final Fee Order. Moreover, the Sungard Settlement could allow the creditors of Sungard to receive distributions without the expense and delay associated with a trial on the merits. Finally, although approval of the Sungard Settlement will not moot the U.S. Trustee's Vacatur Motion, the Sungard Plan Administrator and Sungard remain obligated to cooperate with

both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

11.   **22-50009 – The 4E Brands Settlement:** that the "United States Trustee's Objection to Plan Agent David Dunn's Settlement Motion"[1439] filed on May 20, 2025, by the U.S. Trustee be OVERRULED and recommends APPROVAL of the 4E Brands Settlement. Jackson Walker and the 4E Brands Plan Agent have agreed to a $617,000 settlement. If the 4E Brands Plan Agent prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $1,539,966.30, consisting of $1,287,484.93 paid to Jackson Walker for services performed during bankruptcy and post-confirmation, plus $252,481.37 in litigation expenses incurred by the 4E Brands Plan agent in pursuing claims against Jackson Walker. After deducting in $252,481.37 litigation expenses already incurred by the 4E Brands Plan Agent, the settlement would yield net proceeds of approximately $364,518.63 for the benefit of 4E Brands and its creditors. After considering the credible testimony of David Dunn, the plan agent of 4E Brands, and the evidence of record, including the 4E Brands Settlement and Global Joint Stipulation, the Court finds that Mr. Dunn exercised sound business judgment in approving the settlement. Mr. Dunn appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the 4E Brands Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by 4E Brands against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate

---

[1439] Case No. 4:23-cv-04787, ECF No. 69.

claims or independent claims; (iv) does not preclude 4E Brands or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the 4E Brands Settlement prevents the 4E Brands Plan Agent from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the 4E Brands Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the $617,000 settlement amount is less than the approximately $1,539,966.30 that could potentially be recovered through litigation, it represents approximately 71% of the $866,726.31 awarded to Jackson Walker under the 4E Brands Final Fee Order. The settlement also provides a prompt and certain recovery for creditors while avoiding the expense, delay, and uncertainty associated with continued litigation. Finally, although approval of the 4E Brands Settlement will not moot the U.S. Trustee's Vacatur Motion, the 4E Brands Plan Agent and 4E Brands remain obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

12. **21-90002 – The Basic Energy Settlement**: that "The United States Trustee's Objection To The Liquidating Trustee David Dunn's Settlement Motion Approval"[1440] filed on May 20, 2025, by the U.S. Trustee be OVERRULED and recommends APPROVAL of the Basic Energy Settlement. Jackson Walker and the Basic Energy Trustee have agreed to a $783,000 settlement. If the Basic Energy Trustee prevailed at trial, the maximum potential recovery from Jackson Walker would be approximately $2,093,137.17, consisting of $1,939,207.34 paid to Jackson Walker for services performed during bankruptcy and post-petition, plus $153,929.83 in

---

[1440] Case No. 4:23-cv-04787, ECF No. 68.

litigation expenses incurred by the Basic Energy Trustee in pursuing claims against Jackson Walker. After deducting $153,929.83 in litigation expenses already incurred by the Basic Energy Trustee, the settlement would yield net proceeds of approximately $629,070.17 for the benefit of the Basic Energy Trust and its creditors. After considering the credible testimony of David Dunn, the liquidating trustee of the Basic Energy Trust, and the evidence of record, including the Basic Energy Settlement and Global Joint Stipulation, the Court finds that Mr. Dunn exercised sound business judgment in approving the settlement. Mr. Dunn appropriately weighed the uncertainty of success on the merits, the complexity, duration, expense, and risks of continued litigation, and the interests and views of creditors. The Court further finds that the settlement resulted from good-faith, arm's-length negotiations and was not the product of fraud or collusion. The Court further finds that approval of the Basic Energy Settlement would not impair the relief sought by the U.S. Trustee in the Vacatur Motion because the settlement: (i) releases only claims held by the Basic Energy Trust against Jackson Walker; (ii) does not release any independent claims or relief asserted by the U.S. Trustee; (iii) does not resolve whether the Vacatur Motion asserts estate claims or independent claims; (iv) does not preclude the Basic Energy Trust or its creditors from receiving additional funds if the Court later orders Jackson Walker to make further payments; and (v) does not limit, and could not limit, the Court's inherent authority or its ability to enforce the Bankruptcy Code's requirements governing professional employment and compensation. The Court further notes that nothing in the Basic Energy Settlement prevents the Basic Energy Trustee from seeking entry of a final decree or moving to reopen the case if circumstances warrant. The Court concludes that the Basic Energy Settlement is fair, equitable, and in the best interests of the estate and its creditors. Although the settlement amount is less than the approximately $2,093,137.17 that could potentially be recovered through litigation, it represents approximately 50% of the $1,543,432.34

awarded to Jackson Walker under the Basic Energy Final Fee Order. The settlement also provides a prompt and certain recovery for creditors while avoiding the expense, delay, and uncertainty associated with continued litigation. Finally, although approval of the Basic Energy Settlement will not moot the U.S. Trustee's Vacatur Motion, the Basic Energy Trustee remains obligated to cooperate with both the U.S. Trustee and Jackson Walker in any further proceedings, including a final trial on the merits of the Vacatur Motion.

**SIGNED July 10, 2026**

_____
**Eduardo V. Rodriguez**
**Chief United States Bankruptcy Judge**